**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| | ) |
| **REGINA ANKRAH AND ISAAC** | ) |
| **OWUSU-AFRIYIE, AS CO-** | ) |
| **EXECUTORS OF THE ESTATE OF** | ) |
| **ANGELINA OWUSU-AFRIYIE,** | ) |
|     **Plaintiffs** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES OF AMERICA,** | ) |
| **KENNETH K. GERWECK, M.D., AND** | ) |
| **SANDRA L. SALERNO, R.N.** | ) |
|     **Defendant** | ) |

**CIVIL ACTION NO.:** 4:04-cv-40249-FDS

## DEFENDANT, KENNETH K. GERWECK, M.D.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Defendant, Kenneth K. Gerweck (hereinafter "Defendant") submits the following Memorandum of Law in Support of his Motion for Summary Judgment.

## I. INTRODUCTION

The Plaintiffs, Regina Ankrah and Issac Owusu-Afriyie, have brought this civil complaint against the Defendant as Co-Executors of the Estate of Angelina Owusu-Afriyie, alleging wrongful death under M.G.L.c. 229 § 1 et seq., and conscious pain and suffering. At all times relevant to the Plaintiff's Complaint, the Defendant was a resident-physician employed by the University of Massachusetts Medical School. As such, he was a public employee at the time of the Plaintiff's alleged injuries, and is therefore immune from liability under M.G.L.c. 258 § 2. The Defendant further states that a good faith effort was made to narrow the issues presented on this motion, as required by Rule 7.1(A)(2) of the Local Rules of the United States District Court for the District of Massachusetts. (See "Exhibit 1" Affidavit of Attorney Beattie accompanying the Defendant's Motion for Summary Judgment).

## II.  STATEMENT OF FACTS

1.      The Plaintiff, Regina Ankrah was admitted to the University of Massachusetts Memorial Medical Center Memorial Campus, in labor in the late evening of August 11, 2002. She was treated by Lise Tardif, M.D., an attending family medicine physician at the Medical Center; Kenneth Gerweck, M.D., a PGY-3 family medicine resident physician; and Sandra Salerno, a registered nurse.  Shortly after her admission, an obstetrical consultation was obtained, however, the Plaintiffs allege that the failure to obtain subsequent obstetrical consultations and delay in performing an emergency cesarean section in the face of non-reassuring fetal monitor readings, was the proximate cause of Angelina Owusu-Afriyie's death.  (See "Exhibit 2" Plaintiff's Complaint; See "Exhibit 3" Defendant Kenneth K. Gerweck, M.D.'s Answers to Plaintiff's 1st Set of Interrogatories at Interrogatory No. 11).

2.      Dr. Lise Tardif, Attending Family Medicine physician was on call for the Family Medicine Service on the night of August 11 and into August 12, 2002.  Defendant, Kenneth Gerweck, M.D., was the "on-call" resident for the Family Medicine Service.  (See "Exhibit 4" Deposition of Defendant Kenneth K. Gerweck, M.D., at page 26, lines 2-11).   On the night in question, Dr. Gerweck was responsible for care of family medicine patients at the Memorial campus under the supervision of Dr. Tardif.  Dr. Gerweck actually spent most of the night in the Emergency Room seeing patients, and therefore, spent relatively little time with the Plaintiff, Regina Ankrah.  (See Exhibit 4 page 44, lines 3-21; "Exhibit 7" Deposition of Lise Tardif, M.D. page 68, lines 4-21).  Dr. Gerweck took Ms. Ankrah's admission history and performed the admission physical exam on August 11, 2002 at approximately Nine O'clock PM.  (See "Exhibit 5" Admission History and Physical).  Dr. Gerweck saw Ms. Ankrah only once after that, at one

2

o'clock am.  (See "Exhibit 6" Portion of Physicians Progress Notes).  During his care of Ms.

Ankrah, Dr. Gerweck always discussed his observations and plan of care with Dr. Tardif.  (See

Exhibit 5; Exhibit 3 at Interrogatory No. 3).  Dr. Lise Tardif evaluated Ms. Ankrah frequently

during the course of her labor and made all decisions relative to her care.  (Exhibit 7 at page 38

lines 8-18; and page 68; Exhibit 5).  It was Dr. Tardif's responsibility as the attending physician

to determine when the Obstetrical Service was to be re-consulted.  This was not a decision to be

made by the family medicine resident.  (Exhibit 7 at page 66, line 21-page 67, line 13).  The

cesarean section delivery was performed by the Obstetrical team.  Kenneth K. Gerweck, M.D.

did not participate in the delivery of Ms. Ankrah's infant.  (See Exhibit 4 at page 52, lines 21-

23).

3.      On or about August 11 and 12, 2002, the Defendant, Kenneth Gerweck, M.D.,

was a PGY-3 Resident in the Family Medicine Residency Program, and thereby employed by the

University of Massachusetts Medical School (Hereinafter "the University"), an agent of the

Commonwealth of Massachusetts.  (See "Exhibit 8, ¶ 1" Affidavit of Kenneth K. Gerweck,

M.D.; "Exhibit 9 ¶ 3" Affidavit of Gerald S. Gleich, M.D.; Exhibit 3 at Interrogatory No. 11).

4.      As a PGY-3 Resident in the Family Medicine Residency Program at the

University, Kenneth Gerweck, M.D. was required by the residency program to participate in

certain rotations, including rotations at the University of Massachusetts Memorial Medical

Center Memorial Campus, (Hereinafter "The Medical Center"), where the Plaintiff received the

care incident to this lawsuit.  (See Exhibit 8 ¶ 2; Exhibit 9 ¶ 5).

5.      The University of Massachusetts Medical School has been and still is an agency

of the Commonwealth of Massachusetts.  M.G.L.c. 75 §§ 1, 34.  As such, the University of

Massachusetts Medical School is a public entity and is not separate from the Commonwealth.

*See also McNamara v. Honeyman,* 406 Mass. 43, 47-48 (1989)(Holding that the University of Massachusetts Medical School is not an independent body politic, but an agency of the Commonwealth).

6.    On November 11, 1997, pursuant to legislation passed by the Massachusetts Legislature, the operations of the UMass Clinical System were merged with a private non profit corporation, Memorial Health Care, Inc.  (See "Exhibit 10 ¶ 4" Affidavit of Richard Stanton). This merger formed two separate private non profit corporations;  UMass Memorial Heath Care, Inc. (hereinafter "UMass Memorial"), and the University of Massachusetts Medical Center, Inc., (hereinafter "The Medical Center") along with the attendant campuses.  These two private entities are separate from the University of Massachusetts Medical School.  (Exhibit 10 ¶ 5).

7.    While The Medical Center and UMass Memorial are   private nonprofit corporations separate from the University Medical School, these three entities executed a contractual agreement, by which the University Medical School is the exclusive teaching affiliate of The Medical Center and UMass Memorial.  (See Exhibit 10 ¶ 12; "Exhibit 11" Academic Affiliation and Support Agreement at page 6).  By the terms of this contractual agreement the University is responsible for controlling any and all decisions regarding academic issues and medical education and training for the residents provided by the University.  (See Exhibit 10 ¶ 13; Exhibit 11 page 7).

8.    Further, under the contractual agreement between the University, The Medical Center, and UMass Memorial; it is the University, an agency of the Commonwealth of Massachusetts, by and through the department chairs of the Medical School who are deemed responsible for the supervision, direction and control of residents, regardless of which medical facility they happen to be assigned to work at.  (See Exhibit 10 ¶ 13; Exhibit 11 at page 7).

4

9.    Pursuant to a separate contractual agreement between the University and The Medical Center, entitled the Graduate Medical Education Agreement, residents explicitly remain employees of the University.  (See Exhibit 10 ¶ 14; "Exhibit 12" Graduate Medical Education Agreement at page 3).  The GME Agreement explicitly provides that residents "shall not, at any time, be considered agents or employees of the Medical Center."  (See Exhibit 10 ¶ 14; Exhibit 12 at page 3).  This Agreement further provides in explicit language that the University by and through its various residency program directors shall remain responsible for the supervision and evaluation of all University resident physician.  (See Exhibit 10 ¶ 15; Exhibit 12 at page 5).

10.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D.'s treatment of patients was always supervised by an attending physician.  (See Exhibit 8 ¶ 3; Exhibit 9 ¶ 14).

11.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D.'s work hours, rotation schedules and on-call requirements were established by University personnel who were responsible for the operation of the Family Medicine Residency Program.  (See Exhibit 8 ¶ 4; Exhibit 9 ¶ 8).

12.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. could be dismissed at any time, for any reason, and at the sole an unfettered discretion of the Director of the Family Medicine Residency Program.  (See Exhibit 8 ¶ 5; Exhibit 9 ¶ 9).

13.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. did not have staff privileges at any of the hospitals at which he was assigned to work rotations.  Instead the Defendant had limited resident privileges for the sole purpose of participating in the residency program.  As a result of these limited privileges,

5

the Defendant was unable to admit or discharge any patients without discussing those plans with an attending physician, and securing their approval. (See Exhibit 8 ¶¶ 6+7; Exhibit 9 ¶¶ 6, 14).

14.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, any and all patients treated by Kenneth Gerweck, M.D. were assigned to him, and as a result he had neither independent patients separate of the residency program, nor the choice of what patients he would treat or not treat during the course of his residency program. (See Exhibit 8 ¶ 7; Exhibit 9 ¶ 10).

15.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. did not bill any patients for services rendered. Instead he received a fixed salary for his participation in the residency program, that did not depend on the number of patients treated, his productivity, or his hours worked. (See Exhibit 8 ¶¶ 8, 12; Exhibit 9 ¶¶ 4, 7).

16.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. was on the payroll of the University and thus received all his pay from the Commonwealth of Massachusetts. During his time in the Residency Program, Kenneth Gerweck, M.D. participated as required by the Commonwealth in both the Commonwealth's group insurance plan and the Commonwealth's mandatory contributory retirement plan. (See Exhibit 8 ¶¶ 9-10; Exhibit 9 ¶¶ 11-12; "Exhibit 13" Kenneth Gerweck, M.D.'s University of Massachusetts Employment Records, Social Security Information Redacted).

17.    As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D.'s compensation, health coverage, benefits, discipline and grievance procedures, vacation time, sick leave, hours of work, and other pertinent conditions of

employment were regulated and provided to him by and through the University. (See Exhibit 9 ¶ 11).

18.     As a PGY-3 Resident in the Family Medicine Residency Program at the University, The University retained control over Dr. Gerweck's Training, and his day to day activities, during the course of his employment by the University. (See Exhibit 8 ¶ 13; Exhibit 9 ¶ 6).

19.     During his participation in the Family Medicine Residency Program, Kenneth Gerweck, M.D. considered himself to be an employee of the University of Massachusetts and therefore bound to abide by all policies, rules, and regulations of the University. (See Exhibit 8 ¶ 11).

20.     During his participation in the Family Medicine Residency Program, Kenneth Gerweck, M.D. had an employment contract with the University of Massachusetts, which governed the nature and scope of his employment relationship with the University. (See Exhibit 13).

## III. ARGUMENT

### A.     Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment shall be granted where (1) there are no material facts in dispute and (2) the moving party is entitled to judgment as a matter of law. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (U.S. 1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56 (c). The moving party bears the burden of affirmatively demonstrating these elements. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that

negates an essential element of the opponent's case or by demonstrating that proof of that element is unlikely to be forthcoming at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (U.S. 1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)

If the moving party establishes there is no genuine issue of material fact, "to escape summary judgment…the party bearing the ultimate burden of proof, must 'affirmatively point to specific facts that demonstrate the existence of an authentic dispute.'" *C.K. Smith & Co. v. Motiva Enters. LLC*, 269 F.3d 70, 73 (1st Cir. 2001). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. To be considered material, a disputed fact must have the potential to 'affect the outcome of the suit under the governing law.'" *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "[A] party opposing summary judgment cannot create a genuine issue of material fact by the simple expedient of filing an affidavit that contradicts clear answers to unambiguous questions in an earlier deposition." *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 26 (1st Cir. 2002).

The United States Federal Courts look favorably upon the use of Summary Judgment in appropriate cases, as a procedural tool for the just, speedy, and inexpensive determination of every action. *Gallace v. U.S. Dep't of Agric.*, 273 F. Supp. 2d 53, 57 (D.D.C. 2003), *aff'd per curiam*, 2003 U.S. App. LEXIS 20074 (D.C. Cir. 2003). Further, Summary Judgment as a procedural tool should not be disfavored simply because the case at bar is complex. *Thompson Everett, Inc. v. National Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995). Summary Judgment is favored even in complex litigation. *Id.* Under the Federal Rules of Civil Procedure, Summary Judgment is a favorable procedural tool which should be used, and is encouraged in

appropriate cases. *Northwestern Nat'l Ins. Co. v. Corley*, 503 F.2d 224, 230 (7th Cir. 1974); *Freeman v. Continental Gin Co.*, 381 F.2d 459, 470 (5th Cir. 1967).

**B.    Choice of Law**

The instant case was moved to Federal Court due to the applicability of the Federal Tort Claims Act, as to the actions of the former Defendant Dr. Lisa Tardif.  While jurisdiction over the claims levied against the United States of America, in place of Dr. Tardif, existed due to federal question jurisdiction under 28 U.S.C. § 1331, the claims against the Dr. Gerweck are being heard by this court under the supplemental jurisdiction granted by 28 U.S.C. § 1367. Because the issue of Dr. Gerweck's liability is purely an issue of Massachusetts state law, this court is bound to apply the substantive law of Massachusetts with respect the claims against Dr. Gerweck. *Dykes v. Depuy, Inc.*, 140 F.3d 31, 39 (1st Cir. 1998); *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). *Dykes* clearly states that a District Court "facing a claim that does not arise under the Constitution or the laws of the United States…must apply the substantive law of the forum in which it sits." *Dykes,* 140 F.3d at 39.  Furthermore, "[t]his principal applies with equal force to a state-law claim brought under supplemental jurisdiction." *Id.*  For these reasons, the issue of Dr. Gerweck's liability is governed by Massachusetts substantive law, including substantive law provisions governing the extent of a public employee's immunity under M.G.L.c 258 § 2.

**C.    The University of Massachusetts Medical School is a Public Employer**

The Massachusetts Tort Claims Act defines a "public employee" as any employee of a "public employer."  M.G.L.c. 258 § 1.  The term "public employer" is defined, in part, as an agency or institution of the Commonwealth that exercises "direction and control" over public employees.  *Id.*  In this case it is undisputed that The University of Massachusetts Medical

9

School is a public employer, as it is supported directly by state funds appropriated by the state Legislature and because it has no existence apart from that of the Commonwealth. *McNamara v. Honeyman,* 406 Mass. 43 (1989); *Hannigan v,. New Gamma-Delta Chapter of Kappa Sigma Fraternity,* 367 Mass. 658, 659 (1975)(*superseded by statute on other grounds*); *Robinson v. Commonwealth,* 32 Mass. App. Ct. 6, 9 (1992).

The University of Massachusetts Medical School is an agency of the Commonwealth of Massachusetts. M.G.L.c. 75 §§ 1, 34. As such, the University of Massachusetts Medical School is a public entity and is not separate from the Commonwealth. *See also McNamara v. Honeyman,* 406 Mass. 43, 47-48 (1989). As further evidence of this fact, the state comptroller authority regulates the University of Massachusetts' annual appropriations (M.G.L.c. 75 § 8); the purchasing power of the University's Board of Trustees is limited by M.G.L.c. 75 § 13; employees of the University are designated Commonwealth employees (M.G.L.c. 75 § 14); and the sale and lease of land by the Trustees of the University is made in the name of the Commonwealth and is regulated by statute. M.G.L.c. 75 §§ 25,26 and 27; *McNamara v. Honeyman,* 406 Mass. 43 (1989).

The Merger of the UMass Clinical System with the private entity Memorial Healthcare, Inc., while creating The Medical Center and UMass Memorial, did not in any way change the University of Massachusetts Medical School's status. The Medical School thus remains an agent of the Commonwealth of Massachusetts, and as such, a public employer.

**D.    Kenneth K. Gerweck, M.D. was a Public Employee and Thus Immune From Liability**

Under the Massachusetts Tort Claims Act, "public employees" are immune from personal liability for allegedly negligent acts committed in the course of their employment. M.G.L.c. 258

§ 2. Under the terms of the Tort Claims Act it is the "public employers" that are liable for the negligent act of their "public employees" that are acting within the scope of the employment relationship. *Pruner v. Clerk of the Superior Court in the County of Norfolk,* 382 Mass. 309, (1981); M.G.L.c. 258 § 2. Thus, the Massachusetts Torts Claims Act imposes any and all liability for a public employee's negligent acts on the public employer, or the Commonwealth, and thus relieves the public employee from personal liability. *Schenker v. Binns,* 18 Mass. App. Ct. 404 (1984).

The test for determining whether an individual is a public employee is the same as the test used to determine "whether an agent is a servant for whose negligent act a principal may be liable under the common la doctrine of respondeat superior." *Kelly v. Rossi,* 395 Mass. 659, 661 (1985); *McNamara v. Honeyman,* 406 Mass. 43, 48 (1989); *Joffre v. Chung,* 19 Mass. L. Rep. 556 (Mass. Super. Ct. 2005). With respect to a physician, the Supreme Judicial Court has suggested that the primary consideration is whether the public employer "directs and controls the physician's treatment of the patient." *Williams v. Hartman,* 413 Mass. 398, 400 (1992)(*citing Smith v. Steinberg,* 395 Mass. 666, 669 (1985). In making the determination as to the nature of the required control, the focus is on the *right* of the master to control the acts of its servants and not necessarily on evidence of actual control. *Kelly,* 395 Mass. at 661; *Cowan v. Eastern Racing Assoc., Inc.,* 330 Mass. 135, 141-142 (1953); *Khoury v. Edison Electric Illuminating Co.,* 265 Mass. 236, 238 (1928); *Lafleur v. Cicconi,* 13 Mass. L. Rep. 647 (Mass. Super. Ct. 2001). It is important to note that it is settled law in the Commonwealth, that a physician may exercise independent judgment, and still be deemed the servant if the principal controls the details of a physicians activities. *McNamara,* 406 Mass. at 48; *Joffre v. Chung,* 19 Mass. L. Rep. 556 (Mass.

Super. Ct. 2005)(Holding that a doctor was a public employee because the public employer controlled the details of his activities despite the physician's exercise of independent judgment).

In determining whether resident-physicians are "public employees" and therefore subject to the direction and control of the Commonwealth, the following factors are relevant: 1) whether the public employer assigns the resident's duties; 2) whether the public employer regulates the resident's work schedule; 3) whether the public employer controls which patients the resident treats; 4) whether the public employer assigns the resident to the particular department where the care and treatment at issue was provided; 5) whether the public employer has the authority to dismiss the resident from the residency program; 6) whether the resident is required to follow the regulations and policies of the public employer in the course of the residency; 7) whether the resident has admitting privileges at the hospital; 8) whether the resident was authorized to discharge a patient without the consent of the supervising attending physician; and 9) whether the public employer paid the resident a salary, health benefits, retirement benefits and life insurance benefits. *See Kelly,* 395 Mass. at 664-665; *Smith,* 395 Mass. at 669; *McNamara,* 406 Mass. at 48; *Williams v. Bresnahan,* 27 Mass. App. Ct. 191, 192 (1989). While the Massachusetts courts have stated, that as a general rule a resident-physician is the servant of the hospital where they work, *Kelly,* 395 Mass. at 663, this is not a hard and fast rule, and the ultimate inquiry turns on which entity exercises direction or control over the resident. *Id.* at 664-665. It is therefore settled law in Massachusetts that a resident at a private hospital can still be considered a public employee, if it is their public employer that exercises direction and control over that resident. *Id; Joffre v. Chung*, 19 Mass. L. Rep. 556 (Mass. Super. Ct. 2005).

Under this respondeat superior style analysis, it is clear that Kenneth Gerweck, M.D., was an employee of the University Family Medicine Residency Program, and thus an employee of

the University of Massachusetts Medical School.  The nature of the contractual affiliation between the University and The Medical Center makes it also abundantly clear that it was the University that retained the right to direct and control its resident-physicians.  Under *Kelly*, the general rule that a resident-physician is a servant of the hospital in which he works, can be rebutted by evidence that another entity retained the right to direct and control that resident.  *Id.* at 663-665.  Because the contractual arrangement between the two relevant entities explicitly states that the University remains the employer and retains all responsibility for the direction and supervision of the resident physicians, it is clear that the University at least retains the right to control any residents assigned through a University program.  (See Exhibit 10; Exhibit 11; Exhibit 12).  Furthermore, the binding contractual agreements between the two entities not only reserve in the University the right to supervise and control the resident-physicians assigned by the University, the contracts explicitly deny that the residents are agents or servants of The Medical Center.  (See Exhibit 10; Exhibit 11; Exhibit 12).  Because the relevant inquiry is the *right* to control a servant, it is clear that Kenneth Gerweck, M.D. is the servant of the University, the only entity with a contractual right to direct and control his activities.  *Kelly,* 395 Mass. at 661; *Cowan v. Eastern Racing Assoc., Inc.,* 330 Mass. 135, 141-142 (1953); *Khoury v. Edison Electric Illuminating Co.,* 265 Mass. 236, 238 (1928).  (*See also* Exhibit 8; Exhibit 9).

It is also clear from the record that in addition to retaining the right to control Dr. Gerweck's activities, the University *actually* controlled his professional activities.  It was the University of Massachusetts that assigned Dr. Gerweck his duties as a resident, his work schedule, and his rotation schedule.  *See Kelly,* 395 Mass. at 664; *McNamara,* 406 Mass. 43.  (*See also* Exhibit 8; Exhibit 9).  The University Residency Program determined the rotations which a resident was required to complete, the hospital at which they were to be completed and

when these rotations were to be completed. *See Kelly,* 395 Mass. at 664; *McNamara,* 406 Mass. 43. (*See also* Exhibit 8; Exhibit 9). By virtue of that right, the University also determined what patients a resident in Dr. Gerweck's position would be required to see. *See Kelly,* 295 Mass. at 664; *McNamara,* 406 Mass. 43. (*See also* Exhibit 8; Exhibit 9). It was the University and not the Hospital which assigned Dr. Gerweck to be on-call at the time the treatment at issue occurred. *See Kelly,* 295 Mass. at 664; *McNamara,* 406 Mass. 43. (*See also* Exhibit 8; Exhibit 9).

The Chairman of the Family Medicine Residency Program retained the right to dismiss Dr. Gerweck at any time for any reason, where the hospital had no such right. Dr. Gerweck was required to obey the procedures and policies of the Residency Program and the University. *See Kelly,* 395 Mass. at 664. (*See also* Exhibit 8; Exhibit 9). As a participant in the University's Family Medicine Residency Program Dr. Gerweck had very limited hospital privileges, and could essentially take no action without the approval of an attending physician. *See Kelly,* 395 Mass. at 664; *Williams,* 27 Mass. App. Ct. at 192. (*See also* Exhibit 8; Exhibit 9). It was the University that paid Dr. Gerweck a salary for his participation in the residency program, a pay scale not dependent on the number of patients treated. *McNamara,* 406 Mass. 43; *Williams,* 27 Mass. App. Ct. at 192. (*See also* Exhibit 8; Exhibit 9). By virtue of being on the Commonwealth payroll he was also required to participate in the Commonwealth's group insurance program, and the mandatory contributory retirement program. *Williams,* 27 Mass. App. Ct. at 192. (*See also* Exhibit 8; Exhibit 9).

During the course of the treatment provided to the Plaintiff, Dr. Gerweck was at all times supervised in his treatment by a University Faculty Member, as required by the Academic Affiliation and Support Agreement and the Graduate Medical Education Agreement. (*See*

14

Exhibit 10; Exhibit 11; Exhibit 12; "Exhibit 14" Affidavit of Dr. Gerald Gleich). During the time Dr. Gerweck rendered treatment to the Plaintiff, Regina Ankrah, Dr. Lise Tardif was the Family Medicine attending physician. (*See* Exhibit 4 at page 28, lines 10-14). In Dr. Tardif's role as attending physician, she was responsible for the supervision of Dr. Gerweck, as a resident-physician. (*See* Exhibit 7 at page 38, lines 10-15). At this time, as an attending physician responsible for the supervision of resident physicians at UMMMC, Dr. Tardif held a faculty appointment at the University. (Exhibit 14). Dr. Tardif testified by way of Deposition, that Dr. Gerweck was under her supervision on the night in question, and therefore discussed all the treatment rendered to the Plaintiff with Dr. Tardif, for her approval. (Exhibit 7 at page 66, lines 9-24; page 67 line 1-13). All treatment rendered to the Plaintiff by Dr. Gerweck on the night in question, was therefore rendered under the supervision of a University Faculty member, in compliance with the contractual agreement between the University and the UMMMC. (Exhibit 10; Exhibit 11; Exhibit 12; Exhibit 14).

From the undisputed facts of this case, it is clear that Dr. Gerweck was employed by the University of Massachusetts, an agent of the Commonwealth of Massachusetts and a public employer, who assigned him to The Medical Center Memorial campus for a specific rotation, as required by the policies and procedures of the University Family Medicine Residency Program. It is also abundantly clear that the University, by and through its agents within the Family Medicine Residency Program, at all times exercised direction and control over Dr. Gerweck. This direction and control of Dr. Gerweck included the direct supervision of Dr. Gerweck's limited care of Ms. Ankrah during her labor, by Dr. Lise Tardif a faculty member of the University of Massachusetts Medical School.

## CONCLUSION

Dr. Gerweck was employed by the University for purposes of participating in the Family Medicine Residency Program. In that capacity, Dr. Gerweck was a public employee working for the University of Massachusetts Medical School, a public employer. As a public employee, Dr. Gerweck was at all times during his care of Ms. Ankrah under the direction and control of the University of Massachusetts Medical School. As such, the University of Massachusetts is liable for any and all torts or negligent acts committed by Dr. Gerweck, a public employee, in accordance with M.G.L.c. 258 § 2. Furthermore, under the Massachusetts Tort Claims Act it is the University of Massachusetts that is solely liable for any damages resulting from Dr. Gerweck's employment and he is immune from personal liability in this matter. *Id.*

For the foregoing reasons, the Defendant, Kenneth K. Gerweck, M.D., respectfully requests that his Honorable Court enter Summary Judgment on his behalf.

The Defendant,
**KENNETH K. GERWECK, M.D.**

By His Attorneys,
**MORRISON MAHONEY LLP**

/s/ *Dennis R. Anti, Esquire*

/s/ *Heather G. Beattie, Esquire*
Dennis R. Anti, Esquire, BBO#545898
Heather G. Beattie, Esquire, BBO#643197
1500 Main Street, Suite 2400
P.O. Box 15387
Springfield, MA  01115-5387
(413) 737-4373
(413) 739-3125 (Fax)

Dated:

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on (date).

/s/ *Heather G. Beattie, Esquire*
Heather G. Beattie, Esquire BBO#: 643197

# Exhibit 1

<u>Ankrah, et al v. Gerweck, et al</u>

<u>Civil Action No.: 4:04-cv-40249-FDS</u>

<u>Table of Contents of Exhibits in Support of Defendant, Kenneth K. Gerweck, M.D.'s
Motion for Summary Judgment</u>

**Exhibit 1:**    **Affidavit of Compliance**

**Exhibit 2:**    **Plaintiff's Complaint**

**Exhibit 3:**    **Answers of Defendant, Kenneth K. Gerweck, M.D., to Plaintiff's First set of
Interrogatories**

**Exhibit 4:**    **Deposition of Defendant, Kenneth K. Gerweck, M.D.**

**Exhibit 5:**    **Plaintiff's Admission History and Physical**

**Exhibit 6:**    **Physician Progress Notes**

**Exhibit 7:**    **Deposition of Lise J. Tardif, M.D.**

**Exhibit 8:**    **Affidavit of Kenneth K. Gerweck, M.D.**

**Exhibit 9:**    **Affidavit of Gerald S. Gleich, M.D.**

**Exhibit 10:**    **Affidavit of Richard Stanton**

        **A.**    **Graduate Medical Education Agreement**

        **B.**    **Academic Affiliation and Support Agreement**

        **C.**    **Agreement for Practitioner Services**

        **D.**    **Amended and Restated Definitive Agreement**

**Exhibit 11:**    **Academic Affiliation and Support Agreement**

**Exhibit 12:**    **Graduate Medical Education Agreement**

**Exhibit 13:**    **Employment Records: Kenneth K. Gerweck, M.D.**

**Exhibit 14:**    **Affidavit of Gerald S. Gleich**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO.:** 4:04-cv-40249-FDS

|  |  |
|---|---|
| REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE, AS CO-EXECUTORS OF THE ESTATE OF ANGELINA OWUSU-AFRIYIE, **Plaintiffs** | ) ) ) ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, KENNETH K. GERWECK, M.D., AND SANDRA L. SALERNO, R.N. **Defendant** | ) ) ) ) |

## AFFIDAVIT OF COMPLIANCE

I, Heather G. Beattie, Esquire, having personal knowledge of the following information do hereby depose and stand under oath as follows:

1.    I am counsel of record for Kenneth K. Gerweck, M.D.;

2.    I certify that I have conferred and attempted in good faith to resolve or narrow the issues of this case, in compliance with Rule 7.1(A)(2) of Local Rules of the United States District Court for the District of Massachusetts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS  18th
DAY OF   July    , 2006.

_____
Heather G. Beattie, Esquire
BBO # 643197

# Exhibit 2

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS

CIVIL ACTION
NO.: WOCV 2003-02288

REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE,
AS CO-EXECUTORS OF THE ESTATE OF ANGELINA
OWUSU-AFRIYIE,
        PLAINTIFFS,

v.

KENNETH K. GERWECK, M.D., LISE J. TARDIF,
M.D. AND SANDRA L. SALERNO, R.N.,
        DEFENDANTS.

## COMPLAINT

COUNT I.

1.      The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie and are residents of Worcester, Worcester County, Massachusetts.

2.      The defendant, Kenneth Gerweck, M.D., was at all times relevant to this complaint a physician licensed to practice his profession in the Commonwealth of Massachusetts.

3.      This action is brought to recover for the death of Angelina Owusu-Afriyie for the benefit of her next of kin, pursuant to M.G.L.A. c. 229 §1 et seq.

4.      At all times relevant to this complaint, the defendant, Kenneth Gerweck, M.D., represented and held himself out to be a skilled physician and, in particular, represented to the plaintiffs that he was knowledgeable, competent and qualified to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August 2002.

5.      On or about August 2002, the plaintiff, Regina Ankrah, submitted herself to the care and treatment of the defendant, Kenneth Gerweck, M.D., who negligently and carelessly and without regard for Angelina Owusu-Afriyie's health and well-being, treated Regina Ankrah and Angelina Owusu-Afriyie in a manner which resulted in the death of Angelina Owusu-Afriyie on or about August 12, 2002.

6.      The death of Angelina Owusu-Afriyie and the damage to her estate, including, but not

limited to her funeral and burial expenses, were the direct and proximate result of the carelessness, unskillfulness, negligence and improper care and treatment by the defendant, Kenneth Gerweck, M.D., including but not limited to the following:

a.     his misrepresentations to the plaintiffs that he was knowledgeable, skillful and competent to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002.

b.     his failure to adequately and properly diagnose the medical condition of Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002, and his failure to properly treat said condition;

c.     his failure to recognize, or to have the knowledge to recognize his inability and lack of skill to treat Regina Ankrah and Angelina Owusu-Afriyie, when he knew or should have known of the foreseeable consequences of his inability and failure to properly and skillfully provide Regina Ankrah and Angelina Owusu-Afriyie with acceptable medical care and treatment;

d.     his failure to possess and exercise that degree of skill, training and care as is possessed and exercised by the average qualified members of the medical profession practicing his specialty;

e.     his failure to inform and to warn of the risks involved in or associated with Angelina Owusu-Afriyie and failure to inform and to warn about the treatment of said condition.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Kenneth Gerweck, M.D., for the above-described death of Angelina Owusu-Afriyie and damages to the estate, together with interest and costs.

COUNT II.

1.     The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie repeat and reaver all of the allegations contained in Paragraphs One through Six of Count I above, as if expressly rewritten and set forth herein.

2.     This action is brought to recover for the conscious pain and suffering of the decedent, Angelina Owusu-Afriyie.

3.     As the direct and proximate result of the carelessness and negligence of the defendant, Kenneth Gerweck, M.D., Angelina Owusu-Afriyie was caused to suffer conscious pain.

2

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Kenneth Gerweck, M.D., in an amount to be determined by a jury, together with interest and costs.

## COUNT III.

1.    The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie and are residents of Worcester, Worcester County, Massachusetts.

2.    The defendant, Kenneth Gerweck, M.D., was at all times relevant to this complaint a physician licensed to practice in the Commonwealth of Massachusetts.

3.    This action is brought to recover for the wrongful death of Angelina Owusu-Afriyie for the benefit of her next of kin, pursuant to M.G.L.A. c. 229 §1 et seq.

4.    At all times relevant to this complaint, the defendant, Kenneth Gerweck, M.D., represented and held himself out to be a skilled physician and, in particular, represented to the plaintiffs that he was knowledgeable, competent and qualified to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002.

5.    On or about August of 2002, Regina Ankrah submitted herself to the care and treatment of the defendant, Kenneth Gerweck, M.D., who negligently and carelessly and without regard for the Angelina Owusu-Afriyie's health and well-being, treated Regina Ankrah and Angelina Owusu-Afriyie in a manner which resulted in Angelina Owusu-Afriyie's death on or about August 12, 2002.

6.    The death of Angelina Owusu-Afriyie and the damage to her estate, including, but not limited to her funeral and burial expenses, were the direct and proximate result of the malicious, willful, wanton or reckless conduct of the defendant, Kenneth Gerweck, M.D., or by the gross negligence of the defendant on or about August of 2002.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Kenneth Gerweck, M.D., for the above-described death of Angelina Owusu-Afriyie and damage to the estate, together with interest and costs.

## COUNT IV.

1.    The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver fully herein Paragraphs One through Six of Count I of this complaint as if each were set forth here in its entirety.

2.    On or about August of 2002, the average qualified members of the medical profession practicing the defendant's specialty knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

3.    On or about August of 2002, the defendant, Kenneth Gerweck, M.D., knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

4.    On or about August of 2002, the defendant, Kenneth Gerweck, M.D., did not inform the plaintiffs of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

5.    If the defendant, Kenneth Gerweck, M.D., had informed the plaintiffs of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie, neither the plaintiffs nor a reasonable person in their position would have elected the defendant's choice of treatment.

6.    The alternatives to and the risks and potential consequences of the defendant, Kenneth Gerweck, M.D.'s, choice of treatment were material to a decision by the plaintiffs and a reasonable person in their position as to whether to undergo the defendant's choice of treatment.

7.    The death of Angelina Owusu-Afriyie and the damage to her estate, including but not limited to her funeral and burial expenses, were the direct and proximate result of the defendant, Kenneth Gerweck, M.D.'s, failure to obtain the informed consent of the plaintiffs.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Kenneth Gerweck, M.D., for the above-described death of Angelina Owusu-Afriyie and damage to the estate, together with interest and costs.

## COUNT V.

1.    The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver all of the allegations contained in Paragraphs One through Seven of Count IV of this complaint as if each were set forth here in its entirety.

2.    This action is brought to recover for the conscious pain and suffering of the decedent, Angelina Owusu-Afriyie .

3.    As the direct and proximate result of the defendant, Kenneth Gerweck, M.D.'s, failure to inform the plaintiffs of the alternatives to and risks and potential consequences of the defendant's treatment, Angelina Owusu-Afriyie was caused to suffer conscious pain.

4

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Kenneth Gerweck, M.D., in an amount to be determined by a jury, together with interest and costs.

## COUNT VI.

1.     The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie and are residents of Worcester, Worcester County, Massachusetts.

2.     The defendant, Lise J. Tardif, M.D., was at all times relevant to this complaint a physician licensed to practice in the Commonwealth of Massachusetts.

3.     This action is brought to recover for the death of Angelina Owusu-Afriyie for the benefit of her next of kin, pursuant to M.G.L.A. c. 229 §1 et seq.

4.     At all times relevant to this complaint, the defendant, Lise J. Tardif, M.D., represented and held herself out to be a skilled physician and, in particular, represented to the plaintiffs that she was knowledgeable, competent and qualified to diagnose and treat the Regina Ankrah and Angelina Owusu-Afriyie on or about August 2002.

5.     On or about August 2002, the plaintiff, Regina Ankrah, submitted herself the to the care and treatment of the defendant, Lise J. Tardif, M.D., who negligently and carelessly and without regard for Angelina Owusu-Afriyie's health and well-being, treated Regina Ankrah and Angelina Owusu-Afriyie in a manner which resulted in the death of Angelina Owusu-Afriyie on or about August 12, 2002.

6.     The death of Angelina Owusu-Afriyie and the damage to her estate, including, but not limited to her funeral and burial expenses, were the direct and proximate result of the carelessness, unskillfulness, negligence and improper care and treatment by the defendant, Lise J. Tardif, M.D., including but not limited to the following:

      a.     her misrepresentations to the plaintiffs that she was knowledgeable, skillful and competent to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002.

      b.     her failure to adequately and properly diagnose the medical condition of Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002, and her failure to properly treat said condition;

      c.     her failure to recognize, or to have the knowledge to recognize her inability and lack of skill to treat Regina Ankrah and Angelina Owusu-Afriyie, when she knew or should have known of the foreseeable consequences of her inability and

5

failure to properly and skillfully provide Regina Ankrah and Angelina Owusu-Afriyie with acceptable medical care and treatment;

d.        her failure to possess and exercise that degree of skill, training and care as is possessed and exercised by the average qualified members of the medical profession practicing her specialty;

e.        her failure to inform and to warn of the risks involved in or associated with Angelina Owusu-Afriyie and failure to inform and to warn about the treatment of said condition.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Lise J. Tardif, M.D., for the above-described death of Angelina Owusu-Afriyie and damages to the estate, together with interest and costs.

COUNT VII.

1.        The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver all of the allegations contained in Paragraphs One through Six of Count VI above, as if expressly rewritten and set forth herein.

2.        This action is brought to recover for the conscious pain and suffering of the decedent, Angelina Owusu-Afriyie.

3.        As the direct and proximate result of the carelessness and negligence of the defendant, Lise J. Tardif, M.D., Angelina Owusu-Afriyie was caused to suffer conscious pain.

WHEREFORE, the plaintiff, Regina Ankrah, as Administratrix of the Estate of Angelina Owusu-Afriyie, prays judgment against the defendant, Lise J. Tardif, M.D., in an amount to be determined by a jury, together with interest and costs.

COUNT VIII.

1.        The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie and are residents of Worcester, Worcester County, Massachusetts.

2.        The defendant, Lise J. Tardif, M.D., was at all times relevant to this complaint a physician licensed to practice in the Commonwealth of Massachusetts.

3.        This action is brought to recover for the wrongful death of Angelina Owusu-Afriyie for the benefit of her next of kin, pursuant to M.G.L.A. c. 229 §1 et seq.

4.     At all times relevant to this complaint, the defendant, Lise J. Tardif, M.D., represented and held herself out to be a physician and, in particular, represented to the plaintiffs that she was knowledgeable, competent and qualified to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002.

5.     On or about August of 2002, Regina Ankrah submitted herself to the care and treatment of the defendant, Lise J. Tardif, M.D., who negligently and carelessly and without regard for the Angelina Owusu-Afriyie's health and well-being, treated Regina Ankrah and Angelina Owusu-Afriyie in a manner which resulted in Angelina Owusu-Afriyie's death on or about August 12, 2002.

6.     The death of Angelina Owusu-Afriyie and the damage to her estate, including, but not limited to her funeral and burial expenses, were the direct and proximate result of the malicious, willful, wanton or reckless conduct of the defendant, Lise J. Tardif, M.D., or by the gross negligence of the defendant on or about August of 2002.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Lise J. Tardif, M.D., for the above-described death of Angelina Owusu-Afriyie and damage to the estate, together with interest and costs.

## COUNT IX.

1.     The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver fully herein Paragraphs One through Six of Count VI of this complaint as if each were set forth here in its entirety.

2.     On or about August of 2002, the average qualified members of the medical profession practicing the defendant's specialty knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

3.     On or about August of 2002, the defendant, Lise J. Tardif, M.D., knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

4.     On or about August of 2002, the defendant, Lise J. Tardif, M.D., did not inform the plaintiffs of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie .

5.     If the defendant, Lise J. Tardif, M.D., had informed the plaintiffs of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie, neither the plaintiffs nor a reasonable person in their position would have elected the defendant's choice of treatment.

DEC 18 '03 12:26

6.      The alternatives to and the risks and potential consequences of the defendant, Lise J. Tardif, M.D.'s, choice of treatment were material to a decision by the plaintiffs and a reasonable person in their position as to whether to undergo the defendant's choice of treatment.

7.      The death of Angelina Owusu-Afriyie and the damage to her estate, including but not limited to her funeral and burial expenses, were the direct and proximate result of the defendant, Lise J. Tardif, M.D.'s, failure to obtain the informed consent of the plaintiffs.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Lise J. Tardif, M.D., for the above-described death of Angelina Owusu-Afriyie and damage to the estate, together with interest and costs.

## COUNT X.

1.      The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver all of the allegations contained in Paragraphs One through Seven of Count IX of this complaint as if each were set forth here in its entirety.

2.      This action is brought to recover for the conscious pain and suffering of the decedent, Angelina Owusu-Afriyie.

3.      As the direct and proximate result of the defendant, Lise J. Tardif, M.D.'s, failure to inform the plaintiffs of the alternatives to and risks and potential consequences of the defendant's treatment, Angelina Owusu-Afriyie was caused to suffer conscious pain.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Lise J. Tardif, M.D., in an amount to be determined by a jury, together with interest and costs.

## COUNT XI.

1.      The plaintiff, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie and are residents of Worcester, Worcester County, Massachusetts.

2.      The defendant, Sandra Salerno, R.N., was at all times relevant to this complaint a physician licensed to practice in the Commonwealth of Massachusetts.

3.      This action is brought to recover for the death of Angelina Owusu-Afriyie for the benefit of her next of kin, pursuant to M.G.L.A. c. 229 §1 et seq.

8

4.      At all times relevant to this complaint, the defendant, Sandra Salerno, R.N., represented and held herself out to be a skilled nurse and, in particular, represented to the plaintiffs that she was knowledgeable, competent and qualified to diagnose and treat the Regina Ankrah and Angelina Owusu-Afriyie on or about August 2002.

5.      On or about August 2002, the plaintiff, Regina Ankrah, submitted herself the to the care and treatment of the defendant, Sandra Salerno, R.N., who negligently and carelessly and without regard for Angelina Owusu-Afriyie's health and well-being, treated Regina Ankrah and Angelina Owusu-Afriyie in a manner which resulted in the death of Angelina Owusu-Afriyie on or about August 12, 2002.

6.      The death of Angelina Owusu-Afriyie and the damage to her estate, including, but not limited to her funeral and burial expenses, were the direct and proximate result of the carelessness, unskillfulness, negligence and improper care and treatment by the defendant, Sandra Salerno, R.N., including but not limited to the following:

      a.      her misrepresentations to the plaintiffs that she was knowledgeable, skillful and competent to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002.

      b.      her failure to adequately and properly diagnose the medical condition of Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002, and her failure to properly treat said condition;

      c.      her failure to recognize, or to have the knowledge to recognize her inability and lack of skill to treat Regina Ankrah and Angelina Owusu-Afriyie, when she knew or should have known of the foreseeable consequences of her inability and failure to properly and skillfully provide Regina Ankrah and Angelina Owusu-Afriyie with acceptable medical care and treatment;

      d.      her failure to possess and exercise that degree of skill, training and care as is possessed and exercised by the average qualified members of the medical profession practicing her specialty;

      e.      her failure to inform and to warn of the risks involved in or associated with Angelina Owusu-Afriyie and failure to inform and to warn about the treatment of said condition.

    WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Sandra Salerno, R.N., for the above-described death of Angelina Owusu-Afriyie and damages to the estate, together with interest and costs.

<u>COUNT XII.</u>

DEC 18 '03 12:22

1.    The plaintiff, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver all of the allegations contained in Paragraphs One through Six of Count XI above, as if expressly rewritten and set forth herein.

2.    This action is brought to recover for the conscious pain and suffering of the decedent, Angelina Owusu-Afriyie.

3.    As the direct and proximate result of the carelessness and negligence of the defendant, Sandra Salerno, R.N., Angelina Owusu-Afriyie was caused to suffer conscious pain.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Sandra Salerno, R.N., in an amount to be determined by a jury, together with interest and costs.

## COUNT XIII.

1.    The plaintiff, Regina Ankrah and Isaac Owusu-Afriyie, are the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie and are residents of Worcester, Worcester County, Massachusetts.

2.    The defendant, Sandra Salerno, R.N., was at all times relevant to this complaint a nurse licensed to practice in the Commonwealth of Massachusetts.

3.    This action is brought to recover for the wrongful death of Angelina Owusu-Afriyie for the benefit of her next of kin, pursuant to M.G.L.A. c. 229 §1 et seq.

4.    At all times relevant to this complaint, the defendant, Sandra Salerno, R.N., represented and held herself out to be a nurse and, in particular, represented to the plaintiffs that she was knowledgeable, competent and qualified to diagnose and treat Regina Ankrah and Angelina Owusu-Afriyie on or about August of 2002.

5.    On or about August of 2002, Regina Ankrah submitted herself to the care and treatment of the defendant, Sandra Salerno, R.N., who negligently and carelessly and without regard for the Angelina Owusu-Afriyie's health and well-being, treated Regina Ankrah and Angelina Owusu-Afriyie in a manner which resulted in Angelina Owusu-Afriyie's death on or about August 12, 2002.

6.    The death of Angelina Owusu-Afriyie and the damage to her estate, including, but not limited to her funeral and burial expenses, were the direct and proximate result of the malicious, willful, wanton or reckless conduct of the defendant, Sandra Salerno, R.N., or by the gross negligence of the defendant on or about August of 2002.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Sandra Salerno, R.N., for the above-described death of Angelina Owusu-Afriyie and damage to the estate, together with interest and costs.

## COUNT XIV.

1.    The plaintiff, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver fully herein Paragraphs One through Six of Count XI of this complaint as if each were set forth here in its entirety.

2.    On or about August of 2002, the average qualified members of the medical profession practicing the defendant's specialty knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

3.    On or about August of 2002, the defendant, Sandra Salerno, R.N., knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie.

4.    On or about August of 2002, the defendant, Sandra Salerno, R.N., did not inform the plaintiffs of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie .

5.    If the defendant, Sandra Salerno, R.N., had informed the plaintiffs of the risks, potential consequences and alternatives to the defendant's choice of treatment of Regina Ankrah and Angelina Owusu-Afriyie, neither the plaintiffs nor a reasonable person in their position would have elected the defendant's choice of treatment.

6.    The alternatives to and the risks and potential consequences of the defendant, Sandra Salerno, R.N.'s, choice of treatment were material to a decision by the plaintiffs and a reasonable person in their position as to whether to undergo the defendant's choice of treatment.

7.    The death of Angelina Owusu-Afriyie and the damage to her estate, including but not limited to her funeral and burial expenses, were the direct and proximate result of the defendant, Sandra Salerno, R.N.'s, failure to obtain the informed consent of the plaintiffs.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Sandra Salerno, R.N., for the above-described death of Angelina Owusu-Afriyie and damage to the estate, together with interest and costs.

## COUNT XV.

1.    The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-

11

Executors of the Estate of Angelina Owusu-Afriyie, repeat and reaver all of the allegations contained in Paragraphs One through Seven of Count XIV of this complaint as if each were set forth here in its entirety.

2.    This action is brought to recover for the conscious pain and suffering of the decedent, Angelina Owusu-Afriyie.

3.    As the direct and proximate result of the defendant, Sandra Salerno, R.N.'s, failure to inform the plaintiffs of the alternatives to and risks and potential consequences of the defendant's treatment, Angelina Owusu-Afriyie was caused to suffer conscious pain.

WHEREFORE, the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as the duly appointed Co-Executors of the Estate of Angelina Owusu-Afriyie, pray judgment against the defendant, Sandra Salerno, R.N., in an amount to be determined by a jury, together with interest and costs.

PLAINTIFFS CLAIM TRIAL BY JURY.

The plaintiffs,
By their attorney,

ELIZABETH N. MULVEY
CROWE AND MULVEY
141 TREMONT STREET
BOSTON, MASSACHUSETTS 02111
Telephone: 617-426-4488
BBO No. 542091

12

| CIVIL ACTION COVER SHEET | DOCKET NO(S) WOCV 2003-02288 | Trial Court of Massachusetts Superior Court Department County:___ |
|---|---|---|

PLAINTIFF(S)
Regina Ankrah and Issac Owusu-Afriyie, as co-executors of the estate of Angelina

DEFENDANT(S)
Kenneth Gerweck, M.D., Lise Tardif M.D. and Sandra Salerno, R.N.

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Owusu- Afriyie
Elizabeth Mulvey, Crowe & Mulvey, LLP
141 Tremont St., Boston, MA 02111 617-426-4488
Board of Bar Overseers number: 542091

ATTORNEY (if known)

### Origin code and track designation

Place an x in one box only:
- [x] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B06 | Medical Malpractice | ( A ) | ( X ) Yes    ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .................................................. $
2. Total Doctor expenses .................................................. $
3. Total chiropractic expenses ............................................. $
4. Total physical therapy expenses ........................................ $
5. Total other expenses (describe) ........................................ $
                                                        Subtotal $ Undetermined
B. Documented lost wages and compensation to date ........................ $
C. Documented property damages to date ................................... $
D. Reasonably anticipated future medical and hospital expenses ............ $
E. Reasonably anticipated lost wages ..................................... $
F. Other documented items of damages (describe)
                                                                          $
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

This is a wrongful death, medical malpractice suit whose damages will exceed $25,000.
                                                                          $
                                                        TOTAL $ Undetermined

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

                                                        TOTAL $. .............

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____    DATE: 11/25/03

AOTC-4 mic005-11/99
A.O.S.C. 1-2000

DEC 18 '03 12:28

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

SUPERIOR COURT
CIVIL ACTION
NO: WOCV 2003-02288

REGINA ANKRAH AND ISAAC        )
OWUSU-AFRIYIE, AS              )
CO-EXECUTORS OF THE ESTATE)
OF ANGELINA OWUSU-AFRIYIE, )
     Plaintiffs,              )
                   )
V.                            )
                   )
KENNETH K. GERWECK, M.D.,      )
LISE J. TARDIF, M.D. AND       )
SANDRA L. SALERNO, R.N.,       )
     Defendants.              )

## STATEMENT PURSUANT TO RULE 29

NOW COME the plaintiffs in the above-entitled action and state that as a direct and proximate result of the defendants' unskillfulness, negligence and improper care and treatment on or about August 2002, Regina Ankrah remained in labor for a longer period of time than was necessary thereby causing Angelina Owusu-Afriyie to have a prolonged exposure to the hostile uterine environment, resulting in her death.  The plaintiffs allege that had Angelina been delivered earlier by caesarean section, she would have been born without permanent injury.

The plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, allege that the care and treatment rendered by the defendants, Kenneth K. Gerweck, M.D., Lise J. Tardif, M.D., and Sandra L. Salerno, R.N., fell far below the accepted standard of care for the average qualified physician and nurse, on or about August 2002, in the following respects, including but not limited to: when Ken Gerweck, M.D. failed to reconsult the obstetric team for the abnormal fetal heart rate tracing in a poorly progressing labor complicated by meconium stained fluid and chorioamnionitis; when Lise Tardiff, M.D. failed to reconsult the obstetric team for the abnormal

fetal heart rate tracing in a poorly progressing labor complicated by meconium stained fluid and chorioamnionitis; and when Sandra Salerna, R.N. failed to intervene on the patient's behalf when Ms. Salerna recognized abnormalities in the fetal heart rate tracing, failed to notify the patient's physician and did not attempt intrauterine resuscitation measures.

As a direct and proximate result of the defendant's failure to render care in accordance with the accepted standard of care and failure to provide informed consent, Regina Ankrah remained in labor for a longer period of time than was necessary thereby causing Angelina to have a prolonged exposure to the hostile uterine environment, resulting in her death. The plaintiff alleges that had the defendant rendered care in accordance with the accepted standard of care, more likely than not, Angelina Owusu-Afriye, would have been born without permanent injury. In the event of recovery, the plaintiff believes and therefore avers that recovery will be in excess of twenty-five thousand dollars ($25,000).

The plaintiff reserves the right to introduce further evidence at trial.

Respectfully submitted,
The plaintiffs,
By their attorney,

ELIZABETH N. MULVEY
CROWE & MULVEY, LLP.
141 Tremont Street
Boston, MA 02111
(617) 426-4488
BBO#: 106860

2

**Exhibit 3**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO.:** 4:04-cv-40249-FDS

|  |  |
|---|---|
| REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE, AS CO-EXECUTORS OF THE ESTATE OF ANGELINA OWUSU-AFRIYIE, <br>     Plaintiffs | ) ) ) ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, KENNETH K. GERWECK, M.D., AND SANDRA L. SALERNO, R.N. <br>     Defendant | ) ) ) ) |

### ANSWERS OF THE DEFENDANT, KENNETH K. GERWECK, M.D., TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

1.  Please identify yourself fully by stating your full name, date of birth, residential and business address and your occupation.

    **ANSWER:**

    **Kenneth Kercheville Gerweck**
    **17 Robert Street**
    **Wakefield, Massachusetts 01880**

    **Business Address:**
    **10 Grove Street**
    **East Boston, Massachusetts 02182**

    **D.O.B.:  8/18/70**

    **Occupation:  Physician**

2.  Please provide a full description of your professional credentials by stating in chronological order the dates and places where you received your undergraduate education, your undergraduate degree, your medical school education, your medical school degree, your internships, your general residencies, your specialty residencies, indicating the branches of medicine covered by specialty residencies, all medical specialty boards, organizations and colleges that have certified you, indicating the specialties of such certifications, all state licensures, all research performed, all publications to which you have contributed, and your complete employment history commencing with your graduation from medical school.

1

*4.5.05*

**ANSWER:**

**Objection:**  The defendant objects to this request on the grounds that it seeks information which is overly broad, unduly burdensome and, therefore, not reasonably calculated to lead to the discovery of admissible evidence.
Notwithstanding and without waiving this objection, please refer to Exhibit A.

3.    For each and every occasion upon which you communicated with the plaintiff's decedent or anyone with the plaintiff's decedent, please state separately, as best you can:

    (a)    the date, time, place and form of contact (e.g., examination, visit, taking of plaintiff's decedent's medical history, phone conversation, surgery, hospital rounds, etc.;

    (b)    the substance and content of everything the plaintiff's decedent or anyone with the plaintiff's decedent said or communicated to you or anyone with you, including the substance and content of the plaintiff's decedent's medical history;

    (c)    the substance and content of everything you or anyone with you said or communicated to the plaintiff's decedent or anyone with the plaintiff's decedent;

    (d)    the name and current address of each person, other than the plaintiff's decedent, who was present;

    (e)    the substance and content of all communications between you or anyone with you and other healthcare providers regarding the plaintiff's decedent; and

    (f)    the substance and content of all instructions given b y you or anyone with you to the plaintiff's decedent or anyone with the plaintiff's decedent;

**ANSWER:**

**Objection:**  The defendant objects to this request on the grounds that it seeks information which is overly broad, unduly burdensome to the extent that questions asked are more appropriate for inquiry at the defendant's deposition.    The defendant also objects to the extent that this interrogatory's references to plaintiff's decedent are inaccurate and intended to refer to the plaintiff, Regina Ankrah.    In addition, the defendant has a limited memory of the events and, therefore, pursuant to F.R.C.P. 33(d), respectfully refers the plaintiff to the medical record.  Notwithstanding and without waiving these objections, the defendant states:

My first recollection of Ms. Ankrah is on August 11, 2002 between approximately 8:30 – 9:00 p.m. in a patient room.  I recall that a nurse informed me that Ms. Ankrah had ruptured her membranes prior to arrival per her (the nurse's) vaginal exam.  The medical record indicates that I performed the admission history &

2

physical. I recall that I did not do a vaginal exam at that time because the nurse had just done one.

My next recollection is that I had a discussion with the Obstetrical resident, Dawn Tasillo, regarding the use of Ampicillin and Gentamycin because a diagnosis of chorioamnionitis was likely. I also recall that I had a discussion with Dr. Tardiff regarding the obstetrician's recommendation for amnioinfusion.

I further recall a discussion with Sandy Salerno, R.N. where I inquired regarding Ms. Ankrah's condition and was reassured by Ms. Salerno's response.

I also recall at some point, taking a nap in the on-call room and being awakened by Ms. Salerno because she had concerns regarding Ms. Ankrah. The medical record indicates this was at approximately 4:15 a.m. I do not have a specific recollection of any further discussion at that time except that a decision was made that Dr. Ollari would do a cesarean section.

Following the birth, I recall that I had a general discussion with Dr. Tardiff regarding the outcome. I do not recall when this discussion took place or any specifics of the discussion.

I also believe that I had general discussions with some of my resident friends regarding how difficult it was to have such an outcome at delivery.

4.    For each and every occasion you or anyone with you saw, examined, and/or treated the plaintiff's decedent or anyone with the plaintiff's decedent, please state separately, as best you can:

(a)    the complete details of each examination you or anyone with you performed on the plaintiff's decedent, including the findings of each such examination;

(b)    each diagnosis you or anyone with you made regarding the plaintiff's decedent, including the basis for each such diagnosis;

(c)    each alternate diagnosis you or anyone with you made or considered with regard to the plaintiff's decedent, including the basis for each such alternative diagnosis, and, if appropriate, the reason such diagnosis was rejected;

(d)    each diagnostic test you or anyone with you performed or considered with regard to the plaintiff's decedent, the findings of that test, and, if appropriate, the reason why each such diagnosis was rejected;

(e)    each prognosis you or anyone with you made regarding the plaintiff's decedent, including the basis for each such prognosis;

(f)    each course of treatment you or anyone with you recommended for the plaintiff's decedent, including the basis for each such course of treatment;

3

(g)     a complete description of all treatment you or anyone with you administered and/or ordered for the plainitff's decedent; and

(h)     the name, address and specialty of each physician you or anyone with you contacted with regard to the plaintiff's decedent;

**ANSWER:**

**Objection:** **The defendant objects to this request on the grounds that it seeks information which is overly broad, unduly burdensome to the extent that questions asked are more appropriate for inquiry at the defendant's deposition.    The defendant also objects to the extent that this interrogatory's references to plaintiff's decedent are inaccurate and intended to refer to the plaintiff, Regina Ankrah. In addition, the defendant has a limited memory of the events and, therefore, pursuant to F.R.C.P. 33(d), respectfully refers the plaintiff to the medical record. Notwithstanding and without waiving these objections, the defendant states:**

**Based on my review of the medical records and my recollection, I performed a history and physical on Ms. Regina Ankrah as documented in the medical record. Ms. Ankrah's diagnosis was Stage I labor with presumed chorioamnionitis with spontaneous rupture of membranes before admission with meconium and maternal fever.    I do not recall that I, as the resident, formulated a prognosis.    The treatment plan included an ultrasound, antibiotics, an obstetrical consult, amnioinfusion per obstetrical recommendation, and continuous monitoring.    This plan was initiated.  I only recall that I spoke with Drs. Tardiff and Tassillo.**

5.   Please list by title, author, publisher, volume, edition, and page, each and every article, journal, treatise, text, or book that you consider to be authoritative in the diagnosis and treatment of the plaintiff's decedent's condition.

**ANSWER:**

**Due to the evolving nature of medicine, I do not consider any text to be authoritative as I understand the term.**

6.   Please list by title and publisher all medical journals or other periodicals to which you subscribed, as well as, those that you subscribed to during the period of alleged negligence.

**ANSWER:**

**Objection:** **The defendant objects to this request on the grounds that it seeks information which is overly broad, unduly burdensome and, therefore, not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this objection, the defendant states:**

4

**As I recall, at the time of the alleged negligence, I subscribed to:**

**American Family Physician**

**Journal of Family Practice**

**Journal of the American Medical Association**

7.    For each and every occasion upon which you have ever testified under oath, please state separately:

    (a)    the full caption of the case, including the court, full title, and docket number;

    (b)    the name and address of each person present when each such statement was made;

    (c)    the date, place, and complete content of each such statement;

    (d)    the setting where each statement was made; and

    (e)    describe the occurrence that resulted in the alleged injury or death that was the basis for the claim in each such action.

**ANSWER:**

**Objection:  The defendant objects to this interrogatory to the extent that it seeks information which is irrelevant to the subject matter of this action and, therefore, beyond the scope of F. R. C.P. 26.  The defendant further objects to the extent that it seeks documents which would be privileged under M.G.L. c. 111§ 204 and 205.  The defendant also objects to the extent that this interrogatory seeks information which is protected by the attorney/client privilege and the attorney work product doctrine and is gathered and prepared in anticipation of litigation and, therefore, is beyond the scope of reasonable discovery.  Notwithstanding and without waiving these objections, the defendant states:  I have never testified under oath.**

8.    Have you or any person to your knowledge obtained any statements, in any form, from any person, relating to or concerning the incident alleged in the complaint?  If so, please supply:

    (a)    the name and address of each person making such statements;

    (b)    the name and address of each person present when each such statements was made; and

    (c)    the date, place and verbatim contents of each such statement.

253720v1

**ANSWER:**

**Objection**:  **The defendant objects to this request to the extent that it seeks documents which would be privileged under M.G.L. c. 111§ 203, 204 and 205.  In addition, the defendant objects to the extent that this interrogatory seeks information protected by the attorney/client privilege and the attorney work product doctrine and which would be gathered and prepared in anticipation of litigation and, therefore beyond the scope of discovery under Fed.R.Civ. P. 26(b). Notwithstanding and without waiving these objections, the defendant states:  I am unaware of any non-privileged statements.**

9.  State the name and address of each person whom you believe was a witness to, or has knowledge of any of facts or circumstances alleged by the plaintiff, and as to such witness, please provide:

   (a)  the substance and bases of the facts and opinions known and held by each such witness.

**ANSWER:**

**Objection:  The defendant objects to this interrogatory to the extent that it seeks information protected by the attorney/client privilege and which is gathered and prepared in anticipation of litigation and is, therefore, beyond the scope of permissible discovery.  The defendant also has a limited memory of the events and, therefore, pursuant to F.R.C.P. 33(d), respectfully refers the plaintiff to the medical record.    Notwithstanding and without waiving these objections, the defendant states:**

**I believe the following individuals may have knowledge of the alleged incident.**

**Father of the infant**

**Dr. Lisa Tardiff**

**Sandy Salerno, R.N.**

**Dr. Ollari**

**Dr. Tasilla**

**Other healthcare providers of the plaintiff at Umass Memorial Medical Center.**

10.  State the name and present address of each person whom you expect to call as an expert witness at the trial of this action, and as to each such expert, please provide:

   (a)  his/her qualifications with particular reference to the issues about which such person may be called to testify at the trial of this action;

6

253720v1

(b)    the subject matter on which each expert may be expected to testify;

(c)    the substance of the facts and opinions to which each such expert may be expected to testify;

(d)    the grounds for the opinions of each such expert.

**ANSWER:**

**Objection:  The defendant objects to paragraph (a) of this interrogatory to the extent that it is vague and ambiguous as to "… with particular reference to the issues about which such person may be called to testify…].  Notwithstanding and without waiving this objection, the defendant states:**

**My attorneys inform me that no decision has been made with respect to which expert witnesses will be called upon to testify at the time of trial.**

11.    Please state whether you claim to be a public employee immune from liability under Mass. Gen. Laws ch. 258 at the time you treated the plaintiff.

**ANSWER:**

**Objection:  The defendant objects to this interrogatory to the extent that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the defendant.  Notwithstanding and without waiving these objections, the defendant states:**

**At the time of the alleged negligence, I was a PGY3 resident employed by the University of Massachusetts.**

12.    If the answer to the preceding interrogatory is anything but an unqualified negative, please:

(a)    identify the public employer by whom you claim to have been employed; and

(b)    set forth all facts and circumstances surrounding your alleged employment with that public employer which you claim support your defense that you were a public employee when you treated the plaintiffs' decedent.

**ANSWER:**

**Objection:  The defendant objects to this request on the grounds that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the defendant.  Notwithstanding and without waiving these objections, the plaintiff is referred to answer to interrogatory Number 11.**

13.    If you were during the period of the alleged negligence employed by or a member of any professional corporation or entity, please identify the full name and address of all such entities, the period of the employment, and any office or position you held.

Additionally, please state:

a.    Please state whether you contend that you were an agent, servant, employee, or representative of any of the professional corporations or entities listed in your answer to this Interrogatory.

b.    Please state in detail everything that forms the basis for your contention that you were or were not an agent, servant, employee, or representative of any of the professional corporations or entities listed in your answer to this Interrogatory.

**ANSWER:**

**Objection: The defendant objects to this request on the grounds that it seeks information which is overly broad, unduly burdensome and, therefore, not reasonably calculated to lead to the discovery of admissible evidence.  The defendant also objects to this interrogatory to the extent that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the defendant.  Notwithstanding and without waiving these objections, the plaintiff is referred to answer to Interrogatory #11.**

14.    Please identify the insurance carrier, policy period and policy limits for all primary and excess insurance policies that provide coverage for the alleged incident including, individual policies and professional organizations policies.

**ANSWER:**

**The plaintiff is referred to the insurance declaration page produced by the defendant in response to the plaintiff's request for production of documents.**

15.    a.    Please state whether you contend that the plaintiff's decedent or any member of the plaintiff's decedent's family in any way caused or contributed to cause the injuries for which recovery is south, or failed to take action to prevent those injuries.

b.    If the answer to Interrogatory #15(a) is anything other than an unqualified negative, please state in detail everything that forms the basis for your contention.

**ANSWER:**

**Objection:  The defendant also objects to this interrogatory to the extent that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the defendant.  The defendant reserves the right to supplement this response at the appropriate time prior to trial.**

8

16.    a.    Please state whether you contend that any person or entity in any way caused or contributed to cause the injuries for which recovery is south, or failed to take action to prevent those injuries.

        b.    If the answer to Interrogatory #16(a) is anything other than an unqualified negative, please state in detail everything that forms the basis for your contention.

**ANSWER:**

**Objection:  The defendant also objects to this interrogatory to the extent that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the defendant.  The defendant reserves the right to supplement this response at the appropriate time prior to trial.**

17.    Please type a transcription of all handwritten notes by you regarding the plaintiff's decedent.

**ANSWER:**

**Objection:  The defendant objects to this request on the grounds that it seeks information which is overly broad, unduly burdensome and, therefore, not reasonably calculated to lead to the discovery of admissible evidence and beyond the scope of discovery permitted by Fed.R.Civ.P. 26(b).  Notwithstanding and without waiving these objections, the defendant states:  I am unaware, at this time of any handwritten notes by me.**

SIGNER UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____ DAY OF _____*April 5*_____ 2005.

_____
Kenneth K. Gerweck, M.D.

AS TO OBJECTIONS:

_____
Heather G. Beattie, Esquire
Morrison, Mahoney & Miller, LLP
1500 Main Street, Suite 2400
Springfield, MA  01115-5387
(413) 737-4373, (413) 739-3125 (Fax)

**CERTIFICATE OF SERVICE**

I, Heather G. Beattie, Esquire of MORRISON, MAHONEY & MILLER, LLP, 1500 Main Street, Suite 2400, P.O. Box 15387, Springfield, Massachusetts 01115-5387, hereby certify that on the ___*20*___ day of ___*April*___ 200*5* I caused the foregoing document to be served upon the other party or parties in this action by mailing a copy of the same, postage prepaid, first class mail.

_____
Heather G. Beattie, Esquire, BBO #643197

9

253720v1

**Exhibit 4**





Volume:        I
Pages     1-68
Exhibits:      2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 04-40249

- - - - - - - - - - - - - - - - - x

REGINA ANKRAH and ISAAC OWUSU-AFRIYIE,
AS CO-EXECUTORS OF THE ESTATE
OF ANGELINA OWUSU-AFRIYIE,

            Plaintiffs

V.

THE UNITED STATES OF AMERICA,
KENNETH K. GERWECK, M.D. and
SANDRA L. SALERNO, R.N.,

            Defendants
- - - - - - - - - - - - - - - - - x


        DEPOSITION of KENNETH K. GERWECK, M.D.,

called on behalf of the Plaintiffs, taken pursuant to

the provisions of the Massachusetts Rules of Civil

Procedure, before Kathleen Pellegrino, a Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at Crowe & Mulvey, 141

Tremont Street, Boston, MA 02111, on Thursday,

March 2, 2006, commencing at 10:07 a.m.

            - - - - - - - - - - -
        KATHLEEN PELLEGRINO
    COURT REPORTING SERVICES
        35 French Avenue
    Braintree, MA  02184
        (781) 849-3838

<u>A P P E A R A N C E S</u>

PHILIP J. CROWE, JR., ATTORNEY
Crowe & Mulvey, LLP
141 Tremont Street
Boston, MA   02111
(617) 426-4488
       Counsel for the Plaintiffs


HEATHER G. BEATTIE, ATTORNEY
Morrison Mahoney, LLP
1500 Main Street
Springfield, MA   01115-5387
(413) 737-4373
       Counsel for Kenneth K. Gerweck, M.D. and
       Sandra L. Salerno, R.N.


RAYFORD A. FARQUHAR, ATTORNEY
United States Department of Justice
United States Attorney's Office
Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA   02210
(617) 748-3100
       Counsel for the United States of America

26

```
1        duties.

2   Q    All right.  What were your duties and

3        responsibilities on August 11th of 2002 when

4        Regina Ankrah was a patient at Memorial

5        Hospital?

6   A    That evening I was on call for Family

7        Medicine for the Family Health Center.  So I

8        was involved in various things, including

9        seeing medical patients, spending some time

10       with this obstetric patient, taking calls and

11       doing phone triage.

12

13                  (Whereupon, Mr. Farquhar entered

14       the deposition at 10:28 a.m.)

15

16  Q    When you said you were on call, what do you

17       mean by on call?

18  A    That means that during the after-hours I have

19       -- what do you mean by on call?

20  Q    Did you have an on-call schedule?  How did

21       you happen to be at the hospital on that --

22  A    I was at the hospital because I was on call,

23       and we oftentimes take call from the hospital

24       because we'd see patients in the hospital.
```

KATHLEEN PELLEGRINO

28

| | | |
|---|---|---|
| 1 | Q | To your understanding, was that the first |
| 2 | | time you ever met Mrs. Ankrah? |
| 3 | A | Yes. |
| 4 | Q | What did you consider to be your duties and |
| 5 | | responsibilities with respect to her labor |
| 6 | | and delivery? |
| 7 | A | Well, that's hard to say.  Duties and |
| 8 | | responsibilities?  I was under the |
| 9 | | supervision of the attending physician. |
| 10 | Q | Who was the attending? |
| 11 | A | That's Dr. Tardif. |
| 12 | Q | Was Dr. Tardif an attending Family Practice |
| 13 | | physician? |
| 14 | A | Yes. |
| 15 | Q | Why was Mrs. Ankrah admitted to the Family |
| 16 | | Practice service as opposed to the |
| 17 | | obstetrical service? |
| 18 | A | Because she was a Family Practice patient. |
| 19 | Q | Do you know how she became a Family Practice |
| 20 | | patient? |
| 21 | A | No. |
| 22 | Q | Was there an obstetrical clinic at Memorial |
| 23 | | Hospital at that time also? |
| 24 | A | There was at least an obstetric high-risk |

KATHLEEN PELLEGRINO

44

| | | |
|---|---|---|
| 1 | | note since I had seen her.  It's customarily |
| 2 | | when I see her I would write a note. |
| 3 | Q | What was your schedule at that time?  Were |
| 4 | | you supposed to be in the hospital the whole |
| 5 | | night, or were you on duty that whole time? |
| 6 | A | I was on call the entire time, so I spent |
| 7 | | most of the night in the Emergency Room. |
| 8 | Q | Why did you spend most of your night in the |
| 9 | | Emergency Room? |
| 10 | A | I had a number of patients to see in the |
| 11 | | Emergency Room that had come in from the |
| 12 | | community. |
| 13 | Q | So were you working both in the Emergency |
| 14 | | Department and the Obstetrical Department? |
| 15 | A | That particular evening I spent much more |
| 16 | | time in the Emergency Room. |
| 17 | Q | Why were you then also in the Labor and |
| 18 | | Delivery Department? |
| 19 | A | Because as a person on call, you can be |
| 20 | | called out to various locations within the |
| 21 | | hospital. |
| 22 | Q | Do you know for how long you had been on duty |
| 23 | | that day or when your shift started? |
| 24 | A | No, I don't remember. |

```
 1            I may have never seen her again.

 2      Q    Do you have any other entries in the record

 3            other than the ones that we've just looked

 4            at?

 5      A    Not that I know of.

 6      Q    Well, were you present when the decision was

 7            made to do a cesarean section?

 8      A    I don't know.

 9      Q    Did you ever hear about what happened with

10            respect to this delivery?

11      A    Yes.

12      Q    What did you hear?

13      A    That the baby died.

14      Q    How did you hear that?

15      A    I don't know who told me, but I believe I was

16            in the clinic at the time when I heard about

17            it.

18      Q    Did you hear about it the same day that it

19            happened?

20      A    I'm not sure.

21      Q    You were not present for the cesarean

22            section, correct?

23      A    That's correct.

24      Q    After you heard that the baby died, what did
```

KATHLEEN PELLEGRINO

**Exhibit 5**

| UMass Memorial<br>Medical Center<br>119 Belmont Street<br>Worcester, MA 01605 | ANKRAH,REGINA | Age 20 |
|---|---|---|
| | BERUBE | DOB    11/29/1981 |
| | ACCT#    00010644100 | MR#    000829635 |
| | Allergies/Drugs  NONE | |
| 08/16/2002 15:1Phyllis Dowd RN | Other    None | |
| | Ht    56.0 | 4S.410-A |

**Mem. Admit History and Physical**                                Page 1

| | 08/11/02 | | | | | | |
|---|---|---|---|---|---|---|---|
| | 21:19 | 22:33 | 22:38 | | | | |
| ADMISSION HISTORY and PHYSICAL | Text... | | | | | | |

08/11 21:19

CC: ctxs, lof

HPI: 20 g2p0010 at 40 2/7 by lmp and 8 wk u/s p/w ctxs and ?lof.  started this am w/ mucus d/c, then ctxs, then yellow liquid flow.  no vag bleed, decr fetam movement.  no dysuria, no apparent fevers.

Hx this pregn:
U/S x 3, last about 10 days ago for ?vtx.  was vtx.
vaginal candidiasis, just finished tx.

prenatals:O+, RI, see nurses notes.
recent ppd neg and glucola wnl and hiv neg per pt report (no recent clinic chart here).

PMHx. none
Psurghx.none
meds: pnv    allgs: nkda

Exam: comfortable
T101.1
sve: mec stained fluid (no particulate),
2/50%/+3 far posterior per nurse.
abdom: gravid,nt, ?vtx
u/s: vtx
cvs: rrr no m

toco q3-4min
fht basel 155, no accels, decels starting at start of ctx, lingering 20 sec beyond ctx return to baseline.  dips 20 below baseline.

A/P 20 g2p1 at 40 2/7 in latent labor w/ srom, meconium, temp, fht not reassuring
-fht not reassuring
-start pcn iv for temp, possible chorioamnio.
-consult ob
-CBC, type and screen.
-vtx by u/s
-discussed w/ Dr. Tardiff
Ken Gerweck pgy3

addendum: correction- head is minus 3, no plus 3.

| Vital Signs | | | | | | | |
|---|---|---|---|---|---|---|---|
| Temp | | 38.4 | | | | | |
| Temp F | | 101.1 | | | | | |
| Pulse | | 110 | | | | | |
| Resp | | 20 | | | | | |
| SBP/DBP (mmHg) | | 114 | | | | | |
| | | 71 | | | | | |

| UMass Memorial<br>Medical Center<br>119 Belmont Street<br>Worcester, MA 01605 | ANKRAH,REGINA              Age 20 |
|---|---|
| | BERUBE                DOB    11/29/1981 |
| | ACCT#    00010644100    MR#    000829635 |
| | Allergies/Drugs  NONE |
| 08/16/2002 15:1   Phyllis Dowd RN | Other    None |
| | Ht    56.0                4S.410-A |

Mem. Admit History and Physical                Page  2

|  | | 08/11/02 | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | 21:19 | 22:33 | 22:38 | | | | | |
| Pre-Natal Labs | | | | | | | | |
| Blood Type | | O | | | | | | |
| RH Type | | Pos | | | | | | |
| RH Antibody | | NEGATIVE | | | | | | |
| Rubella | | Immune | | | | | | |
| HbSAg | | Negative | | | | | | |
| VDRL/RPR | | Nonreact | | | | | | |
| Platelets | | 221 | | | | | | |
| AFP | | Normal | | | | | | |
| Chickenpox | | Unknown | | | | | | |
| Chlamydia | | Unknown | | | | | | |
| TB Exposure | | Unknown | | | | | | |
| Herpes | | Unknown | | | | | | |
| Gp+ Beta Strep | | Unknown | | | | | | |
| Gonorrhea | | Not_Done | | | | | | |
| Sickle Cell | | Not_Done | | | | | | |
| Urine Glucose PN | | Negative | | | | | | |
| Urine Protein PN | | Trace | | | | | | |
| Recorded By: | fmrgek | e4whp | e4whp | | | | | |

| UMass Memorial<br>Medical Center<br>119 Belmont Street<br>Worcester, MA 01605 | ANKRAH,REGINA | Age 20 |
|---|---|---|
| | BERUBE | DOB    11/29/1981 |
| | ACCT#    00010644100 | MR#    000829635 |
| | Allergies/Drugs  NONE | |
| | Other    None | |
| 08/16/2002 15:1Phyllis Dowd RN | Ht  56.0 | 4S.410-A |

Mem. Admit History and Physical                    Page 3  (EOD)

    e4whp -- Paula Whynot RN,CNII
    e4sas -- Sandra Salerno R.N.
    fmrgek -- Kenneth Gerweck MD



# Exhibit 6

| UMass Memorial Medical Center 119 Belmont Street Worcester, MA 01605 | ANKRAH,REGINA | | Age 20 |
|---|---|---|---|
| | BERUBE | DOB | 11/29/1981 |
| | ACCT#    00010644100 | MR# | 000829635 |
| | Allergies/Drugs  NONE | | |
| | Other    None | | |
| 08/16/2002 15:1 Phyllis Dowd RN | Ht  56.0 | | 4S.410-A |

MEM - Physician Progress Notes — Page 1

| | | 08/11/02 | | | | 08/12/02 | |
|---|---|---|---|---|---|---|---|
| | 21:54 | 22:29 | 23:11 | 23:23 | 01:08 | 02:41 | 04:40 |
| Note Type | Consult Resident L&D | Attend | Attend | Attend | Resident | Attend | Consult Resident L&D |
| Progress Notes | Text... | Text... | Text... | Text... | Text... | Text... | Text... |

| | |
|---|---|
| 08/11 21:54 | OB R4 Consult Note |
| | This is a 20yo G2P0010 at 40.3wks gestation with EDC based on |
| | LMP, 8, 20wk US who is admitted this evening with SROM and |
| | cxns. Pt is certain of SROM approx 8pm but had ? mucous |
| | discharge earlier in the day. Fluid is currently meconium |
| | stained. Cxns began spontaneously and pt mostly complains of |
| | pressure during a cxn. |
| | Denies complications this pregnancy. Had bx of vulvar skin |
| | tags by Dr Ramsaran, path= squamous papillomas |
| | No PMH or PSH |
| | obhx: SAB |
| | No meds. No allergies |
| | From Liberia. Boyfriend/FOB to be present at delivery |
| | Prenatals WNL |
| | O: T38.4 P 110 BP 114/71 |
| | NAD but nervous |
| | abd soft between cxns, non tender |
| | toco q3-4 |
| | FHT baseline 140s btbv 5-7. variable appearing decels down to |
| | 110s during and continuing after several of the cxns |
| | sve per Dr Gerlick 2/50/-1, thick meconium fluid |
| | 13.5>37.6<168 |
| | A/P 20yo G2P0010 at 40.2wks admitted with SROM, spontaneous |
| | cxns, in early labor. FSE and IUPC placed to further evaluate |
| | FHT and cxn pattern. Given fever of 101.1 would treat as for |
| | chorioamnionitis with amp/gent. Tylenol prn to lower fever and |
| | maternal heart rate. If decelerations prove to be variable in |
| | nature, amnioinfusion may be useful. Will need close |
| | monitoring for progress in labor and for status of FHT. |
| | Dr Ollari aware |
| | Ob available for further consultation as needed |
| | DTasillo,MD |
| | OB Attending |
| | Please see Dr Tasillo's notes for full details, asked to see |
| | pt by Dr Tardiff 20 yop G2P0 at 40 2/7 weeks who presented |
| | SROM for MSAF at approx 8 PM and a fever of 101.2. |
| | Uncomplicated prenatal course.  FSE and IUPC placed. FHT in |
| | the 130 5-10 btbv with intermittent decelerations into 110s x |
| | 30 sec c/w variable decelerations.  Agree with Ampicillin and |
| | Gentamycin for possibility of chorioamnionitis. Please |
| | reconsult as needed. |
| | Ollari |
| 08/11 22:29 | Attending FHC: |
| | G2P0 at 40 2/7 weeks by 8 weeks u/s. Presents to L&D c/o lof, |
| | ctxs and yellow fluid. Think she may have ROM around 8:00 pm |
| | but have been trickeling for a while today. Upon presentation, |

| UMass Memorial | ANKRAH,REGINA | Age 20 |
|---|---|---|
| Medical Center | BERUBE | DOB    11/29/1981 |
| 119 Belmont Street | ACCT#    00010644100 | MR#    000829635 |
| Worcester, MA 01605 | Allergies/Drugs  NONE | |
| | Other    None | |
| 08/16/2002 15:1Phyllis Dowd RN | Ht  56.0 | 4S.410-A |

### MEM – Physician Progress Notes

Page 2

| | 08/11/02 | | | 08/12/02 | | |
|---|---|---|---|---|---|---|
| | 21:54 | 22:29 | 23:11 | 23:23 | 01:08 | 02:41 | 04:40 |

| | | |
|---|---|---|
| | | had non reassuring strip: poor BTBV, no accels baseline |
| | | 150's-160's. Decels with late appearance difficult to time |
| | | with contractions given external monitors. Contractions irreg |
| | | q 2-4 min. Fluid on chucks meconial stained. Checked by |
| | | nursing 2/50%/ -3 can't barely touch presenting part with ? |
| | | vtx. Quick bedside portable u/s showed vtx presentation. Also |
| | | vitals taken temp of 101 F. |
| | | Li9se Tardif M.D. |
| | 08/11 23:11 | Attending FHC: |
| | | Continuation of previous note. Interrupted by pte needing to |
| | | be checked... |
| | | Given non reactive strip, meconium fluid, dilatation of only 2 |
| | | cm and a fever, OB was consulted for help with management. |
| | | IUPC and fetal scalp electrodes were placed. Decels were |
| | | better characterised as variables and fluid was darker |
| | | meconium stained. An amnioinfusion was started along with amp |
| | | and gent for possible chorio. Anesthesia were given heads up |
| | | on the case. OB to remain aware of this patient during |
| | | management of labor. |
| | | |
| | | Lise Tardif M.D. |
| | 08/11 23:23 | Attending FHC: |
| | | Called at bedside re: pte c/o lots of pelvic pressure. Ctx |
| | | changed from q5-7 min in doublets with LBP to q 2min with |
| | | pelvic pressure. Pte requesting epidural. Better variability |
| | | of strip with some accels is now visible (after having started |
| | | amnioinfusion). Antibiotics just started. |
| | | Exam: 3cm/75%/ -1 with more midline position of cervix. |
| | | Thinner meconium stained fluid. |
| | | |
| | | Imp: Progressing, Possible rotation of the head. |
| | | Still having variables (? lat cord) |
| | | |
| | | Plan: Too early for epidural. Will try nubain 5 mg im/iv to |
| | | hold on until 4 cm for epidural. Epidural was Ok        by OB |
| | | at least at 4 cm. |
| | | Continue amnioinfusion. |
| | | Expectant management. |
| | | |
| | | Lise Tardif M.D. |
| | | |
| | 08/12 01:08 | S: uncomfortable |
| | | O: uncomfortable |
| | | 37.4  116/53  87 |
| | | sve 4/80%/-1 |
| | | toco q2, 60s duration |
| | | fht basel 150, good beat to beat, no accels, +variable decels |
| | | to 110, quick rebound for most, howver, some w/ late |
| | | component. |

| UMass Memorial<br>Medical Center<br>119 Belmont Street<br>Worcester, MA 01605 | ANKRAH,REGINA | Age 20 |
|---|---|---|
| | BERUBE | DOB    11/29/1981 |
| | ACCT#    00010644100 | MR#    000829635 |
| | Allergies/Drugs  NONE | |
| | Other    None | |
| 08/16/2002 15:1 Phyllis Dowd RN | Ht    56.0 | 4S.410-A |

MEM – Physician Progress Notes                                            Page 3

| | | 08/11/02 | | | | 08/12/02 | |
|---|---|---|---|---|---|---|---|
| | | 21:54 | 22:29 | 23:11 | 23:23 | 01:08 | 02:41 | 04:40 |

A/P 20 g1p0 at 40 2/7 in transition, srom mec, fever.
-fht w/ good variability but still w/ concerning decels
-cont amnioinfusion
-cont abx for suspected chorio.
-monitor closely (has iupc and fse)
-s/p nubain.  now will do epidural
-discussed w/ Dr. Tardiff

Ken Gerweck pgy3

**08/12 02:41**  Attending FHC:
As above. Pte just got epidural. Relieved +++. Now sleeping.
Strip lost all variability. Now baseline 160-165. Ctx reduced
in intensity and frequency. Variables have disappeared.
Amnioinfusion going in easily although only trickeling out
very slowly. My last check showed head well applied to cervix.
Most likely fluid behind baby. Now uterus maybe more
dysfunctional with contractions given increased fluid by
amnioinfusion. This seems to have brought disappearance of
variables. Still suspecting lat cord. On antibiotics for
suspected chorio. Will continue to observe ctxs and strip in
the next few hres. Continue antibiotics. Keep OB aware. Stop
amnioinfusion for now. May restart later if needed.

Lise Tardif M.D.

**08/12 04:40**  OB R4 PN
Asked by Dr Tardif to reevaluate this pt/FHT
Pt received her epidural and is now comfortable. Is aware of
rectal pressure.
Was 4cm before epidural (130am)
Temp now 102.6
Cxns continue to be regular q2-3min
FHT baseline elevated to 170s with decreased variability +/-5.
Run of late decels earlier was followed by variable decels
sve 4/90/0
A/P 20yo G2P0010 at 40.2wks admitted in spontaneous labor. Now
with chorioamnionitis treated with amp/gent. FHT with
decreased variability, late decelerations. Pt remote from
delivery therefore would recommend delivery by cesarean
section. Pt aware
d/w Dr Ollari
DTasillo,MD

| Recorded by: | obtad | FH1326 | FH1326 | FH1326 | fmrgek | FH1326 | obtad |
|---|---|---|---|---|---|---|---|
| | OB8092 | | | | | | |

| | | 08/12/02 | | | | 08/13/02 | |
|---|---|---|---|---|---|---|---|
| | | 05:36 | 06:06 | 06:07 | 20:21 | 06:33 | 08:49 | 11:58 |
| Note Type | | Consult | | | Resident | | Med. Stu |
| | | Attend | | | | Postpart | Postpart |
| | | L&D | | | | | |
| Progress Notes | | Text... | | Text... | Text... | Text... | Text... |
| | 08/12 06:06 | OB Attending | | | | | |

| UMass Memorial<br>Medical Center<br>119 Belmont Street<br>Worcester, MA 01605 | ANKRAH,REGINA<br>BERUBE<br>ACCT#      00010644100<br>Allergies/Drugs  NONE | Age 20<br>DOB      11/29/1981<br>MR#      000829635 |
|---|---|---|
| | Other      None | |
| 08/16/2002 15:1 Phyllis Dowd RN | Ht   56.0 | 4S.410-A |

MEM – Physician Progress Notes                                  Page 4

| | 08/12/02 | | | 08/13/02 | |
|---|---|---|---|---|---|
| | 05:36 | 06:06 | 06:07 | 20:21 | 06:33 | 08:49 | 11:38 |
| | Reconsulted by FP team regarding FHT.  FHT in the 170s with |
| | repetitive decelerations.  Decision made to proceed |
| | immediately to C section.  LCTCS performed with Dr Tasillo.  A |
| | viable female infant delivered vtx, with a nuchal cord, and |
| | thick MSAF.  Mouth and nares Delee suctioned. Infant handed to |
| | NICU team in attendance. Infant with poor respiratory effort |
| | requiring intubation.  Apgars pending.  cord pH 7.04. Infant |
| | transferred to NICU.  Placental culture obtained. Normal |
| | placenta, uterus, tubes, and ovaries.  Uterine incision closed |
| | in one layer. Upon entering the peritoneal cavity the bladder |
| | was significantly distended. It was needle drained for |
| | approximately 150 cc.  EBL 800cc. |
| | Ollari |
| | Addendum |
| | Initial consult was performed at the time of admission.  The |
| | obstetrical team was not asked to reconsult until 4:40AM, the |
| | time of Dr Tasillo's next note. |
| | Ollari |
| 08/12 20:21 | R1 PN |
| | CTSP for increased temp. |
| | Pt doing well, c/o some crampy abdominal pain imnproved since |
| | yesterday. Denies sob/cp/chills/dysuria/calf pain. |
| | PE VS 100.9 @16:00, 100.0@20:25 |
| | Gen: pt appears comfortable, no acute distress. |
| | Lungs: cta b/l |
| | Abd: soft, midly and diffusely tender; incision c/d/i no |
| | drainage or erythema.  Striae pink.  (normal per pt.) |
| | Ext no c/c/e no calf tenderness |
| | A/P 20 g1p1010 POD 2 s/p LTCS for NRFHT, chorio still with |
| | cyclic temps on antbx. Now resolved. Bld cx pending, keep |
| | antbx until pt is afebrile. |
| | K.Kedian fpr1 #1297 |
| 08/13 06:33 | R1 PN |
| | Pt comfortable, was sleeping |
| | No fever this am, on abx Clinda + Gent |
| | VSS |
| | Uterus firm, but mod tender |
| | Inc CDI |
| | A/P 20 yo G21010 POD1 LTCS w/ Fever |
| | Cont Clinda and Gent pending Cultures |
| | ABrough |
| | Addendum |
| | Ms Coffey Social Work to see pt this morning |
| 08/13 08:49 | OB Attending |
| | Pain well controlled. Tolerating clears. Voiding without |
| | difficulty.  Patient states that she is sad regarding death of |
| | infant. She says that Isaac, the father of the baby, comes |
| | from a tribe where if you lose your firstborn you should not |
| | grieve too much or the infant's spirit will follow you.  Pt |
| | has not yet held the baby. |

| UMass Memorial<br>Medical Center<br>119 Belmont Street<br>Worcester, MA 01605 | ANKRAH,REGINA | | Age 20 | |
|---|---|---|---|---|
| | BERUBE | | DOB    11/29/1981 | |
| | ACCT#    00010644100 | | MR#    000829635 | |
| | Allergies/Drugs  NONE | | | |
| 08/16/2002 15:1 Phyllis Dowd RN | Other    None | | | |
| | Ht    56.0 | | 4S.410-A | |

**MEM – Physician Progress Notes**      Page 5

| | | 08/12/02 | | | | 08/13/02 | |
|---|---|---|---|---|---|---|---|
| | 05:36 | 06:06 | 06:07 | 20:21 | 06:33 | 08:49 | 11:38 |
| | | Tm 38.4 7:15 PM yesterday, P 100-120, 90-120/50-70s, 2630/1800 | | | | | |
| | | abd fundus nontender, inc CDI on erythema | | | | | |
| | | ext calves nontender | | | | | |
| | | 20 yo POD 1 LTCS with chorioamnionitis and NRFHT complicated | | | | | |
| | | by neonatal death.  Will continue Gentamycin and Clindamycin | | | | | |
| | | until afebrile for 24 hours.  Social worker will see patient | | | | | |
| | | today.  Encouraged patient to spend time with infant as part | | | | | |
| | | of grieving process. | | | | | |
| | | Ollari | | | | | |
| 08/13 11:38 | | Lab addendum | | | | | |
| | | Hct= 28.8 | | | | | |
| | | Wound culture, prelim= 3+ GBS | | | | | |
| | | Gent trough= 4.7 (0.5-2) | | | | | |
| | | Elena Tsai MSIII | | | | | |
| Delivery Comments | | Text... | | | | | |
| 08/12 06:06 | | 20yo G2P0010 at 40.3wks with chorioamnionitis, non reassuring | | | | | |
| | | FHT for primary LTCS | | | | | |
| Pre-Op Diagnosis | | | Text... | | | | |
| 08/12 06:07 | | 40wk IUP | | | | | |
| | | NRFHT | | | | | |
| | | Chorioamnionitis | | | | | |
| Post-Op Diagnosis | | | | same | | | |
| Procedure | | | | Text... | | | |
| 08/12 06:07 | | primary LTCS via Pfannensteil | | | | | |
| Attending at Delivery | | | OLLARI | | | | |
| Resident at Delivery | | | TASILLO | | | | |
| Anesthesia Delivery | | Epidural | | | | | |
| EBL | | | 1000 | | | | |
| Urine Output | | | -125 | | | | |
| Total IV Fluids | | | 1200 | | | | |
| Complications | | | none | | | | |
| Last Exam Dil. Prior to C/S | | | 4.0 | | | | |
| Last Exam Station Prior to C/S | | | 0 | | | | |
| Arrest of Dilatation in Hours | | | .3 | | | | |
| Arrest of Descent in Hours | | | 0 | | | | |
| Findings | | | Text... | | | | |
| 08/12 06:07 | | viable female infant, cephalic presentation. meconium stained | | | | | |
| | | fluid (+below cords). WtAPGARs per NICU. cord pH pending. | | | | | |
| | | Normal placenta, meconium stained. Normal uterus, tubes and | | | | | |
| | | ovaries | | | | | |
| Recorded by: | e4sas | OB8092 | obtad | fprkek | ERBRA | OB8092 | mstse |
| | | obtad | | | | | |

| | 08/13/02 | | 08/14/02 | | | | 08/15/02 |
|---|---|---|---|---|---|---|---|
| | 12:22 | 16:27 | 08:50 | 10:00 | 13:46 | 22:09 | 07:02 |
| Note Type | Consult | Consult | Attend | Resident | Med._Stu | Resident | Resident |
| | | | Postpart | Postpart | Postpart | Postpart | Postpart |
| Progress Notes | Text... | Text... | Text... | Text... | Text... | Text... | Text... |
| 08/13 12:22 | Care Coordinatoin | | | | | | |
| | Chart and nsg data base reviewed and events noted,Case | | | | | | |
| | referred to social worker elena coffey for counseling and | | | | | | |

# Exhibit 7

RECEIVED
MAY 2 2 2006
By

Volume:           I
Pages    1-74
Exhibits:         0


COMMONWEALTH OF MASSACHUSETTS

U.S. DISTRICT COURT
CIVIL ACTION
NO. 04-40249

- - - - - - - - - - - - - - - - - x

REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE,
AS CO-EXECUTORS OF THE ESTATE OF
ANGELINA OWUSU-AFRIYIE,

                    Plaintiffs

V.

THE UNITED STATES OF AMERICA,
KENNETH K, GERWECK, M.D. and
SANDRA L. SALERNO, R.N.

                    Defendants

- - - - - - - - - - - - - - - - - x


            DEPOSITION of LISE J. TARDIF, M.D., called on

behalf of the Plaintiffs, taken pursuant to the

provisions of the Massachusetts Rules of Civil

Procedure, before Kathleen Pellegrino, a Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at Crowe & Mulvey, 141

Tremont Street, Boston, MA 02111, on Monday,

May 8, 2006, commencing at 1:05 p.m.


            - - - - - - - - - - -
         KATHLEEN PELLEGRINO
      COURT REPORTING SERVICES
         35 French Avenue
       Braintree, MA  02184
         (781) 849-3838

<u>A P P E A R A N C E S</u>

PHILIP J. CROWE, JR., ATTORNEY
Crowe & Mulvey, LLP
141 Tremont Street
Boston, MA  02111
(617) 426-4488
        Counsel for the Plaintiffs


RAYFORD A. FARQUHAR, ATTORNEY
U.S. Department of Justice
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3100
        Counsel for Lise Tardif, M.D. and The
        United States of America


HEATHER G. BEATTIE, ATTORNEY
Morrison Mahoney
1500 Main Street, Suite 2400
Springfield, MA  01115-0001
(413) 737-4373
        Counsel for Kenneth K. Gerweck, M.D. and
        Sandra L. Salerno, R.N.

38

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What were your duties and responsibilities |
| 3 | | with respect to this labor and delivery? |
| 4 | A | Managing the labor and delivery, if needed, |
| 5 | | consulting Obstetric backup, the delivery of |
| 6 | | the baby and the care of the mother and the |
| 7 | | baby. |
| 8 | Q | Were there any residents also involved in |
| 9 | | this labor and delivery? |
| 10 | A | There was one resident with me that night. |
| 11 | Q | Is that Dr. Gerweck? |
| 12 | A | Dr. Gerweck. |
| 13 | Q | Were you his supervisor in the hierarchy of |
| 14 | | things at that time? |
| 15 | A | Yes. |
| 16 | Q | So if he had questions, you were the person |
| 17 | | that he was supposed to go to, correct? |
| 18 | A | Yes. |
| 19 | Q | Again, if you can tell from memory or looking |
| 20 | | at the record, when was it that you first |
| 21 | | became involved in this labor and delivery? |
| 22 | A | From my recollection, early on.  I would say |
| 23 | | in the first maybe half hour of coming to the |
| 24 | | hospital. |

KATHLEEN PELLEGRINO

39

| | | |
|---|---|---|
| 1 | Q | And continued to be involved until |
| 2 | | approximately 4:30 the next morning? |
| 3 | A | When the consultation was made. |
| 4 | Q | Once the consultation was made, did |
| 5 | | Mrs. Ankrah then become a patient of the |
| 6 | | Obstetrical Department? |
| 7 | A | Yes. |
| 8 | Q | According to the admitting sheet, and if you |
| 9 | | just want to open it up, it appears that |
| 10 | | Mrs. Ankrah was admitted at 20:19, which I |
| 11 | | think is 8:19, is that right? |
| 12 | A | 20:19 is 8:19. |
| 13 | Q | That's p.m., correct? |
| 14 | A | Yes. |
| 15 | Q | Just so I have it right.  Now, if you look at |
| 16 | | the Admitting History and Physical, do you |
| 17 | | have -- |
| 18 | A | I have the History and Physical.  Is that the |
| 19 | | same one? |
| 20 | Q | Yes. |
| 21 | A | Page 1? |
| 22 | Q | That's it.  Now, how does this document get |
| 23 | | generated and made part of the record, if you |
| 24 | | know? |

66

```
 1            there's several other doctors, and they could

 2            be under supervision of what we call the

 3            preceptor, who is the doctor in charge that

 4            day for the visits, and he may come and ask a

 5            question.  As the preceptor not being

 6            available, you can answer his question.  It

 7            will be under the supervision of a different

 8            physician.

 9    Q     But whenever Dr. Gerweck was working with you

10            on call, --

11    A     On call is under my supervision.

12    Q     -- he's under your supervision and your

13            supervision alone, is that correct?

14    A     Correct.

15    Q     That's because he was a resident and not an

16            attending, is that correct?

17    A     Correct.

18    Q     And he was not Board Certified, is that

19            correct?

20    A     Correct.

21    Q     In his role as a resident, is it fair for me

22            to say that it was your expectation that you

23            were the one to decide when the obstetricians

24            were consulted and not Dr. Gerweck?
```

1    A    It's usually we'll discuss, and if, for

2         example, we have a disagreement, usually the

3         attending's decision will pertain.  If the

4         resident asks me should we consult OB and I

5         judge it is indeed necessary, we'll go ahead

6         and do.  If we disagree, we'll sit down and

7         make discussion, and, you know, at some point

8         experience will prevail.  If I sense that my

9         experience dictates no, not yet, then it will

10        be no, not yet.

11   Q    But it's ultimately your decision whether or

12        not the obstetrical resident or the --

13   A    Correct.

14                  MR. FARQUHAR:  Wait for the

15        question.

16   Q    -- obstetrical service is consulted; it's not

17        Dr. Gerweck's decision?

18   A    Yes.

19   Q    Do you recall any conversations with

20        Dr. Gerweck regarding this patient while you

21        were caring for the patient overnight?

22   A    Not recalling the content, but we did work

23        together handling this patient.

24   Q    But you don't have a specific memory of any

```
 1              of the actual conversations?

 2    A    Not word for word, just a vague content

 3         usually pertaining to management.

 4    Q    Do you have a memory that Dr. Gerweck spent a

 5         great deal of time that night in the

 6         Emergency Room with other patients?

 7    A    I do recall a very busy night.  I do recall

 8         him being very busy and calling me several

 9         times for other things.  I do recall that.

10    Q    In looking back, pursuant to your memory, do

11         you have a memory of who was with Ms. Ankrah

12         more, who was examining Ms. Ankrah more,

13         whether it was you or Dr. Gerweck?

14    A    We were both there at the beginning, but

15         going towards further in the night,

16         Dr. Gerweck was busy, and I was also busy,

17         but it was not as much with Ms. Ankrah as I

18         came across.

19    Q    So you were with Ms. Ankrah more as the night

20         progressed, is that correct?

21    A    Correct.

22    Q    Do you have a memory of when it was you

23         actually last saw Ms. Ankrah before 4:00?

24    A    I don't.  I did not -- I know that I visited
```

KATHLEEN PELLEGRINO

**Exhibit 8**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO.:** 4:04-cv-40249-FDS

| | |
|---|---|
| REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE, AS CO-EXECUTORS OF THE ESTATE OF ANGELINA OWUSU-AFRIYIE, **Plaintiffs** | ) ) ) ) ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, KENNETH K. GERWECK, M.D., AND SANDRA L. SALERNO, R.N. **Defendant** | ) ) ) ) ) |

## AFFIDAVIT OF KENNETH K. GERWECK, M.D.

I, Kenneth K. Gerweck, M.D., having personal knowledge of the following information do hereby depose and stand under oath as follows:

1.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, in August of 2002 I was employed by the University of Massachusetts Medical School (hereinafter "The University") as a resident in the Family Medicine Residency Program at the University of Massachusetts Memorial Medical Center. (Hereinafter "UMMMC").

2.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed resident at UMMMC, I was required to participate in rotations including rotations at the UMMMC Memorial campus and University Campus.

3.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident at UMMMC Memorial campus, my treatment of patients was always done under the supervision of an attending physician.

4.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family practice resident at UMMMC Memorial Campus, my work hours and on-call requirements were established by Dr. Gerry Gliech, Director of the Family Medicine Residency Program.

5.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident, I could be dismissed at any time and for any reason at the discretion of the Director, Dr. Gerry Gliech.

6.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident, I did not have staff privileges at any hospital, but instead had limited resident privileges for the purpose of participating in the residency program.

7.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident I was unable to admit, or discharge any patients without discussing those plans with an attending physician.  My patients were assigned to me and I had no choice of what patients I would treat or not treat.  I had no independent private patients of my own.

8.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family practice resident, I received a fixed salary that was not dependent on the number of patients I treated, my productivity, or the number of hours I worked.

9.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family practice resident, I was on the payroll of the University of Massachusetts, and thus received all pay from the Commonwealth of Massachusetts.

10. At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family practice resident, I participated in the Commonwealth's group insurance plan, and the Commonwealth's mandatory contributory retirement plan.

11. At all times pertinent to the incident alleged in the Plaintiff's Complaint, I considered myself to be an employee of the University of Massachusetts, and, therefore, required to abide by all policies, rules, and regulations of the University.

12. At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident, I did not bill any patients for my services or receive any compensation directly from the patients.

13. At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident at UMMMC Memorial campus, my day to day activities were controlled by the attending physicians on faculty at the University of Massachusetts Medical School, and Dr. Gerald Gleich, the Director of the Family Medicine Residency Program at the University of Massachusetts.

14. At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed family medicine resident at UMMMC Memorial campus, any treatment that I allegedly rendered to Regina Ankrah, was done in my capacity as an employee of the University of Massachusetts as a family medicine resident at the UMMMC Memorial campus and within the scope of my duties and responsibilities as such an employee.

2

15.    At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a University of Massachusetts employed Family medicine resident at UMMMC Memorial campus, any treatment I rendered to Regina Ankrah was done under the supervision of Dr. Lise Tardiff, the Family Medicine Attending physician, who was on duty and physically present in the hospital during Ms. Ankrah's labor.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS _18th_ DAY OF ___July___, 2006.

                                            Kenneth K. Gerweck, M.D.

# Exhibit 9

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO.:** 4:04-cv-40249-FDS

| | |
|---|---|
| REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE, AS CO-EXECUTORS OF THE ESTATE OF ANGELINA OWUSU-AFRIYIE, **Plaintiffs** | ) ) ) ) ) ) ) |
| **v.** | ) ) |
| THE UNITED STATES OF AMERICA, KENNETH K. GERWECK, M.D., AND SANDRA L. SALERNO, R.N. **Defendant** | ) ) ) ) ) |

## AFFIDAVIT OF GERALD S. GLEICH

I, Gerald S. Gleich, M.D., having personal knowledge of the following information do hereby depose and stand under oath as follows:

1.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, in August of 2002 I was employed by the University of Massachusetts (hereinafter "The University") as Director of the Worcester Family Medicine Residency Program at the University of Massachusetts Medical School, (Hereinafter "The Medical School") and the University of Massachusetts Memorial Group.

2.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, I was responsible for directing the overall operation, management, and administrative functions of the University of Massachusetts Worcester Family Medicine Residency Program.

3.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, Kenneth K. Gerweck, M.D., was a resident employed by the University of Massachusetts Medical School in the Family Medicine Residency Program at the University of Massachusetts Memorial Medical Center (hereinafter "UMMMC").

4.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, Kenneth K. Gerweck, M.D., received a fixed salary, from the University that was not dependent on his productivity, the number of patients he saw or his work hours.

5.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, Kenneth K. Gerweck, M.D., as an employee of the Medical School, was required to do rotations at the UMMMC and affiliated teaching facilities, including the Memorial Campus.

6.    At all times pertinent to the incident alleged in the Plaintiff's Complaint, the University of Massachusetts Medical School retained control over Dr. Gerweck's training, and his day to day activities when he worked at the UMMMC Memorial Campus.

7.    At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a physician employed by the University of Massachusetts Medical School in the Family Medicine Residency Program, Dr. Gerweck did not bill any patients for care rendered by him at any facility affiliated with his residency program.

8.    At all times pertinent to the incident alleged in the Plaintiff's Complaint, Dr. Gerweck's hours and work schedule for all residency rotations were regulated by me as Director of the Family Medicine Residency Program at the Medical School.

9.    At all times pertinent to the incident alleged in the Plaintiff's Complaint, I as Director of the Family Medicine Residency Program at the Medical School, could dismiss Dr. Gerweck who was employed as a family medicine resident, at any time for any reason.

10.   At all times pertinent to the incident alleged in the Plaintiff's Complaint, Dr. Gerweck did not have any discretion over which patients he would treat. He was required to treat any and all patients to whom he was assigned.

11.   At all times pertinent to the incident alleged in the Plaintiff's Complaint, Dr. Gerweck's compensation, health coverage, benefits, discipline and grievance procedures, vacation time, sick leave, hours of work, and other conditions of employment were provided to him by the University of Massachusetts Medical School.

12.   At all times pertinent to the incident alleged in the Plaintiff's Complaint, Dr. Gerweck participated in the Commonwealth's group health insurance plan and was required to participate in the Commonwealth's contributory retirement plan.

13.   At all times pertinent to the incident alleged in the Plaintiff's Complaint, Dr. Gerweck, as a physician employed by the University of Massachusetts Medical School in the Family Medicine Residency Program, was required to abide by all rules, policies and regulations of the University.

14.   At all times pertinent to the incident alleged in the Plaintiff's Complaint, as a physician employed by the University of Massachusetts Medical School in the Family Medicine Residency Program, Dr. Gerweck's care of patients was always supervised by an attending physician.

15.   At all times pertinent to the incident alleged in the Plaintiff's Complaint, any treatment rendered to Regina Ankrah, was done is his capacity as an employee of the University of Massachusetts as a family medicine resident at the UMMMC Memorial campus and was within the scope of his duties and responsibilities as such an employee.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS _12th_
DAY OF _July_____, 2006.

_____
Gerald S. Gleich, M.D.

# Exhibit 10

RECEIVED
JUL 1 4 2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 4:04-cv-40249-FDS

| | |
|---|---|
| REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE, AS CO-EXECUTORS OF THE ESTATE OF ANGELINA OWUSU-AFRIYIE, **Plaintiffs** | ) ) ) ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, KENNETH K. GERWECK, M.D., AND SANDRA L. SALERNO, R.N. **Defendant** | ) ) ) ) |

## AFFIDAVIT OF RICHARD STANTON

I, Richard Stanton, having personal knowledge of the following information do hereby depose and stand under oath as follows:

1.    I am the Deputy Chancellor for Finance and Administration at the University of Massachusetts Medical School. In this capacity, I am responsible for all financial matters as they relate to the Medical School. In addition, the Human Resources Department reports directly to me on matters involving University personnel.

2.    The University of Massachusetts operates the University of Massachusetts School of Medicine and related professional schools for nurses and other health care professionals (collectively "the University"). The University is an agency of the Commonwealth of Massachusetts.

3.    In conjunction with the Medical School, The University had operated the University of Massachusetts Medical Center ("UMMC"), a faculty Group Practice Plan and a Self-Insurance Trust to provide coverage for UMMC and practitioners in the Group Practice. UMMC, the Group Practice and the Self-Insurance Trust were collectively know as the "UMass Clinical Division". The UMass Clinical Division, the Worcester City Campus Corporation ("WCCC") and the health care providers and organizations controlled by WCCC were collectively known as the "UMass Clinical System."

4.    On November 11, 1997, the Massachusetts Legislature enacted Chapter 163 of the Acts of 1997. This legislation authorized the consolidation of the activities of the UMass Clinical System with Memorial Health care, Inc., a private nonprofit corporation ("Memorial"). At the time, Memorial was the parent corporation and sole corporate member of Memorial Hospital, Inc. ("Memorial Hospital").

5.      The legislation authorized the establishment of two new private nonprofit corporations known as UMass Memorial Health Care, Inc. ("UMass Memorial") and UMass Memorial Medical Center, Inc. ("the Medical Center"). The Medical Center was established to operate the consolidated activities of UMMC and Memorial Hospital. UMass Memorial was established to oversee and control the consolidated actives and operations of the UMass Clinical System and Memorial.

6.      The legislation provided that, on the effective date of the merger, physicians in the Group Practice who had nine or more years of service to the University as of November 11, 1997, could chose to either (1) remain "an employee of the University" whose services would be provided (or "leased") to the Medical Center until February, 2008; or (2) be offered employment by the Medical Center. The legislation provided that physicians who had nine or less years of service to the University as of November 11, 1997, would, within one year of the effective date of the merger, "cease to be University employees."

7.      Pursuant to the legislation, various documents were executed on March 31, 1998, to effectuate the merger. "Articles of Merger" were filed with the Secretary of State on April 1, 1998, making that the effective date of the merger.

8.      The primary merger document is called the "Amended and Restated Definitive Agreement" (the "Definitive Agreement"), which outlines the terms and conditions of the merger. The Definitive Agreement incorporates by reference the provisions of the legislations relating to the employment status of physicians.

9.      The Definitive Agreement states that "all members of the medical staff at the Medical Center shall be required to have and maintain faculty appointments at the Medical School" and provide "academic service" under the supervision of the Chancellor of the University. The Definitive Agreement requires the Chancellor and the President/CEO of UMass Memorial to agree on an allocation between the University and UMass Memorial for compensation of "individuals serving in dual capacities on behalf of the Medical School and UMass Memorial."

10.     The University and UMass Memorial executed an "Agreement for Practitioner Services" which relates to physicians who remained "employees of the University" whose services are leased to the Medical Center. The Agreement for Practitioner Services was intended in part for "the preservation of certain benefits and employment status" for University physicians. Under the Agreement for Practitioner Services, the University supplies the service of its physicians and the Medical Center reimburses the University for the associated costs of those services.

11.     The Agreement for Practitioner Services provides that "the University shall be responsible for payment of all salaries, employee benefits, fringe benefits and reimbursable expenses" for its physicians who render services to the Medical Center. The University is "responsible and liable for all administrative employment matters" regarding these physicians, such as withholding of taxes, payments of the Commonwealth pension system, and the payment of workers compensation coverage.

The University is required to maintain professional liability insurance coverage for its physicians under the Agreement for Practitioner Services.

12.    The University, UMass Memorial and the Medical Center executed an "Academic Affiliation and Support Agreement" (the "Affiliation Agreement"), making the Medical School the exclusive academic and clinical teaching affiliate of the Medical Center. The Affiliation Agreement was intended in part to ensure that the University residents would continue to have access to clinical training sites and research opportunities and programs following the merger. The Affiliation Agreement was also aimed to further the University's goal of responding to "the needs of the Commonwealth and its citizens for quality clinical and related health services."

13.    The Affiliation Agreement provides that the University "shall control decisions regarding academic issues and medical education and training" for its residents, including their rotations and work assignments. The University, through the department chairs of the Medical School, is deemed "responsible for the supervision, direction, and control of residents" assigned to the Medical Center.    (Academic Affiliation and Support Agreement, Section 2.2.1, attached hereto). The Affiliations Agreement also provides that "[o]nly medical staff members at the [Medical Center and affiliated University hospitals] with Medical School faculty appointments shall participate in the training of medical residents…" (Academic Affiliation and Support Agreement, Section 2.2.5).

14.    The University and the Medical Center also executed a Graduate Medical Education Agreement (the "GME Agreement") which relates to the employment status of University residents who are assigned to the Medical Center. The GME Agreement provides that "residents are acting as and shall remain employees of the University and shall not, at any time, be considered agents or employees of the Medical Center." (GME Agreement, Part II, Paragraph A, attached hereto). Under the GME Agreement, the Medical Center pays the University for the services provided by the residents.

15.    The GME Agreement provides that the University "shall recruit, select, appoint, promote and employ physicians to University graduate medical education programs; and shall assign certain of these residents to the Medical Center for education and service purposes." (GME Agreement, Part II, Paragraph A). Pursuant to the GME Agreement, the University shall ensure that residents are properly qualified and licensed to practice medicine.    (GME Agreement, Part II, Paragraph B). The University is required to establish and implement "Resident Personnel Policies" which apply to "all residents appointed by the University, including residents when assigned to the Medical Center." (GME Agreement, Part II, Paragraph C). The University, through its Residency Program Directors, shall remain responsible for the "overall supervision and evaluation of residents" assigned to the Medical Center. (GME Agreement, Part II, Paragraph D). In consultation with the Medical Center, the University establishes the "faculty supervision, work hour and work environment standards", and retains "ultimate responsibility for the residents." (GME Agreement, Part II, Paragraph E). The GME Agreement further provides that all evaluations of residents working at the Medical Center are required to be completed on forms provided by the University within a University-required period of time. (GME Agreement, Part II, Paragraph H).

16.   Under the GME Agreement, the University establishes an annual stipend schedule for residents and pays for and maintains their employee benefits including health, dental, and life insurance, malpractice insurance, retirement, workers compensation, and unemployment insurance. (GME Agreement, Part IV, Paragraphs A and B). The University also incurs certain educational and administrative expenses to support the residents and the residency programs. The Resident Personnel Policies regulate vacation, sick leave and other excused days for University residents.

17.   The GME Agreement provides that the University "shall assume final responsibility for all administrative and educations aspects" of its sponsored residency programs. (GME Agreement, Part II, "University").

18.   The University must comply with the Accreditation Council for Graduate Medical Education ("ACGME") Program and Institutional Requirement and maintain an administrative system to oversee the residency programs. This responsibility is conducted through the University's GME Committee, Office of Medical Education, and Office of Graduate Medical Education. (GME Agreement, Part II, "University").

19.   I certify that the attached documents are true and accurate copies of the Amended and Restated Definitive Agreement, the Academic Affiliation and Support Agreement, the Graduate Medical Education Agreement and the Agreement for Practitioner Services as maintained by the University of Massachusetts Medical School and in effect in August 2002.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS /9 DAY OF _____, 2006.

_____
Richard Stanton

4

# Exhibit 10

# Part A

GRADUATE MEDICAL EDUCATION AGREEMENT
BETWEEN
UNIVERSITY OF MASSACHUSETTS WORCESTER
AND
UMASS MEMORIAL MEDICAL CENTER, INC.

This Graduate Medical Education Agreement (herein "Agreement") made this 31st day of March, 1998 is between the University of Massachusetts Worcester (herein "University") located in Worcester, Massachusetts and the UMass Memorial Medical Center, Inc. (herein "Medical Center") located in Worcester, Massachusetts.

## PART 1 - MISSION and GOALS

The University, as a publicly supported Medical School, and the Medical Center, as a private, non-profit corporation, with a hospital located at 55 Lake Avenue North, Worcester, MA. 01655 (herein "University Campus"), a hospital located at 119 Belmont Street, Worcester, MA. 01605 (herein "Memorial Campus") and a hospital located at 281 Lincoln Street, Worcester, MA. 01605 (herein "Hahnemann Campus") share a commitment to provide quality patient care and medical education. This mission is pursued through the University's and the Medical Center's participation in and funding of Graduate Medical Education programs which provide scholarly activities and supervised clinical training in an organized, supportive and humane learning environment. The GME Programs sponsored by the University are intended to address physician workforce needs of the Commonwealth and the region, to promote a strong clinical education network, and to provide supervised resident-physician services. The University and the Medical Center have separately entered into an Academic Affiliation and Support Agreement dated as of March 31, 1998 (the "Affiliation Agreement") and a Medical Educational Services Agreement dated as of March 31, 1998 (the "Medical Educational Services Agreement").

A.   EDUCATION
The primary purpose of Graduate Medical Education is to prepare physicians for independent medical specialty practice in accordance with Accreditation Council for Graduate Medical Education Program and Institutional Requirements, and consistent with the eligibility requirements for American medical specialty board certification. The residency and fellowship programs at the University and the Medical Center seek to be academically rigorous, and to be focused on the development of each resident (herein "Resident") as regards knowledge, skills and professional values.

B.   CLINICAL SERVICE
Since an integral part of all residency and fellowship programs is the provision of clinical services to meet practical training and experience requirements, it is expected that University/Medical Center Residents and fellows will provide safe, effective and compassionate patient care services, under qualified faculty supervision, and with opportunities to achieve progressive, incremental clinical responsibilities. The University/Medical Center Graduate Medical Education programs strive for an appropriate balance between supervised clinical service and education, and for appropriate Resident working conditions.

C.   FINANCING

The Medical Center shall pay the University for services provided by the Residents pursuant to Section 3.3 of the Affiliation Agreement and pursuant to the Medical Educational Services Agreement, provided there shall be no duplication of recovery.

D.  PHYSICIAN WORKFORCE
It is expected that the University/Medical Center residency and fellowship programs will address the health care needs of Massachusetts by emphasizing the training of generalist physicians, and of those specialists who might alleviate shortages in geographical and specialty underserved areas within the Commonwealth.

# PART II - MUTUAL RESPONSIBILITIES

UNIVERSITY
The University, as the sponsoring institution of affiliated graduate medical education programs, shall assume final responsibility for all administrative and educational aspects of its sponsored residency and fellowship programs. The University shall comply with the Accreditation Council of Graduate Medical Education (ACGME) Institutional Requirements and shall ensure that all residency and fellowship programs comply with the ACGME Program Requirements. The University shall have in place an administrative system to oversee all residency programs. This responsibility is conducted through the UMass Graduate Medical Education Committee, the Office of Medical Education and the Office of Graduate Medical Education. The University shall consult with the Client Medical Officer of the Medical Center or the designee of the President off UMass Memorial Health Care, Inc. with respect to overall coordination and implementation of the residency and fellowship programs. The University shall ensure that the Medical Center is adequately informed about general and program specific quality and planning GME issues and shall ensure that the Medical Center appropriately participates in the review of the GME programs. A copy of the ACGME Institutional Requirements shall be provided to the Medical Center.

A.  APPOINTMENT AND ASSIGNMENT OF RESIDENTS
The University shall recruit, select, appoint, promote and employ physicians to University graduate medical education programs; and shall assign certain of these Residents to the Medical Center for education and service purposes. Residents are acting as and shall remain employees of the University and shall not, at any time, be considered agents or employees of the Medical Center or its hospitals while performing services under this Agreement. Under no circumstances shall this Agreement be considered a contract of partnership or joint venture between the University and the Medical Center.

B.  LICENSING AND INSURANCE
The University shall ensure that Residents are: 1) qualified for appointment as a member of the house staff; 2) properly licensed to practice medicine as a Resident under supervision in the Commonwealth; and 3) provided with professional liability insurance. The University shall notify the Hospital of the current licensure, appointment and insurance status of each Resident.

C.  PERSONNEL POLICIES

The University shall establish and implement personnel and institutional policies, which shall apply to all Residents appointed by the University, including Residents when assigned to the Medical Center. These policies shall be specified in the University of Massachusetts Resident Personnel Policies.

**D.    PROGRAM DIRECTOR**

The University, through its department chairs (herein "Department Chairs"), shall appoint a single program director (herein "Program Director") for each specialty residency program, who shall have direct and overall responsibility and authority for the program.  The respective Program Directors shall be responsible for providing written educational goals and program design, for recruitment and selection of Residents, for supervision of teaching staff at the University and at the Medical Center, for the overall supervision and evaluation of residents, for the fair application of personnel and institutional policies, and for the general administration of the program. Each program director shall exercise these responsibilities with the cooperation and involvement of the respective teaching staffs at the Medical Center.  The Program Directors shall consult with the Chief Medical Officer or the designee of the President of the Medical Center with respect to overall coordination and implementation of the residency and fellowship programs.

Each named Program Director shall provide in writing an outline of the educational objectives to be achieved while the Residents are assigned to the Medical Center.  To meet this responsibility, each Program Director shall meet at least annually with the teaching staff representatives from the Medical Center.  The purposes of the meetings are to coordinate educational activities, to resolve conflicts, to maintain communications, and to review and evaluate the effectiveness of the program toward meeting educational, clinical service, affiliation and physician manpower goals.

**E.    SUPERVISION**

The University shall establish the faculty supervision, work hour and work environment standards for the Residents, in consultation with the Medical Center.  The University, through appropriate Department Chairs or their designees, shall retain ultimate responsibility for the Residents.

# PART II - MUTUAL RESPONSIBILITIES

## MEDICAL CENTER

The Medical Center shall support the educational goals of each affiliated residency program by providing qualified teaching, supervision, administration and other necessary components of an accredited training program.  Further, the Medical Center must adhere to, and cooperate with the University in meeting, all ACGME Institutional and Program Requirements.  The Medical Center shall cooperate with the University in implementing Residency Program Personnel and Sexual Harassment Policies.  The Medical Center shall provide Residents the opportunities to meet American medical specialty board eligibility requirements and to develop a personal program of learning, to participate in supervised patient care and to participate in their residency program's educational and scholarly activities.  The Medical Center shall designate one or more Medical Center officials who will assume overall administrative and educational responsibility for the Residents while assigned to the Medical Center; these officials shall be a signatory to this Agreement/Contract.  These Medical Center officials shall facilitate communication with the University and shall facilitate the Medical Center's participation in the review of and planning for the University's GME Programs.

F. **EDUCATION**
The Medical Center shall provide to the Residents appropriate opportunities for supervised clinical training and classroom instruction toward meeting established program educational goals. The Medical Center shall acknowledge that some of the individual Residents assigned to and funded by the Medical Center will, from time to time, be at institutions other than the Medical Center for required or elective educational rotations or other educational functions, and that such rotations or off-duty time be included in the Medical Center's payment to the University. The University shall not be totally responsible for providing or funding substitute physician coverage during these absences.

G. **SUPERVISION**
The Medical Center shall, for patient care and related purposes, provide immediate, direct supervision of the Residents. Residents shall report to the division directors, or their designees, of the division to which the Residents are assigned at the Medical Center. Residents, when providing services in the Medical Center, shall abide by all applicable hospital policies, rules, by-laws, regulations and procedures.

The Medical Center shall designate a residency program director for each program included in the Agreement.

H. **EVALUATIONS**
The Medical Center shall ensure that the division director, or designee, of the Medical Center division to which the Residents are assigned shall complete required evaluations of the assigned Residents on the form provided by the University, within the specified time period.

I. **LIABILITY INSURANCE AND WORKERS COMPENSATION**
The Medical Center shall cooperate with the University and its agents in the investigation and defense of incidents involving potential or actual liability involving services by Residents pursuant to this Agreement, including, but not limited to, access to relevant documents and records.

As a condition of professional liability insurance, Residents are required to report to the Medical Center and to the University Residency Program Director the following incidents; these incidents must be reported regardless of where they occur:

1. Unexpected death
   Any of the following which occur as a result of medical intervention:
2. Paralysis, paraplegia, quadriplegia
3. Spinal cord injury
4. Nerve injury or neurological defect
5. Brain damage
6. Total or partial loss of limb, or the use of a limb
7. Sensory organ or reproductive organ loss or impairment
8. Substantial disability or disfigurement

The Medical Center shall, at all times during the term of this Agreement, ensure that each teaching physician on the Medical Center's Medical Staff maintains professional liability insurance or coverage. The Medical Center shall also cooperate with the University in all OSHA, JCAHO and Workers Compensation requests.

J.    WORK-RELATED ILLNESS OR INJURY

The Medical Center shall ensure that any work-related injury, including blood/body fluid exposure, is immediately evaluated, and if necessary, treated on site. The Medical Center shall assist in necessary documentation for Workers Compensation claims in accordance with University requirements.

K.    HARASSMENT AND DISCRIMINATION

The Medical Center will be responsible for taking reasonable steps to maintain an environment and atmosphere in which sexual or other forms of harassment are not tolerated. The Medical Center will be responsible for notifying its employees and attending physicians of its policy on sexual harassment, the support services available to individuals who are the victims of harassment (at that site) and the possible sanctions against individuals who commit such actions. The Medical Center agrees to report any complaints involving Residents to the Office of Graduate Medical Education.

## PART III GENERAL TERMS AND CONDITIONS

A.    NOTICES
All notices under this Agreement will be effective only if in writing and delivered either in-hand, by certified mail or by common carrier providing overnight delivery and confirmation of receipt as follows:

If to the University, to:
Chancellor/Dean
University of Massachusetts Medical Center
55 Lake Avenue North
Worcester, MA 01655

With a copy to:
Associate Dean/Director, Graduate Medical Education
University of Massachusetts Medical Center
55 Lake Avenue North
Worcester, MA 01655

If to the Medical Center, to:
President/CEO
UMass Memorial Medical Center, Inc.
55 Lake Avenue North

Worcester, MA 01655

Either party, by notice given to the other party in accordance with this paragraph, may designate another address or person(s) for receipt of notices or copies hereunder. Any notice required or permitted by this Agreement and given in accordance with this paragraph shall be effective:

(a) upon receipt (i) at the address of the party to whom directed or (ii) by the designated addressee, if delivered in-hand, whichever is earlier; (b) five days after the date of mailing, if by certified or registered mail; or (c) one day after delivery to the carrier, if by overnight carrier.

**B.   PARTIES**
Nothing contained in this Agreement is intended to or shall confer upon any person not a party hereto any rights or remedies, and no person other that the parties hereto shall be required to approve or consent to any amendment or modification of the provisions of this Agreement or any waiver of such provisions.

**C.   ASSIGNMENT**
The rights and obligations created under this Agreement involve the particular purposes, objectives and characteristics of each of the contracting parties and, therefore, neither party shall assign or transfer its rights or delegate any obligations hereunder.

**D.   SEVERABILITY**
If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

**E.   WAIVER**
The failure of a party to insist upon strict performance of any of the terms of this Agreement in any one or more instances shall not be construed to be a waiver or relinquishment of any such rights or provisions, but the same shall remain in full force and effect.

**F.   APPLICABLE LAW**
This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

**G.   AMENDMENT**
This Agreement may be amended by consent of the parties as set forth in a properly executed and written document.

## PART IV FINANCIAL COMMITMENTS

**A.   STIPEND**

The University, in consultation with the Medical Center, shall establish an annual stipend schedule fo each Post Graduate Year (PGY) Level. The annual stipends listed in this Agreement are for a full, 365-day payroll year. The University shall provide a stipend differential for each Chief Resident position. In addition, the University has established a policy for allowing Residents with previous accredited residency training or relevant experience to receive a stipend one PGY level higher than the occupied PGY position. (For example, a Resident who completed a PGY-I Internal Medicine year before entering a PGY-I Emergency Medicine position might receive a PGY-2 stipend.)

**B.   FRINGE BENEFITS**

The University directly incurs costs or is assessed costs by the Commonwealth of Massachusetts for Resident employee benefits, including but not limited to health and life insurance, dental insurance, retirement, workers compensation, and unemployment insurance. Residents have the option of purchasing group long term disability insurance at their own expense through the University.

**C.   MALPRACTICE INSURANCE**

The University shall procure and maintain medical malpractice insurance for Residents. Such insurance shall be allocated among the individual residency program positions utilizing the general classifications of the Medical Professional Mutual Insurance Company.

**D.   ADMINISTRATIVE AND EDUCATION EXPENSES**

The University incurs other expenses to support the Residents and the residency program through the Office of Graduate Medical Education and other University cost centers. These expenses include, but are not limited to, costs of recruitment, selection and orientation of new Residents; accreditation and medical licensure; payroll and other personnel processing; uniforms and name tags; certificates; counseling services; financial aid/debt management assistance; administrative and clerical personnel; education and support personnel and services and related items. The Medical Center acknowledges these costs to the University and is reimbursed for both the direct and indirect costs of such residents; therefore, the Medical Center shall make a contribution to the University toward these costs in an amount to be mutually agreed upon by the parties. The parties agree that the dollar level of funding in the University's fiscal year ended June 30, 1997 shall continue to apply unless and until the parties otherwise agree.

**E.   VACATIONS AND OTHER ABSENCES**

The scheduled annual rotations of Full-Time Equivalent (FTE) positions assigned to and funded by the Medical Center may include planned out-of-Medical Center rotations for vacation and other purposes. The individual Residents occupying an assigned position at the Medical Center may be excused with pay from duty for vacation or sick days or for an approved leave of absence. The University Resident Personnel Policies regulate Resident vacation, sick, leave and other excused days; the implementation and scheduling of vacations varies among specialty residency programs.

Where appropriate, respective University Residency Program Directors and the Medical Center=s division directors may incorporate, under the provisions of this Agreement and with the approval of the

Medical Center's President/CEO and the University's Chancellor/Dean, a rotation schedule identifying expected Medical Center and out-of-Medical Center rotations among the assigned FTE positions.

F.  MEDICARE REPORTING
The University and the Medical Center shall exchange data and documentation required by the Federal Medicare program for timely and complete reporting of the annual count of Resident FTE positions, under the Intern and Resident Information System (IRIS). The University shall respond to reasonable Medical Center requests for information regarding the Medicare Direct Medical Education (DME) Reimbursement and Indirect Medical Education (IME) Adjustment methodologies. The Medical Center shall ensure that each of the Medical Center's hospitals shall provide the University with its annual DME and IME counts and other reasonable information.

To the extent legally permissible, the University shall allocate to the Medical Center a proportional share of the total annual count of Full-Time Equivalent residency program positions which are out-of-Medical Center and not included in any other participating hospital's Medicare DME or IME count, based on the number of Medical Center-funded positions in the respective residency program.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as a sealed instrument this ___ day of _____, 1998.

UNIVERSITY OF MASSACHUSETTS

By: _____

Its: _____

UMASS MEMORIAL MEDICAL CENTER, INC.

By: _____

Its: _____

Exhibit 10

Part B – 1

EXECUTION COPY

## ACADEMIC AFFILIATION AND SUPPORT AGREEMENT

Academic Affiliation and Support Agreement (the "Affiliation Agreement") made and entered into as of the 21st day of March, 1998 by and among UNIVERSITY OF MASSACHUSETTS, an institution of higher education of the Commonwealth of Massachusetts (the "University") on behalf of its academic medical system, including its Medical school (the "Medical School"), UMASS MEMORIAL HEALTH CARE, INC., a Massachusetts nonprofit corporation, ("UMass Memorial"), and UMASS MEMORIAL MEDICAL CENTER, INC., a Massachusetts nonprofit corporation of which UMass Memorial is the sole member (the "Medical Center"). Each of the University, UMass Memorial and the Medical Center are sometimes referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, an Amended and Restated Definitive Agreement executed on March 1998 by and between the University, Worcester City Campus Corporation d/b/a UMass Health System, Inc., Memorial Health Care, Inc., UMass Memorial Health Care, Inc. and UMass Memorial Medical Center, Inc. (the "Definitive Agreement") sets forth the agreements, principles and understandings pursuant to which this Agreement and other agreements by and between the Parties have been executed the date hereof (together, the "Transaction Documents");

WHEREAS, the University includes as an integral part of its academic programs an academic medical system, which currently consists of the Medical School, a graduate school of nursing, a graduate school of biomedical sciences, and various research enterprises (the "Academic System");

WHEREAS, prior to the date hereof, the University operated in conjunction with the Academic System an acute care hospital (the "Teaching Hospital") which as of the date hereof consolidated into the operations of the Medical Center;

WHEREAS, as of the date hereof the Medical Center owns and operates, in addition to the former Teaching Hospital, a second acute care hospital formerly known as Memorial Hospital ("Memorial Hospital") (such hospitals together referred to herein as "the Hospitals," and individually as the "UMass Campus" and the "Memorial Campus," respectively);

WHEREAS, as of the date hereof UMass Memorial is the sole member of the Medical Center and also includes under its ownership or control a broad array of other entities that engage in the provision of health care services and related activities (the "Existing Affiliates");

WHEREAS, UMass Memorial intends to grow the System through merger, consolidation, or acquisition of additional health care entities ("Future Affiliates") over the term

of this Agreement (UMass Memorial, the Existing Affiliates and the Future Affiliates together referred to herein as the "System");

WHEREAS, the University desires to ensure continued access within the System to high quality clinical training sites and to clinical research opportunities and programs by its residents, medical students and other health care trainees under the auspices of the Academic System from time to time;

WHEREAS, the University desires to assure the continuation of the role formerly played by the Teaching Hospital in attempting to respond to the needs of the Commonwealth and its citizens for quality clinical and related health services;

WHEREAS, UMass Memorial and the Medical Center desire to continue to deliver, and to enhance their delivery of, quality medical services to the public;

WHEREAS, UMass Memorial desires to promote medical education, teaching and research by the provision of appropriate training and research sites within the Hospitals and throughout the System as may be appropriate; and

WHEREAS, the Parties are committed to long-term collaboration through a series of operational and financial linkages and shared destinies in order to achieve their mutual objectives, all as described in the Definitive Agreement;

NOW THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows, intending to be legally bound:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, and in addition to the terms defined elsewhere herein, the following terms have the following definitions:

"Academic Affiliates" shall have the meaning set forth in Section 2.1.2.

"Academic System" shall have the meaning set forth in the recitals.

"Affiliation Agreement" shall have the meaning set forth in the preamble.

"Base Payment" shall have the meaning set forth in Section 8.1.

"Chancellor" shall have the meaning set forth in Section 2.1.1.

"Closing Date" shall mean the date on which the transactions contemplated by the Definitive Agreement are closed.

"Combined Score" shall have the meaning set forth in Section 8.1.

"Definitive Agreement" shall have the meaning set forth in the recitals.

"Development Office" shall have the meaning set forth in Article 5.

"Direct Cost" shall have the meaning set forth in §1.21 of the Definitive Agreement.

"Existing Affiliates" shall have the meaning set forth in the recitals.

"Exploit" shall mean to utilize in any manner, including without limitation making, having made, using, selling, leasing, and renting, and in the case of a work of authorship, includes copying or creating derivative works of such work of authorship.

"Foundation" shall have the meaning set forth in Article 5.

"Future Affiliates" shall have the meaning set forth in the recitals.

"Group Practice" means the faculty group practice plan of the University of Massachusetts.

"Hospital Affiliates" shall have the meaning set forth in Section 2.2.2.

"Hospitals" shall have the meaning set forth in the recitals.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due), including any liability for Taxes.

"License Agreement" means the license agreement entered into by UMass Memorial and/or the Medical Center and the University on the Closing Date.

"MBIA Bonds" means that portion of the Massachusetts Health and Educational Facilities Authority Revenue Bonds, Capital Asset Program Issue, Series J-2, the proceeds of which were loaned to the University pursuant to a Financing Agreement dated as of June 8, 1995.

"Medical Center" shall have the meaning set forth in the preamble.

"Medical Center Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Medical School" shall have the meaning set forth in the preamble.

"Memorial" means Memorial Health Care, Inc.

"Memorial Affiliate" or "Memorial Affiliates" shall refer to one or more of Memorial Health Care, Inc., Memorial Hospital, Inc., Memorial Medical Group, Inc., Memorial Services, Inc., or Memorial Ventures, Inc.

"Memorial Campus" shall have the meaning set forth in the recitals.

"Memorial Hospital" shall have the meaning set forth in the recitals.

"Memorial Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Mixed Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Most Recent Balance Sheet" means the combined balance sheet contained within the Most Recent Financial Statements.

"Most Recent Financial Statements" means, with respect to the UMass Clinical Division or any WCCC Affiliate, the audited combined Financial Statements of such entity for the fiscal year ended June 30, 1997, and with respect to any Memorial Affiliate, means the audited Financial Statements of such entity for the fiscal year ended September 30, 1997.

"Net Operating Revenues" means for any fiscal year, Net Service Revenue less all operating expenses, excluding any extraordinary or non-recurring items, the cumulative effect of changes in accounting principles, any gains or losses from the early extinguishment of debt or from the sale or other disposition of investments or fixed or capital assets and also excluding gifts, unrealized gains or losses on investments, interest, dividends and other investment income, as determined in accordance with GAAP consistently applied and audited by an independent certified public accounting firm.

"New Affiliates" shall have the meaning set forth in Section 8.1.1(g).

"Occupancy Agreement" means the long-term occupancy and shared services agreement entered into by UMass Memorial and/or the Medical Center and the University on the Closing Date.

"Occupied Space" means all space made available to UMass Memorial or the Medical Center under the Occupancy Agreement.

"Oversight Group" shall have the meaning set forth in Section 5.1.

"Participation Payments" shall have the meaning set forth in Section 8.1.1.

"Party" or "Parties" shall have the meaning set forth in the preamble.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Physician Advisory Board" means the board reporting to the Board of Trustees of UMass Memorial on all major clinical and care delivery-related issues, and described in Section 6.2.12 of the Definitive Agreement.

"Practice Plan" means the physicians formerly employed by the University and whose services are to be provided to UMass Memorial Physicians.

"President/CEO" shall have the meaning set forth in Section 2.1.1.

"Representative" shall have the meaning set forth in Section 11.1.

"Research Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Self-Insurance Trust" means all assets as of the Closing Date attributable to the "University of Massachusetts Medical Center Self-Insurance Trust" shown on the Most Recent Financial Statements of the University, intended to establish a separate revenue and expense center for the operations of the self-insurance trust maintained to insure activities of the UMass Clinical Division.

"Strategic Plan" means the strategic plan of the System, described in Section 5.1 of the Definitive Agreement.

"System" shall have the meaning set forth in the recitals.

"Teaching Hospital" shall have the meaning set forth in the recitals.

"Transaction Documents" shall have the meaning set forth in the recitals.

"University" shall have the meaning set forth in the preamble.

"UMass Campus" shall have the meaning set forth in the recitals.

"UMass Clinical Division" refers to the Teaching Hospital, the Group Practice, and the Self-Insurance Trust of the University of Massachusetts Medical Center, collectively.

"UMass Clinical System" refers to the UMass Clinical Division, Worcester City Campus Corporation and the health care providers and other organizations controlled by WCCC, collectively.

"UMass Memorial" shall have the meaning set forth in the preamble.

"UMass Memorial Affiliate" means UMass Memorial and its subsidiaries and affiliates (including without limitation the Medical Center) from and after the Closing Date.

"WCCC" means Worcester City Campus Corporation.

## ARTICLE 2

## NATURE OF AFFILIATION

2.1. Designation of Academic and Teaching Hospital Relationship.

2.1.1.  The Academic System will be the sole medical school and clinical teaching program affiliation of the Hospitals and the Existing Affiliates, unless the Chancellor of the Medical School (the "Chancellor") and the President/Chief Executive Officer of UMass Memorial (the "President/CEO") agree to the contrary; provided, however, that in the event the Hospitals need additional residents that the Medical School is unwilling or unable to provide, after notice provided to the Medical School of at least twelve (12) months, then the Medical Center may establish a hospital-based residency program in order to satisfy such unmet need. UMass Memorial may affiliate with other medical schools and health education programs, however, for services and programs not offered by or not otherwise part of the Academic System.

2.1.2.  The Hospitals will be the primary teaching hospitals and clinical training program affiliates for the Academic System's undergraduate and graduate medical education programs and other health training programs.  At the Chancellor's request, UMass Memorial shall use its best efforts to cause each of its Existing Affiliates to serve as training sites for such Academic System training programs.  UMass Memorial shall endeavor to cause Future Affiliates and other hospitals and health care entities that may currently or in the future have contractual clinical affiliations with UMass Memorial or the Medical Center to serve as training sites, at the Chancellor's request, except that any such training affiliations need not be exclusive to the Academic System, and need not be comprehensive to the extent that such arrangements would conflict with other training affiliations in place at such time.  All Affiliates that are serving from time to time as training sites for the Academic System (including without limitation the Hospitals) are referred to herein as the "Academic Affiliates"

## 2.2. Academic Medical Education and Training Programs.

2.2.1. The Medical School shall control decisions regarding academic issues and medical education and training, including, but not limited to, continuing medical education programs of the Parties and rotations and assignments regarding graduate and undergraduate medical education training. All continuing medical education programs and, unless otherwise agreed by the Chancellor, all education and training programs of other health care professionals of the Academic Affiliates shall be conducted by or under the auspices of the Medical School. The Medical School department chairs are responsible for the supervision, direction, and control of residents assigned to the Hospitals. Each resident who receives a stipend through the Medical School or the Medical Center, and/or is appointed to a Medical School integrated residency program is subject to the Medical School Residency Program Personnel Policies. On matters of patient care and professional conduct, residents must also abide by the policies, rules and regulations of the Medical Center and the Hospitals and other Hospital Affiliates at which they are assigned.

2.2.2. All patients seen or treated at the Hospitals or any of the other hospitals that are Academic Affiliates (together, the "Hospital Affiliates") or in connection with any of their programs shall, at all times, be under the supervision and responsibility of an attending physician privileged by the respective hospital. The Hospital Affiliates shall not admit patients whose care and treatment will be provided solely by students or residents.

2.2.3. The Medical School may select and assign undergraduate students to specific clinical clerkships in the Hospital and, as applicable, in the Hospital Affiliates, in a manner and in numbers determined by the respective department chair. The Medical School shall provide the Hospital Affiliates with documentation of appropriate credentials for all undergraduate students and residents assigned to such hospitals by the Medical School.

2.2.4. Any Academic Affiliate has the right to request the Medical School to immediately transfer a student after the reasons therefor have been discussed with the respective Medical School department chair. The student may request a review of a directed transfer in accordance with Medical School policies.

2.2.5. The department chair/division directors of the respective departments and services shall be primarily responsible for assurance and documentation of the quality of the teaching programs for medical students assigned to the Academic Affiliates. Only medical staff members at the Hospital Affiliates with Medical School faculty appointments shall participate in the training of medical residents and shall be responsible for the supervision of undergraduate medical students assigned to the Academic Affiliates. Medical School students while on assignment to the Academic Affiliates shall remain subject to Medical School grading, administrative, and governance policies and procedures as specified in the Medical School

Catalog, the Student Handbook, and as otherwise may be applicable. They shall also abide by all appropriate rules and regulations of any Academic Affiliate at which they are assigned.

2.2.6. The System reasonably shall cooperate to provide clinical trial sites and to participate in clinical trials sponsored by the Medical School. All clinical trials and other research activities conducted by or in the facilities of UMass Memorial or the Hospitals shall be subject to the prior approval of the Chancellor and shall be conducted in accordance with policies and procedures of the University.

2.3. Research, Grants and Intellectual Property Rights.

2.3.1. Definitions. For purposes of this Section 2.3, the following terms have the following definitions, all of which exclude Intellectual Property conceived or developed by private physicians who do not have an independent contractor or employment relationship with UMass Memorial or the Medical Center and as to which neither UMass Memorial nor the Medical Center has any rights:

"Research Intellectual Property" means any Intellectual Property conceived or developed during the course of or otherwise derived from research (whether funded or unfunded) involving any material use of resources of the University or the Medical Center, including clinical drug trials and including clinical outcomes research wholly funded by or through the University but excluding clinical outcomes research wholly funded by UMass Memorial or the Medical Center.

"Medical Center Intellectual Property" means any Intellectual Property that is conceived or developed by any of the employees of UMass Memorial or the Medical Center as part of or is otherwise derived from the System's investment in improving its administrative processes, including, but not limited to, clinical outcomes research wholly funded by UMass Memorial or the Medical Center, data bases, information systems, and software relating to billing, collection, and business management of patients and capitated patient bases, patient lists, and medical records.

"Memorial Intellectual Property" means the Intellectual Property of any of the Memorial Affiliates.

"Mixed Intellectual Property" means any Intellectual Property that is conceived or developed by UMass Memorial or the Medical Center or either of its employees or to the extent it may legally required of independent contractors to do so, its independent contractors or other than Research Intellectual Property or Medical Center Intellectual Property, and specifically including clinical outcomes research not wholly funded by or through any of the University, UMass Memorial, or the Medical Center or wholly funded by the University.

**2.3.2.** *Transfer by Memorial Affiliates of Rights to Memorial Intellectual Property.* Subject to the provisions of Sections 2.3.3.1 and 2.3.3.4, the Memorial Affiliates will fully disclose and transfer to the University ownership and all rights to commercially Exploit Memorial Intellectual Property that they hold as of the Closing.

**2.3.3.** *Research Sponsorship.*

**2.3.3.1.** All funded research activities by UMass Memorial, the Medical Center, or by individuals or New Affiliates as defined in Section 8.1.1 or other Persons whose revenues are included in the Participation Payments, subject to any of their applicable research or employment policies, shall be conducted under the auspices of the Medical School. The Medical School shall be the sponsoring institution designated for all such research grants sponsored by UMass Memorial, the Medical Center, or involving any member of the Medical School Faculty.

**2.3.3.2.** The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate in good faith to resolve any issues concerning the right of UMass Memorial or the Medical Center to pursue and retain grants that are not directly available to the University.

**2.3.4.** *Agreement Concerning Rights to Intellectual Property Arising from Operations of System After the Closing Date.*

**2.3.4.1.** *Disclosure and Assignment of Intellectual Property Interests.* UMass Memorial and the Medical Center shall fully disclose to the University all of the Research Intellectual Property and Mixed Intellectual Property, whether such rights arise on or after the date of the Definitive Agreement. Each of UMass Memorial and the Medical Center shall, to the extent it is legally able to do so, require its employees and independent contractors, who are engaged in research or clinical care activities to assign to UMass Memorial or the Medical Center, as applicable, all rights to Research Intellectual Property and Mixed Intellectual Property arising in the course of or as a result of such activities except to the extent that any such employees or independent contractors are members of the Medical School Faculty and already subject to an obligation to assign any such rights to the University under the Medical School's intellectual property policies; provided, however, that no such transfer shall be required to the extent that any such individuals have independent rights in such Research Intellectual Property or Mixed Intellectual Property prior to the date of the Definitive Agreement or would be permitted to retain such rights under the Medical School's research and intellectual property policies. Rights arising prior to the date of the Definitive Agreement for the benefit of any member of the medical staff of Memorial Hospital shall be retained by such medical staff members.

2.3.4.2. <u>Right to Exploit Research Intellectual Property</u>. The Parties agree that, except as provided in Section 2.3.3.4 below, ownership of all Research Intellectual Property owned by UMass Memorial or the Medical Center shall be transferred to the University and that the University shall have the right, and neither UMass Memorial nor the Medical Center shall have the right, to commercially Exploit such Research Intellectual Property.

2.3.4.3. <u>Right to Exploit Mixed Intellectual Property</u>. The Parties agree that ownership of all Mixed Intellectual Property owned by UMass Memorial or the Medical Center shall be owned jointly and equally with the University and that the Parties shall agree in good faith as to the process by which to commercially Exploit such Mixed Intellectual Property and shall (in the absence of other agreement between the Parties) share equally in the revenues of such commercialization.

2.3.4.4. <u>Retained Rights to Use of Intellectual Property</u>. UMass Memorial and the Medical Center will retain the right to use Memorial Intellectual Property, Research Intellectual Property and Mixed Intellectual Property transferred to the University under Sections 2.3.1 or 2.3.3.2 for their own internal use, and each of them shall have the right to distribute or disseminate such Research Intellectual Property and Mixed Intellectual Property to third parties engaged in non-commercial research, free of cost, under an agreement which restricts use to non-commercial research and which prohibits redistribution or dissemination to others.

2.3.4.5. <u>Right to Exploit Medical Center Intellectual Property</u>. UMass Memorial shall retain ownership of and all rights with respect to Medical Center Intellectual Property, including the right to commercially exploit such Medical Center Intellectual Property, and the University shall not have the right to commercially exploit such Medical Center Intellectual Property. The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate in good faith to resolve any issues concerning the applicability of this Section 2.3.3.5 to any specific item of Intellectual Property.

2.3.4.6. <u>Cooperation</u>. UMass Memorial and the Medical Center will execute, and will cause the Memorial Affiliates to execute any transfers, assignments or other documents reasonably requested by the University and will cooperate fully with the University in order to obtain, register, or convey any Memorial Intellectual Property, Research Intellectual Property, or interest in Mixed Intellectual Property that is required to be conveyed hereunder; provided, however, that actions (other than execution of documents) and costs associated with such registration, conveyance, and similar actions (including without limitation the costs of prosecuting patent applications and similar rights) shall be taken by and at the expense of the University.

# ARTICLE 3

## ACADEMIC AND CLINICAL DEPARTMENTS OF MEDICAL SCHOOL AND MEDICAL CENTER

### 3.1. Academic and Clinical Operating Principles.

3.1.1. The Academic System and the System will develop complementary academic and clinical strategies that are linked through joint investments in academic and clinical programs designed to foster a cooperative and team-oriented approach.

3.1.1.1. The Academic System will have jurisdiction over academic issues (e.g., curriculum development, use of educational funds), and the System will have jurisdiction over clinical issues (e.g., service site location, program development, etc.). The University and UMass Memorial will inform and consult with each other on major changes in mission or operations. The Parties recognize that joint decision-making between the University, UMass Memorial, and the Medical Center will be necessary with respect to decisions that affect all of these entities.

3.1.1.2. UMass Memorial and the Medical Center will continue to have representation on committees of the Academic System that address matters directly related to the operations of the System, including without limitation the following: Education Policy Committee; Graduate Medical Education Committee; Continuing Medical Education Committee; Executive Council; and Faculty Council. Such representatives on such committees will be appointed by the President/Chief Executive Officer of UMass Memorial after consultation with the Chancellor.

### 3.2. Physician Leadership and Organization

3.2.1. General Principles. Except for (i) members of the medical staff of the former Memorial Hospital who did not hold Medical School faculty appointments prior to the Closing and (ii) other individual physicians specifically excluded by approval of the Chancellor, all members of the medical staff of the Medical Center shall be required to have and maintain faculty appointments at the Medical School as requested by the Medical School and to provide a reasonable amount of academic service under the supervision of the Chancellor, at no additional compensation from any of the Parties, (not to exceed more than two hundred (200) hours per year for physicians employed by any UMass Memorial Affiliate or the Practice Plan without the approval of the President/Chief Executive Officer of UMass Memorial and not to exceed fifty (50) hours per year for physicians in private practice without the prior approval of the Board of Trustees of UMass Memorial including, but not limited to, participation in resident training programs). Subject to the limitation set forth in the prior sentence, the annual amount of required academic service shall be determined from time to time by the Chancellor based on the needs of the Medical School and the resources available to it; provided, however that any increase in the

standard number of uncompensated hours to be provided by new employed members of the faculty of the Medical School is subject to approval by the Physician Advisory Board. By mutual agreement of the Chancellor and the Medical Center, the Medical Center may create or may designate specific medical staff categories to which individuals who have been exempted from the faculty appointment requirement may be appointed. The Academic System will work with the System to train, support and place physicians, students, and other health care professionals for community and clinical service in accordance with the Strategic Plan.

### 3.2.2. Organization.

3.2.2.1. Clinical departments of the Medical Center will mirror the organizational structure of the academic departments of the Academic System. The academic department chair and division director of the Academic System will serve as the department chair and division director, respectively, of the corresponding clinical department of the Medical Center and are referred to herein as a "department chair" or "division director" when functioning in either an academic or clinical capacity. The initial clinical chairs will be set forth on a schedule to be delivered at Closing. At least three of the initial chairs will be appointed from among physicians formerly affiliated with Memorial. Unless and until changed by the Board of Trustees of UMass Memorial, at least three of the chairs will have their principal offices at the Memorial campus. The chairs will be responsible for clinical process redesign and enforcement of the proposed redesign.

3.2.2.1.1. Initial vice chairs will be appointed so as to provide representation of both campuses in, the principal offices of the chairs and vice chairs of each department between the UMass Campus and the Memorial Campus.

3.2.2.1.2. Initial division directors will include representatives of the UMass Campus and the Memorial Campus. Departmental chairs will be responsible for appointment of the division directors, in consultation with the chief medical officers of the Medical Center and the Physician Advisory Board ("PAB"), subject to final approval by the President/Chief Executive Officer of UMass Memorial.

3.2.2.1.3. The Medical Center will have a single medical staff with a single chair of each department. The medical staff will include (i) physicians employed by the University whose services are provided under a Contracted Employee Agreement (if any), (ii) physicians employed by UMass Memorial Physicians, Inc., (iii) physicians employed by UMass Memorial Medical Group, Inc. and (iv) private practitioners. The medical staff bylaws shall be consistent with the Definitive Agreement.

3.2.2.1.4. The composition of the employed medical group or groups and the strategy to be pursued by the Medical Center in integrating physicians will be determined by the Strategic Plan.

3.2.2.1.5.  The System will endeavor to establish a primary care physician network that is appropriate in size and location, and whose incentives are appropriately aligned with the System.  The Parties anticipate that the initial target ratio of primary care physicians to specialists will be developed as part of the development of the Strategic Plan.  Thus, desired growth or decrease in the number of specialists will be determined as part of the Strategic Plan.  The Parties anticipate that quality, cost efficiency and productivity will be measured and monitored for all physicians in the network.

3.2.3.  Appointment and Activities of Departmental Chairs.  Academic chairs/ department chairs will be recruited by a search committee appointed by the Chancellor and shall be appointed by the Chancellor with the advice and consent of the President/Chief Executive Officer of UMass Memorial.  During the first three years following the Closing Date, the search committees will be comprised of equal numbers of representatives formerly affiliated with each of the Academic System and Memorial.  The Chancellor and the President/Chief Executive Officer of UMass Memorial will jointly agree upon the recruitment package to be offered to any candidate for the position of academic chair/department chair.  The search committee will include participants from the PAB or their nominees.  The Chancellor and the President/Chief Executive Officer of UMass Memorial will jointly undertake the annual performance review of the academic chairs/department chairs of each department and will agree upon the compensation package for such individuals.  Either the Chancellor or the President/Chief Executive Officer of UMass Memorial may request termination of an academic chair/department chair, with such request to be processed expeditiously and in accordance with appropriate Medical School due process.  Prior to the Closing, the Medical School and Memorial shall endeavor to establish a mutually agreeable process for termination of an academic chair/department chair, with such process to include a final determination no later than three (3) months from receipt of request for termination.  In the event the Medical School and Memorial fail to agree upon such a process, or in the event they agree upon such a process but for any reason a final determination to terminate an academic chair/department chair has not been rendered within the said three (3) month period, then the President/Chief Executive Officer of UMass Memorial may remove such individual from the position of department chair; thereafter, the President/Chief Executive Officer of UMass Memorial may appoint an interim chair with the approval of the Chancellor, which approval shall not be unreasonably withheld.  In the event the President/Chief Executive Officer of UMass Memorial and the Chancellor shall fail to agree upon the appointment of an interim department chair, then a four (4) member subcommittee of the Board of Trustees of UMass Memorial shall appoint the interim department chair, and the Chancellor and the President/Chief Executive Officer shall each designate two (2) trustees to serve on such subcommittee.

3.2.4.  Accountability.  All research activities will be managed and governed by the University, and the academic chairs of each department will be responsible for establishing mechanisms to ensure accountability for satisfactory use of clinical time.

3.2.5. <u>Clinical Services to the Commonwealth</u>. The System will endeavor to respond to the need of the Commonwealth for clinical services as identified by the Academic System.

3.3. <u>Cross Funded Employees</u>.

The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate with each other with respect to the establishment and cost allocation of compensation of individuals serving in dual capacities on behalf of the Medical School and UMass Memorial and/or the Medical Center, all as set forth more specifically below.

3.3.1. <u>Payments</u>. The Medical Center will supply the University with the services of certain individuals who also provide services to the Medical Center (the "Cross Funded Employees") for teaching, research, and other purposes. The University will supply the Medical Center with the services of certain individuals for clinical purposes. The proposed annual funding by each of the University and the Medical Center for such Cross Funded Employees shall be established pursuant to Section 3.3. Each of the University and the Medical Center will be reimbursed on a weekly basis, in arrears, for the cost of salaries and benefits of the Cross Funded Employees.

3.3.2. There will be no reduction in the aggregate dollar value of professional and support services provided by Cross Funded Employees and paid for by either of the University or the Medical Center during the University's fiscal year ending June 30, 1999 below the actual level incurred in the fiscal year ending 1998.

3.3.3. Prior to March 31, 1999, and prior to March 31 of each subsequent year during the term of this Agreement, each of the University and the Medical Center will present a proposed budget to the other setting forth proposed requirements under this Section 3.3 for the University's fiscal year commencing on July 1 of such year. The University and the Medical Center will negotiate in good faith to reach agreement with respect to the proposed level of services to be provided hereunder.

3.3.4. The Parties agree that the mutual goal of promoting and supporting research and teaching activities must be tempered by the economic realities of operating a fiscally sound clinical system. The Parties further agree that it is desirable, within the constraints of fiscal responsibility, to continue to support a broad range of physicians and other academic researchers. Accordingly, the Parties agree to support the applicable departmental chairs and to consider and attempt to accommodate continued financial support for the Cross Funded Employees and to cooperate in the chair's efforts to locate alternative funding sources for temporary interruptions or changes in financial other support for such individuals, including use of the Departmental Education Funds. The Parties agree that, in the event adequate funding is unavailable from either of the University or the Medical Center or from alternative funding sources for a particular Cross Funded Employee, the individual, if a

# Exhibit 10

# Part B – 2

physician, shall remain free to practice as a private physician in the community, but the University agrees that it will not object if the chair refuses to allow such individual to continue his academic appointment if such individual becomes employed, directly or indirectly by any licensed health care provider or affiliate thereof (excluding UMass Memorial and its affiliates) and continues to provide services in Worcester County. Anything to the contrary herein notwithstanding, each of the Medical Center and the University acknowledges and agrees that the other party shall retain authority to establish the salary and benefits, and to terminate or otherwise alter the terms and conditions of employment of the Cross Funded Employees employed by it; provided, however, that with respect to the Cross Funded Employees remaining employed by the University during the transition period contemplated by the Agreement for Practitioner Services, the Medical Center's authority with respect to such Cross Funded Employees shall be determined in accordance with the applicable Agreement for Employee Services. In the event of a proposed termination of the employment of any Cross Funded Employee, or any reduction in hours, salary or other compensation of such individual, the University and the Medical Center shall share in the severance costs, if any, of such Cross Funded Employee in proportion to the percentages each party was responsible for funding such employee immediately prior to such termination or reduction.

3.3.5. [Reserved.]

3.3.6. <u>System Support for Faculty Academic Pursuits</u>. In implementing the procedures set forth in Section 3.3.4 and subject always to the right of the Medical Center to establish salary and benefits, and to terminate or otherwise alter the terms and conditions of employment of the Cross Funded Employees, UMass Memorial and the Medical Center shall work with the department chairs in their efforts to define faculty compensation and allocate patient care and other responsibilities in order to promote academic and research efforts consistent with the mission of the Medical School.

## ARTICLE 4

## DEPARTMENTAL EDUCATION FUNDS

All academic funds (net assets) derived from the Group Practice and held by the University as of the Closing Date, including the net assets in the fund labeled "Group Practice Plan Fund Balance" on the Most Recent Balance Sheet of the UMass Clinical Division will remain assets of the University and will be held by the Medical Center as agent for the University and allocated to each academic department regardless of whether the department chair was formerly affiliated with UMass Clinical System or Memorial. The funds shall be transferred by the Medical Center, as agent, to the University pursuant to the provisions of Section 13.1.4. of the Definitive Agreement. Expenditures from such funds will be made upon the prior approval of the Chancellor and President/Chief Executive Officer of UMass Memorial.

Immediately after the Closing, UMass Memorial shall, in consultation with the department chairs and the Chancellor, undertake and complete within six months of the Closing a review of the method of funding academic support payments from the Practice Plan to the clinical departments of the Medical Center (the "Departmental Education Funds"). The ten percent (10%) level of funding of the Departmental Education Funds in effect as of the date of execution of this Agreement (excluding the annual transfer of "Residual Earnings" as calculated pursuant to the Rules and Regulations of the Group Practice Bylaws in Exhibit Q) shall remain in effect until such time as the review of the method of funding has been completed. Thereafter, UMass Memorial shall have the right to substitute a new method after consultation with the Chancellor; provided however that the dollar level of funding for fiscal year 1996 shall be maintained unless and until the Chancellor and the President/Chief Executive Office of UMass Memorial shall otherwise agree.

Expenditures from the Departmental Education Funds during the year in which related income is earned will be made by the Medical Center, in accordance with the budget approved by the Chancellor and the President/Chief Executive Officer of UMass Memorial. The balances, if any, remaining in the Departmental Education Funds each year following reconciliation of such approved expenditures as of the end of September (which shall expressly exclude all Residual Earnings as defined in Exhibit Q or other portion of annual net income), together with all accrued interest earned thereon, shall be transferred to the appropriate academic departments of the Medical School within one hundred twenty (120) days of such reconciliation date. In the event that any such remaining balances are not transferred within such time, such untransferred amounts shall accrue interest from the end of UMass Memorial's fiscal year as to which such reconciliation applies at the Late Payment Rate. The System and the Academic System will work together in the future to identify additional sources of funds to subsidize less lucrative academic departments.

## ARTICLE 5

## DEVELOPMENT ACTIVITIES

The Medical School development office (the "Development Office") shall be the sole development office that will conduct the fund raising and development efforts for the Medical School and all UMass Memorial Affiliates in existence on the Closing Date (the "Existing Affiliates"). Prior to the Closing, UMass Medical Center Foundation, Inc. shall amend its articles and bylaws in the forms attached hereto as Exhibits B and C, respectively, to change its name to UMass Memorial Foundation, Inc. (the "Foundation") and to provide that the predecessor entities shall appoint an equal number of board members of the Foundation. The Foundation shall provide advice and assistance to the Development Office in such efforts. The Chancellor shall serve, ex-officio, as the Chief Executive Officer of the Foundation, and such other staff as may be required will be provided by the Medical School. All fund raising efforts and approaches to potential donors on behalf of the Medical School, the System, and the Existing Affiliates shall be conducted by the Development Office. The Development Office may conduct fund raising efforts on behalf of entities that become affiliated with System after the Closing

Date by mutual agreement of the Chancellor and the President/Chief Executive Officer of UMass Memorial, but in no event shall UMass Memorial conduct independent fund raising efforts for such new affiliate, (although such new affiliate may conduct its own fund raising efforts provided it does not use the "UMass" name).

5.1. <u>Oversight Group</u>. A Development Office oversight group, appointed by the Chancellor and including the President/Chief Executive Officer of UMass Memorial (the "Oversight Group"), shall be responsible for approving fund raising plans and strategies for contacting potential donors and resolving outstanding issues relating to distributions of the funds raised by the Development Office. The Development Office's annual plans and strategic plans shall be adopted with the advice and consent of the President/Chief Executive Officer of UMass Memorial.

5.2. <u>Clinical Fundraising Division</u>. A specific division shall be established within the Development Office that shall be responsible for implementing the Development Office's development efforts for the System. The head of this division shall be appointed by the President/Chief Executive Officer of UMass Memorial, subject to the approval of the Chancellor.

# ARTICLE 6

## <u>ACADEMIC AND OPERATIONAL INTEGRATION</u>

Academic and Operational Integration shall be governed by the provisions of Section 3.1 of this Agreement.

# ARTICLE 7

## <u>USE OF NAME</u>

Use of the name "UMass" shall be governed by the License Agreement. So long as the License Agreement is in effect, UMass Memorial shall consistently use the Marks (as defined in License Agreement) in its name and in all of its operations and general publicity materials, in accordance with and subject to the License Agreement, and shall cause the UMass Memorial Affiliates in existence on the Closing Date and any New Affiliates that have an academic affiliation agreement with the University to use the Marks in their names, operations or in all general publicity materials in accordance with and subject to the License Agreement, unless otherwise agreed by the University. The University agrees not to grant a license to use the name "UMass" or permit any entity (other than a UMass Memorial Affiliate) to use such name as part of the name of any health facility (excepting only student health facilities, including the existing Amherst facility, which serves patients in addition to students) or physician group; provided,

-17-

however, that the University may grant a license to use the name "UMass" to a publicly-owned hospital.

## ARTICLE 8

## ACADEMIC SUPPORT

The System agrees to make the following payments to the University on the terms and conditions set forth herein. UMass Memorial and the Medical Center shall be jointly and severally liable for all amounts set forth in Sections 8.1 and 8.1.1.

8.1. Baseline Support. The System has agreed to make a specific annual payment to the University during the term of this Affiliation Agreement so long as the University continues to operate a medical school. The University hereby acknowledges and agrees that, except with respect to claims for coverage under the Self Insurance Trust relating to coverage prior to the date the Self Insurance Trust is transferred to a UMass Memorial Affiliate or designee under Section 10.4 of the Definitive Agreement, from and after the Closing Date it shall have no right to and shall not attempt to claim any right to any portion of the Self Insurance Trust including income or appreciation thereon (other than in connection with the obligation of UMass Memorial or the Medical Center under Section 10.4 of the Definitive Agreement to provide tail coverage and otherwise indemnify the University and its employees who were covered by the Self Insurance Trust prior to Closing) or to assess a "Medical School Tax", "Dean's Tax" or other charge against clinical or professional revenues (other than the Departmental Education Fund Tax described in Article IV and the Participation Payment described in Section 8.1.1) generated by any of the UMass Memorial Affiliates (or any future Subsidiary thereof) or any employees or independent contractors thereof and, except as provided in the Occupancy Agreement or otherwise agreed to in writing by the University and the Medical Center or any other UMass Memorial Affiliate, no other charges shall be assessed against or with respect to the clinical facility or otherwise. The Medical Center will pay the University an annual "par level" baseline support payment during the term of this Affiliation Agreement of Twelve Million Dollars ($12,000,000) (the "Base Payment"), subject to an annual adjustment for inflation by the COLA, payable in twelve (12) equal installments of One Million Dollars ($1,000,000) monthly, in arrears, on the fifteenth day of each month commencing after the first full month after the Closing, subject to inflationary adjustments on each anniversary during the term of this Affiliation Agreement as set forth herein; provided, however, that if the Closing occurs other than on the last day of a calendar month, the monthly payment shall be pro-rated for the number of days elapsed in the month following the Closing Date; and provided, further, that the Parties agree the existing Medical School Tax as defined in the Rules and Regulations Relative to the Operation and Governance of the Group Practice as set forth in Exhibit Q of the Definitive Agreement in effect prior to the Closing Date shall be continued through the end of the calendar month of the Medical Center during which the Closing occurs, and there will be a credit against

the $1,000,000 monthly support payment equal to the amount paid by the Practice Plan (or any successor entity) in payment of such Medical School Tax during such partial calendar month.

As more fully set forth in the Occupancy Agreement, in the event the Medical School closes during the term of the Occupancy Agreement, then from and after the date of such occurrence, the System will be relieved of all obligation to pay baseline support under this Section 8.1, and the University and the System shall negotiate a lease arrangement to permit continued occupancy of the Occupied Space at fair market value subject to certain adjustments set forth therein, all as further set forth in the Occupancy Agreement.

There shall be an adjustment to the Base Payment and the Participation Payment in the event of a material change in the enrollment of medical students at the University or a material decline in restricted research expenditures at the Academic System calculated in accordance with the provisions of this Section 8.1.

The adjustment shall be calculated by reference to a system of 200 points. Of the 200 points, 100 shall be attributable to student enrollment and 100 shall be attributable to restricted research awards. The Parties agree that the number of first year medical students enrolled at the University as of January 1, 1997 was 100 and that this shall be deemed equivalent to 100 points. The parties agree that the level of restricted research expenditures on the Most Recent Balance Sheet of Medical School Academic System for the academic year ending June, 1996 was $32,139,000 and that this level shall be deemed equivalent to 100 points.

In the event the number of first year medical students enrolled at the University as of January 1 of any year during the term of this Affiliation Agreement is less than the level set forth above, then the number of points attributable to student enrollment for that year shall be reduced to a number equal to one hundred (100) times a fraction, the numerator of which is the number of students enrolled as of January 1 in that year and the denominator of which is the number of students enrolled as of January 1, 1997.

In the event the dollar value (held constant to 1996 dollar values by adjustment to the COLA) of restricted research expenditures received by the University for the academic year in which the calculation occurs is less than the level set forth above, then the number of points attributable to restricted research expenditures for that year shall be reduced to a number equal to one hundred (100) times a fraction, the numerator of which is the dollar value of restricted research expenditures received by the University in that academic year (held constant to 1996 dollar values by adjustment to the COLA) and the denominator of which is the dollar value of 1996 restricted research expenditures.

The sum of the points for student enrollment and restricted research expenditures is herein referred to as the "Combined Score." If the average of the Combined Score for any three consecutive years during the term of this Affiliation Agreement is less than 100, then the Base Payment and the Participation Payment referred to in Section 8.1.1 shall be reduced

proportionally from what they would have been. By way of example only and not as a limitation, if the average Combined Score for three consecutive years is 80, then the Base Payment and the Participation Payment shall be reduced to 40% of what they otherwise would have been. If in either of the two years immediately following the year in which such a proportional reduction occurs , the average Combined Score for the prior three (3) years increases to above 100, then the Base Payment and the Participation Payment shall be restored in that year to the levels they would have been but for the prior reduction.

If the Combined Score is less than 100 in two consecutive years following such a reduction (i.e., there are three consecutive years of reduced Base Payment and Participation Payment), then the Parties shall in good faith renegotiate a reduction in the payment provisions of Section 8.1. and 8.1.1, but in no event shall the reduced payment level be less than the fair market value of the use of the Occupied Space subject to adjustment as set forth in the Occupancy Agreement, and in the event the Parties cannot agree upon the renegotiated payment level, the matter shall be resolved pursuant to arbitration in accordance with Section 11.1.

8.1.1.  Participation Payments.  The University will be entitled to a percentage of the Net Operating Revenues of the System generated in each fiscal year during the term of this Affiliation Agreement and commencing after the Closing Date (the "Participation Payments") in accordance with the following schedule, payable within 120 days after the end of each fiscal year and prorated for any partial years as set forth in subparagraph (c) below:

(a)    when Net Operating Revenues are positive and between 0% and 2% of Net Service Revenues, an incentive of 10% of Net Operating Revenues will be paid;

(b)    when Net Operating Revenues are between 2.01% and 3% of Net Service Revenues, an incentive equal to base (defined as "a" above) plus 15% of the incremental Net Operating Revenues above 2% will be paid;

(c)    when Net Operating Revenues are between 3.01% and 4% of Net Service Revenues, an incentive equal to base (defined as "b" above) plus 25% of the incremental Net Operating Revenues above 3% will be paid;

(d)    when Net Operating Revenues are between 4.01% and 5% of Net Service Revenues, an incentive equal to base (defined as "c" above) plus 30% of the incremental Net Operating Revenues above 4% will be paid;

(e)    when Net Operating Revenues are between 5.01% and 6% of Net Service Revenues, an incentive equal to base (defined as "d" above) plus 28% of the incremental Net Operating Revenues above 5% will be paid;

(f)    when Net Operating Revenues equal or exceed 6.01% of Net Service Revenues, an incentive equal to base (defined as "e" above) plus 28% of the incremental Net Operating Revenues above 6% will be paid.

(g)    In the event that any Person is combined or consolidated on the audited financial statements of UMass Memorial after the Closing (a "New Affiliate") then if and to the extent the principal place of business of such Person is located in Worcester County, Massachusetts or such Person is listed on Exhibit P of the Definitive Agreement, the Participation Payments set forth in Section 8.1.1 hereof shall apply to the combined Net Operating Revenues of UMass Memorial including the New Affiliate unless (a) the Parties otherwise agree in writing or (b) the New Affiliate is an insurance company, health maintenance organization, or similar entity; and in any event the Participation Payments set forth in Section 8.1.1 shall include any mobile institutional health care service operating at more than one fixed location, such as mobile catheterization services, mobile magnetic resonance imaging service, or mobile CAT scanners.

(h)    In the event this Affiliation Agreement commences or terminates other than on a date coinciding with the end of a fiscal year of the Medical Center, the Participation Payment shall be prorated during any partial fiscal year based on the number of days elapsed during the portion of the fiscal year during which this Affiliation Agreement is in effect divided by 365; provided, however, that with respect to the Participation Payment during the first partial fiscal year, there shall be included in the calculation of Net Operating Revenues only the Net Operating Revenues attributable to operations from and after the Closing Date. The University shall have the right, at its expense, to audit or otherwise review the determination of Net Operating Revenues of the System.

8.1.2.    Debt Service Support. The Medical Center shall expressly assume (i) all obligations to pay to the Trustee for the MBIA Bonds at the times when due all obligations of the University with respect to principal and interest on the MBIA Bonds and (ii) all other obligations of the University under that certain Financing Agreement dated as of June 8, 1995 relating to the MBIA Bonds, all as set forth in an assumption agreement to be in form and substance satisfactory to the Parties and the insurer of the MBIA Bonds. The University agrees to cooperate fully with the System with respect to any defeasance, refunding, refinancing, or restructuring of said debt obligations, and the System shall be entitled to retain all savings (if any) of any such defeasance, refunding, refinancing, or restructuring of said debt. In no event shall the University be obligated to become directly or indirectly liable (by guaranty or otherwise) for any such defeasance, refunding, refinancing, or restructuring of said debt. The University shall take no action that shall adversely affect the status of interest on the MBIA Bonds as exempt from federal income taxation or otherwise cause the MBIA Bonds to be in default.

8.1.3.    Shared Services. The Parties agree that the University and the System will continue to share and purchase certain goods and services from each other to the extent provided in and in accordance with the terms of the Occupancy Agreement at cost.

8.1.4.  Former Related Party Budgeted Transactions.  If and to the extent previously reflected on the Combining Statement of Operations in the most recent Financial Statements, services or goods previously purchased or sold to or from the UMass Clinical System by or from the Academic System will continue to be so purchased or sold at cost until the Parties shall otherwise mutually agree.

## ARTICLE 9

## AGREEMENT TO BE RESPONSIVE TO NEEDS OF THE COMMONWEALTH

### 9.1.  Service to the Community

The Parties recognize the University's historic efforts to respond to the Commonwealth's need for clinical and related health care services for its citizens. Such efforts have included the provision to the public of both highly specialized services, particularly to the extent not available through other area services, and community-based primary care services. Within the realm of primary care, the University has actively developed and continually worked to enhance a primary care network, in connection with which it has provided resident physicians to various community health centers and programs to deliver needed services, and has supported community-based education for health care providers, students and workers. UMass Memorial and the Hospitals agree to continue to endeavor to respond to the State's and the community's needs as they may be identified from time to time by the Chancellor.

Such community and state needs will be among the factors taken into consideration by the strategic planning process of UMass Memorial in decisions concerning new program development, expansion or contraction of existing services, the location of clinical training sites, resource allocation, and other decisions that have a potential significant impact on the meeting of such needs.

### 9.2.  Covenants with Respect to Medicaid Contracts.

As of or subsequent to the Closing, the University and the Medical Center shall enter into a Medical Educational Services Agreement and the Medical Center shall enter into a Medicaid Provider Agreement, all as set forth in Sections 10.8 and 10.9 of the Definitive Agreement.

## ARTICLE 10

## TERM AND TERMINATION

### 10.1.  Initial Term; Renewal.

This Agreement shall remain in full force and effect for a period of ninety-nine (99) years from the date hereof, and shall expire on March 30, 2097. Following the expiration of such term, the Parties intend to renegotiate this Affiliation Agreement and the relationships created hereby, subject to compliance with all applicable law, and intend that at least three (3) years prior to such date, UMass Memorial, the Medical School, and the Medical Center will convene a special task force, to be comprised of at least the Chancellor and the President/CEO, in order to review the accomplishments of the Affiliation, current and projected medical and health care professional education needs within the Commonwealth of Massachusetts, and the status of and trends in the health care needs of the population of the Commonwealth of Massachusetts; and to work in good faith to determine in what manner the affiliation should be continued, and to take or to cause to be taken such actions as may be necessary to permit to continue without interruption such an affiliation as may be appropriate.

10.2. Termination.

This Agreement may be terminated prior to the expiration of the term hereof only in accordance with the provisions of this Section 10.2.

10.2.1. If the University ceases to operate a Medical School, then at the election of and upon written notice provided by the President/Chief Executive Officer of UMass Memorial, (i) this Affiliation Agreement shall terminate and (ii) the obligation of UMass Memorial and the Medical Center to make any payments under Section 8.1 [Base Payments] or 8.1.1 [Participation Payments] shall cease, and (iii) in accordance with the Occupancy Agreement, UMass Memorial shall in good faith negotiate a lease arrangement for the Occupied Space with the University at fair market value subject to certain adjustments set forth in the Occupancy Agreement.

10.2.2. Subject always to the provisions of the Occupancy Agreement, which shall control with respect to the rights of parties concerning all defaults or Events of Default as described therein, if UMass Memorial fails to pay when due any amounts under the Definitive Agreement, this Affiliation Agreement, or the Occupancy Agreement, then, (unless such failure is otherwise the subject of a specific remedy in the Occupancy Agreement), after ninety (90) days written notice and failure to cure within said ninety (90) day period, at the election of and upon written notice provided by the Chancellor, this Affiliation Agreement, the License Agreement, and the Occupancy Agreement shall terminate, and the University shall retain all remedies at law or in equity. This Section shall not be construed to alter any of the provisions of the Occupancy Agreement with respect to the termination of the Occupancy Agreement or late payments made thereunder.

10.2.3. If the University fails to pay when due any amounts under the Occupancy Agreement, then, after ninety (90) days written notice and failure to cure within said ninety (90) day period, at the election of and upon written notice provided by the President/Chief Executive

-23-

1157459 11

Officer of UMass Memorial, the Occupancy Agreement shall terminate, and UMass Memorial shall retain all remedies at law or in equity.

# ARTICLE 11

## DISPUTE RESOLUTION

In the event that any dispute arises under any provision of this Agreement, or in the interpretation of its terms, which cannot be resolved between the Chancellor and the President/CEO, any Party may invoke the binding arbitration provisions as set forth in Section 11.1 below, except that the University, on the one hand, and UMass Memorial and/or the Medical Center, on the other hand, shall each bear one-half the costs and expenses of the mediator, any third parties selected by the mediator to assist in resolving the dispute, and the costs associated with any subsequent arbitration.

11.1. Arbitration. If a dispute arises under this Agreement which cannot be resolved by the personnel directly involved, any Party may invoke the procedures set forth in this Section by giving the other Parties written notice of the dispute, in which case such Party shall designate a person with decision making authority (the "Representative") to act on behalf of the disputing Party in the dispute. The other Parties shall be required to respond to the disputing party's notice within twenty (20) days of receipt by designating in writing its own Representative. The Parties agree to use the following procedure prior to any Party pursuing other available remedies.

11.1.1. The Parties, acting through their respective Representatives, shall meet at a mutually acceptable time and place within twenty (20) days after the non-disputing Parties designates its Representative to the disputing Party. The Representatives shall attempt in good faith to negotiate a resolution of the dispute.

11.1.2. If, within thirty (30) days after the first meeting of the Representatives the Parties have not succeeded in negotiating a resolution of the dispute, they agree to submit the dispute to mediation in accordance with Commercial Mediation Rules of the American Arbitration Association.

11.1.3. The Parties will jointly appoint a mutually acceptable mediator to mediate the dispute. If the parties are unable to agree on a mutually acceptable mediator within twenty (20) days of the conclusion of the negotiations, then the Parties shall request the American Arbitration Association to assist the parties in finding a mutually acceptable mediator. Each party shall bear its own costs incurred in the mediation and UMass Memorial and/or the Medical Center, on the one hand, and the University, on the other hand shall bear one-half the costs and expenses of the mediator and any third parties selected by the mediator to assist in resolving the dispute.

11.1.4.   The Parties agree to participate in good faith in the mediation and negotiations related thereto for a period of thirty (30) days.  If the Parties do not resolve the dispute through mediation within such period, any Party may submit the matter to binding arbitration before a three member panel of arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

11.1.5.   The entirety of this Section is intended to be fully enforceable in accordance with the Uniform Arbitration Act for Commercial Disputes, including but not limited to, all provisions relating to mediation.  Notwithstanding anything herein to the contrary, nothing in this Section shall preclude any Party from seeking interim or provisional relief in the form of a temporary restraining order, preliminary injunction or other interim relief concerning the dispute, either prior to or during the proceedings provided for in this Section, if such action is deemed necessary to protect the interests of such Party.

11.1.6.   [Reserved.]


## ARTICLE 12

## MISCELLANEOUS

12.1.   Consistency of By-Laws, Rules, Regulations and Policies.

UMass Memorial and the Medical Center shall adopt and keep in effect bylaws, rules, regulations and policies, and the Medical Center shall adopt and keep in effect medical staff bylaws, all of which are consistent with the terms of this Agreement, except to the extent prohibited by applicable law or accreditation requirements.

12.2.   Entire Agreement.

This Agreement and the Definitive Agreement represent the entire understanding of the Parties with respect to the subject matter hereof, and supersede any and all prior understandings with respect thereto.  No amendment of this Agreement shall be effective unless reduced to writing and signed by each of the Parties.

12.3.   Definitions.

To the extent that any capitalized term is not specifically defined within this Agreement, such term shall have the same meaning as it has in the Definitive Agreement.

12.4.   Waiver.

The waiver by any Party of any breach of this Agreement by any other Party or the waiver of any term of this Agreement shall not be deemed to be a waiver of any subsequent breach and shall not prevent subsequent enforcement of any such term.

## 12.5. Assignment.

This Agreement shall be binding upon the Parties and their respective permitted successors and assigns. No party may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other parties; provided, however, that Memorial and/or UMass Memorial may direct the allocation of assets to be conveyed hereunder or under any document contemplated hereby to any entity controlled by them (or, with respect to the Self Insurance Trust, to a so-called captive insurance company in accordance with the provisions of Section 10.4 of the Definitive Agreement), and further provided that UMass Memorial and the Medical Center may assign this Agreement to the surviving entity in the event UMass Memorial or the Medical Center merges, combines or consolidates with another entity. In the event the Medical School combines, merges, or consolidates with another Medical School without the consent of the Board of Trustees of UMass Memorial (which shall not be unreasonably withheld but which may take into consideration, in addition to other factors, the support of any successor medical school for any competitor of any UMass Memorial Affiliate in Worcester County), then the President/Chief Executive Officer of UMass Memorial may propose to the University a reduction in payments under Article 8, and, subject always to the provisions of Section 12.8, the University and UMass Memorial shall agree upon such reduction, if any, as is appropriate. In the event the University and UMass Memorial fail to agree upon any proposed reduction, the matter shall be resolved pursuant to arbitration in accordance with Section 11.1.

## 12.6. Notices.

All notices hereunder shall be deemed to have been given when delivered in person or one day after sending by reputable overnight delivery service or three (3) days after mailing by certified mail, return receipt requested, addressed to any Party at its address set forth below or at any other address of which any Party notifies the others in writing.

If to University of Massachusetts, to :

Chancellor
University of Massachusetts
18 Tremont Street
Boston, MA 02108

If to UMass Memorial Health Care, Inc. or
UMass Memorial Medical Center, Inc., to:

President/Chief Executive Officer
UMass Memorial Health Care
119 Belmont Street
Worcester, MA 01605

12.7. <u>Governing Law</u>.

This Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

12.8. <u>Good Faith and Fair Dealing</u>.

The University and UMass Memorial shall meet annually to assess the overall arrangement to consider such adjustments as may be appropriate and mutually agreeable to facilitate the satisfactory implementation of the purposes of this Agreement. Each Party agrees to cooperate in good faith and to deal fairly with the others in attempting to effect the transactions contemplated by this Agreement as well as performance of any obligations required hereunder subsequent to the Closing.

12.9. <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as a sealed instrument this 31st day of March, 1998.

UNIVERSITY OF MASSACHUSETTS

By: _____
Its: _____Chancellor_____

UMASS MEMORIAL HEALTH CARE, INC.

By: _____
Its: _____President/Chief Executive Officer___

UMASS MEMORIAL MEDICAL CENTER, INC.

By: _____
Its: _____President/Chief Executive Officer___

1137429.09

-28-

**Exhibit 10**

**Part C**

[FORM OF]

## AGREEMENT FOR PRACTITIONER SERVICES

THIS AGREEMENT, made and entered into as of this _____ day of _____, 19__, by and between the University of Massachusetts (the "University"), an institution of higher education of the Commonwealth of Massachusetts and [UMass Memorial affiliate] (the "Medical Group"), a Massachusetts not-for-profit corporation that provides professional medical services and is organized to support the purposes of UMass Memorial Medical Center, In, (the "Medical Center"), a Massachusetts not-for-profit corporation that operates two hospitals known as the "Memorial Campus" and the "UMass Campus." Each of the University and the Medical Group are sometimes referred to herein as a "Party" and collectively as the "Parties."

## WITNESSETH:

WHEREAS, legislation enacted by the General Court of the Commonwealth of Massachusetts, St. 1997, C. 163 (the "Legislation"), authorizes a transaction (the "Transaction") in which health care facilities owned and operated by the University, an instrumentality of the Commonwealth, will be operated together with health care facilities of Memorial Health Care, Inc. ("Memorial"), a private not-for-profit corporation, by one or more "medical service entities" which are not-for-profit corporations that will not be agencies or instrumentalities of the Commonwealth; and

WHEREAS, terms of the Transaction are set out in a document approved on February 12, 1997 by and among the University, Worcester City Campus Corporation, and Memorial, as amended and restated (the "Definitive Agreement") and related agreements as they may be amended from time to time; and

WHEREAS, prior to the date hereof and in conjunction with the UMass Medical Center, the University has operated a medical group practice (the "Group Practice Plan") comprised of physicians and Ph.D. clinical practitioners (collectively, "Practitioners") as an unincorporated division, through which the University now wishes to provide professional services through the Medical Group to the patients of the Medical Center and to the general public;

WHEREAS, the Medical Group is a "corporation," as provided in the Legislation, which will employ as of the date hereof many of the Practitioners employed prior to the date hereof by the University as part of the Group Practice Plan; and

1190959.05

WHEREAS the Legislation and the Definitive Agreement authorize and require that the University enter into agreements with a "corporation" with respect to Practitioners whose employment is not transferred to the Medical Group as of the closing of the Transaction (the "UMass Practitioners"), so that services of the UMass Practitioners may be available to the Medical Group under terms which provide for (a) the continued delivery of essential services to the Medical Group by the UMass Practitioners, (b) the preservation of certain benefits and employment status for the UMass Practitioners and (c) respect for the rights of the UMass Practitioners who are members of collective bargaining units at the University during the term of this Agreement; and

WHEREAS, the transaction was authorized by the Legislation to assure the continuation of the historic role played by the University in response to the needs of the Commonwealth and its citizens for quality clinical and related health services that may be unavailable or otherwise difficult to obtain and to assure continued access to and availability of the facilities operated by the Medical Center for the students, residents and faculty of the Medical School of the University;

WHEREAS, the Legislation provides for a comprehensive transition plan under which most of the employees of the University's Clinical Division will be offered employment with the Medical Center or the Medical Group shortly after the transaction, while those employees who have obtained or soon will obtain a vested status in the State Employees' Retirement System will be permitted to remain employees of the University until February, 2008, but not thereafter, so as to minimize the inconvenience and economic uncertainty for these vested and soon to be vested employees.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties agree as follows:

1.   Retention and Engagement.

   (a)   Subject to the terms and conditions set forth below, the Medical Group agrees that the University will supply it with the services of certain of the UMass Practitioners ("Contract Practitioners") to fill certain positions described on Schedule A attached hereto. Schedule A sets out for the Contract Practitioners the position descriptions, expected work schedules and the current compensation levels for such positions for which the Medical Group is willing to reimburse the University. The Medical Group will reimburse the University on a weekly basis with respect to Contract Practitioners paid on a weekly basis, and monthly with respect to Contract Practitioners paid on a quarterly basis, with all payments subject to reconciliation on a quarterly basis. The Parties intend that the Medical Group have reasonable control of its expenses related to the Contract Practitioners and the Medical Group accordingly retains the right with reasonable written notice to the University, to modify this information on Schedule A, such modification to be implemented by the University as soon as administratively

-2-

possible. However, no modification is permitted which would violate the provisions of Sections 7 and 10 of this Agreement, the Legislation or the Definitive Agreement.

(b) Schedule A will also itemize the University benefit programs in which the Contract Practitioners participate, the costs of which will be reimbursed to the University by the Medical Group in the manner and to the extent provided under Section 5. The Medical Group may advise the University with ninety (90) days advance written notice that it desires to pay lesser amounts of reimbursement for the benefit programs associated with one or more of the contract positions. In that event, the University will either find replacement programs for costs which are acceptable to the Medical Group or will reduce or eliminate the benefits, but only if the reduction or elimination of benefits does not violate Sections 7 and 10 of this Agreement, the Legislation or the Definitive Agreement.

(c) Schedule A will provide for a monthly payment, in addition to the costs of salaries and benefits for the Contract Practitioner positions, which will pay to the University for its Direct Costs, as defined in the Definitive Agreement, incurred in providing the Contract Practitioners, or such other amount as may be agreed upon by the parties with respect thereto. However, for any period during which there is in effect between the parties a shared services agreement providing for the use of a common human resources function, then the provisions of such shared service agreement shall control with respect to the assessment of any such costs, and such costs shall not be included in Schedule A. Without the prior written consent of the University, the Medical Center may not terminate Human Resources as a "Shared Service" (as defined in that Certain Occupancy and Shared Services Agreement dated as of March 31, 1998) if any Contract Practitioners remain listed on Exhibit A hereto or prior to February 11, 2008, whichever first occurs.

(d) If at any time the University is unable to supply the Medical Group with Contract Practitioners for one or more positions in Schedule A, it shall so notify the Medical Group in writing, and this will not be considered a breach of this Agreement by the University, provided that the Medical Group shall only pay for the services of such practitioners as are in fact supplied to it.

2. Term. The term of this Agreement shall commence as of the above date and shall continue through February 11, 2008. Upon termination, neither Party shall have any obligations to the other under this Agreement except for those set forth herein and/or those which accrue prior to termination.

3. Powers and Duties of the University. Subject to Sections 5 and 11, during the term of this Agreement, the University, at its sole cost and expense, shall:

(a) pursuant to Section 6, pay, or cause to be paid, all compensation, employee benefits, and employment taxes, accrued or accruing, for Contract Practitioners who render service to the Medical Group under this Agreement at the level and amount, as the

-3-

1190959.05

University determines from time to time, consistent with obligations under laws of the Commonwealth of Massachusetts including the Legislation and obligations of any applicable collective bargaining agreement;

(b)    as a condition of his or her employment, require each Contract Practitioner to:

(i)    maintain an unrestricted license to practice medicine, or for a non-physician Practitioner, such other license or certification as may be necessary in order to provide the patient services contemplated by this Agreement, in full force and effect in the Commonwealth of Massachusetts and remain in good standing with the Board of Registration in Medicine;

(ii)    maintain a federal Drug Enforcement Administration certificate, without restrictions, to the extent necessary for his or her practice;

(iii)    maintain medical staff membership on the medical staff of the Medical Center, provided that non-physician practitioners may maintain medical staff privileges in a limited category;

(iv)    perform all professional services in accordance with all applicable federal, state and local laws and regulations and with prevailing standards of care and medical ethics;

(v)    abide by all rules, regulations, policies, and procedures Medical Center to the extent not inconsistent with any applicable collective bargaining agreement and applicable rules as described in Section 7;

(vi)    conform strictly to the standards relating to quality of p imposed by the Medical Group and the Medical Center and other matters relating to delivery of health care services under this Agreement;

(vii)    be and remain a participating provider in the Medicare Medicaid programs; and

(viii)    execute a billing assignment agreement pursuant to which the Contract Practitioner authorizes the Medical Group (A) to bill, in the name of the Medical Group or in the Contract Practitioner's name and under his or her provider number and on his or her behalf, all claims (including co-payments from patients) for reimbursement or indemnification from all payors, fiscal intermediaries or patients for all covered items and services provided by the Contract Practitioner to patients; (B) to retain such amounts for the Medical Group's sole use; (C) to endorse in the name of the Contract Practitioner all notes, checks, money orders, insurance payments, and any other instruments received as payment of

-4-

1190959.05

accounts receivable; (D) to waive any right or claim to any accounts receivable generated by billings and claims for reimbursement by any Contract Practitioner; and (E) to cooperate fully with the Medical Group in facilitating all collections of accounts receivable transferred to the Medical Group, including endorsement of checks and delivery to the Medical Group of all revenues in whatever form, received from patients or payors on their behalf attributable to services rendered by the Contract Practitioner, and completion of all forms, if any, necessary for the collection of said monies;

(c)    use reports furnished to it by the Medical Group with respect to each Contract Practitioner to assess the performance of each Contract Practitioner on a periodic basis;

(d)    direct a Contract Practitioner to cease providing services immediately upon receipt of notice from the Medical Group upon learning of the

(i)    Revocation, suspension or limitation of any license necessary for the Contract Physician to provide services to Medical Group under this Agreement;

(ii)    Revocation, suspension or limitation of the Contract Physician's right to participate in the Medicare or Medicaid programs;

(iii)    Pronouncement by any governmental entity that the Contract Physician has engaged in professional misconduct or is professionally incompetent;

(iv)    Charge or conviction of the Contract Physician for commission of a felony or crime involving moral turpitude;

(v)    Commission of a theft, fraud, or embezzlement by the Contract Physician or proof of his or her dishonesty;

(vi)    Failure of the Contract Physician to abide by any of the conditions of his or her employment with the University described in this Paragraph 3;

(e)    upon any change in the Contract Practitioner's employment status, including the Practitioner's termination of employment from the University, provide written notice thereof to the Medical Group.

4.    Powers and Duties of Medical Group.

(a)    At its sole cost and expense, the Medical Group shall:

-5-

1190959.05

(i)    provide appropriate documentation, in accordance with reasonable standards required by University rules and the disciplinary provisions of any applicable collective bargaining agreement, with respect to the performance of any Contract Practitioner which it determines is performing on an unsatisfactory basis or any other situation involving discipline.

(ii)    provide appropriate testimony or other evidentiary support to the University, in the event that the University determines that a Contract Practitioner should be terminated or otherwise disciplined in accordance with the provisions of University rules or any applicable collective bargaining agreement.

(b)    Subject to Sections 7 and 10, the Medical Group may, for any reason, notify the University that it will no longer accept the services of any particular Contract Practitioner or Contract Practitioners and the University shall thereupon act in accordance with Section 3(d), above.

(c)    The Medical Group or the Medical Center, as applicable, shall have the exclusive right on behalf of the Contract Practitioners, and the University shall not have the right, to negotiate and enter into managed care contracts or other arrangements with insurers, the Medicare or Medicaid Programs, and other third party payors on behalf of the Contract Practitioners, except as provided in Sections 10.8 and 10.10 of the Definitive Agreement with respect to any Medicaid Provider Agreements and state contracts entered into by the Medical School and subcontracted to the Medical Group or the Medical Center.

(d)    The University shall have no right to retain any proceeds of bills or claims for services provided under this Agreement by the Contract Practitioners except for any mutually agreed upon state contracts. If and to the extent that the University receives any proceeds of bills or claims for services rendered hereunder by the Contract Practitioners, then it shall promptly turn such funds over to the Medical Group.

5.    Compensation to the University.  The Medical Group shall pay to the University (i) such amounts as are reflected on Schedule A associated with Contract Practitioner positions authorized on Schedule A, including without limitation the salary and benefits, including any applicable taxes, attributable to such Contract Practitioners, as described below, (ii) any additional benefits which may subsequently be required by law to be made available or which the parties may agree to make available to the Contract Practitioners, and any additional taxes which may subsequently be required to be paid, (iii) Direct Costs, as defined in the Definitive Agreement, incurred by the University, or such other amount as the parties may agree, as provided and determined in accordance with Section 1(c) of this Agreement, unless there is in effect between the parties a shared services agreement providing for the use of a common human resources function, in which case such shared services agreement shall control with respect to such costs; and (iv) any costs of University, including severance payments, relating to a Contract Practitioner (A) while he is the subject of a disciplinary or other proceeding

-6-

under University or medical staff rules, or (B) if University terminates the employment of a Contract Practitioner pursuant to a change in Schedule A, unless otherwise provided in and subject to the provisions of Article III of the parties' Affiliation Agreement, as defined in the Definitive Agreement. The Parties intend that the University shall be fully reimbursed for the costs associated with providing the Contract Practitioners as calculated above and that the Medical Group, subject to the provisions of Sections 7 and 10 and the Legislation and the Definitive Agreement, has the right to change prospectively its requirements and costs associated with this Agreement by amending Schedule A as permitted under Section 1. The Parties agree to review the compensation to the University from time to time and, if unable to agree, to submit disputes to arbitration under Section 19 without terminating this Agreement; provided, however, that the setting of the amounts that will be paid by the Medical Group to the University on account of salaries, benefits and other compensation pursuant to Schedule A shall be within the sole discretion of the Medical Group, except as may be required by law, and the arbitrator shall have no power to substitute his judgment for that of the Medical Group with respect thereto. The Medical Group shall not be responsible for the past service portion of retiree health insurance available to the Contract Practitioners.

In determining the amounts to be paid by the University with respect to the cost of pension benefits, the cost of pension benefits shall be the actual pension cost paid by the University with respect to the Contract Practitioners, consistent with Section 5(e) and (l) of the Legislation, subject to the following conditions:

(a)   The University shall use its best efforts to cause the 15-year amortization period described in the third paragraph of Section 5(e) of the Legislation to commence as of July 1, 1997.

(b)   The University shall work with the Medical Group pursuant to paragraph (e) below to ensure that the pension liability described in Section 5(l) of the Legislation will be determined by netting against the increased costs the savings resulting from early separation of University employees in connection with the transactions authorized by the Legislation, and which could result in a positive amount (net liability) or negative amount (net savings). If it is a net liability, the University shall not elect to amortize it any earlier or more rapidly than the amortization under Section 5(e) of the Legislation.

(c)   If the amounts to be amortized under Section 5(e) and (l) of the Legislation result in a net reduction in the University's pension costs, the University shall use its best efforts to cause the method of such amortization to result in higher total reductions in the earliest years to reflect the higher UMASS Worcester payroll in those years. If the amounts to be so amortized result in a net increase in University's pension costs, then the University may, but is not required to, attempt to cause the method of such amortization to result in higher total increases in said earliest years.

-7-

1190959.05

(d)   The total cost of pension benefits, determined in accordance with (a) through (c) above, shall be allocated among all UMASS Worcester employees (including Contract Employees) on the basis of a single percentage of pay (pension cost rate).

(e)   The Medical Group shall have the right to send one or more employees or other representatives to all meetings between the University and the Public Employee Retirement Administration Commission relating to the implementation of Section 5(e) and (l) of the Legislation and any other matters affecting the cost of pension benefits hereunder.

(f)   The cost, if any, of retiree medical benefits shall be the same percentage of pay (retiree medical cost rate) generally applicable to all UMass Worcester employees, less any portion of that cost rate attributable to costs allocable to periods of service before April 1, 1998.  No retiree medical cost may be retroactively assessed with respect to a Contract Practitioner after that individual has ceased to be employed by the University.

6.   <u>Salary, Benefits, and Professional and General Liability Coverage.</u>

(a)   The Medical Group shall not pay the Contract Practitioners any remuneration or other consideration directly or indirectly.  At all times University shall be responsible for payment of all salaries, employee benefits, fringe benefits, and reimbursable expenses (including travel and lodging for approved purposes) for the Contract Practitioners in the amount, mode, and time of payment, set forth in University rules and practices.

(b)   Subject to Sections 5 and 11 of this Agreement, the University at all times is responsible and liable for all administrative employment matters regarding the Contract Practitioners such as withholding, when applicable, of all of the Contract Practitioners' federal and state taxes, all required payments to the State pension system, and the payment of the Contract Practitioners' workers' compensation coverage.

(c)   Prior to granting any vacation or personal leave to a Contract Practitioner, the University shall consult with the Medical Group and shall grant such leave only consistent with the operational needs of the Medical Group.

(d)   The University shall maintain throughout the entire term of this Agreement professional liability insurance coverage, either through self insurance or third party carrier, on all of its Contract Practitioners, in such amounts as the parties shall agree from time to time, and in an amount no less than that requested by the Medical Group after consultation with it.  Upon termination of any insured Contract Practitioner from employment, the University, if the coverage is of the "claims made" type, shall pay the "tail premium",

-8-

1190959.05

"final endorsement premium" or any other premium or charge for extending the coverage of such professional liability insurance. The parties agree that the costs for providing this coverage shall be charged to the Medical Group directly by the insurer or by the University in addition to the fees charged under Section 5, unless the Medical Group arranges for so-called captive insurance coverage of such liabilities on an actuarially sound basis reasonably acceptable to the University and consistent with the actuarial assumption used by the University in funding the self insurance trust on the date of this Agreement. For convenience and efficiency, the parties agree to consult with respect to ways to coordinate the purchase and funding of such coverage. To the extent that coverage is made available under the terms of any self-insured trust sponsored by the Medical Center, the cost for Contract Practitioners shall be determined on a basis equivalent to the cost of such coverage for practitioners employed by the Medical Group, as such are adjusted for medical speciality and similar factors. The parties also recognize that the Medical Group also may directly employ a large number of practitioners and will provide malpractice and liability insurance with respect to them.

7.    Collective Bargaining Agreements. University Policies and Public Employee Benefits.

(a)    Notwithstanding anything to the contrary contained herein, any actions under this Agreement which affect the University's employment of Contract Practitioners are subject to the terms of any applicable collective bargaining agreement and any existing contract between the University and any Contract Practitioner.

(b)    The Medical Group acknowledges that University employment rules and policies in effect as of the date hereof shall remain applicable to all Contract Practitioners except as changed in a manner consistent with any bargaining obligations that may exist or as required by law and that the University shall be reimbursed for all expenses of Contract Practitioners until such time as those Contract Practitioners are removed from Schedule A by Medical Group without violating said rules or other applicable law. Changes in such rules and policies which affect other University employees will not apply to Contract Practitioners unless agreed to by the Medical Group. As quickly as administratively practicable, the University will attempt to implement upon request from the Medical Group changes in employment rules and policies insofar as they affect Contract Practitioners. The University shall not be in breach of this Agreement for any failure or inability to take, or delay in taking, any action which would constitute a violation of any applicable collective bargaining agreement or the University employment rules and policies for or any law applicable to these Contract Practitioners.

(c)    No action may be taken to reduce the level of compensation or to reduce or alter benefits of Contract Practitioners or deprive them of any future benefit to the extent this would violate State or Federal law.

(d)    The University retains the sole and absolute right to negotiate with unions with respect to the Contract Practitioners and to determine any modifications of, or

-9-

1190959.05

matters relating to, any applicable collective bargaining agreement with respect to the Contract Practitioners. Prior to the renewal of any collective bargaining agreement, the Medical Group will deliver to the University proposed terms of amendment to Schedule A showing the positions and compensation levels which it determines to be reasonable in the upcoming term of the bargaining agreement and identifying other costs and issues which it considers material to its continued use of Contract Practitioners in the particular bargaining unit. The Medical Group will not be responsible to reimburse costs associated with Contract Practitioners if the University, unless required to do so by law or by University policies in effect on February 13, 1997 to the extent, if any, still in effect (and not changed in accordance with paragraph (b) of this Section or otherwise), agrees to pay compensation or benefits in excess of the terms proposed for Schedule A by the Medical Group, as said schedule may be amended by the Medical Group from time to time.

(e)     Nothing herein shall be construed to affect or govern the employment rules or policies, or the application of any collective bargaining agreement, with respect to Contract Practitioners who may be transferred, reassigned or relocated from a position at or on the campus of the former Clinical Division of the University to a position at some other location within the Medical Center or the Medical Group, and nothing herein shall be construed to expand the scope or application of any such rules, policies, or collective bargaining agreements.

8.     Amendment. With mutual written consent, this Agreement may be amended by the Parties at any time.

9.     Relationship of Parties. Nothing contained in this Agreement shall be construed to constitute either Party as a partner, or agent of the other Party, nor shall either Party have any authority to bind the other in any respect. None of the employees of either Party shall be deemed to be employees of the other Party, or (except as the parties may expressly agree in writing, or as may be required by law) entitled to participate in any fringe benefits or programs enjoyed by the employees of the other Party, including without limitation, workers' compensation, unemployment, health or life insurance, pension or profit sharing plans, vacation or sick pay, or other employee or statutory employee benefits. The exclusive rights to exercise all power and control over employees belonging to an employer at common law and by statute, including, without limitation, the rights to determine whether a particular Contract Practitioner is to be furnished under this Agreement, terminated or otherwise disciplined, the compensation of a Contract Practitioner, the manner and means by which the Contract Practitioners perform their duties hereunder, and such other conditions incidental to employment, at all times shall remain with the University, provided that the Medical Group shall retain the right to ensure compliance with applicable ethical, professional, and regulatory standards and other policies and practices.

10.     Good Faith and Fair Dealing. Each party agrees to cooperate in good faith, and to deal fairly with the other in attempting to perform any and all obligations required

-10-

1190959.05

hereunder. The parties recognize that the Medical Group and the Medical Center greatly benefit if they have access to the pool of skills and experience possessed by the Contract Practitioners, subject to the Medical Group's ability effectively and efficiently to manage its operations. Accordingly, such Practitioners, if they continue as employees of the University in contract positions, will not be discriminated against by the Medical Group because of their status as Contract Practitioners, and the University may so represent to them. The University, acting through its academic medical center at the University of Massachusetts at Worcester, agrees that it will not sponsor, initiate or support legislation to the extent that it would have the effect of increasing the cost to the Medical Group of the services of Contract Practitioners, and will make its best efforts in good faith to oppose such legislation to that extent, should it be initiated by others.

The parties further agree that any disputes under this Section are to be resolved through the dispute resolution mechanism of Section 18. No Contract Practitioner has any standing to be a Party in such proceeding or to have third Party beneficial rights under this Agreement.

11.    Indemnification. To the extent permitted by law, the Medical Group shall indemnify, defend and hold harmless the University and its trustees and officers against and in respect of all liabilities, obligations, judgments, liens, injunctions, charges, orders, decrees, rulings, damages, dues, assessments, losses, fines, penalties, expenses, fees, costs, amounts paid in settlement (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or threatened action) arising out of any claim, complaint, demand, cause of action, hearing, action, suit or other proceeding asserted or initiated in respect to any negligent or intentional act or omission by a Contract Practitioner related to or arising out of the Contract Practitioner's performance of services hereunder.

12.    Interpretation of Agreement and Entire Agreement. This Agreement shall be interpreted in a manner consistent with the Legislation and together with the Definitive Agreement, expressly including, without limitation, the provisions of Section 7.2.3.6 and Article 8 thereof and the indemnification given by the Medical Center to the University therein, shall represent the entire understanding of the parties with respect to the subject matter hereof, and supersede any and all prior understandings with respect thereto. No amendment of this Agreement shall be effective unless reduced to writing and signed by each of the Parties. The provisions of this Agreement shall control to the extent not directly inconsistent with the Legislation.

13.    Waiver. The failure of either Party to insist in any one or more instances upon performance of any terms or conditions of this Agreement shall not be construed as a waiver of future performance of any such term, covenants or condition, but the obligations of either Party with respect thereto shall continue in full force and effect.

-11-

14. <u>Governance</u>. This Agreement at all times shall be governed by the laws of the Commonwealth of Massachusetts.

15. <u>Notice</u>. All notices and other communications required or desired to be given hereunder shall be deemed given if in writing and sent by registered or certified mail, postage prepaid, or delivered to a reputable overnight courier, charges prepared, to the following addresses:

If to the University:

Chancellor
University of Massachusetts at Worcester
55 Lake Avenue North
Worcester, MA 01605

If to the Medical Center:

Chief Executive Officer
UMass Memorial Health Care, Inc.
119 Belmont Street
Worcester, MA 01605

A Party is entitled to rely upon the address set forth herein unless notified of a change of address as in the manner provided in this Section.

16. <u>Assignability</u>. This Agreement shall be binding upon the Parties and their respective permitted successors and assigns. No Party may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other Parties except as permitted by the Definitive Agreement.

17. <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one of such counterparts.

18. <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

19. <u>Dispute Resolution</u>. In the event that any dispute arises under any provision of this Agreement, or in the interpretation of its terms, which cannot be resolved between the parties, either Party may invoke binding arbitration, in accordance with the dispute resolution provisions set forth in the Definitive Agreement. In the event of such a dispute, the parties

-12-

1190959.05

agree to consider and to confer with each other concerning the advisability of engaging in expedited arbitration procedures.

   20.   <u>No Third Party Beneficiaries</u>.  This Agreement is not intended, nor shall it be construed, to confer any enforceable rights on any person or entity not a Party hereto, including without limitation any Contract Practitioner.

1190959.05

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

[UMASS MEMORIAL AFFILIATE]

By:_____

UNIVERSITY OF MASSACHUSETTS

By:_____

-14-

1190959.05

# Exhibit 10

# Part D – 1

EXECUTION COPY

# AMENDED AND RESTATED DEFINITIVE AGREEMENT

among

University of Massachusetts,

Worcester City Campus Corporation
(d/b/a UMass Health System, Inc.),

Memorial Health Care, Inc.,

UMass Memorial Health Care, Inc.

and

UMass Memorial Medical Center, Inc.

1192368.12

# TABLE OF CONTENTS

........................................................................................... 1

RECITALS ................................................................. 3

ARTICLE I. Definitions ......................................................... 3

1.1.    "Academic System" ................................................. 3
1.2.    "Act" ............................................................ 3
1.3.    "Action" .......................................................... 3
1.4.    "Affected Lease" ................................................... 3
1.5.    "Affiliation Agreement" ............................................. 3
1.6.    "Agreement" ...................................................... 4
1.7.    "Assumed Liabilities" .............................................. 4
1.8.    "Balance Sheet Assets" ............................................. 4
1.9.    "Bill of Transfer" .................................................. 4
1.10.   "Chancellor" ...................................................... 4
1.11.   "Clinton" ......................................................... 4
1.12.   "Closing" and "Closing Date" ....................................... 4
1.13.   "COLA" ........................................................... 4
1.14.   "Combined Score" .................................................. 4
1.15.   "Commonwealth" ................................................... 4
1.16.   "Contracted Employee" ............................................. 4
1.17.   "Contracted Employee Agreement" ................................... 4
1.18.   "Contracts" ....................................................... 4
1.19.   "Departmental Education Funds" ..................................... 4
1.20.   "Development Office" ............................................... 4
1.21.   "Direct Cost" ..................................................... 5
1.22.   "DON" ............................................................ 5
1.23.   "Employee Benefit Plan" ............................................ 5
1.24.   "Environmental Law" ............................................... 5
1.25.   "Environmental Liabilities and Costs" ............................... 6
1.26.   "Existing Affiliates" ............................................... 6
1.27.   "Excluded Assets" ................................................. 6
1.28.   "Exploit" ......................................................... 6
1.29.   "Foundation" ...................................................... 6
1.30.   "GAAP" ........................................................... 6
1.31.   "Group Practice" .................................................. 6
1.32.   "Hospital Trust Fund" .............................................. 6
1.33.   "Indemnified Party" ............................................... 6
1.34.   "Indemnifying Party" .............................................. 6
1.35.   "Initial Term" .................................................... 6
1.36.   "Insurance Consultant" ............................................. 6
1.37.   "Intellectual Property" ............................................ 6
1.38.   "Investigations"

| | | |
|---|---|---|
| | | 7 |
| 1.39. | "Knowledge" | 7 |
| 1.40. | "Late Payment Rate" | 7 |
| 1.41. | "Leases" | 7 |
| 1.42. | "Legislature" | 7 |
| 1.43. | "Liability" | 7 |
| 1.44. | "License Agreement" | 7 |
| 1.45. | "Lien" | 7 |
| 1.46. | "Losses" | 8 |
| 1.47. | "Marlborough" | 8 |
| 1.48. | "Master Trust Indenture" | 8 |
| 1.49. | "Material Adverse Effect" | 8 |
| 1.50. | "MBIA Bonds" | 8 |
| 1.51. | "Medical Center" | 8 |
| 1.52. | "Medical Center Intellectual Property" | 8 |
| 1.53. | "Medical School" | 8 |
| 1.54. | "Memorial" | 8 |
| 1.55. | "Memorial Affiliates" | 8 |
| 1.56. | "Memorial Bonds" | 8 |
| 1.57. | "Memorial Campus" | 8 |
| 1.58. | "Memorial Hospital" | 8 |
| 1.59. | "Memorial Intellectual Property" | 9 |
| 1.60. | "Memorial Medical Group" | 9 |
| 1.61. | "Mixed Intellectual Property" | 9 |
| 1.62. | "Most Recent Balance Sheet" | 9 |
| 1.63. | "Most Recent Financial Statements" | 9 |
| 1.64. | "Net Operating Revenues" | 9 |
| 1.65. | "Net Service Revenue" | 9 |
| 1.66. | "New Affiliate" | 9 |
| 1.67. | "Occupancy Agreement" | 9 |
| 1.68. | "Occupied Space" | 10 |
| 1.69. | "Ordinary Course of Business" | 10 |
| 1.70. | "Oversight Group" | 10 |
| 1.71. | "Participation Payments" | 10 |
| 1.72. | "Party" or "Parties" | 10 |
| 1.73. | "Person" | 10 |
| 1.74. | "Physician Advisory Board" | 10 |
| 1.75. | "PPIP" | 10 |
| 1.76. | "Practice Plan" | 10 |
| 1.77. | "Reportable Event" | 10 |
| 1.78. | "Representative" | 10 |
| 1.79. | "Research Facility" | 10 |
| 1.80. | "Research Intellectual Property" | 10 |
| 1.81. | "Safety Laws" | 10 |
| 1.82. | "Security Interest" | |

1192368.12

|  |  |  |  |
|---|---|---|---|
| 1.83. | "Self-Insurance Trust" | ................................. | 11 |
| 1.84. | "Strategic Plan" | ....................................... | 11 |
| 1.85. | "Subleased Property" | ................................... | 11 |
| 1.86. | "Subsidiary" | .......................................... | 11 |
| 1.87. | "System" | ............................................. | 11 |
| 1.88. | "Tax" or "Taxes" | ...................................... | 11 |
| 1.89. | "Teaching Hospital" | ................................... | 11 |
| 1.90. | "Third Party Claim" | ................................... | 11 |
| 1.91. | "Transferred Assets" | .................................. | 11 |
| 1.92. | "UMass Campus" | ....................................... | 11 |
| 1.93. | "UMass Clinical System" | ............................... | 11 |
| 1.94. | "UMass Clinical Division" | .............................. | 11 |
| 1.95. | "UMass Memorial" | ..................................... | 11 |
| 1.96. | "UMass Memorial Affiliate" | ............................ | 11 |
| 1.97. | "UMass Memorial Physicians" | ........................... | 12 |
| 1.98. | "UMass Transferred Assets" | ............................ | 12 |
| 1.99. | "University" | .......................................... | 12 |
| 1.100. | "WCCC" | .............................................. | 12 |
| 1.101. | "WCCC Affiliates" | .................................... | 12 |
| 1.102. | "WCCC Transferred Assets" | ............................ | 12 |
| 1.103. | "WCH Site" | .......................................... | 12 |
| ARTICLE II. | Mission | ................................................. | 13 |
| ARTICLE III. | Academic Relationship | ................................. | 13 |
| 3.1. | Principles of Relationship | .............................. | 13 |
| 3.2. | Financial Support and Relationships | ..................... | 17 |
| 3.3. | Construction of Research Facility | ....................... | 17 |
| 3.4. | Departmental Education Funds | ......................... | 18 |
| 3.5. | Academic and Clinical Operating Principles | .............. | 18 |
| 3.6. | Affiliation Management Group | .......................... | 18 |
| 3.7. | Consultation Regarding Matters of Mutual Concern | ....... | 19 |
| 3.8. | Vision Statement of the Academic System | ............... | 19 |
| 3.9. | Development Activities | ................................. | 20 |
| 3.10. | Distribution of Funds and Cost | ......................... | 20 |
| 3.11. | Use of Name | .......................................... | 20 |
| ARTICLE IV. | Physician Leadership and Organization | ................. | 20 |
| 4.1. | General Principles | ..................................... | 21 |
| 4.2. | Organization | .......................................... | 22 |
| 4.3. | Appointment and Activities of Departmental Chairs | ....... | 22 |
| 4.4. | Accountability | ........................................ | 23 |
| 4.5. | Clinical Services to the Commonwealth | ................. | 23 |
| 4.6. | Compensation | ......................................... | |

1192368.12

4.7.   System Support for Faculty Academic Pursuits . . . . . . . . . . . . . . . . 23

ARTICLE V. Strategic Plan; Clinical Program Integration . . . . . . . . . . . . . . . . 23
       5.1.   Development of Strategic Plan . . . . . . . . . . . . . . . . . . . . . . . 23
       5.2.   General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE VI. The System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
       6.1.   Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
       6.2.   Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
       6.3.   The Medical Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
       6.4.   Restrictions on Operations of UMass Memorial and Nonprofit UMass
       Memorial Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE VII. Consolidation of Operations . . . . . . . . . . . . . . . . . . . . . . . . . 30
       7.1.   General Organizational Structure . . . . . . . . . . . . . . . . . . . . . . 32
       7.2.   Consolidation of UMass Clinical Division and Certain Other Assets of the
       UMass Clinical System into the System . . . . . . . . . . . . . . . . . . . . . . . 37
       7.3.   Transfer of Assets from WCCC to System . . . . . . . . . . . . . . . . . . 41

ARTICLE VIII. Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ARTICLE IX. Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . 41
       9.1.   Representations and Warranties of the University and WCCC . . . . . . . 46
       9.2.   Representations and Warranties of Memorial . . . . . . . . . . . . . . . . 51

ARTICLE X. Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
       10.1.   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
       10.2.   Operation of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
       10.3.   Filing of Cost Reports and Tax Returns . . . . . . . . . . . . . . . . . . . 52
       10.4.   Self Insurance Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
       10.5.   Use of Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
       10.6.   Maintenance of Medical Records . . . . . . . . . . . . . . . . . . . . . . 52
       10.7.   Covenant Not to Amend Bylaws . . . . . . . . . . . . . . . . . . . . . . . 52
       10.8.   Medicaid Provider Agreement . . . . . . . . . . . . . . . . . . . . . . . . 53
       10.9.   Medical Educational Services . . . . . . . . . . . . . . . . . . . . . . . . 53
       10.10.  State Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
       10.11.  Service to the Community . . . . . . . . . . . . . . . . . . . . . . . . . . 54

ARTICLE XI. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
       11.1.   Survival of Representations and Warranties . . . . . . . . . . . . . . . . . 54
       11.2.   Indemnity by the Medical School and WCCC . . . . . . . . . . . . . . . . 54
       11.3.   Medical School's Environmental Indemnification . . . . . . . . . . . . . . 55
       11.4.   WCCC's Environmental Indemnification

1192368.12

                                                            55

11.5.  Indemnity by Memorial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

11.6.  Matters Involving Third Parties . . . . . . . . . . . . . . . . . . . . . . . . 57

11.7.  Medicaid Provider Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 57

ARTICLE XII. Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

12.1.  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

12.2.  Transfer by Memorial Affiliates of Rights to Memorial Intellectual

Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

12.3.  Research Sponsorship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

12.4.  Agreement Concerning Rights to Intellectual Property . . . . . . . . . . . . . . . .

ARTICLE XIII. The Closing Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

13.1.  Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

13.2.  Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

ARTICLE XIV. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

14.1.  Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

14.2.  Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

14.3.  Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

14.4.  Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

14.5.  Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

14.6.  Public Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

14.7.  Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

14.8.  Certain Pre-Closing Expenses . . . . . . . . . . . . . . . . . . . . . . . . 65

14.9.  Consultation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

14.10. Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

14.11. Transition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

14.12. No Third Party Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . 68

14.13. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

14.14. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

14.15. Defaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

14.16. Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

14.17. Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

14.18. Good Faith and Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . .

14.19. Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

1192361.12

EXHIBITS

Exhibit A  [Reserved]
Exhibit B  Amendment of Articles of Organization of UMass Memorial Foundation, Inc.
Exhibit C  Bylaws of UMass Memorial Foundation, Inc.
Exhibit D  Articles of Organization of UMass Memorial
Exhibit E  Bylaws of UMass Memorial
Exhibit F  Articles of Organization of the Medical Center
Exhibit G  Bylaws of the Medical Center
Exhibit H  Memorandum Describing Pre-Closing Transfers
Exhibit I  Agreement of Merger of Memorial Health Care, Inc. with and into UMass Memorial
Exhibit J  Articles of Merger of Memorial Health Care, Inc. with and into UMass Memorial
Exhibit K  Organizational Chart Post-Transaction
Exhibit L  Form of Occupancy and Shared Services Agreement
Exhibit M  Form of Academic Affiliation and Support Agreement
Exhibit N  Form of License Agreement
Exhibit O  Medical Educational Services Agreement
Exhibit P  List of Section 3.2.1.1. Persons
Exhibit Q  Group Practice Plan Rules and Regulations
Exhibit R  Agreement of Merger of Memorial Hospital, Inc. with and into the Medical Center
Exhibit S  Articles of Merger of Memorial Hospital, Inc. with and into the Medical Center
Exhibit T  Cash Liquidation of Interfund Balances
Exhibit U  HealthAlliance Agreement
Exhibit V  UMass Memorial/DPH Uncompensated Care Agreement
Exhibit W  Form of Agreement for Employee Services
Exhibit X  Form of Agreement for Practitioner Services

1192368.12

# AMENDED AND RESTATED
## DEFINITIVE AGREEMENT

This Amended and Restated Definitive Agreement (the "Agreement") is dated as of this 31st day of March, 1998, by and among the University of Massachusetts, a public institution of higher education of The Commonwealth of Massachusetts acting through its academic medical center at the University of Massachusetts at Worcester (the "University"), Worcester City Campus Corporation d/b/a UMass Health System, Inc. ("WCCC"), Memorial Health Care, Inc., a non-profit corporation organized and existing under the laws of The Commonwealth of Massachusetts ("Memorial"), UMass Memorial Health Care, Inc. ("UMass Memorial") and UMass Memorial Medical Center, Inc. (the "Medical Center"). Each of the University, WCCC, Memorial, UMass Memorial and the Medical Center are sometimes referred to herein as a Party and collectively as the "Parties." This Agreement supersedes and restates in its entirety that certain Definitive Agreement among certain of the Parties dated as of February 13, 1997.

## RECITALS

In conjunction with its medical school (the "Medical School"), the University currently operates an acute care hospital (the "Teaching Hospital"), a faculty group practice plan (the "Group Practice") and a self-insurance trust to provide insurance coverage for the Teaching Hospital and practitioners in the Group Practice (as more fully described in Article I hereof, the "Self-Insurance Trust") as unincorporated divisions of the University. The University has the right to appoint the board of directors of WCCC, and WCCC controls, directly or indirectly, a broad array of health care providers and support organizations, including Marlborough Hospital ("Marlborough") and The Clinton Hospital Association ("Clinton"). The Teaching Hospital, the Group Practice and the Self-Insurance Trust are sometimes collectively referred to herein as "UMass Clinical Division." UMass Clinical Division, WCCC and the health care providers and other organizations controlled by WCCC are sometimes collectively referred to herein as the "UMass Clinical System."

Memorial is the sole corporate member of Memorial Hospital, Inc. ("Memorial Hospital") and Memorial Medical Group, Inc. ("Memorial Medical Group") and offers through other controlled affiliates a variety of complementary health care services in the central Massachusetts area. Memorial, Memorial Hospital, Memorial Medical Group, Memorial Properties, Inc. and Memorial Ventures, Inc. are sometimes individually referred to herein as a "Memorial Affiliate" and collectively as the "Memorial Affiliates."

UMass Clinical Division has historically fulfilled multiple missions, including providing both highly specialized clinical services to patients, particularly to the extent not available through other area services, and community-based primary care services; serving as the principal site for clinical education and training for the University's students and residents; and providing a site for clinical research and development services, including clinical trials for pharmaceuticals, biologics, devices, and techniques developed at the University's research

-1-

facilities. UMass Clinical Division has also provided important services to various agencies of the Commonwealth and has been a significant provider of free care for indigent patients. In response to rapid changes in the health care industry, however, the University desires to cease to operate the UMass Clinical Division directly, in order (i) to reduce the risk of losses attributable to future operations of an academic medical center while maintaining access to a premier teaching hospital, (ii) to provide a training site for its students and residents and a site for clinical research and development services, and (iii) to preserve, promote, strengthen and enhance the clinical teaching affiliations that support the Academic System. As a result, the University desires to support the establishment of a new health care system resulting from a consolidation of certain of the assets and certain of the liabilities of the UMass Clinical System and Memorial.

The University and Memorial realize and agree that each of their financial health and their ability to fulfill their respective missions is mutually dependent, and the Parties are entering into the proposed consolidation in order to promote the continued viability of the missions historically pursued by UMass Clinical Division and Memorial and to be continued by the consolidated entity.

Memorial is a private, non-profit hospital that provides health care services and educational opportunities for medical students of the University in the central Massachusetts area. Memorial shares the University's view of the rapidly changing health care environment, and desires to consolidate its operations with those of the UMass Clinical System in order to continue to deliver quality medical care services to the people of central Massachusetts and to promote medical education, training and research.

In order to achieve the respective objectives recited above, the Great and General Court of The Commonwealth of Massachusetts has enacted Chapter 163 of the Acts of 1997 to authorize the consolidation of the activities of substantially all of the UMass Clinical System with Memorial (the "Act"). The Act acknowledges the establishment of two new, private, non-profit Massachusetts corporations, UMass Memorial and the Medical Center. The Medical Center has been established to operate the combined activities of the Teaching Hospital and Memorial Hospital. UMass Memorial has been established to control the combined activities and operations of the UMass Clinical System and the Memorial Affiliates.

The Parties anticipate that on the Closing Date, Memorial will merge with and into UMass Memorial and that as a result UMass Memorial will be the sole corporate member or sole shareholder of each of the Memorial Affiliates (excluding Memorial). The Parties further anticipate that on the Closing Date, Memorial Hospital will merge with and into the Medical Center and that, pursuant to the Act, certain assets and certain liabilities of UMass Clinical Division will be transferred to UMass Memorial, the Medical Center or one or more of UMass Memorial's other controlled subsidiaries. The Parties further agree that on the Closing Date, and assuming all conditions precedent to the Closing (as hereafter defined) have been satisfied or waived and in accordance with the Act, UMass Memorial and/or the Medical Center will enter

-2-

into a long-term occupancy and shared services agreement with the University (the "Occupancy Agreement"), an academic affiliation and support agreement with the University (the "Affiliation Agreement"), and a license agreement with the University (the "License Agreement"), all on substantially the terms set forth in this Agreement and the Exhibits attached hereto. The Medical Center will also directly assume debt service obligations with respect to certain capital indebtedness of the UMass Clinical Division.

The Parties anticipate that at Closing, UMass Physicians System, Inc. will change its name to UMass Memorial Physicians, Inc. ("UMass Memorial Physicians"). After the Closing, the Parties shall mutually agree upon the manner in which the services of the physicians employed by the University as of the Closing Date will be provided to a UMass Memorial affiliate. The physicians formerly employed by the University and whose services are to be provided to such UMass Memorial affiliate are referred herein as the "Practice Plan." At the Closing, Memorial Medical Group will maintain its separate legal existence but will change its name to UMass Memorial Medical Group, Inc.

The Parties further anticipate that on the Closing Date, certain assets and liabilities of WCCC (including its rights as member or controlling entity with respect to certain subsidiaries and affiliates of WCCC) will be transferred to UMass Memorial or one or more of its subsidiaries or affiliates. UMass Memorial and its subsidiaries and affiliates (including without limitation the Medical Center) from and after the Closing Date are each sometimes referred to herein individually as a "UMass Memorial Affiliate" and collectively as the "System."

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows, intending to be legally bound:

ARTICLE I. Definitions

In addition to the terms defined elsewhere herein, the following terms shall have the respective meanings set forth below:

1.1.    "Academic System" shall have the meaning set forth in Section 3.1.

1.2.    "Act" shall have the meaning set forth in the recitals.

1.3.    "Action" shall have the meaning set forth in Section 7.2.5.

1.4.    "Affected Lease" shall have the meaning set forth in Section 7.2.5.

1.5.    "Affiliation Agreement" shall have the meaning set forth in the recitals.

1.6.    "Agreement" means this Definitive Agreement.

-3-

1192368.12

1.7.    "Assumed Liabilities" shall have the meaning set forth in Section 7.2.3.

1.8.    "Balance Sheet Assets" shall have the meaning set forth in Section 7.2.1.2.

1.9.    "Bill of Transfer" shall have the meaning set forth in Section 13.1.2.

1.10.    "Chancellor" means the individual serving from time to time as the Chief Executive Officer of the University of Massachusetts at Worcester as designated by the Board of Trustees of the University of Massachusetts.

1.11.    "Clinton" shall have the meaning set forth in the recitals.

1.12.    "Closing" and "Closing Date" shall have the meaning set forth in Section 13.1 hereof.

1.13.    "COLA" shall mean the percentage increase (or decrease) in the U.S. Bureau of Labor Statistics Consumer Price Index - Revised - Urban Wage Earners and Clerical Workers - Boston Metropolitan Area - All Items (1982-84=100) (the "CPI Index") for the twelve months ending in September in each year, or, in the event the CPI Index is no longer issued, such other comparable adjustment index as the UMass Memorial and the University may mutually agree upon.

1.14.    "Combined Score" shall have the meaning set forth in Section 3.2.1.

1.15.    "Commonwealth" means The Commonwealth of Massachusetts.

1.16.    "Contracted Employee" shall have the meaning set forth in Section 7.2.3.6.

1.17.    "Contracted Employee Agreement" shall have the meaning set forth in Section 7.2.3.6.

1.18.    "Contracts" shall have the meaning set forth in Section 7.2.1.6.

1.19.    "Departmental Education Funds" shall have the meaning set forth in Section 3.4 hereof.

1.20.    "Development Office" shall have the meaning set forth in Section 3.9.1.

1.21.    "Direct Cost" means, with respect to any good, item, or service, all salaries, wages, benefits, supplies, and materials, all as defined by GAAP consistently applied, but only to the extent the foregoing are directly attributable to such good, item or service in accordance with GAAP consistently applied.  All recoveries from third parties for the good, item, or service, if any (e.g., payments for resale of power to others), will be offset against costs

-4-

otherwise included in this definition prior to calculation of cost to be allocated hereunder. With respect to any good, item, or service provided under the Occupancy Agreement, all categories of Direct Cost will be included in the budget preparation and approval process outlined in the Occupancy Agreement. In no event shall Direct Cost include any mark-up or increase for administrative or indirect costs.

1.22.   "DON" means a determination of need issued in accordance with the provisions of Section 25C of Chapter 111 of the General Laws of the Commonwealth.

1.23.   "Employee Benefit Plan" means any of the following (with all capitalized terms having the respective meanings set forth in the Employee Retirement Income Security Act of 1974, as amended, and including without limitation all plans that would constitute Governmental Plans for purposes thereof): (a) nonqualified deferred compensation or retirement plan or arrangement which is an Employee Pension Benefit Plan, (b) qualified defined contribution retirement plan or arrangement which is an Employee Pension Benefit Plan, (c) qualified defined benefit retirement plan or arrangement which is an Employee Pension Benefit Plan (including any Multiemployer Plan), or (d) Employee Welfare Benefit Plan or material fringe benefit plan or program, including without limitation retiree health benefits.

1.24.   "Environmental Law" means any federal, state or local regulation or legal requirement relating to pollution, or protection or cleanup of the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Resource Conservation and Recovery Act, as amended, the Clean Air Act, as amended, the Clean Water Act, as amended, and any other law or legal requirement, as now or hereinafter in effect, relating to: (a) the containment, removal, remediation, response, cleanup or abatement of any sort of any chemical substance released into the environment including, without limitation, those laws or legal requirements relating to the management, use, storage, disposal, cleanup or removal of asbestos, asbestos-containing materials, polychlorinated biphenyls or any other chemical substance released into the environment (excluding the existence of asbestos, asbestos containing materials above the ground or polychlorinated biphenyls in buildings or otherwise located above ground and not leaking); (b) the manufacture, generation, formulation, processing, labeling, distribution, introduction into commerce, use, treatment, handling, storage, recycling, disposal or transportation of any chemical substance; or (c) exposure of persons, including employees, to any chemical substance.

1.25.   "Environmental Liabilities and Costs" means all Losses incurred: (i) that are required by a governmental agency or third party in order to comply with any Environmental Law; (ii) that are required by a governmental agency or third party as a result of a release of any chemical substance; or, (iii) that are required by a governmental agency or third party, as a result of any conditions in violation of Environmental Law present at, created by or arising out of the past or present operations of UMass Clinical Division at the UMass Campus or of WCCC

1192368.12

through the Closing Date or of any prior owner or operator at the UMass Campus or of a facility or site at which WCCC now operates or has previously operated.

1.26.    "Existing Affiliates" shall have the meaning set forth in Section 3.9.1.

1.27.    "Excluded Assets" shall have the meaning set forth in Section 7.2.2.

1.28.    "Exploit" shall mean to utilize in any manner, including without limitation making, having made, using, selling, leasing, and renting, and in the case of a work of authorship, includes copying or creating derivative works of such work of authorship.

1.29.    "Foundation" shall have the meaning set forth in Section 3.9.1.

1.30.    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

1.31.    "Group Practice" shall have the meaning set forth in the recitals.

1.32.    "Hospital Trust Fund" means all assets, liabilities and net assets as of the Closing Date attributable to the "Teaching Hospital" shown on the Most Recent Financial Statements of the University's Clinical Services Division, intended to establish a separate revenue and expense center for the operations of the Teaching Hospital.

1.33.    "Indemnified Party" shall have the meaning set forth in Section 11.6.1.

1.34.    "Indemnifying Party" shall have the meaning set forth in Section 11.6.1.

1.35.    "Initial Term" shall have the meaning set forth in Section 6.2.1.1.

1.36.    "Insurance Consultant" means a nationally recognized insurance consulting firm that is reasonably acceptable to the University and qualified to survey risks and to recommend insurance coverage for hospitals, health-related facilities and services and organizations engaged in such operations.

1.37.    "Intellectual Property" means the entire right, title and interest in and to all proprietary rights of every kind and nature, including patents, copyrights, trademarks, mask works, trade secrets and proprietary information, all applications for any of the foregoing, and any license or agreements granting rights related to the foregoing.

1.38.    "Investigations" shall have the meaning set forth in Section 9.1.11.1.

-6-

1.39.   "Knowledge" means actual knowledge after reasonable investigation and with respect to the WCCC Affiliates means actual knowledge based on inquiry of the principal officers of the applicable WCCC Affiliate.

1.40.   "Late Payment Rate" shall mean the latest published rate for United States Treasury securities adjusted to a constant maturity of three (3) months as published weekly in the Federal Reserve Statistical Release H.15(519) of Selected Interest Rates (the "Interest Index"), plus one percent (1%). If the Interest Index is no longer available, UMass Memorial and the University shall agree upon a reasonably equivalent substitute interest index.

1.41.   "Leases" shall have the meaning set forth in Section 7.2.1.3.

1.42.   "Legislature" means the Great and General Court of The Commonwealth.

1.43.   "Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due), including any liability for Taxes.

1.44.   "License Agreement" shall have the meaning set forth in the recitals.

1.45.   "Lien" means any mortgage, pledge, lien, security interest, charge, claim, equity, encumbrance, restriction on transfer, conditional sale or other title retention device or arrangement (including, without limitation, a capital lease), transfer for the purpose of subjection to the payment of any indebtedness, or restriction on the creation of any of the foregoing, whether relating to any property or right or the income or profits therefrom; provided, however, that the term "Lien" shall not include (i) statutory liens for Taxes to the extent that the payment thereof is not in arrears or otherwise due, (ii) encumbrances in the nature of zoning restrictions, easements, rights or restrictions of record on the uses of real property if the same do not detract from the value of the property encumbered thereby or impair the use of such property in the business of the UMass Clinical Division or any of the WCCC Affiliates as currently conducted, (iii) statutory or common law liens to secure landlords, lessors or renters under leases or rental agreements confined to the premises rented to the extent that no payment or performance under any such lease or rental agreement is in arrears or is otherwise due, (iv) deposits or pledges made in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable laws or other social security regulations and (v) statutory or common law liens in favor of carriers, warehousemen, mechanics and materialmen, statutory or common law liens to secure claims for labor, materials or supplies and other like liens, which secure obligations to the extent that payment thereof is not in arrears or otherwise due.

1.46.   "Losses" shall have the meaning set forth in Section 11.2.

-7-

1.47.   "Marlborough" shall have the meaning set forth in the recitals.

1.48.   "Master Trust Indenture" means the Master Trust Indenture dated as of November 5, 1991 between The Medical Center of Central Massachusetts, Inc. (now known as Memorial) and Shawmut Bank, N.A., as Master Trustee, as supplemented by the Supplemental Master Indenture for Obligation No. 1 dated as of November 5, 1991 and the Supplemental Master Indenture for Obligation No. 2 dated as of October 6, 1992.

1.49.   "Material Adverse Effect" means any change or effect or any prospective change or effect that, individually or when taken together with other changes or effects, is or is reasonably likely (whether now or after the Closing Date) to be materially adverse to the financial condition or results of operation of a Party including its Subsidiaries, the financial arrangements contemplated by this Agreement, the Occupancy Agreement, the Affiliation Agreement, the License Agreement, the Contracted Employee Agreement, the value to any of the Parties of completing the proposed combination, the continued participation of any Memorial Affiliate or any constituent entity within the UMass Clinical System in the Medicare or Medicaid programs, or any Party's ability to consummate the transactions contemplated herein.

1.50.   "MBIA Bonds" means that portion of the Massachusetts Health and Educational Facilities Authority Revenue Bonds, Capital Asset Program Issue, Series J-2, the proceeds of which were loaned to the University pursuant to a Financing Agreement dated as of June 8, 1995.

1.51.   "Medical Center" shall have the meaning set forth in the recitals.

1.52.   "Medical Center Intellectual Property" shall have the meaning set forth in Section 12.1.

1.53.   "Medical School" shall have the meaning set forth in the recitals.

1.54.   "Memorial" shall have the meaning set forth in the preamble.

1.55.   "Memorial Affiliates" shall have the meaning set forth in the recitals.

1.56.   "Memorial Bonds" means the Massachusetts Health and Educational Facilities Authority Revenue Bonds, The Medical Center of Central Massachusetts Issue, Series A and Series B.

1.57.   "Memorial Campus" means the health care facilities located at or substantially contiguous to 119 Belmont Street, Worcester, Massachusetts.

1.58.   "Memorial Hospital" shall have the meaning set forth in the recitals.

1.59.   "Memorial Intellectual Property" shall have the meaning set forth in Section 12.1.

1192368.12

1.60.  "Memorial Medical Group" shall have the meaning set forth in the recitals.

1.61.  "Mixed Intellectual Property" shall have the meaning set forth in Section 12.1.

1.62.  "Most Recent Balance Sheet" means the combined balance sheet contained within the Most Recent Financial Statements.

1.63.  "Most Recent Financial Statements" means, with respect to the UMass Clinical Division or any WCCC Affiliate, the audited Financial Statements of such entity (combined, if applicable) for the fiscal year ended June 30, 1997, and with respect to any Memorial Affiliate, means the audited Financial Statements of such entity for the fiscal year ended September 30, 1997.

1.64.  "Net Operating Revenues" means for any fiscal year, Net Service Revenue less all operating expenses, excluding any extraordinary or non-recurring items, the cumulative effect of changes in accounting principles, any gains or losses from the early extinguishment of debt or from the sale or other disposition of investments or fixed or capital assets and also excluding gifts, unrealized gains or losses on investments, interest, dividends and other investment income, as determined in accordance with GAAP consistently applied and audited by an independent certified public accounting firm.

1.65.  "Net Service Revenue" means for any fiscal year all revenues including but not limited to patient service revenue (net of contractual adjustments and free care), premium revenue, revenue from contracts with other institutions and any other operating revenue earned by UMass Memorial and all Subsidiaries consolidated on the balance sheet of UMass Memorial as of the Closing Date, together with any New Affiliate as set forth in Section 3.2.1.1 that is not expressly excluded thereunder from the calculation of Net Operating Revenues, excluding any extraordinary or non-recurring items, the cumulative effect of changes in accounting principles, any gains or losses from the early extinguishment of debt or from the sale or other disposition of investments or fixed or capital assets, and also excluding gifts, bequests, contributions and donations, unrealized gains or losses on investments, interest, dividends and other investment income as determined in accordance with GAAP consistently applied and audited by an independent certified public accounting firm.

1.66.  "New Affiliate" shall have the meaning set forth in Section 3.2.1.1(g).

1.67.  "Occupancy Agreement" shall have the meaning set forth in the recitals.

1.68.  "Occupied Space" means all space made available to UMass Memorial or the Medical Center under the Occupancy Agreement.

1197368.12

1.69.    "Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

1.70.    "Oversight Group" shall have the meaning set forth in Section 3.9.1.1.

1.71.    "Participation Payments" shall have the meaning set forth in Section 3.2.1.1.

1.72.    "Party" or "Parties" shall have the meaning set forth in the preamble.

1.73.    "Person" means an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

1.74.    "Physician Advisory Board" shall have the meaning set forth in Section 6.2.12 hereof.

1.75.    "PPIP" means the Physician Performance Incentive Plan.

1.76.    "Practice Plan" shall have the meaning set forth in the recitals.

1.77.    "Reportable Event" shall have the meaning set forth in Section 4043 of the Employee Retirement Income Security Act of 1997, as amended ("ERISA").

1.78.    "Representative" shall have the meaning set forth in Section 14.10.

1.79.    "Research Facility" shall have the meaning set forth in Section 3.3.

1.80.    "Research Intellectual Property" shall have the meaning set forth in Section 12.1.

1.81.    "Safety Laws" means any federal, state and local law, regulation or legal requirement relating to health or safety, including the Occupational Safety and Health Act, as amended, as now or hereinafter in effect relating to (a) exposure of employees to any chemical substance or (b) the physical structure, use or condition of a building, facility, fixture or other structure, including, without limitation, those relating to equipment or manufacturing processes, or the management, use, storage, disposal. cleanup or removal of any chemical substance.

1.82.    "Security Interest" means any mortgage, pledge, lien, encumbrance, charge, or other security interest, other than (a) mechanic's, materialmen's, and similar liens, (b) liens for Taxes not yet due and payable, (c) purchase money liens and liens securing rental payments under capital lease arrangements, and (d) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

1.83.   "Self-Insurance Trust" means all assets as of the Closing Date attributable to the "University of Massachusetts Medical Center Self-Insurance Trust" shown on the Most Recent Financial Statements of the University, intended to establish a separate revenue and expense center for the operations of the self-insurance trust maintained to insure activities of the UMass Clinical Division.

1.84.   "Strategic Plan" shall have the meaning set forth in Section 5.1 hereof.

1.85.   "Subleased Property" shall have the meaning set forth in Section 7.2.5.

1.86.   "Subsidiary" means any corporation with respect to which a specified Person owns a majority of the common stock or membership rights or has the power to vote or direct the voting of sufficient securities or membership rights to elect a majority of the directors (or persons performing similar functions).

1.87.   "System" shall have the meaning set forth in the recitals.

1.88.   "Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Internal Revenue Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

1.89.   "Teaching Hospital" shall have the meaning set forth in the recitals.

1.90.   "Third Party Claim" shall have the meaning set forth in Section 11.6.1.

1.91.   "Transferred Assets" means the UMass Transferred Assets and the WCCC Transferred Assets.

1.92.   "UMass Campus" means the health care facilities located at 55 Lake Avenue North, Worcester, Massachusetts.

1.93.   "UMass Clinical System" shall have the meaning set forth in the recitals.

1.94.   "UMass Clinical Division" shall have the meaning set forth in the recitals.

1.95.   "UMass Memorial" shall have the meaning set forth in the recitals.

1.96.   "UMass Memorial Affiliate" shall have the meaning set forth in the recitals.

1.97.   "UMass Memorial Physicians" shall have the meaning set forth in the recitals.

-11-

1192368.12

1.98.   "UMass Transferred Assets" shall have the meaning set forth in Section 7.2.1.

1.99.   "University" shall have the meaning set forth in the preamble.

1.100.   "WCCC" shall have the meaning set forth in the preamble.

1.101.   "WCCC Affiliates" means WCCC and all Subsidiaries thereof, including without limitation all entities listed in Section 7.1.3 (regardless of whether such entity will become a Subsidiary of UMass Memorial on the Closing Date).

1.102.   "WCCC Transferred Assets" shall have the meaning set forth in Section 7.3.

1.103.   "WCH Site" shall have the meaning set forth in Section 7.3.4.2.

## ARTICLE II. Mission

The Parties agree that the Mission Statement for the System will be as follows:

"UMass Memorial is and will continue to be the premier health care system in central New England. We are the preferred choice of the people who live in that area and the physicians who care for them. Appreciating the rapidly changing nature of health care delivery, it is our intent to act swiftly and decisively to help mold the future of health care delivery and to ensure the highest ideals of quality and access. We are committed to not-for-profit status with our ultimate focus in improving the health of the various communities we serve.

UMass Memorial is preferred because we all strive to meet the needs of the people we serve every time. We continuously scrutinize our work for self-improvement and demonstrate superior quality and cost effectiveness. Patients receive warm, personal care which recognizes each as an individual. Ours is a system to which we would entrust the care of our own family members.

UMass Memorial is an integral part of an outstanding scientific and educational community. We treasure, nurture and derive great benefit from our linked destiny with the University of Massachusetts at Worcester. We are dedicated to training the next generation of physicians, nurses and allied health professionals according to high professional and ethical standards and to supporting and promoting the interests of the Academic System. Our commitment to inquiry and innovation leads to the advancement of knowledge and the education of scientists. Research and education are vital to our providing high quality health care services.

UMass Memorial creates for its workforce an environment of mutual respect and trust built through fairness and the creation of opportunities for growth and learning.

As the largest employer in central Massachusetts, we are committed to the economic growth of the region, to the quality of life for our communities and to meeting the health care needs of the Commonwealth of Massachusetts."

## ARTICLE III. Academic Relationship

3.1.    Principles of Relationship. The University's academic medical system, which includes, but is not limited to, the University's Medical School, Graduate School of Nursing, Research Enterprise, and Graduate School of Biomedical Sciences (the "Academic System"), and the System will continue to share in "Linked Destinies." The Parties agree that during the term of the Affiliation Agreement the Academic System will continue to support the operation and reputation of the System, and the System will support the operation and reputation of the Academic System.

3.2.    Financial Support and Relationships. The System agrees to make the following payments to the University on the terms and conditions set forth herein. UMass Memorial and the Medical Center shall be jointly and severally liable for all amounts set forth in Sections 3.2.1 and 3.2.1.1.

3.2.1. Baseline Support. The System has agreed to make a specific annual payment to the University during the term of the Affiliation Agreement so long as the University continues to operate a medical school. The University hereby acknowledges and agrees that from and after the Closing Date it shall have no right to and shall not attempt to claim any right to any portion of the Self Insurance Trust including income or appreciation thereon (other than in connection with the obligation of UMass Memorial or the Medical Center under Section 10.4 to provide tail coverage and otherwise indemnify the University and its employees who were covered by the Self Insurance Trust prior to Closing) or to assess a "Medical School Tax", "Dean's Tax" or other charge against clinical or professional revenues (other than the Departmental Education Fund Tax described in Section 3.4 and the Participation Payment described in Section 3.2.1.1) generated by any of the UMass Memorial Affiliates (or any future Subsidiary thereof) or any employees or independent contractors thereof and, except as provided in the Occupancy Agreement or otherwise agreed to in writing by the University and the Medical Center or any other UMass Memorial Affiliate, no other charges shall be assessed against or with respect to the clinical facility or otherwise. The System will pay the University an annual "par level" baseline support payment during the term of the Affiliation Agreement of Twelve Million Dollars ($12,000,000) (the "Base Payment"), subject to an annual adjustment for inflation by the COLA, payable in twelve (12) equal installments of One Million Dollars ($1,000,000) monthly, in arrears, on the fifteenth day of each month commencing after the first full month after the Closing, subject to inflationary adjustments on each anniversary during the term of the Affiliation Agreement as set forth therein; provided, however, that if the Closing occurs other than on the last day of a calendar month, the monthly payment shall be pro-rated for the number of days elapsed in the month following the Closing Date; and provided, further, that the Parties agree the existing Medical School Tax as defined in the Rules and Regulations Relative to the Operation and Governance of the Group Practice as set forth in Exhibit Q attached hereto in effect prior to

-13-

the Closing Date shall be continued through the end of the calendar month of the Medical Center during which the Closing occurs, and there will be a credit against the $1,000,000 monthly support payment equal to the amount paid by the Practice Plan (or any successor entity) in payment of such Medical School Tax during such partial calendar month.

As more fully set forth in the Occupancy Agreement, in the event the Medical School closes during the term of the Occupancy Agreement, then from and after the date of such occurrence, the System will be relieved of all obligation to pay baseline support under this Section 3.2.1, and the University and the System shall negotiate a lease arrangement to permit continued occupancy of the Occupied Space at fair market value subject to certain adjustments set forth therein, all as further set forth in the Occupancy Agreement.

There shall be an adjustment to the Base Payment and the Participation Payment in the event of a material change in the enrollment of medical students at the University or a material decline in restricted research expenditures at the Academic System calculated in accordance with the provisions of this Section 3.2.1.

The adjustment shall be calculated by reference to a system of 200 points. Of the 200 points, 100 shall be attributable to student enrollment and 100 shall be attributable to restricted research expenditures. The Parties agree that the number of first year medical students enrolled at the University as of January 1, 1997 was 100 and that this shall be deemed equivalent to 100 points. The parties agree that the level of restricted research expenditures on the Most Recent Balance Sheet of Medical School Academic System for the academic year ending June, 1996 was $32,139,000 and that this level shall be deemed equivalent to 100 points.

In the event the number of first year medical students enrolled at the University as of January 1 of any year during the term of the Affiliation Agreement is less than the level set forth above, then the number of points attributable to student enrollment for that year shall be reduced to a number equal to one hundred (100) times a fraction, the numerator of which is the number of students enrolled as of January 1 in that year and the denominator of which is the number of students enrolled as of January 1, 1997.

In the event the dollar value (held constant to 1996 dollar values by adjustment to the COLA) of restricted research expenditures received by the University for the academic year in which the calculation occurs is less than the level set forth above, then the number of points attributable to restricted research expenditures for that year shall be reduced to a number equal to one hundred (100) times a fraction, the numerator of which is the dollar value of restricted research expenditures received by the University in that academic year (held constant to 1996 dollar values by adjustment to the COLA) and the denominator of which is the dollar value of 1996 restricted research expenditures.

The sum of the points for student enrollment and restricted research expenditures is herein referred to as the "Combined Score." If the average of the Combined Score for any three consecutive years during the term of the Affiliation Agreement is less than 100, then the Base

-14-

1192368.12

Payment and the Participation Payment referred to in Section 3.2.1.1 shall be reduced proportionally from what they would have been. By way of example only and not as a limitation, if the average Combined Score for three consecutive years is 80, then the Base Payment and the Participation Payment shall be reduced to 40% of what they otherwise would have been. If in either of the two years immediately following the year in which such a proportional reduction occurs, the average Combined Score for the prior three (3) years increases to above 100, then the Base Payment and the Participation Payment shall be restored in that year to the levels they would have been but for the prior reduction.

If the Combined Score is less than 100 in two consecutive years following such a reduction (i.e., there are three consecutive years of reduced Base Payment and Participation Payment), then the Parties shall in good faith renegotiate a reduction in the payment provisions of Section 3.2.1. and 3.2.1.1, but in no event shall the reduced payment level be less than the fair market value of the use of the Occupied Space subject to adjustment as set forth in the Occupancy Agreement, and in the event the Parties cannot agree upon the renegotiated payment level, the matter shall be resolved pursuant to arbitration in accordance with Section 14.10.

3.2.1.1. Participation Payments. The University will be entitled to a percentage of the Net Operating Revenues of the System generated in each fiscal year during the term of the Affiliation Agreement and commencing after the Closing Date (the "Participation Payments") in accordance with the following schedule, payable within 120 days after the end of each fiscal year and prorated for any partial years as set forth in subparagraph (c) below:

(a)    when Net Operating Revenues are positive and between 0% and 2% of Net Service Revenues, an incentive of 10% of Net Operating Revenues will be paid;

(b)    when Net Operating Revenues are between 2.01% and 3% of Net Service Revenues, an incentive equal to base (defined as "a" above) plus 15% of the incremental Net Operating Revenues above 2% will be paid;

(c)    when Net Operating Revenues are between 3.01% and 4% of Net Service Revenues, an incentive equal to base (defined as "b" above) plus 25% of the incremental Net Operating Revenues above 3% will be paid;

(d)    when Net Operating Revenues are between 4.01% and 5% of Net Service Revenues, an incentive equal to base (defined as "c" above) plus 30% of the incremental Net Operating Revenues above 4% will be paid;

(e)    when Net Operating Revenues are between 5.01% and 6% of Net Service Revenues, an incentive equal to base (defined as "d" above) plus 28% of the incremental Net Operating Revenues above 5% will be paid;

1192368.12

**Exhibit 10**

**Part D – 2**

(f)     when Net Operating Revenues equal or exceed 6.01% of Net Service Revenues, an incentive equal to base (defined as "e" above) plus 28% of the incremental Net Operating Revenues above 6% will be paid.

(g)     In the event that any Person is combined or consolidated on the audited financial statements of UMass Memorial after the Closing (a "New Affiliate") then if and to the extent the principal place of business of such Person is located in Worcester County, Massachusetts or such Person is listed on Exhibit P, the Participation Payments set forth in Section 3.2.1.1 hereof shall apply to the combined Net Operating Revenues of UMass Memorial including the New Affiliate unless (a) the Parties otherwise agree in writing or (b) the New Affiliate is an insurance company, health maintenance organization, or similar entity; and in any event the Participation Payments set forth in Section 3.2.1.1 shall include any mobile institutional health care service operating at more than one fixed location, such as mobile catheterization services, mobile magnetic resonance imaging service, or mobile CAT scanners.

(h)     In the event the Affiliation Agreement commences or terminates other than on a date coinciding with the end of a fiscal year of the Medical Center, the Participation Payment shall be prorated during any partial fiscal year based on the number of days elapsed during the portion of the fiscal year during which the Affiliation Agreement is in effect  divided by 365; provided, however, that with respect to the Participation Payment during the first partial fiscal year, there shall be included in the calculation of Net Operating Revenues only the Net Operating Revenues attributable to operations from and after the Closing Date.  The University shall have the right, at its expense, to audit or otherwise review the determination of Net Operating Revenues of the System.

3.2.1.2.  _Debt Service Support/Assumption of Debt_.  The Medical Center shall expressly assume (i) all obligations to pay to the Trustee for the MBIA Bonds at the times when due, (ii) all obligations of the University under that certain Financing Agreement dated as of June 8, 1995 relating to the MBIA Bonds, all as set forth in an assumption agreement to be in form and substance satisfactory to the Parties and the insurer of the MBIA Bonds; (iii) all obligations of the University with respect to these certain capitalized leases set forth on Schedule 7.2.1.2; and (iv) all guaranty and other financial obligations of the University under that certain Agreement dated December 11, 1997 relative to the affiliation of the health care system operated by Central New England HealthAlliance, Inc. with the UMass Clinical System (the "HealthAlliance Affiliation"), a copy of which is attached hereto as Exhibit U.  The University shall take no action that shall adversely affect the status of interest on the MBIA Bonds to be in default exempt from federal income taxation or otherwise cause the MBIA Bonds to be in default.

3.2.1.3.  _Shared Services_.  The Parties agree that the University and the System will continue to share and purchase certain goods and services from each other to the extent provided in and in accordance with the terms of the Occupancy Agreement at cost.

1192368.12

3.2.1.4. <u>Former Related Party Budgeted Transactions</u>. If and to the extent previously reflected on the Combining Statement of Operations in the most recent Financial Statements, services or goods previously purchased or sold to or from the UMass Clinical System by or from the Academic System will continue to be so purchased or sold at cost until the Parties shall otherwise mutually agree.

3.3.    <u>Construction of Research Facility</u>. The Parties have agreed to the acquisition, renovation, construction, equipping and support of a new research facility with an anticipated cost of approximately Forty Six Million Five Hundred Thousand Dollars ($46,500,000) (the "Research Facility"). The Parties agree that Ten Million Dollars ($10,000,000) of the Excluded Assets to be held by WCCC or, at the option of the University, by the University as of the Closing Date shall be used by the University or WCCC for the acquisition, renovation, construction, equipping, and support of the Research Facility to be owned by the University or WCCC. The Medical Center shall pay to the University the sum of Twenty One Million Five Hundred Thousand Dollars ($21,500,000), to be (i) contributed as a restricted fund for use in connection with the Research Facility, and (ii) paid in installments of Eleven Million Dollars ($11,000,000), payable on the first anniversary of the Closing and Ten Million Five Hundred Thousand Dollars ($10,500,000) payable on the second anniversary of the Closing. The Parties agree that the University and UMass Memorial will work together to raise from private sources an additional Fifteen Million Dollars ($15,000,000) required to complete such support for the Research Facility.

3.4.    <u>Departmental Education Funds</u>. All academic funds (net assets) derived from the Group Practice and held by the University as of the Closing Date, including the net assets in the fund labeled "Group Practice Plan Fund Balance" on the Most Recent Balance Sheet of the UMass Clinical Division will remain assets of the University and will be held by the Medical Center as agent for the University and allocated to each academic department regardless of whether the department chair was formerly affiliated with UMass Clinical System or Memorial. The funds shall be transferred by the Medical Center, as agent, to the University pursuant to the provisions of Section 13.1.4. Expenditures from such funds will be made upon the prior approval of the Chancellor and President/Chief Executive Officer of UMass Memorial.

Immediately after the Closing, UMass Memorial shall, in consultation with the department chairs and the Chancellor, undertake and complete within six months of the Closing a review of the method of funding academic support payments from the Practice Plan to the ten clinical departments of the Medical Center (the "Departmental Education Funds"). The ten percent (10%) level of funding of the Departmental Education Funds in effect as of the date of execution of this Agreement (excluding the annual transfer of "Residual Earnings" as calculated pursuant to the Rules and Regulations of the Group Practice Bylaws in Exhibit Q) shall remain in effect until such time as the review of the method of funding has been completed. Thereafter, UMass Memorial shall have the right to substitute a new method after consultation with the Chancellor; provided, however that the dollar level of funding for fiscal year 1996 shall be maintained unless and until the Chancellor and the President/Chief Executive Office of UMass Memorial shall otherwise agree.

-17-

1193368.12

Expenditures from the Departmental Education Funds during the year in which related income is earned will be made by the Medical Center, in accordance with the budget approved by the Chancellor and the President/Chief Executive Officer of UMass Memorial. The balances, if any, remaining in the Departmental Education Funds each year following reconciliation of such approved expenditures as of the end of September (which shall expressly exclude all Residual Earnings as defined in Exhibit Q or other portion of annual net income), together with all accrued interest earned thereon, shall be transferred to the appropriate academic departments of the Medical School within one hundred twenty (120) days of such reconciliation date. In the event that any such remaining balances are not transferred within such time, such untransferred amounts shall accrue interest from the end of the fiscal year as to which such reconciliation applies at the Late Payment Rate. The System and the Academic System will work together in the future to identify additional sources of funds to subsidize less lucrative academic departments.

3.5.    Academic and Clinical Operating Principles.

3.5.1. The Academic System and the System will develop complementary academic and clinical strategies that are linked through joint investments in academic and clinical programs designed to foster a cooperative and team-oriented approach.

3.5.1.1. The Academic System will have jurisdiction over academic issues (e.g., curriculum development, use of educational funds), and the System will have jurisdiction over clinical issues (e.g., service site location, program development, etc.). The University and UMass Memorial will inform and consult with each other on major changes in mission or operations. The Parties recognize that joint decision-making between the University, UMass Memorial, and the Medical Center will be necessary with respect to decisions that affect all of these entities.

3.5.1.2. UMass Memorial and the Medical Center will continue to have representation on committees of the Academic System that address matters directly related to the operations of the System, including without limitation the following: Education Policy Committee; Graduate Medical Education Committee; Continuing Medical Education Committee; Executive Council; and Faculty Council. Such representatives on such committees will be appointed by the President/Chief Executive Officer of UMass Memorial after consultation with the Chancellor.

3.6.    Affiliation Management Group. The Medical School and UMass Memorial shall establish a senior management group including senior representatives for each of them. This management group will review proposals regarding issues of common concern to the Parties, including but not limited to joint strategic planning, annual budgeting with respect to joint operations, programs or activities, and academic priorities.

3.7.    Consultation Regarding Matters of Mutual Concern. The Parties agree that on matters that affect both clinical operations and academic activities, the Chancellor and the

-18-

President/Chief Executive Officer of UMass Memorial shall cooperate and consult with each other and use their best efforts to reach a mutually acceptable decision.

3.8.    Vision Statement of the Academic System. The Academic System, with the advice and participation of the System, will establish a clear vision statement that will include accountability based on objective performance measures such as national standing on research awards, ranking in primary care, and similar tangible performance measures, with the understanding that implementation of this vision statement will be supported by UMass Memorial consistent with the terms of this Agreement.

3.9.    Development Activities.

3.9.1.    Single Development Office. The Medical School development office (the "Development Office") shall be the sole development office that will conduct the fund raising and development efforts for the Medical School and all UMass Memorial Affiliates in existence on the Closing Date (the "Existing Affiliates"). Prior to the Closing, UMass Medical Center Foundation, Inc. shall amend its articles and bylaws in the forms attached hereto as Exhibits B and C, respectively, to change its name to UMass Memorial Foundation, Inc. (the "Foundation") and to provide that the predecessor entities shall appoint an equal number of board members of the Foundation. The Foundation shall provide advice and assistance to the Development Office in such efforts. The Chancellor shall serve, ex-officio, as the Chief Executive Officer of the Foundation, and such other staff as may be required will be provided by the Medical School. All fund raising efforts and approaches to potential donors on behalf of the Medical School, the System, and the Existing Affiliates shall be conducted by the Development Office. The Development Office may conduct fund raising efforts on behalf of entities that become affiliated with the System after the Closing Date by mutual agreement of the Chancellor and the President/Chief Executive Officer of UMass Memorial, but in no event shall UMass Memorial conduct independent fund raising efforts for such new affiliate, (although such new affiliate may conduct its own fund raising efforts provided it does not use the "UMass" name).

3.9.1.1.    Oversight Group. A Development Office oversight group, appointed by the Chancellor and including the President/Chief Executive Officer of UMass Memorial (the "Oversight Group"), shall be responsible for approving fund raising plans and strategies for contacting potential donors and resolving outstanding issues relating to distributions of the funds raised by the Development Office. The Development Office's annual plans and strategic plans shall be adopted with the advice and consent of the President/Chief Executive Officer of UMass Memorial.

3.9.1.2.    Clinical Fundraising Division. A specific division shall be established within the Development Office that shall be responsible for implementing the Development Office's development efforts for the System. The head of this division shall be appointed by the President/Chief Executive Officer of UMass Memorial, subject to the approval of the Chancellor.

1192368.12

3.10.  Distribution of Funds and Cost.  Donors will have an opportunity to designate their donations and bequests to (i) the Medical School or UMass Memorial, (ii) specific programs within the Medical School or the System, (iii) specific purposes, or (iv) a general fund. Amounts donated with designation as to the Medical School or UMass Memorial or to specific programs or entities under the control of either, shall immediately be transferred to the Medical School or to UMass Memorial, as applicable.  Amounts denoted with designation for a specific program or purpose not under the control of the Medical School or UMass Memorial shall immediately be transferred to the Medical School or UMass Memorial depending upon which of such entities is most responsible for and capable of fulfilling the donor's stated intentions. Amounts donated without designation shall be shared equally by the Medical School and the System.  The Medical School and the System shall share the costs associated with the Development Office in proportion to the percentage of the total amounts respectively allocated to each during the applicable fiscal year.  The Development Office shall receive all donations as agent for the University and/or the System, as the case may be, shall hold all funds in trust for the benefit of the intended recipient, and shall distribute such funds in accordance with the instructions of the intended recipient.

3.11.  Use of Name.  Use of the name "UMass" shall be governed by the License Agreement.  So long as the License Agreement is in effect, UMass Memorial shall consistently use the Marks (as defined in License Agreement) in its name and in all of its operations and general publicity materials, in accordance with and subject to the License Agreement, and shall cause the UMass Memorial Affiliates in existence on the Closing Date and any New Affiliates that have an academic affiliation agreement with the University to use the Marks in their names, operations or in all general publicity materials in accordance with and subject to the License Agreement, unless otherwise agreed by the University.  The University agrees not to grant a license to use the name "UMass" or permit any entity (other than a UMass Memorial Affiliate) to use such name as part of the name of any health facility (excepting only student health facilities, including the existing Amherst facility, which serves patients in addition to students) or physician group; provided, however, that the University may grant a license to use the name "UMass" to a publicly-owned hospital.

ARTICLE IV.  Physician Leadership and Organization

4.1.  General Principles.  Except for (i) members of the medical staff of the former Memorial Hospital who did not hold Medical School faculty appointments prior to the Closing and (ii) other individual physicians specifically excluded by approval of the Chancellor, all members of the medical staff of the Medical Center shall be required to have and maintain faculty appointments at the Medical School as requested by the Medical School and to provide a reasonable amount of academic service under the supervision of the Chancellor, at no additional compensation from any of the Parties, (not to exceed more than two hundred (200) hours per year for physicians employed by any UMass Memorial Affiliate or the Practice Plan without the approval of the President/Chief Executive Officer of UMass Memorial and not to exceed fifty (50) hours per year for physicians in private practice without the prior approval of the Board of Trustees of UMass Memorial including, but not limited to, participation in resident training

-20-

programs). Subject to the limitation set forth in the prior sentence, the annual amount of required academic service shall be determined from time to time by the Chancellor based on the needs of the Medical School and the resources available to it; provided, however that any increase in the standard number of uncompensated hours to be provided by new employed members of the faculty of the Medical School is subject to approval by the Physician Advisory Board. By mutual agreement of the Chancellor and the Medical Center, the Medical Center may create or may designate specific medical staff categories to which individuals who have been exempted from the faculty appointment requirement may be appointed. The Academic System will work with the System to train, support and place physicians, students, and other health care professionals for community and clinical service in accordance with the Strategic Plan.

4.2.    Organization.

4.2.1.  Clinical departments of the Medical Center will mirror the organizational structure of the academic departments of the Academic System. The academic department chair and division director of the Academic System will serve as the department chair and division director, respectively, of the corresponding clinical department of the Medical Center and are referred to herein as a "department chair" or "division director" when functioning in either an academic or clinical capacity. The initial department chairs will be set forth on a schedule to be delivered at Closing. At least three of the initial department chairs will be appointed from among physicians formerly affiliated with Memorial. Unless and until changed by the Board of Trustees of UMass Memorial, at least three of the department chairs will have their principal offices at the Memorial campus. The department chairs will be responsible for clinical process redesign and enforcement of the proposed redesign.

4.2.1.1.  Initial vice chairs will be appointed so as to provide representation of both campuses in the principal offices of the chairs and vice chairs of each department between the UMass Campus and the Memorial Campus.

4.2.1.2.  Initial division directors will include representatives of the UMass Campus and the Memorial Campus. Departmental chairs will be responsible for appointment of the division directors, in consultation with the chief medical officers of the Medical Center and the Physician Advisory Board ("PAB"), subject to final approval by the President/Chief Executive Officer of UMass Memorial.

4.2.1.3.  The Medical Center will have a single medical staff with a single chair of each department. The medical staff will include (i) physicians employed by the University whose services are provided under a Contracted Employee Agreement (if any), (ii) physicians employed by UMass Memorial Physicians, Inc., (iii) physicians employed by UMass Memorial Medical Group, Inc., and (iv) private practitioners. The medical staff bylaws shall be consistent with this Agreement.

-21-

4.2.1.4.  The composition of the employed medical group or groups and the strategy to be pursued by the Medical Center in integrating physicians will be determined by the Strategic Plan.

4.2.1.5.  The System will endeavor to establish a primary care physician network that is appropriate in size and location, and whose incentives are appropriately aligned with the System. The Parties anticipate that the initial target ratio of primary care physicians to specialists will be developed as part of the development of the Strategic Plan. Thus, desired growth or decrease in the number of specialists will be determined as part of the Strategic Plan. The Parties anticipate that quality, cost efficiency and productivity will be measured and monitored for all physicians in the network.

4.3.    Appointment and Activities of Departmental Chairs.  Academic chairs/ department chairs will be recruited by a search committee appointed by the Chancellor and shall be appointed by the Chancellor with the advice and consent of the President/Chief Executive Officer of UMass Memorial. During the first three years following the Closing Date, the search committees will be comprised of equal numbers of representatives formerly affiliated with each of the Academic System and Memorial. The Chancellor and the President/Chief Executive Officer of UMass Memorial will jointly agree upon the recruitment package to be offered to any candidate for the position of academic chair/department chair. The search committee will include participants from the PAB or their nominees. The Chancellor and the President/Chief Executive Officer of UMass Memorial will jointly undertake the annual performance review of the academic chairs/department chairs of each department and will agree upon the compensation package for such individuals. Either the Chancellor or the President/Chief Executive Officer of UMass Memorial may request termination of an academic chair/department chair, with such request to be processed expeditiously and in accordance with appropriate Medical School due process. Prior to the Closing, the Medical School and Memorial shall endeavor to establish a mutually agreeable process for termination of an academic chair/department chair, with such process to include a final determination no later than three (3) months from receipt of request for termination. In the event the Medical School and Memorial fail to agree upon such a process, or in the event they agree upon such a process but for any reason a final determination to terminate an academic chair/department chair has not been rendered within the said three (3) month period, then the President/Chief Executive Officer of UMass Memorial may remove such individual from the position of department chair; thereafter the President/Chief Executive Officer of UMass Memorial may appoint an interim department chair with the approval of the Chancellor, which approval shall not be unreasonably withheld. In the event the President/Chief Executive Officer of UMass Memorial and the Chancellor shall fail to agree upon the appointment of an interim department chair, then a four (4) member subcommittee of the Board of Trustees of UMass Memorial shall appoint the interim department chair, and the Chancellor and the President/Chief Executive Officer shall each designate two (2) trustees to serve on such subcommittee.

4.4.    Accountability.  All research activities will be managed and governed by the University, and the academic chairs of each department will be responsible for establishing mechanisms to ensure accountability for satisfactory use of clinical time.

-22-

4.5.    <u>Clinical Services to the Commonwealth</u>. The System will endeavor to respond to the need of the Commonwealth for clinical and support services as identified by the Academic System.

4.6.    <u>Compensation</u>. The Chancellor and the President/Chief Executive Officer of UMass Memorial shall agree on an allocation between the Medical School and UMass Memorial and/or the Medical Center for compensation of individuals serving in dual capacities on behalf of the Medical School and UMass Memorial and/or the Medical Center.

4.7.    <u>System Support for Faculty Academic Pursuits</u>. UMass Memorial and the Medical Center shall work with the department chairs in their efforts to define faculty compensation and allocate patient care and other responsibilities in order to promote academic and research efforts consistent with the mission of the Medical School.

ARTICLE V. <u>Strategic Plan; Clinical Program Integration</u>

5.1.    <u>Development of Strategic Plan</u>. The Parties agree that the success of the combination of the Academic System and Memorial will be driven by the development of a new strategic plan for the System. The Office of the President is principally responsible for the development of the strategic plan (the "Strategic Plan"), and the officers comprising the Office of the President will be offered a compensation package that includes strong incentives to accomplish the Strategic Plan. The Parties anticipate that the Strategic Plan will be based on market data, focused on the needs of individuals, will enhance the indispensability of both the Academic System and the clinical delivery abilities of the System, and will serve as the vehicle for reinforcing the linked destiny of the clinical and academic systems.

5.2.    <u>General Principles</u>. The Parties anticipate that the following principles will be included as part of the Strategic Plan: (1) the System will endeavor to identify centers of special emphasis that are complementary to the academic mission of the Academic System; (2) the service area served by the System will be expanded; (3) the Strategic Plan will be based on an integrated delivery system model that includes a full continuum of care, although the Parties agree that it may be more efficient to purchase services rather than to develop service abilities for certain rare quaternary procedures; (4) a single committee of the System and the Academic System will be established to combine (as appropriate) and rationalize programs and services; (5) programs and services will be located based on most efficient use of all the System resources; (6) recognizing that reassigning of functions may be required, and in order to assure fairness, any changes to staffing levels will be first assessed by outside consultants drawing on objective benchmarking and best practices data; (7) cost targets for the services provided by the System will be established as part of the Strategic Plan; (8) new revenue sources should be encouraged, consistent with the need for success under capitation; (9) the System should maintain a multiple-payor strategy; (10) the System should consider seeking delegated-provider status; (11) the System should form or join a larger regional network with other not-for-profit entities soon after the Closing Date in order to achieve a better balance with highly consolidated payors; and (12)

-23-

the System should pursue innovative revenue opportunities with the Academic System through joint enterprises.

## ARTICLE VI. The System

6.1.    Formation.  Prior to the Closing Date, the Parties will cause UMass Memorial to be formed as a non-stock, non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, pursuant to Articles of Organization substantially in the form of Exhibit D attached hereto and made a part hereof.  In addition, prior to the Closing Date, UMass Memorial will adopt Bylaws substantially in the form of Exhibit E attached hereto and made a part hereof, which Bylaws will adopt as the mission of UMass Memorial the mission statement described in Article II hereof.

6.2.    Governance.

6.2.1.  The governing body of UMass Memorial shall be a Board of Trustees as established in the Bylaws of UMass Memorial.  The governing body of the Medical Center shall be a Board of Trustees, which initially and during the Initial Term shall consist of those individuals serving from time to time as the Trustees of UMass Memorial except as otherwise expressly permitted hereunder.  As of the Closing Date, the Board of Trustees of UMass Memorial shall be constituted as follows in accordance with the Bylaws:

6.2.1.1.  For a period of four (4) years after the Closing Date (the "Initial Term"), the University shall designate ten (10) individuals to serve on the Board of Trustees of UMass Memorial and the Medical Center, of whom four (4) shall be designated by the Chancellor of the University with the advice and consent of the President of the University, one of whom, to the extent required by law, shall be the elected student representative of the Worcester campus pursuant to M.G.L.c.75, §1A.

6.2.1.2.  During the Initial Term, the Board of Trustees of Memorial shall designate ten (10) individuals to serve on the Board of Trustees of UMass Memorial and the Medical Center.

6.2.1.3.  The Chancellor of the Medical School, the President/Chief Executive Officer of UMass Memorial, and the Executive Vice President/Chief Operating Officer of UMass Memorial shall each be voting members of the Board of Trustees of UMass Memorial and the Medical Center in an ex officio capacity during the Initial Term and shall be included within the individuals designated by the University and Memorial.  A majority of the Board members shall reside or work in the service area of the System as defined in the Strategic Plan.  After the Initial Term, the Chancellor and the President/Chief Executive Officer shall continue to serve as ex officio members, with vote, of the Board of Trustees of UMass Memorial, but the Executive Vice President/Chief Operating Officer shall no longer be a member of the Board of Trustees, and thus the size of the Board of Trustees shall be reduced from 20 to 19 members.

-24-

1192368.12

In the event that any of the ten individuals appointed by Memorial shall die, resign, or be removed from office during the Initial Term, the remaining trustees initially appointed by Memorial shall have the right to appoint a successor for the remainder of the Initial Term by majority vote. In the event that any of the ten individuals initially appointed by the University shall die, resign, become disqualified, or be removed from office during the Initial Term, the University shall have the right to appoint a successor for the remainder of the Initial Term; provided, however, that if such individual is also a trustee selected by the Chancellor, then the successor to such individual shall be appointed by the Chancellor as more fully set forth in the Bylaws of UMass Memorial.

6.2.1.4. Subject to the provisions of Section 6.2.1.5, the composition of the Board of UMass Memorial may be increased during the Initial Term by a two-thirds vote of the Trustees then in office in order to facilitate additional providers joining the System, provided that the Board shall not exceed twenty-three (23) individuals; shall include the President/Chief Executive Officer of UMass Memorial and during the Initial Term, the Executive Vice President/Chief Operating Officer of UMass Memorial, ex officio with vote; shall include an equal number of Memorial-affiliated trustees and University-affiliated trustees during the Initial Term; and whenever the trustees are required to take action by vote of two-thirds of the trustees then in office during the Initial Term, such vote shall require at least three University-affiliated trustees. After the Initial Term, the composition of the Board of UMass Memorial may be increased or decreased for any reason subject to the provisions of Section 6.2.1.5.

6.2.1.5. Subject to the provisions of Section 6.2.1.6, and so long as the Affiliation Agreement is in effect, the Chancellor shall be an ex officio member of the Board of Trustees of UMass Memorial and retain the permanent right to designate four trustees with the advice and consent of the University President, one of whom, to the extent required by law, shall be the elected student representative of the Worcester campus pursuant to M.G.L.c. 75, §1A.

6.2.1.6. In the event of an increase or decrease in the size of the Board of Trustees, in no event shall the total number of trustees selected by the Chancellor and including the Chancellor be less than five-nineteenths (5/19) of the entire voting membership of the sitting Board of Trustees, including ex-officio members.

6.2.1.7. All clinical enterprises conducted by UMass Memorial or its subsidiaries or affiliates will report to the Board of Trustees of UMass Memorial.

6.2.1.8. The Board of Trustees of UMass Memorial shall meet at least monthly.

6.2.1.9. The affirmative vote of two-thirds of the Board of Trustees of UMass Memorial then in office shall be required to effect any of the following:

1192368.12

(a)    Closure of an acute care campus
(b)    Closure of a principal clinical service
(c)    Sale of all or substantially all of the assets of the corporation, merger or consolidation, or dissolution
(d)    Sale or other disposition of a subsidiary
(e)    Amendment of certain Sections of the bylaws as set forth in the form of bylaws attached as Exhibit B.
(f)    Termination of the employment of the President/Chief Executive Officer and, during the Initial Term the Executive Vice President/Chief Operating Officer.

6.2.2.  The Committees of the Board of Trustees of UMass Memorial will be as follows: Finance, Audit, Nominating, Compensation and Senior Management Evaluation, and Academic Integration Committee and such other committees as the board may determine. The Nominating Committee will be comprised of the Chancellor, the President/Chief Executive Officer, and no more than two other Trustees (one from each predecessor entity) appointed by the Chairperson. The Academic Integration Committee will be comprised of the Chancellor, of the two trustees designated by the Chancellor, the President/Chief Executive Officer, and two other Trustees who do not serve in an ex officio capacity.

6.2.3.  The officers of UMass Memorial shall be a Chairperson, Vice Chairperson during the Initial Term, President/Chief Executive Officer, Executive Vice President/Chief Operating Officer during the Initial Term, Treasurer, Secretary, and such other officers as may be permitted by the Bylaws, each of whom shall have the powers and perform the duties set forth in the Bylaws.

6.2.4.  The Parties agree that individuals selected for senior management positions must be enthusiastic and committed, efficient, knowledgeable concerning the mission, vision, and details of strategy of the System, and empowered to implement that mission, vision and strategy. In furtherance of these understandings, the Parties agree that such individuals should have a significant portion of their compensation at risk for achievement of measurable goals and that there should be a cross-linkage of financial incentives between the Academic System and the System.

6.2.5.  During the Initial Term, the offices of Chief Executive Officer of UMass Memorial and the Chairperson will be individuals associated with different predecessor organizations, and the Vice Chairperson and Chairperson shall be individuals associated with different predecessor organizations.

6.2.6. The Initial Chairperson of UMass Memorial shall be designated by the University and shall be one of the trustees affiliated with the University. Peter H. Levine, M.D. will serve as President/Chief Executive Officer during the Initial Term. Arthur R. Russo, M.D. will serve as the Executive Vice President/Chief Operating Officer during the Initial Term. The President/Chief Executive Officer and the Executive Vice President/Chief Operating Officer will work together to fulfill the duties of the Office of the President. At the expiration of the Initial Term or such earlier time as Dr. Levine no longer holds the office of President/Chief Executive Officer, Dr. Russo will succeed Dr. Levine as President/Chief Executive Officer. If this succession plan is disrupted, a search committee will be formed. The committee will be appointed by the Chairperson and chaired by the Chancellor and will be responsible for nominating a successor, who may have been affiliated with the UMass Clinical System or unaffiliated with either of the Parties. The approval of the University will be required to change the succession plan.

6.2.7. The major responsibilities of the President/Chief Executive Officer of UMass Memorial will be to lead development of the Strategic Plan, Board relations, community relations, development, managed care strategy and relations, system integration, and the overall financial performance (excess of revenues over expenses) of the System and will chair the Physician Advisory Board.

6.2.8. During the Initial Term, the major responsibilities of the Executive Vice President/Chief Operating Officer of UMass Memorial will be to oversee operations of the Medical Center, the medical group(s), the clinics and other clinical entities, and affiliated partners and regional hospitals. In addition, the Executive Vice President/Chief Operating Officer will be responsible for financial performance from operations (excess of revenues over expenses) for the System, and will chair the Clinical Policy Committee (Chairs Council) of the Medical School.

6.2.9. Subject to the provisions of Section 6.2.1.9(f), the Board of Trustees of UMass Memorial will have ultimate decision making power to hire or fire the President/Chief Executive Officer or the Executive Vice President/Chief Operating Officer based on evaluative criteria determined by the Board of Trustees. The Board of Trustees will endeavor to balance the initial succession among the Chief Executive Officer and Board Chairperson from different predecessor organizations.

6.2.10. The individuals who shall initially hold offices other than the President/Chief Executive Officer or Executive Vice President/Chief Operating Officer shall be mutually agreed upon by the Parties prior to the Closing and shall be specified in a schedule delivered at the Closing.

6.2.11. After the Initial Term, appointment of the Chancellor will require the advice and consent of the President/Chief Executive Officer of UMass Memorial and the appointment of the President/Chief Executive Officer of UMass Memorial will require the advice and consent of the Chancellor; provided, however, that in the event the University determines

-27-

that it will no longer recognize the right of the President/Chief Executive Officer to consent to the appointment of the Chancellor, then UMass Memorial shall no longer be obligated to obtain the consent of the University to the appointment of the president/Chief Executive Officer of UMass Memorial, although each of the University and UMass Memorial will continue to consult with each other prior to the appointment of such officers.

6.2.12.  There will be a Physician Advisory Board (the "PAB") that reports directly to the Board of Trustees, thus allowing physician guidance to the Board of Trustees on all major clinical and care delivery-related issues. The specific responsibilities of the PAB, set forth more fully in the Bylaws of UMass Memorial, include the following:

6.2.12.1.  Assisting the President/Chief Executive Officer in the development of strategic goals and objectives.

6.2.12.2.  Advising the System on managed care strategy.

6.2.12.3.  Endorsing managed care contracts for approval by the Board of Trustees; provided, however, that such endorsement, if any, shall be for informational purposes only and shall not preclude the Board of Trustees from acting on any managed care contract.

6.2.12.4.  [Reserved].

6.2.12.5.  Providing a source of physician members for chair search committees and advising and consenting to the appointment of clinical representatives on such search committees.

6.2.12.6.  Participating in the performance evaluation of the President/Chief Executive Officer of UMass Memorial against completion of agreed upon goals and objectives.

6.2.12.7.  Reviewing major issues before they are presented to the Board of Trustees; provided, however, that failure to accomplish such review shall not invalidate any actions by the Board of Trustees.

6.2.13.  The PAB will assist the Board of Trustees in monitoring a physician incentive system, including the PPIP, that provides both short and long-term incentives for physicians affiliated with System for managed care risk contracting. Short-term incentives will be similar to those in use at the UMass Clinical System as of the date hereof, including measures of clinical productivity, panel size, quality metrics and patient satisfaction. Long-term incentives will be similar to those currently in use at Memorial with such changes as the Parties mutually agree upon prior to Closing and will reward risk contract participation and cost/quality data sharing. The contribution to the PPIP for fiscal year 1998 will be not less than three million dollars ($3,000,000) nor more than six million dollars ($6,000,000), based on performance criteria currently applicable under the PPIP and thereafter the contribution to the PPIP will be a

1193368.12

fixed amount set by the Board of Trustees and established so as to align adequately the incentives of physicians and the Medical Center.

6.2.14. The PAB for the Initial Term will consist of 27 physicians: eight appointed by each of Memorial and the University; four elected by the medical staffs of each of Memorial Hospital and the Teaching Hospital, and in addition the Chancellor, the President/Chief Executive Officer, and the Executive Vice President/Chief Operating Officer, who will serve ex officio with vote. At least twelve of the PAB members will be primary care physicians (defined to include obstetricians) and at least eight departmental chairs shall be members of the PAB, selected from among the following departments: Medicine, Surgery, Obstetrics, Pediatrics, Family Medicine, Psychiatry, Surgical or Medical Subspecialty, ERAP (Emergency Room, Radiology, Anesthesia and Pathology) representative. The PAB will include significant private practice representation. The President/Chief Executive Officer of UMass Memorial will be the Chairperson of the PAB, and the Executive Vice President/Chief Operating Officer will be the Vice Chairperson of the PAB. After the Initial Term, at least one-third of the PAB members shall be departmental chairs unless otherwise determined by a vote of two-thirds of the Board of Trustees of UMass Memorial.

6.3.    <u>The Medical Center</u>. Prior to the Closing Date, the Parties will cause the Medical Center to be formed as a non-stock, non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, pursuant to Articles of Organization substantially in the form of <u>Exhibit F</u> attached hereto and made a part hereof. In addition, prior to the Closing Date, the Medical Center will adopt Bylaws substantially in the form of <u>Exhibit G</u> attached hereto and made a part hereof. As of the Closing Date and during the Initial Term, the Board of Trustees of the Medical Center shall be comprised of those individuals serving as the initial Trustees of UMass Memorial. The affirmative vote of two-thirds of the Board of Trustees of the Medical Center then in office shall be required to effect any of the following, and vacancies in the Board of Trustees of the Medical Center shall be filled and removals of individuals from the Board of Trustees shall be effected in accordance with Section 6.2.1.3:

(a)    Closure of an acute care campus
(b)    Closure of a principal clinical service
(c)    Sale of all or substantially all of the assets of the corporation, merger or consolidation, or dissolution
(d)    Sale or other disposition of a subsidiary
(e)    Amendment of certain Sections of the Bylaws of the Medical Center as set forth in the form of bylaws attached as Exhibit G.

The University shall have the right to approve any change in the corporate member of the Medical Center.

6.4.    <u>Restrictions on Operations of UMass Memorial and Nonprofit UMass Memorial Affiliates</u>.

1192368.12

6.4.1. Continuation of Nonprofit Status; Maintenance of Assets. The provisions of Section 4(a) and 4(b) of the Act relating to maintenance of nonprofit status, limitation on disposition of assets to a for-profit entity and merger or consolidation for ten years following the effective date of the Act are hereby incorporated by reference as a legally binding obligation.

6.4.2. Equity or Ownership Interests in UMass Memorial Affiliates. After November 25, 1997, no officer, trustee, or employee of UMass Memorial or the Medical Center shall acquire an equity ownership interest, other than in a nominee capacity, in any for-profit UMass Memorial Affiliate.

## ARTICLE VII. Consolidation of Operations

7.1.    General Organizational Structure

7.1.1. Transfers Immediately Prior to Closing Date. On or before the Closing, the University and WCCC shall have taken all steps necessary to effect the transfers described on Exhibit H.

7.1.2. Combination of Memorial with UMass Memorial. Prior to the Closing Date but after the transfers contemplated by Section 7.1.1, Section 7.2.1, and Section 7.3, UMass Memorial and Memorial shall execute the Agreement of Merger substantially in the form of Exhibit I attached hereto and made a part hereof and shall execute and file Articles of Merger substantially in the form of Exhibit J attached hereto and made a part hereof, with the Secretary of State of The Commonwealth of Massachusetts pursuant to which Memorial will merge with and into UMass Memorial, effective as of the Closing Date. As a result of such merger, on the Closing Date (i) the separate corporate existence of Memorial shall cease and all of its assets, properties, rights and powers including but not limited to all of its rights and interests as the sole member, owner, or controlling entity of the other Memorial Affiliates, as well as all debts due it, shall be transferred to, and vested in, UMass Memorial without further act or deed, (ii) UMass Memorial, as the surviving entity, shall retain all of its assets, properties, rights and powers, as well as all debts due it, (iii) the rights of creditors of Memorial shall not in any manner be impaired, and (iv) UMass Memorial, as the surviving entity, shall remain liable for all of its liabilities and obligations existing prior to the Closing Date and shall be deemed to have assumed the liabilities and obligations of Memorial existing prior to the Closing Date as if it had itself incurred such liabilities and obligations.

7.1.3. Entities to be Transferred. As of the Closing Date, and in addition to the transfer of certain assets and liabilities described elsewhere in this Agreement, the Parties agree that WCCC shall transfer to UMass Memorial all of WCCC's rights, interest, ownership and control of the following entities, to be effected by appropriate amendments to the Articles of Organization and bylaws of such entities that effect a change in the sole corporate membership of such entities and result in a control relationship depicted on the organizational chart set forth as Exhibit K attached hereto and incorporated herein: (1) UMass Physicians System, Inc.; (2) UMASS Hospital System, Inc.; (3) UMASS Health System Ventures, Inc.; (4) 328 Shrewsbury

-30-

Street LLC; (5) UMASS Behavioral Health System, Inc. and (6) UMASS Health System Realty I Corp., meaning and intending to convey all ownership or voting rights of WCCC in any of its Subsidiaries or affiliates, excluding only UMASS Management System, Inc., University Health Research Programs, Inc., and WFBR a/w U.M., Inc.

7.1.4. <u>Amendments to Articles of Organization and Bylaws of Certain Entities</u>. As of the Closing Date, the articles of organization and bylaws of the following corporations shall be amended as set forth below:

7.1.4.1.  The articles of organization and bylaws of Memorial Medical Group, Inc. shall be amended to rename corporation as UMass Memorial Medical Group, Inc.

7.1.4.2.  The articles of organization and bylaws of Memorial Services, Inc. shall be amended pursuant to articles of merger with UMass Health System Realty I Corporation, with Memorial Services, Inc. to be the surviving corporation and to be named UMass Memorial Realty, Inc., with said articles of merger and bylaws to contain such other amendments as are agreed upon by the Parties.

7.1.4.3.  The articles of organization and bylaws of UMASS Physicians System, Inc. shall be amended to name UMass Memorial as its sole corporate member and shall change the name of the corporation to UMass Memorial Physicians, Inc.

7.1.4.4.  The articles of organization and bylaws of UMASS Hospital System, Inc. shall be amended to name UMass Memorial as its sole corporate member and shall change the name of the corporation to UMass Memorial Hospitals, Inc.

7.1.4.5.  The articles of organization and bylaws of UMASS Health System Ventures, Inc. shall be amended to name UMass Memorial as its sole corporate member and shall change the name of the corporation to UMass Memorial Health Ventures, Inc.

7.1.4.6.  The articles and bylaws of UMASS Health System Realty Corp. I shall be amended to merge said corporation with Memorial Services, Inc., which will be renamed UMass Memorial Realty, Inc.

7.1.4.7.  The articles, bylaws or other organizational documents of UMass Memorial Affiliates that are not directly controlled at Closing by UMass Memorial will be amended at Closing to reflect the reorganization set forth on <u>Exhibit K</u>.

7.1.5. <u>Effectiveness of Agreements</u>. As of the Closing Date, the University, UMass Memorial, and the Medical Center shall enter into an Occupancy Agreement in accordance with and consistent with the substance of the term sheet attached hereto as <u>Exhibit L</u>;

1192368.12

the Affiliation Agreement substantially in the form of Exhibit M; and the License Agreement substantially in the form of Exhibit N.

7.2.    Consolidation of UMass Clinical Division and Certain Other Assets of the UMass Clinical System into the System.

7.2.1.  Transfer of Assets from University to System.  The University agrees to transfer to UMass Memorial or the Medical Center (as specified on Exhibit H) at the Closing but prior to the Merger of Memorial Hospital with and into the Medical Center, subject to the Assumed Liabilities as hereafter defined and upon the terms and conditions contained herein, except as listed on Schedule 7.2.1, or as set forth in Section 7.2.2, the following properties and assets of UMass Clinical Division (collectively, the "UMass Transferred Assets"), meaning and intending to convey all assets necessary to the operation of UMass Clinical Division except to the extent of assets that are shared by the Medical School and the UMass Clinical Division, the use of which will be provided to the UMass campus pursuant to the Occupancy Agreement or this Agreement.

7.2.1.1.  All assets of the University reflected on the Most Recent Balance Sheet of UMass Clinical Division and all assets of the University that have been acquired since the date of Most Recent Balance Sheet that would, if acquired during the last fiscal year, be required in accordance with GAAP to be set forth on the face of the Most Recent Balance Sheet (rather than any notes thereto) (other than assets reflected on the Most Recent Balance Sheet that have been disposed of in the Ordinary Course of Business or as otherwise expressly permitted by this Agreement since the date of the Most Recent Balance Sheet) (collectively, the "Balance Sheet Assets"), including without limitation:

(a)    all tangible personal property (such as equipment, inventories, supplies, medical records, furniture, automobiles and helicopters);

(b)    all accounts receivable, notes receivable, cash, cash equivalents, securities, prepaid expenses and other current assets of UMass Clinical Division, including any contingent assets not yet recorded such as certain accounts receivable;

(c)    all pledges received prior to the Closing for future contributions specifically to support UMass Clinical Division other than for medical education purposes, and (subject to obtaining any governmental, judicial or other approvals that may be necessary), all non-academic trust and endowment funds allocable to UMass Clinical Division, all of which shall be listed on Schedule 7.2.1;

7.2.1.2.  All of the University's rights with respect to leasehold interests and subleases and rights thereunder relating to the real and personal property as listed on Schedule 7.2.1.2. (the "Leases");

7.2.1.3.  All of the University's rights under all regulatory, governmental or administrative licenses, permits, authorizations, orders, registrations, certificates, variances, approvals, consents and franchises used or useful in connection with the operation of UMass Clinical Division or any pending applications relating to any of the foregoing, including without limitation all governmental permits, licenses, authorizations, approvals and consents described in Schedule 7.2.1.3;

7.2.1.4.  All patient mailing lists used or useful in connection with the operation of the business of UMass Clinical Division; provided that the University shall retain an irrevocable right to have and use such lists for any lawful and charitable purposes after notice to UMass Memorial;

7.2.1.5.  All rights under any contracts, indentures, mortgages, instruments, Security Interests, guaranties, or other agreements relating to the operation of UMass Clinical Division as listed on Schedule 7.2.1.5 (the "Contracts");

7.2.1.6.  All claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment;

7.2.1.7.  All business and financial records, books, ledgers, files, plans, documents, correspondence, lists, drawings, notebooks, specifications, advertising and promotional materials, marketing materials, studies, reports, equipment repair, maintenance or service records relating to the operation of the business of UMass Clinical Division whether written or electronically stored or otherwise recorded (other than such materials that relate to the Medical School or the University independently of the Clinical Division provided that the University shall retain an irrevocable right to have and use any of the foregoing materials that relate to joint operations of the UMass Clinical Division and the Medical School or the University);

7.2.1.8.  All rights in and with respect to the insurance policies and contracts listed on Schedule 7.2.1.8. that relate to the UMass Clinical Division.

7.2.1.9.  All rights in and with respect to the Self Insurance Trust, subject to the provisions in Section 10.4.

7.2.2.  Excluded Assets. There shall be excluded from the UMass Transferred Assets to be assigned, transferred, conveyed and delivered to the System or any UMass Memorial Affiliate hereunder, and to the extent in existence on the Closing Date, there shall be retained by the University, the following assets, properties and rights (collectively, the "Excluded Assets"):

7.2.2.1.  The right to receive payments in satisfaction of amounts shown as the net assets of the Group Practice as of the Closing Date held in or allocable to the Departmental Education Funds;

1192368.12

7.2.2.2.  Ten Million Dollars ($10,000,000) in cash and liquid investments to be transferred to WCCC or retained by the University to be used to construct the Research Facility.

7.2.2.3.  All Research Intellectual Property;

7.2.2.4.  All grants and awards for funded research;

7.2.2.5.  All real property, improvements, and fixtures (except to the extent transferred or conveyed pursuant to the Occupancy Agreement);

7.2.3.  Assumption of Liabilities.  On the terms and subject to the conditions set forth herein and subject to Section 7.2.4 hereof, from and after the Closing, the Medical Center will assume and satisfy or perform when due the following Liabilities and obligations of the University (the "Assumed Liabilities"):

7.2.3.1.  all Liabilities of the University set forth on the face of the Most Recent Balance Sheet of UMass Clinical Division (rather than in any notes thereto);

7.2.3.2.  all Liabilities of the University relating directly to the operation of UMass Clinical Division incurred after the Most Recent Balance Sheet of UMass Clinical Division in the Ordinary Course of Business that would, if incurred during the last fiscal year, be required in accordance with GAAP to be set forth on the face of the Most Recent Balance Sheet (rather than any notes thereto);

7.2.3.3.  all Liabilities and obligations of the University under the Leases listed on Schedule 7.2.1.2;

7.2.3.4.  all Liabilities and obligations under the Contracts listed in Schedule 7.2.1.5; and

7.2.3.5.  subject to and except as provided in the provisions of Sections 11.2, 11.3 and 11.7 hereof, all other Liabilities and existing security interests, mortgages, liens, encumbrances, restrictions on transfer, claims, and Losses (excluding those Liabilities under Sections 7.2.4.1 and 7.2.4.2), including but not limited to all Liabilities of the University arising out of or resulting from the operations of UMass Clinical Division, whether arising prior or subsequent to the Closing, including, without limitation, all claims or amounts due to reimbursement arrangements, final settlements or other amounts owed to the Medicare or Medicaid programs or other third party payors; all fines, penalties, assessments, or claims under any applicable federal or state antifraud and abuse, false claims or false billing laws; accrued sick, vacation, earned time, wages and payroll liabilities; claims relating to noncompliance with any Safety Laws and Environmental Liabilities and Costs but only to the extent relating to the existence of asbestos, polychlorinated biphenyls or other chemical substances within buildings, structures, or self-contained units above ground that are not leaking, such as transformers; claims

-34-

relating to personnel or employment matters, including without limitation, unfair labor practice claims, employee grievances, workers compensation, discrimination or disability claims; malpractice, professional liability, personal injury and general liabilities; long term debt obligations, loans, contracts, including the Contracts and Leases; provided, however, that in the event that the Medical Center reasonably believes that any of such Liabilities is attributable to or caused by the academic operations of the Medical School, the President/Chief Executive Officer and the Chancellor shall meet to resolve the matter in accordance with the provisions of Section 14.18.

7.2.3.6.  Any Losses that the University incurs to or with respect to any physician, nurse, or other employee, if any, contracted to the Medical Center after the Closing (a "Contracted Employee") or any governmental entity or any third party claiming by or through such employee under any agreement between the University and the Medical Center providing for the provision of services of any such employee (a "Contracted Employee Agreement") if and to the extent such agreement relates to a class of Contracted Employees or a significant proportion of the workforce and because of (a) any actions or inactions by the Medical Center, whether intentional or negligent, including, without limitation, any suits or grievances brought against the University by any Contracted Employee, or any union on behalf of any Contracted Employee because of employment issues or because the working conditions at the Medical Center facilities are not in accordance with any applicable law, regulation, union agreement or the applicable work rules and policies of the University in effect for any such Contracted Employee as of the date of the Closing as may be modified from time to time pursuant to the Contracted Employee Agreement; or (b) the decision by the University to terminate or take any other action with respect to a Contracted Employee at the request of the Medical Center for changes in Schedule A or if the Medical Center refuses to permit the Contracted Employee to work in a position or at the compensation level to which the Contracted Employee is entitled under any applicable union agreement, above-described University rule, or law, or the Medical Center refuses to pay compensation to the University under the applicable Contracted Employee Agreement at a level which is sufficient for the University to meet the requirements of any applicable union agreement, above-described University rule, or law, or (c) any Liability which the University incurs with respect to taxes assessed on account of or with respect to Contracted Employees other than those for whom the University receives reimbursement under a Contracted Employee Agreement.

7.2.3.7.  The Medical Center, shall perform, discharge and pay when due all Assumed Liabilities and, shall indemnify, defend and hold University harmless from all of the Assumed Liabilities.

7.2.4.  Liabilities Not Assumed.  The System will not assume or perform any of the following Liabilities and obligations:

7.2.4.1.  any Liability or obligation of the University for post employment benefits arising out of or relating to Massachusetts General Laws Chapters 32 or 32A or any successor or amended statute similar thereto other than payments pursuant to any Contracted

1192368.12

Employee Agreement and relating solely to service costs attributable to service subsequent to the Closing Date; and

7.2.4.2.  Any Liability or obligation of the University in respect of Environmental Liabilities and Costs, (other than Environmental Liabilities and Costs relating to the existence of asbestos, polychlorinated biphenyls or other chemical substances within buildings, structures, or self-contained units above ground that are not leaking, such as transformers), arising out of any noncompliance with Environmental Laws prior to Closing or any condition existing at or prior to Closing which constitutes a violation of or gives rise to a duty to remediate under any Environmental Law which is occurring or occurred on the UMass Campus, without limit as to time, knowledge or amount, (i) generated, used, stored, disposed of or released on the UMass Campus at any time prior to the Closing Date, (ii) released from or in connection with the UMass Campus prior to the Closing Date or (iii) generated, used, stored, disposed of or released in connection with the University's past or present operations on the UMass Campus.

7.2.5.  Procedure for Leases that Cannot be Assigned.  With respect to any lease set forth on Schedule 7.2.1.2, effective as of the Closing Date, UMass Memorial or the Medical Center (as specified on said Schedule 7.2.1.2) shall (x) assume and agree to perform all the obligations and duties of lessee of all such leased property under such leases solely to the extent required to be performed and arising in connection with the use of such leased property by UMass Clinical Division prior to the Closing Date or by UMass Memorial or the Medical Center on or after the Closing Date, and (y) agree to indemnify and save the University harmless from all liabilities and obligations arising out of such assumed obligations and duties described in clause (x) above.  To the extent the consent of any lessor is required with respect to the assignment of any such lease and such consent cannot be obtained or such lease cannot be assigned (an "Affected Lease"), then, subject to obtaining any necessary consent, the University shall sublease the property which is subject to the Affected Lease (the "Subleased Property") to UMass Memorial or Medical Center, as specified on Schedule 7.2.1.2, pursuant to a form of sublease mutually agreeable to the parties, which shall provide that UMass Memorial or the Medical Center, as specified in Schedule 7.2.1.2, shall have all of the rights, subject to all of the obligations, of the University under the Affected Lease, including without limitation the option to purchase the Subleased Property on the terms provided in the Affected Lease.  In the event the Affected Lease has not been subleased, then for so long as UMass Memorial or the Medical Center is permitted to use such property and realize the benefit of the Affected Lease to UMass Memorial or the Medical Center, UMass Memorial or the Medical Center, as specified on Schedule 7.2.1.2, will pay the University such amount as is necessary to permit the University to continue to make the lease payments due under the Affected Lease, and the University upon the receipt of such funds, will continue to make such payment.

7.2.6.  Procedure for Contracts that Cannot be Assigned.  Except as otherwise provided in this Agreement, effective as of the Closing Date, the University hereby assigns to UMass Memorial or the Medical Center, as specified on Schedule 7.2.1.5, all of its right, title and interest in and to executory contracts with parties not affiliated with the University which pertain

-36-

1192368.12

# Exhibit 10

# Part D – 3

to the operations of the UMass Clinical System and which shall be listed by category on Schedule 7.2.1.5, but expressly excluding any collective bargaining agreements and other agreements with labor unions. Effective as of the Closing Date, UMass Memorial or the Medical Center, as specified on Schedule 7.2.1.5, hereby (x) agrees to perform all of the obligations and duties of the University which arise under the contracts listed in said Schedule 7.2.1.5 and which relate to services provided to UMass Memorial or the Medical Center thereunder or to the operation of UMass Memorial or the Medical Center and (y) agrees to indemnify and save the University harmless from all liabilities and obligations arising out of said obligations and duties described in clause (x) above. To the extent that the consent of any party to any such contract is required with respect to such assignment and such consent is not obtained, then, for so long as UMass Memorial or the Medical Center is permitted to realize all of the benefits of the affected contract, UMass Memorial or the Medical Center will pay the University such amount as is necessary to permit the University to continue to make the payments due under such contract, and the University upon the receipt of such funds, will make such payments, and the University, UMass Memorial, and the Medical Center will in good faith take whatever steps are reasonable to obtain such consent and give UMass Memorial or the Medical Center, as specified on Schedule 7.2.1.5, the full benefit of such contract.

      7.2.7.  Transfer of Trust Funds.  On or prior to the Closing Date, the University shall initiate all such action as is necessary (including, but not limited to, seeking any necessary governmental or other approvals) and, within thirty (30) days of the Closing Date shall commence court actions under the cy pres doctrine, if required, to transfer to UMass Memorial all trusts, and bequests allocable to UMass Clinical Division. The University shall use its best efforts, at the Clinical System's cost, to transfer all such trusts and bequests to UMass Memorial. A list of such trusts and bequests shall be set forth on Schedule 7.2.1.1 to be delivered by the University to Memorial no less than thirty (30) days prior to the Closing together with copies of the instruments under which such trusts and bequests are held by the University. Until the cy pres petitions are approved or if for any other reason any portion of any such trust or bequest is not turned over to UMass Memorial on the Closing Date, the University shall hold all funds within such trust or bequest together with all income thereon for the benefit of UMass Memorial and shall turn over all such amounts to UMass Memorial upon transfer of such trust or bequest to UMass Memorial by cy pres or earlier if permitted. In the event that the University fails to request such transfer or file such cy pres petition as provided above, UMass Memorial shall be entitled to process such a request and file such a cy pres petition with prior written notice to the University, and the University shall cooperate with UMass Memorial and become a party to such petition.

      7.3.    Transfer of Assets from WCCC to System.  WCCC agrees to transfer to UMass Memorial or UMass Memorial Realty, Inc., as set forth on Schedule H, and at the Closing, subject to and upon the terms and conditions contained herein, the following properties and assets of WCCC (collectively, the "WCCC Transferred Assets"):

      7.3.1.  All assets of WCCC reflected on the Most Recent Balance Sheet of WCCC and all assets that have been acquired since the date of Most Recent Balance Sheet of

WCCC (other than assets reflected on the Most Recent Balance Sheet of WCCC that have been disposed of in the Ordinary Course of Business since the date of the Most Recent Balance Sheet) (collectively, the "Balance Sheet Assets"), including without limitation and to the extent any of the following assets exist:

7.3.1.1. all rights and status as a sole member, corporate member, owner, shareholder, or controlling entity with respect to any Subsidiary or affiliate as set forth in Section 7.1.3, including without limitation all rights to nominate, elect or appoint any members of the governing body of any such Subsidiary or affiliate;

7.3.1.2. all tangible personal property (such as equipment, inventories, supplies, medical records, furniture and automobiles);

7.3.1.3. all accounts receivable, notes receivable, cash, cash equivalents, securities, prepaid expenses and other current assets, including any contingent assets such as certain not yet recorded accounts receivable;

7.3.1.4. all pledges, if any, received prior to the Closing for future contributions other than for medical education purposes, and (subject to obtaining any governmental, judicial or other approvals that may be necessary), all non-academic trust and endowment funds.

7.3.1.5. All WCCC's rights with respect to leasehold interests and subleases and rights thereunder relating to the real and personal property as listed on Schedule 7.3.1.5 (the "Leases");

7.3.1.6. All WCCC's rights under all licenses, permits, authorizations, orders, registrations, certificates, variances, approvals, consents and franchises or any pending applications relating to any of the foregoing, including without limitation all governmental permits, licenses, authorizations, approvals and consents described in Schedule 7.3.1.6;

7.3.1.7. All patient, customer, supplier and mailing lists used or useful in connection with the operation the business conducted by WCCC;

7.3.1.8. All WCCC's rights under any contracts, indentures, mortgages, instruments, Security Interests, guaranties, or other agreements relating to the business conducted by WCCC as listed on Schedule 7.3.1.8 (the "Contracts");

7.3.1.9. All business and financial records, books, ledgers, files, plans, documents, correspondence, lists, plats, architectural plans, drawings, notebooks, specifications, creative materials, advertising and promotional materials, marketing materials, studies, reports, equipment repair, maintenance or service records relating to the operation of

the business of WCCC whether written or electronically stored or otherwise recorded exclusive of corporate organizational and similar documents relating to WCCC;

7.3.1.10.  All rights in and with respect to the insurance policies and contracts listed on Schedule 7.3.1.10.

7.3.1.11.  All real property, improvements, and fixtures.

7.3.2.  Excluded Assets. There shall be excluded from the WCCC Transferred Assets to be assigned, transferred, conveyed and delivered hereunder, and to the extent in existence on the Closing Date, there shall be retained by WCCC, the following assets, properties and rights (collectively, the "Excluded WCCC Assets"):

7.3.2.1.  The name, corporate existence and identity of WCCC;

7.3.2.2.  The sum of Ten Million Dollars ($10,000,000), in cash or liquid investments to be held by WCCC or transferred to the University as of the Closing Date and applied to the construction of the Research Facility (if not excluded under Section 7.2.2.2);

7.3.2.3.  Subject to the provisions of Article XII, all Intellectual Property of WCCC;

7.3.2.4.  The name, corporate existence and identity of WFBR a/w U.M., Inc.;

7.3.2.5.  The name, corporate existence and identity of UMass Management System, Inc.;

7.3.2.6.  University Health Research Programs, Inc. and all assets and liabilities thereof.

7.3.3.  Assumption of Liabilities.  On the terms and subject to the conditions set forth herein and subject to Section 7.3.4 hereof, from and after the Closing, UMass Memorial will assume and satisfy or perform when due the following Liabilities and obligations of WCCC (the "WCCC Assumed Liabilities"):

7.3.3.1.  all Liabilities of WCCC attributable to operation of WCCC set forth on the face of the Most Recent Balance Sheet of WCCC (rather than in any notes thereto);

7.3.3.2.  all Liabilities of WCCC relating directly to the operation of WCCC incurred after the Most Recent Balance Sheet of WCCC in the Ordinary Course of Business that would, if incurred during the last fiscal year, be required in accordance with

GAAP to be set forth on the face of the Most Recent Balance Sheet of WCCC (rather than any notes thereto);

7.3.3.3. all Liabilities and obligations of WCCC under the Leases listed on Schedule 7.3.1.5; and

7.3.3.4. all Liabilities and obligations under the Contracts listed in Schedule 7.3.1.8; and

7.3.3.5. subject to and except as provided in sections 11.2 and 11.4 hereof, all other Liabilities, existing security interests, mortgages, liens, encumbrances, restrictions on transfer, claims and Losses, including Environmental Liabilities and Costs but only to the extent relating to the existence of asbestos, polychlorinated biphenyls or other chemical substances within buildings, structures, or self-contained units above ground that are not leaking, such as transformers, and including but not limited to all Liabilities of WCCC or attributable to operations or assets of WCCC prior to the Closing.

7.3.3.6. UMass Memorial shall perform, discharge and pay when due all of the WCCC Assumed Liabilities and shall indemnify, defend and hold WCCC harmless from all of the WCCC Assumed Liabilities.

7.3.4. <u>Liabilities Not Assumed</u>. UMass Memorial will not assume or perform any of the following Liabilities and obligations:

7.3.4.1. any Liability or obligation pertaining to any WCCC Affiliate other than WCCC (except to the extent the University is liable therefor); and

7.3.4.2. any Liability or obligation of WCCC or UMASS Health System Realty I Corp. in respect of Environmental Liabilities and Costs, (other than Environmental Liabilities and Costs relating to the existence of asbestos, polychlorinated biphenyls or other chemical substances within buildings, structures, or self-contained units above ground that are not leaking, such as transformers), arising out of any noncompliance with Environmental Laws prior to the Closing Date or any condition existing at or prior to Closing which constitutes a violation of or gives rise to a duty to remediate under any Environmental Law without limit as to time, knowledge or amount, (i) generated, used, stored, disposed of or released on the site of the former Worcester City Hospital, 162 Chandler and 26 Queen Street, Worcester, Massachusetts (the "WCH Site") at any time prior to the Closing Date, (ii) released from or in connection with any property or facility on the WCH Site at any time prior to the Closing Date or (iii) generated, used, stored, disposed of or released in connection with the past or present operations on the WCH Site.

## ARTICLE VIII. Employees

Any provision of Section 5 of the Act requiring action or consent by any corporation (as defined in the Act) is hereby incorporated by reference, and UMass Memorial expressly acknowledges that it is legally bound thereby.

## ARTICLE IX. Representations and Warranties

9.1.    Representations and Warranties of the University and WCCC. Each of the University and WCCC hereby represents and warrants to Memorial and UMass Memorial that as of the date hereof and as of the Closing Date, except as disclosed in writing on Schedule 9.1 to be delivered to Memorial no later than ten (10) days prior to the Closing or otherwise disclosed in writing to Memorial prior to the Closing, which disclosure shall make specific reference to the section below to which such disclosure relates (it being agreed that the University is hereby making representations only with respect to itself (which term expressly includes the Teaching Hospital, the Group Practice, and the Self-Insurance Trust) and not with respect to WCCC or any WCCC Affiliate, and it being further agreed that WCCC is hereby making representations only with respect to itself and each of the WCCC Affiliates):

9.1.1.    Authority.  To the extent required by law or by the terms hereof, each of the University and the WCCC Affiliates has or will have, prior to the Closing, obtained all approvals and taken all action necessary (i) to permit the University and WCCC it to execute and deliver this Agreement and all other agreements, instruments and other documents required to be executed in connection with or otherwise incident to the transactions contemplated hereunder and (ii) to permit it to perform all of its respective obligations arising under or in connection with this Agreement and the agreements contemplated hereby.

9.1.2.    Subsidiaries and Investments.  None of the WCCC Affiliates have any Subsidiaries or equity investments in any other entity except as listed on Schedule 9.1.2. and WCCC or its Subsidiaries listed in Section 7.1.3 possess all rights to elect or appoint the board of directors or board of trustees of such entities (or a person performing similar functions), except as set forth on Schedule 9.1.2.

9.1.3.    Litigation.  Except as disclosed on a written summary provided to Memorial prior to Closing, there is no litigation, claim, controversy, legal action, investigation or other proceeding pending or, to the knowledge of the University or the WCCC Affiliates threatened, against or relating to the University in connection with the UMass Clinical Division, and WCCC Affiliates, or any of their respective operations or businesses at law, in equity, by way of arbitration or before any governmental department, commission, board or agency (each an "Action"), which, if adversely determined, would have a Material Adverse Effect on the UMass Clinical Division or WCCC, and neither of the University nor WCCC has any knowledge that any such Action is likely to be brought with respect to the University or WCCC or their respective businesses or operations.  There is no Action pending or, to the knowledge of the

1192368.12

University or WCCC threatened, before any of the foregoing against or concerning the real property to be subject to the Occupancy Agreement, or any of the building related thereto or situated thereon, or against, relating to or adversely affecting the right, title or interest of the University or WCCC, in or to any such property or arising out of or under any environmental law, rule or regulation.

9.1.4. <u>Material Contracts</u>. To the knowledge of the University and WCCC, Schedule 9.1.4 sets forth (and shall set forth as of the Closing Date) each written or oral agreement as to which the University, with respect to the operations of the UMass Clinical Division, or WCCC, with respect to the operations of the WCCC Affiliates, is a party, guarantor, obligor or otherwise, which obligates the University directly or contingently, except (i) those which have been made in the ordinary course of the operations of the UMass Clinical Division and the WCCC Affiliates and may be terminated without liability or subsequent obligation on not more than thirty (30) days notice; (ii) purchase orders for supplies entered into in the Ordinary Course of Business of the UMass Clinical Division or the WCCC Affiliates, and (iii) those, other than as described in clauses (i) and (ii) above, made in the Ordinary Course of Business of the UMass Clinical Division or the WCCC Affiliates that will be fully performed within a period of not more than thirty (30) days from the date of Closing and which do not individually create obligations in excess of $100,000. The University and WCCC have, or prior to the Closing Date shall have, delivered or made available to Memorial correct and complete copies of all such written agreements (including, without limitation, all amendments thereto) and a summary of each such oral agreement. To the knowledge of the University, all such contracts, with respect to the University and, to the knowledge of WCCC with respect to WCCC, are valid and in effect and no default exists thereunder nor has any party given any notice or made any threat, or otherwise revealed an intent to cancel, or otherwise terminate its relationship with the UMass Clinical Division and the WCCC Affiliates.

9.1.5. <u>Reimbursement Matters</u>. At Memorial's request the University and WCCC shall provide Memorial with a list of all the known pending Medicare, Medicaid or other governmental or third party claims, appeals, audits, inquiries or adjustment requests relating to the UMass Clinical Division and the WCCC Affiliates. The UMass Clinical Division and each WCCC Affiliate which is a health care provider has timely filed all third-party payor cost reports required for reimbursement for patient care rendered by the UMass Clinical System. Such cost reports have been audited and/or settled through the date set forth on Schedule 9.1.5, and, except as set forth in said Schedule and to the knowledge of the University, there are no amounts owing by the University, or any WCCC Affiliate to any third-party payor, governmental or nongovernmental.

9.1.6. <u>Compliance with Laws, Licenses, and Certification Requirements</u>. To the knowledge of the University and WCCC, the business and operations of the UMass Clinical Division and the WCCC Affiliates have been operated in material compliance with all laws, statutes, ordinances, regulations, orders, policies, and guidelines of all governmental entities, regulatory authorities, and accrediting and certifying authorities with which the failure to comply could have a Material Adverse Effect including, without limitation, its participation in the

-42-

Medicare and Medicaid programs, its accreditation by the Joint Commission on Accreditation of Healthcare Organizations, and its certifications or licenses issued by the Department of Public Health and the Department of Mental Health of the Commonwealth.

9.1.7. <u>Institutional Affiliations; Accreditations</u>. Schedule 9.1.7 shall set forth the description of the institutional affiliations, certifications and accreditations of the UMass Clinical Division and the WCCC Affiliates. Neither the University nor any WCCC Affiliate has received notice of possible loss or material limitation of any such affiliated, accredited or certified status.

9.1.8. <u>No Illegal or Improper Payments</u>. Neither the University nor any WCCC Affiliate has, directly or indirectly, paid or delivered any fee, commission or form of payment or remuneration, or items of value, however characterized, to any person, government official or other party which is in any manner related to the business or operations of the UMass Clinical Division or any WCCC Affiliate that the University or any WCCC Affiliate knows or has reason to believe to have been illegal under any Federal, state or local law, including without limitation, the Anti-Fraud and Abuse Statutes (42 U.S.C. §1320a-7b), or to have been in violation of the requirements for participation in the Medicare or Medicaid programs.

9.1.9. <u>Eminent Domain</u>. There are no pending or threatened, eminent domain proceedings against any of the Occupied Space or any property currently owned by any of the WCCC Affiliates or any portion thereof, and neither the University nor any WCCC Affiliate has received any notice that any such proceeding is presently threatened or contemplated by any taking authority.

9.1.10. <u>Insurance</u>. Schedule 9.1.10 contains an accurate description of all policies of fire, casualty, liability, property, worker's compensation, or other insurance carried by the University or any WCCC Affiliate and relating to the UMass Clinical Division or any WCCC Affiliate, showing in each case the insurance carrier, premiums, nature and period of coverage, policy limits and deductibles. Such insurance is in full force and effect, and neither the University nor any WCCC Affiliate have received any notice of actual or proposed cancellation or material reduction in coverage. The University's self insured coverage of malpractice and general liability claims is consistent with reasonable management and insurance practices, and based upon reasonable actuarial assumptions, the assets in the Self-Insurance Trust to be transferred to UMass Memorial are reasonably expected to cover all claims (including claims incurred but not yet reported).

9.1.11. <u>No Investigations, Notices or Warnings</u>.

9.1.11.1. Except as may have been disclosed in writing to Memorial prior to Closing on a schedule specifically referring to this Section 9.1.11.1 there are no outstanding inquiries, requests for information, actions, investigations, claims or suits pending (whether or not any formal written notification or any subpoena has been issued in connection therewith), or to the best knowledge and belief of the University or any WCCC Affiliate threatened, (nor, to the knowledge of the University or any WCCC Affiliate, is there any basis therefor) against or

-43-

affecting the University or any WCCC Affiliate as pertains to the operations of the UMass Clinical System, before or by any governmental authority or agency, accreditation body or third-party payor (including, without limitation, the Medicare and Medicaid programs and the Office of Inspector General of the United States Department of Health and Human Services or the Attorney General of the Commonwealth of Massachusetts) (collectively "Investigations") which relate to billing practices, violations of the so-called Stark law, third party relationships, fraud and abuse matters, false claims, overpayments (other than in the ordinary course of audit adjustments) or antitrust matters. Neither the University nor any WCCC Affiliate has received any warning or notice of decertification, revocation, suspension or termination, of any constituent entity within the UMass Clinical System with respect to Medicare or Medicaid programs.

9.1.11.2. To the knowledge of the University and WCCC, there are no other Investigations (i) which could prevent or hinder the consummation of the transactions contemplated by this Agreement or call into question the validity of any action taken or to be taken in connection with the transactions contemplated by this Agreement or (ii) which in any single case or in the aggregate might result in any Material Adverse Effect in the business, prospects, condition, affairs or operations of the UMass Clinical System or any material impairment to the right or ability of UMass Memorial or the Medical Center to carry on operations, activities or business of the UMass Clinical System as now conducted.

9.1.12. Required Licenses and Permits. The University has the licenses, permits, certifications, approvals, accreditations and authorizations (or exemptions from the requirement of maintaining same), and each WCCC Affiliate, and the constituent entities within the UMass Clinical System possess all licenses, permits, certifications, approvals, accreditations and authorizations, which are material or required in order to operate and carry on the activities of the UMass Clinical System in the ordinary course of business.

9.1.13. Medical Staff. Except as set forth in a written summary delivered to Memorial prior to the Closing, there are no pending or, to the best knowledge and belief of the University or any WCCC Affiliate, threatened appeals, challenges, disciplinary or corrective actions, or disputes involving medical staff applicants, staff members, or allied health professionals at any constituent entity within the UMass Clinical System.

9.1.14. Financial Information Cost Reports. The University has delivered to Memorial and no later than February 28, 1997 WCCC shall have delivered audited combined financial statements related to the operations of the UMass Clinical System for the twelve (12) months ended on June 30, 1994, 1995 and 1996 and unaudited financial statements related to the operations of the UMass Clinical Division and the WCCC Affiliates for the five (5) months ended November 30, 1996, which statements are complete and correct and fairly present the combined financial position of the UMass Clinical Division and the WCCC Affiliates on the date of such statements and the combined results of their operations, changes in net assets, and cash flows for the periods covered thereby and such financial statements have been prepared in accordance with GAAP, consistently applied (except for changes in accounting principles referred to in the independent auditors' reports on such statements) throughout the periods

-44-

1197368.12

involved and prior periods, and except that the UMass Clinical Division reduced its accrued third-party liabilities during 1996 as a result of deregulation and changes in the Massachusetts third-party payor environment; and in addition, received a special Disproportionate Share Safety Net Adjustment (the Adjustment) during 1996. UMass Clinical Division accounted for these transactions in the 1996 financial statements as a reduction to the third-party liability and as direct increases to fund balance without corresponding increases to current year income from operations. These favorable third-party settlements and the Adjustment should be reflected in the statement of operations for the year ended June 30, 1996, in order to conform with generally accepted accounting principles. The University and WCCC have provided or made available to Memorial, correct and complete copies of the most recently filed Medicare and Medicaid cost reports for UMass Clinical Division, Marlborough, and Clinton and management letters for each of fiscal years 1994 through 1996 for the UMass Clinical System. The status of all Medicare and Medicaid cost reports of UMass Clinical Division, Marlborough, and Clinton for the last three (3) cost reporting years shall be described on Schedule 9.1.14 and there are no pending appeals, adjustments, challenges, audits, litigation, notices of intent to reopen or open such cost reports except as shall be set forth in Schedule 9.1.14.

9.1.15. Hill-Burton. The transactions contemplated herein will not result in UMass Memorial or the Medical Center being obligated to repay any loans, grants or loan guarantees relating to UMass Clinical Division, Marlborough, or Clinton pursuant to the Hill-Burton Act (42 U.S.C. §291a, et seq.) program or to provide uncompensated care in consideration thereof.

9.1.16. Undisclosed Liabilities. To the knowledge of the University and WCCC and except as shall be disclosed in Schedule 9.1.16, neither the University nor any WCCC Affiliate is subject to any material liability related to the business or operations of the UMass Clinical Division and the WCCC Affiliates, whether absolute or contingent, which is not reflected on the Most Recent Balance Sheet of the UMass Clinical Division and WCCC, or is in excess of amounts reflected or reserved for in said balance sheets, other than liabilities of the same nature as those set forth in such balance sheets and reasonably incurred in the Ordinary Course of Business since the date of the Most Recent Balance Sheet.

9.1.17. No Material Change. Except as disclosed on Schedule 9.1.17, since the date of the Most Recent Balance Sheet, there has not been any material change to the properties, assets, liabilities, business or operations of the UMass Clinical Division or the WCCC Affiliates that individually, or in the aggregate, constitutes a material change from the condition of the UMass Clinical Division or the WCCC Affiliates reflected on the financial statements as of such date.

9.1.18. Disclosure. None of the representations or warranties contained in this Agreement, and no statement, certificate, schedule, list, exhibit, instrument, or other writing furnished or to be furnished by the University or any WCCC Affiliate in connection with the provisions of this Agreement or the transactions contemplated hereby, taken together as a whole, contains or will contain any untrue statement of a material fact or omits or will omit a material

1192368.12

fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they are made, not misleading.

    9.2.    <u>Representations and Warranties of Memorial</u>. Memorial hereby represents and warrants to the University and WCCC that as of the date hereof and as of the Closing Date, except as shall be set forth on <u>Schedule 9.2</u> in writing to be delivered to the University not less than ten (10) days prior to the Closing, which disclosure shall make specific reference to the paragraph below to which such disclosure relates:

    9.2.1. <u>Authority</u>. To the extent required by law or by the terms hereof, each of the Memorial Affiliates has or will have, prior to the Closing, obtained all approvals and taken all action necessary (i) to permit it to execute and deliver this Agreement and all other agreements, instruments and other documents required to be executed in connection with or otherwise incident to the transactions contemplated hereunder and (ii) to permit it to perform all of its obligations arising under or in connection with this Agreement and the agreements contemplated hereby.

    9.2.2. <u>Subsidiaries and Investments</u>. Memorial has no subsidiaries or equity investments in any other entity (except as a passive investor) except as set forth on Schedule 9.2.2.

    9.2.3. <u>Litigation</u>. Except as disclosed on a written summary provided to the University prior to Closing, there is no litigation, claim, controversy, legal action investigation or other proceeding pending or, to the knowledge of Memorial or any Memorial Affiliate threatened, against or relating to any of the Memorial Affiliates or its operations or business at law, in equity, by way of arbitration or before any governmental department, commission, board or agency (each an "Action"), which, if adversely determined, would have a Material Adverse Effect on the Memorial Affiliates, and none of the Memorial Affiliates has any knowledge that any such Action is likely to be brought with respect to any Memorial Affiliate or its business or operations.

    9.2.4. <u>Title to Properties and Liens</u>. Each of the Memorial Affiliates has legal and valid title to all of the real and personal property and other assets necessary for its operations and none of such real or personal properties is subject to any mortgage, pledge, lien, security interest, claim, charge, encumbrance or other defect except for (i) the Master Trust Indenture, (ii) liens for taxes not yet due and payable and (iii) minor liens and encumbrances which in the aggregate do not materially detract from the value or the marketability of the property subject thereto or materially impair the operations of the Memorial Affiliates and have not arisen otherwise than in the ordinary course of business. There are no tenants, occupancies, rights, privileges or license in or to the real property or the buildings located thereon to be subject to the lease, or any portion thereof, other than the current occupancy by the Memorial affiliates.

    9.2.5. <u>No Knowledge of Hazardous Waste</u>. None of the Memorial Affiliates has any knowledge of the presence, or any processing, use, storage, disposal or treatment of any oil

or hazardous or toxic materials or substances at, on or beneath the real property owned by the Memorial Affiliates and on which the operations of the Memorial Affiliates are conducted, except medical and research-related waste customarily disposed of in the ordinary course of business and in compliance with law, and has not received any notice concerning any release or threat of release of any oil or hazardous or toxic materials or substances at, on or beneath the real property or regarding the generation, storage or disposal of biomedical waste or which has created any liability to an owner, tenant or occupant of any of the real property under any Federal, state or local law or regulation or which would require reporting to a governmental representative.

9.2.6.  Material Contracts.  Schedule 9.2.6 sets forth (and shall set forth as of the Closing Date) each written or oral agreement as to which any Memorial Affiliate is a party, guarantor, obligor or otherwise, which obligates any Memorial Affiliate directly or contingently, except (i) those which have been made in the Ordinary Course of the Business and may be terminated without liability or subsequent obligation on not more than thirty (30) days notice; (ii) purchase orders for supplies entered into in the Ordinary Course of Business, and (iii) those, other than as described in clauses (i) and (ii) above, made in the Ordinary Course of Business that will be fully performed within a period of not more than thirty (30) days from the date of this Agreement and which do not individually create obligations in excess of $100,000. Memorial has, or prior to the Closing Date shall have, delivered or made available to the University correct and complete copies of all such written agreements (including, without limitation, all amendments thereto) and a summary of each such oral agreement.  All such contracts, with respect to the Memorial Affiliates and, to the knowledge of Memorial with respect to the other parties to such contracts, are valid and in effect and no default exists thereunder nor has any party given any notice or made any threat, or otherwise revealed an intent to cancel, or otherwise terminate its relationship with the Memorial Affiliates.

9.2.7.  Reimbursement Matters.  At the request of the University, Memorial shall provide the University with a list of all pending known Medicare, Medicaid or other governmental or third party claims, appeals, audits, inquiries or adjustment requests.  The Memorial Affiliates have timely filed all third-party payor cost reports required for reimbursement for patient care rendered by the Memorial Affiliates.  Such cost reports have been audited and/or settled through the date set forth on Schedule 9.2.7, and, except as set forth in said Schedule, there are no amounts owing by the Memorial Affiliates to any third-party payor, governmental or nongovernmental payor.

9.2.8.  Compliance with Laws, Licenses, and Certification Requirements.  To the best of its knowledge, the business and operations of each Memorial Affiliate have been operated in material compliance with all laws, statutes, ordinances, regulations, orders, policies, and guidelines of all governmental entities, regulatory authorities, and accrediting and certifying authorities with which the failure to comply would have a Material Adverse Effect on the ongoing operations, activities or assets of the Memorial Affiliates, including, without limitation, their participation in the Medicare and Medicaid programs, their accreditation by the Joint Commission on Accreditation of Healthcare Organizations, and their certifications or licenses

-47-

119236l.12

issued by the Departments of Public Health and the Department of Mental Health of the Commonwealth.

9.2.9. <u>Institutional Affiliations; Accreditations</u>. <u>Schedule 9.2.9</u> shall set forth the description of the affiliations, certifications and accreditations of the Memorial Affiliates, including affiliations with other medical schools and Persons entitled to negotiate with managed care organizations on behalf of any of the Memorial Affiliates. None of the Memorial Affiliates has received any notice of possible loss of affiliated, certified or accredited status.

9.2.10. <u>No Illegal or Improper Payments</u>. None of the Memorial Affiliate has, directly or indirectly, paid or delivered any fee, commission or form of payment or remuneration, or items of value, however characterized, to any person, government official or other party which is in any manner related to the business or operations of the Memorial Affiliates that Memorial knows or has reason to believe to have been illegal under any Federal, state or local law, including without limitation, the Anti-Fraud and Abuse Statutes (42 U.S.C. §1320a-7b), or to have been in violation of the requirements for participation in the Medicare or Medicaid programs or the requirements for maintaining the status of any of the Memorial Affiliates as an organization exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.

9.2.11. <u>Facilities, Equipment and Conditions</u>. All of the equipment and facilities used by the Memorial Affiliates are and have been operated by the Memorial Affiliates in substantial conformity with all applicable laws, ordinances, regulations, orders and other requirements relating thereto adopted or currently in effect.

9.2.12. <u>Eminent Domain</u>. There are no pending or threatened eminent domain proceedings against any of the real property on which the operations of the Memorial Affiliates are currently located or any portion thereof, and none of the Memorial Affiliates has received any notice that any such proceeding is presently threatened or contemplated by any taking authority.

9.2.13. <u>Insurance</u>. All tangible properties, assets, and operations of Memorial and the Memorial Affiliates are covered by such fire, casualty, professional liability and other insurance policies issued by reputable companies or plans in lieu thereof, as are customarily obtained to cover comparable properties, assets and operations, in amounts, scope and coverage which are reasonable in light of existing conditions. Such insurance is listed on <u>Schedule 9.2.13</u> and is in full force and effect, and none of the Memorial Affiliates has received notice of actual or proposed cancellation or material reduction in coverage.

9.2.14. <u>No Investigations, Notices or Warnings</u>.

9.2.14.1. Except as may have been disclosed in writing to Memorial prior to Closing on a schedule specifically referring to this Section 9.1.14.1, there are no outstanding inquiries, requests for information, actions, investigations, claims or suits pending (whether or not any formal written notification or any subpoena has been issued in connection therewith), or to the best knowledge and belief of Memorial threatened (nor, to the knowledge of any Memorial

-48-

Affiliate, is there any basis therefor) against or affecting any of the Memorial Affiliates, before or by any governmental authority or agency, accreditation body or third-party (including, without limitation, the Medicare and Medicaid programs and the Office of Inspector General of the United States Department of Health and Human Services or the Attorney General of the Commonwealth of Massachusetts) (collectively "Investigations") which relate to billing practices, third party relationships, the so-called Stark law, fraud and abuse matters, false claims, overpayments (other than in the ordinary course of audit adjustments) or antitrust matters. None of the Memorial Affiliates has received any warning or notice of decertification, revocation, suspension or termination, or of threatened or potential decertification, revocation, suspension or termination, of any of the Memorial Affiliates, with respect to the Medicare or Medicaid programs.

9.2.14.2. There are no other Investigations (i) which could prevent or hinder the consummation of the transactions contemplated by this Agreement or call into question the validity of any action taken or to be taken in connection with the transactions contemplated by this Agreement or (ii) which in any single case or in the aggregate might result in any Material Adverse Effect on the business, prospects, condition, affairs or operations of any of the Memorial Affiliates or any material impairment to the right or ability of UMass Memorial or the Medical Center to carry on the operations, activities or business of the Memorial Affiliates as now conducted including, without limitation, participation in the Medicare and Medicaid programs.

9.2.15. Required Licenses and Permits. The Memorial Affiliates possess all licenses, permits, certifications, approvals, accreditations and authorizations which are material or required in order to operate and carry on the activities of the Memorial Affiliates in the usual course of business, all of which shall be set forth in Schedule 9.2.15.

9.2.16. Medical Staff. Except as set forth in a written summary delivered to the University prior to the Closing, there are no pending or, to the best knowledge and belief of Memorial, threatened appeals, challenges, disciplinary or corrective actions, or disputes involving medical staff applicants, staff members, or allied health professionals with respect to the Memorial Affiliates.

9.2.17. Financial Information Cost Reports. Memorial has delivered to the University audited combined financial statements related to the operations of the Memorial Affiliates for the twelve (12) months ended on September 30, of 1994, 1995, and 1996 and unaudited financial statements related to the combined operations of the Memorial Affiliates for the three (3) months ended December 31, 1996, which statements are complete and correct and fairly present the combined financial position of the Memorial Affiliates on the date of such statements and the combined results of their operations, changes in net assets, and cash flows for the periods covered thereby and such financial statements have been prepared in accordance with GAAP, consistently applied (except for changes in accounting principles referred to in the independent auditors' reports on such statements) throughout the periods involved and prior periods. Memorial has provided or made available to the University and WCCC, correct and

-49-

complete copies of its most recently filed Medicare and Medicaid cost reports for Memorial Hospital and management letters for each of fiscal years 1994 through 1996 for Memorial. The status of all Medicare and Medicaid cost reports of Memorial Hospital for the last three (3) cost reporting years shall be described on Schedule 9.2.17 and there are not pending appeals, adjustments, challenges, audits, litigation, notices of intent to reopen or open such cost reports except as set forth in Schedule 9.2.17.

9.2.18. <u>Hill-Burton</u>.  The transactions contemplated herein will not result in the University or WCCC being obligated to repay any loans, grants or loan guarantees relating to the Memorial Affiliates pursuant to the Hill-Burton Act (42 U.S.C. §291a, <u>et</u> <u>seq</u>.) program or to provide uncompensated care in consideration thereof.

9.2.19. <u>Undisclosed Liabilities</u>.  Except as shall be disclosed in Schedule 9.2.19, none of the Memorial Affiliates is subject to any material liability related to its business or operations, whether absolute or contingent, which is not reflected on the Most Recent Balance Sheet or is in excess of amounts reflected or reserved for in said balance sheet, other than liabilities of the same nature as those set forth in such balance sheet and reasonably incurred and reasonably incurred in the Ordinary Course of Business since the date of the Most Recent Balance Sheet.

9.2.20. <u>No Material Change</u>.  Since the date of the Most Recent Balance Sheet, there has not been any material change to the properties, assets, liabilities, business or operations of the Memorial Affiliates which singly, or in the aggregate, constitutes a material change from the condition of Memorial reflected on such balance sheet as of such date.

9.2.21. <u>Patents, Trade Names, Trade Marks and Other Rights</u>.

9.2.21.1. <u>Schedule 9.2.21</u> sets forth a complete list of and Memorial has delivered to the University complete copies of (i) United States and foreign patents, patent applications, copyrights and copyright registrations, all United States and State trade name, trademark and service mark registrations and applications and all other trade names, trademarks and service marks owned or used by the Memorial Affiliates material to the operations of the Memorial Affiliates, (2) all licenses or other agreements relating to any asset, property or right of the character described to in the preceding clause to which any of the Memorial Affiliates is a party; and (3) all licenses or agreements pertaining to know-how, trade secrets, inventions, disclosures or uses of ideas and intellectual property to which any of the Memorial Affiliates is a party.

9.2.21.2. Except as disclosed in Schedule 9.2.21, the Memorial Affiliates own or have the right to use all patents, trademarks, service marks, trade names, copyrights, inventions, improvements, processes, trade secrets and know-how used in conducting their businesses. No proceedings are pending or, to the knowledge of the Memorial Affiliates, threatened which challenge the validity or ownership of any such patent, trademark, service mark, or copyright or the ownership of any other right or property referred to in the preceding

-50-

1192368.12

sentence, and none of the Memorial Affiliates has any knowledge of infringing use of any of the foregoing by others. None of the Memorial Affiliates has had any notice of, or knowledge of any reasonable basis for, a claim against it that any of its operations, activities, equipment, machinery or processes infringes the patents, trademarks, service marks, trade names, copyrights or other property rights or others or that it is unfairly competing with or illegally using the trade secrets or property rights of others.

9.2.22. <u>Disclosure</u>. None of the representations or warranties contained in this Agreement, and no statement, certificate, schedule, list, exhibit, instrument, or other writing furnished or to be furnished by Memorial or the Memorial Affiliates, taken together as a whole, in connection with the provisions of this Agreement or the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they are made, not misleading.

## ARTICLE X. <u>Covenants</u>

The Parties agree as follows:

10.1. <u>General</u>. Each of the Parties will use its best efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Section 13.2).

10.2. <u>Operation of Business</u>. Each of the Parties covenants that it will not (and will not cause or permit any of its Subsidiaries to) engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business without first consulting with the other Parties and taking into account any concerns that may be expressed with respect to the effect of such transaction on the transactions contemplated by this Agreement, it being agreed that the University's Covenant hereunder relates solely to the operation of UMass Clinical Division. Each of the Parties covenants that, prior to Closing, it will keep (and will cause each of its Subsidiaries to keep) its business and properties substantially intact, including its present operations, physical facilities, working conditions, and relationships with licensors, patients, third party payors, and employees, it being agreed that the University's Covenant hereunder relates solely to the operation of UMass Clinical Division.

10.3. <u>Filing of Cost Reports and Tax Returns</u>. The Parties agree that the System shall provide assistance and personnel necessary to prepare, on behalf of the University and for signature by appropriate officers of the University, all final cost reports, closing reports, audited financial statements, terminating tax returns (if any), and similar filings necessary to wind down the affairs of the UMass Clinical Division. All such final reports shall be the responsibility of the University.

-51-

10.4.   Self Insurance Trust.  The Parties agree that the assets contained in the funds constituting the Self-Insurance Trust shall continue to be held at Closing by the University and shall be maintained and used by the University consistent with the purposes of the instrument of trust that created the Self-Insurance Trust and solely for purposes of satisfying liabilities arising from or attributable to risks formerly insured or secured by the assets of said fund. Upon written request by UMass Memorial, the University will transfer such assets to one or more entities designated by UMass Memorial, which hereby agrees to segregate such assets or cause such assets to be segregated by board designation and to maintain and use such assets or to cause to be maintained and used solely for purposes of satisfying liabilities arising from or attributable to risks formerly insured or secured by the assets of such fund; provided, however, that the System may use such funds (1) for purposes of establishing or maintaining so-called captive insurance coverage, provided that it first delivers to the Chancellor a report of an Insurance Consultant stating that the self-insurance of such risks (or the participation by the System in an insurance program sponsored by any association or organization exposed to comparable risks) is consistent with reasonable management and insurance practices and stating the actuarial assumptions upon which such report is based or (2) for other purposes of the System, provided that it first delivers to the Chancellor one or more commercial insurance policies with reputable commercial insurance companies licensed to do business in the Commonwealth providing so-called "tail coverage" limits reasonably acceptable to the Chancellor.  Prior to Closing, the University shall cause the Governance Document adopted by the Board of Trustees of the University for the Self-Insurance Trust to be amended to reconstitute the management, claims, and investment committees to consist of the individuals set forth on Schedule 10.4.

10.5.   Use of Name.  As further set forth in the Affiliation Agreement, the System and all Subsidiaries existing as of the Closing shall use the name "UMass" in their corporate names or in connection with all general promotional materials during the term of the Affiliation Agreement and on the terms and conditions set forth in such agreement.

10.6.   Maintenance of Medical Records.  The Parties agree that the Medical Center shall maintain all medical records of the Teaching Hospital and Memorial Hospital in the manner and to the extent required by law.

10.7.   Covenant Not to Amend Bylaws.  UMass Memorial shall not amend its Bylaws nor permit any amendment to the Bylaws of the Medical Center in a manner inconsistent with Section 6.2.1.5 or 6.2.1.6 or the Act.

10.8.   Medicaid Provider Agreement.  As of or subsequent to the Closing, the Medical Center shall enter into a Medicaid Provider Agreement with the Commonwealth's Medicaid Program and a Medical Educational Services Agreement (as defined in Section 10.9) with the University or the Medical School.  The Medical School shall indemnify, defend and hold harmless the Medical Center from any Losses incurred by it in connection with the execution of

-52-

1197368.12

the Medical Educational Services Agreement and the related provisions of the Medicaid Provider Agreement, all as further set forth in Section 11.7.

10.9.   _Medical Educational Services_.  As of or subsequent to the Closing, the Medical Center and the University or the Medical School shall enter into an agreement pursuant to which the Medical School will be obligated to provide medical educational services for patients served at the Medical Center (the "Medical Educational Services Agreement") in substantially the form attached hereto as Exhibit Q.

10.10.   _State Contracts_.  The Medical School shall be the vendor for state services contracts (excluding Medicaid contracts governed by the provisions of Sections 10.8 and 10.9) including, but not limited to, services on behalf of the Department of Mental Health, the Department of Mental Retardation, the Department of Public Health, the Department of Social Services, and the Department of Correction; provided, however, that the Medical Center may provide services to state agencies pursuant to those certain contracts listed on Schedule 10.10. UMass Memorial shall not unreasonably refuse to provide clinical and support services to the Medical School to meet its obligations under such contracts, provided that the Medical School may provide itself or through others any clinical or support services that UMass Memorial does not agree to provide.

10.11.   Service to the Community

The Parties recognize the University's historic efforts to respond to the Commonwealth's need for clinical and related health care services for its citizens.  Such efforts have included the provision to the public of both highly specialized services, particularly to the extent not available through other area services, and community-based primary care services.  Within the realm of primary care, the University has actively developed and continually worked to enhance a primary care network, in connection with which it has provided resident physicians to various community health centers and programs to deliver needed services, and has supported community-based education for health care providers, students and workers.  UMass Memorial and the Medical Center agree to continue to endeavor to respond to the State's and the community's needs as they may be identified from time to time by the Chancellor.

Such community and state needs will be among the factors taken into consideration by the strategic planning process of UMass Memorial in decisions concerning new program development, expansion or contraction of existing services, the location of clinical training sites, resource allocation, and other decisions that have a potential significant impact on the meeting of such needs.

-53-

## ARTICLE XI: Indemnification

11.1.    Survival of Representations and Warranties.  All of the representations and warranties of the Parties contained herein or in any document certificate or other instrument required to be delivered hereunder shall not survive the Closing; provided, however, that representations and warranties with respect to the Group Practice that are subject to the indemnification provision of sections 11.2 and 11.3 shall continue in full force and effect until the tenth (10th) anniversary of the Closing. All covenants and indemnities of any Party in this Agreement or in any document or certificate delivered hereunder shall, unless otherwise specifically provided therein, remain in full force and effect forever.

11.2.    Indemnity by the Medical School and WCCC.  For a period of ten (10) years following the Closing, the Medical School hereby agrees to indemnify, defend and hold harmless Memorial, UMass Memorial and their respective trustees, officers and Subsidiaries against and in respect of all Liabilities, obligations, judgments, Liens, injunctions, charges, orders, decrees, rulings, damages, dues, assessments, Taxes, losses, fines, penalties, expenses, fees, costs, amounts paid in settlement (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or threatened action), arising out of any claim, damages, complaint, demand, cause of action, audit, investigation, hearing, action, suit or other proceeding asserted or initiated or otherwise existing in respect of any matter (collectively, the "Losses") that results from any Losses relating to or arising from the operations of the Group Practice prior to the Closing Date (including without limitation for past billing practices); provided, however, that anything to the contrary in this Section 11.2 notwithstanding, but subject always to Section 11.3, the Medical School's Liability for any Losses hereunder relating to the Group Practice (including for Losses that exceed the amounts available to pay such Losses relating to the Group Practice under the Self-Insurance Trust) shall be payable solely from the cash equivalent value of the equity or fund balance, if any, that is in the Departmental Education Funds on the date or dates that any payment required to be paid under this indemnification becomes fixed and payable therefor or (if earlier), the date on which any governmental or third party payor shall have made an offset or charge against amounts otherwise due to the Group Practice or the Practice Plan as a result of any facts giving rise to such Losses.  In the event of any offset or charge against amounts otherwise due to the Group Practice or the Practice Plan, which offset or charge is subsequently reversed or eliminated pursuant to a final, non-appealable order of any court or regulatory agency, the Medical Center shall refund to the Departmental Education Funds any amount so reversed or eliminated by such order. The Departmental Education Funds shall be separately reported in the Medical School's audited financial statements. UMass Memorial shall provide the Medical School written notice for any claim made in respect of the indemnification provided in this Section 11.2, whether or not arising out of a claim by a third party.

11.3.    Medical School's Environmental Indemnification.  Notwithstanding any other provision of this Agreement to the contrary, this Section 11.3 shall control the Medical School's obligation to indemnify UMass Memorial and their respective trustees, officers and Subsidiaries for Environmental Liabilities and Costs. The Medical School agrees to indemnify and hold

1192361.12

harmless UMass Memorial and their respective trustees, officers and Subsidiaries against all Environmental Liabilities and Costs to the extent arising out of any condition existing on the UMass Campus (bounded as of the Closing Date) at or prior to the Closing that constitutes a violation of, or gives rise to a duty to remediate under, Environmental Laws without limit in time, knowledge or amount, excluding Environmental Liabilities and Costs relating to the existence of asbestos, polychlorinated biphenyls or other chemical substances within buildings, structures, or self-contained units above ground that are not leaking, such as transformers; and provided further that there shall be excluded from the definition of Environmental Liabilities and Costs claims for personal injuries based in tort. Anything in the preceding sentence to the contrary notwithstanding, the University's obligations under this Section 11.3 shall be satisfied first (and no later than one (1) year from the date of notification of a claim hereunder), from a special appropriation, if any, by the Massachusetts legislature (which the University shall use its best efforts to obtain); and in the absence of such special appropriation within said (one) (1) year period, shall be limited in amount (but not time) to such amounts as constitute funds of the Medical School other than grants and donor-restricted funds or funds received from general appropriations or proceeds from debt backed by the full faith and credit of the Commonwealth.

11.4.  _WCCC's Environmental Indemnification_. Notwithstanding any other provision of this Agreement to the contrary, this Section 11.4 shall control WCCC's obligation to indemnify Memorial and UMass Memorial and their respective trustees, officers and Subsidiaries for Environmental Liabilities and Costs. WCCC agrees to indemnify and hold harmless Memorial and UMass Memorial and their respective trustees, officers and Subsidiaries against all Environmental Liabilities and Costs to the extent arising out of any condition existing at the WCH site (bounded as of the Closing Date) on or prior to the Closing that constitutes a violation of, or gives rise to a duty to remediate under, Environmental Laws without limit in time, knowledge or amount, excluding Environmental Liabilities and Costs relating to the existence of asbestos, polychlorinated biphenyls or other chemical substances within buildings, structures, or self-contained units above ground that are not leaking, such as transformers; and provided further that there shall be excluded from the definition of Environmental Liabilities and Costs claims for personal injuries based in tort.

11.5.  _Indemnity by Memorial_. Memorial hereby agrees, and as of the Closing UMass Memorial and the Medical Center, jointly and severally agree to, indemnify, defend and hold harmless the University and WCCC and their respective trustees, officers and Subsidiaries against and in respect of all Liabilities, obligations, judgments, liens, injunctions, charges, orders, decrees, rulings, damages, dues, assessments, Taxes, losses, fines, penalties, damages, expenses, fees, costs, amounts paid in settlement (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or threatened action) arising out of any claim, complaint, demand, cause of action, audit, investigation, hearing, action, suit or other proceeding asserted or initiated in respect of any matter resulting from any Assumed Liability or any WCCC Assumed Liability, including the Medical Center's agreement to assume the Assumed Liabilities and UMass Memorial's agreement to assume the WCCC Assumed Liabilities contained herein.

-55-

# Exhibit 10

# Part D – 4

11.6.   Matters Involving Third Parties.

11.6.1. If any third party shall notify any Party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Section 11.6, then the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party thereby is prejudiced.

11.6.2. Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (A) the Indemnifying Party notifies the Indemnified Party in writing within 15 days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (B) the Indemnifying Party provides the Indemnified Party with evidence acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder, (C) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, (D) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests of the Indemnified Party, and (E) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.

11.6.3. So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Section 11.6.2 above, (A) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (B) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (which consent shall not unreasonably be withheld), and (C) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim unless written agreement is obtained releasing the Indemnified Party from all liability thereunder.

11.6.4. In the event any of the conditions in Section 11.6.3 above is or becomes unsatisfied, however, (A) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith), (B) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including attorneys' fees and expenses), and (C) the Indemnifying Parties will remain responsible for any Losses the Indemnified Party may suffer resulting from, arising out

-56-

of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section 11.6.

11.7.  Medicaid Provider Agreement. The University agrees to indemnify, defend and hold harmless the Medical Center from and against any Losses that arise from or relate to the Medical Educational Services Agreement or the related provisions of the Medicaid Provider Agreement, including but not limited to, Losses resulting from any audit, investigation, action, hearing, claim or suit. The University's obligation under this Section 11.7 shall extend to any reduction in reimbursement otherwise due the Medical Center from any payor, provided such reduction arises from or relates to costs reported or payments made by the Medical Center pursuant to Section 2 or Section 5 of the Medical Educational Services Agreement.

Anything to the contrary in the preceding paragraph notwithstanding, the Medical School's obligation under this Section 11.7 to indemnify the Medical Center shall be limited in amount (but not time) to such amounts as constitute funds received by the Medical School under or in connection with the Medical Educational Services Agreement, and if such funds are insufficient, to such amounts as constitute funds of the Medical School other than grants and donor restricted funds or funds received from general state appropriations; provided, however, that in the event an indemnification claim arises hereunder and cannot be satisfied from such funds, then UMass Memorial and the Medical Center shall have a right of offset against any Base Payments or Participation Payments due hereunder, subject to satisfaction of the following procedures. Prior to asserting any right of offset hereunder, UMass Memorial and the Medical Center, as the case may be, shall give thirty (30) day's written notice to the Medical School of the claim for offset prior to effecting such offset, specifying in reasonable detail the nature of the claim and the manner in which the claim is attributable to the existence of the Medical Educational Services Agreement or the Medicaid Provider Agreement referred to above, and provided, further that such offset may only be effected on or after the date or dates that any payment required to be paid under this Section 11.7 becomes fixed and payable therefor by a notice from a governmental or third party payor of such amount or (if earlier), the date on which any governmental or third party payor shall have made an offset or charge against amounts otherwise due to UMass Memorial or the Medical Center as a result of any facts giving rise to such Losses. In the event of any offset or charge against amounts otherwise due to UMass Memorial and/or the Medical Center, which offset or charge is subsequently reversed or eliminated pursuant to a final, non-appealable order of any court or regulatory agency, the Medical Center shall refund to the University the amount of any such reversed or eliminated charge.

## ARTICLE XII. Intellectual Property.

12.1.  Definitions. For purposes of this Article XII, the following terms have the following definitions, all of which exclude Intellectual Property conceived or developed by private physicians who do not have an independent contractor or employment relationship with UMass Memorial or the Medical Center and as to which neither UMass Memorial nor the Medical Center has any rights:

-57-

"Research Intellectual Property" means any Intellectual Property conceived or developed during the course of or otherwise derived from research (whether funded or unfunded) involving any material use of resources of the University or the Medical Center, including clinical drug trials and including clinical outcomes research wholly funded by or through the University but excluding clinical outcomes research wholly funded by UMass Memorial or the Medical Center.

"Medical Center Intellectual Property" means any Intellectual Property that is conceived or developed by any of the employees of UMass Memorial or the Medical Center as part of or is otherwise derived from the System's investment in improving its administrative processes, including, but not limited to, clinical outcomes research wholly funded by UMass Memorial or the Medical Center, data bases, information systems, and software relating to billing, collection, and business management of patients and capitated patient bases, patient lists, and medical records.

"Memorial Intellectual Property" means the Intellectual Property of any of the Memorial Affiliates.

"Mixed Intellectual Property" means any Intellectual Property that is conceived or developed by (A) UMass Memorial or (B) the Medical Center or (C) either of their employees or (D) to the extent either of them may legally require independent contractors to do so, their independent contractors, other than Research Intellectual Property or Medical Center Intellectual Property, and specifically including clinical outcomes research not wholly funded by or through any of the University, UMass Memorial or the Medical Center.

12.2.    Transfer by Memorial Affiliates of Rights to Memorial Intellectual Property. Subject to the provisions of Sections 12.4.1 and 12.4.4, at Closing, the Memorial Affiliates will fully disclose and transfer to the University ownership and all rights to commercially Exploit Memorial Intellectual Property that they held as of the Closing.

12.3.    Research Sponsorship.

12.3.1.  All funded research activities by UMass Memorial, the Medical Center, or by individuals or New Affiliates as defined in Section 3.2.1.1 or other Persons whose revenues are included in the Participation Payments, subject to any of their applicable research or employment policies, shall be conducted under the auspices of the Medical School. The Medical School shall be the sponsoring institution designated for all such research grants sponsored by UMass Memorial, the Medical Center, or involving any member of the Medical School Faculty.

12.3.2.  The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate in good faith to resolve any issues concerning the right of UMass

1192368.12

Memorial or the Medical Center to pursue and retain grants that are not directly available to the University.

12.4.    Agreement Concerning Rights to Intellectual Property.

12.4.1.    Disclosure and Assignment of Intellectual Property Interests. UMass Memorial and the Medical Center shall fully disclose to the University all of the Research Intellectual Property and Mixed Intellectual Property, whether such rights arise on or after the date of this Agreement. Each of UMass Memorial and the Medical Center shall, to the extent it is legally able to do so, require its employees and independent contractors, who are engaged in research or clinical care activities to assign to UMass Memorial or the Medical Center, as applicable, all rights to Research Intellectual Property and Mixed Intellectual Property arising in the course of or as a result of such activities except to the extent that any such employees or independent contractors are members of the Medical School Faculty and already subject to an obligation to assign any such rights to the University under the Medical School's intellectual property policies; provided, however, that no such transfer shall be required to the extent that any such individuals have independent rights in such Research Intellectual Property or Mixed Intellectual Property prior to the date of this Agreement or would be permitted to retain such rights under the Medical School's research and intellectual property policies. Rights arising prior to the date of this Agreement for the benefit of any member of the medical staff of Memorial Hospital shall be retained by such medical staff members.

12.4.2.    Right to Exploit Research Intellectual Property. The Parties agree that, except as provided in Section 12.4.4 below, ownership of all Research Intellectual Property owned by UMass Memorial or the Medical Center shall be transferred to the University and that the University shall have the right, and neither UMass Memorial nor the Medical Center shall have the right, to commercially Exploit such Research Intellectual Property.

12.4.3.    Right to Exploit Mixed Intellectual Property. The Parties agree that ownership of all Mixed Intellectual Property owned by UMass Memorial or the Medical Center shall be owned jointly and equally with the University and that the Parties shall agree in good faith as to the process by which to commercially Exploit such Mixed Intellectual Property and shall (in the absence of other agreement between the Parties) share equally in the revenues of such commercialization.

12.4.4.    Retained Rights to Use of Intellectual Property. UMass Memorial and the Medical Center will retain the right to use Memorial Intellectual Property, Research Intellectual Property and Mixed Intellectual Property transferred to the University under Sections 12.2 or 12.4.2 for their own internal use, and each of them shall have the right to distribute or disseminate such Research Intellectual Property and Mixed Intellectual Property to third parties engaged in non-commercial research, free of cost, under an agreement which restricts use to non-commercial research and which prohibits redistribution or dissemination to others.

1197368.12

12.4.5. Right to Exploit Medical Center Intellectual Property. UMass Memorial shall retain ownership of and all rights with respect to Medical Center Intellectual Property, including the right to commercially exploit such Medical Center Intellectual Property, and the University shall not have the right to commercially exploit such Medical Center Intellectual Property. The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate in good faith to resolve any issues concerning the applicability of this Section 12.4.5 to any specific item of Intellectual Property.

12.4.6. Cooperation. UMass Memorial and the Medical Center will execute, and will cause the Memorial Affiliates to execute any transfers, assignments or other documents reasonably requested by the University and will cooperate fully with the University in order to obtain, register, or convey any Memorial Intellectual Property, Research Intellectual Property, or interest in Mixed Intellectual Property that is required to be conveyed hereunder; provided, however, that actions (other than execution of documents) and costs associated with such registration, conveyance, and similar actions (including without limitation the costs of prosecuting patent applications and similar rights) shall be taken by and at the expense of the University.

ARTICLE XIII. The Closing Conditions

13.1.    Closing. This agreement shall terminate automatically in the event the closing of the transactions contemplated hereby (the "Closing") does not occur on or before June 30, 1998 or such other date as the parties may agree. The date on which the closing occurs is referred to herein as the "Closing Date."

13.1.1. At the Closing, the University and each WCCC Affiliate will use their best efforts and take all action as may be necessary to put the System in possession and operating control of the Transferred Assets.

13.1.2. At the Closing, the Parties, UMass Memorial and the Medical Center will execute the documents referred to in Section 3.2.1.2, Articles VI and VII and other customary closing documents in forms mutually agreeable to the Parties, including an instrument of conveyance and assumption of liabilities pursuant to which such transfers shall be effectuated (the "Bill of Transfer").

13.1.3. At any time and from time to time after the Closing, at the request of the System and without further consideration the University and WCCC will execute and deliver such other instruments of transfer, conveyance, assignment and confirmation and take such action as the System may reasonably determine is necessary to transfer, convey and assign to the System, and to confirm the System's title to or interest in the Transferred Assets (including without limitation all accounts receivable and proceeds thereof), to put the System in actual possession and operating control thereof and to assist the System in exercising all rights with

-60-

respect thereto. At any time and from time to time after the Closing, at the request of the University and without further consideration, UMass Memorial will execute and deliver such other instruments of transfer, conveyance, assignment and confirmation and take such action as the University may reasonably determine is necessary to transfer, convey and assign to the University, and to confirm the University's title to the Memorial Intellectual Property and all academic research grants and awards all as more fully set forth in the License Agreement.

13.1.4. <u>Cash Liquidation of Interfund Balances</u>. At the Closing, the University shall be paid the amount of cash or cash equivalents as set forth on Exhibit T payable in sixty (60) equal monthly installments as set forth therein.

13.2. <u>Conditions</u>. None of the Parties shall be obligated to consummate the transactions contemplated by this Agreement unless each of the following conditions shall have occurred on or before the Closing Date, any of which may be waived in writing by a Party upon written notice delivered at the Closing:

13.2.1. <u>Combination of Memorial with UMass Memorial</u>. The combination of Memorial with and into UMass Memorial pursuant to the Articles of Merger attached as Exhibit I and of Memorial Hospital with and into the Medical Center pursuant to Articles of Merger attached hereto as Exhibit S, shall have been declared effective by the Secretary of State of the Commonwealth.

13.2.2. <u>Legal Opinions</u>. Memorial and the University shall each have received an opinion from counsel to the other as to due authorization, execution, delivery and enforceability in form mutually satisfactory to the Parties with standard assumptions and qualifications.

13.2.3. <u>Consents Relating to Bonds</u>. All documents referred to in Section 3.2.1.2 shall have been delivered and all necessary consents to the transactions contemplated hereby of bond insurers and other third parties under the Memorial Bonds and the MBIA Bonds shall have been obtained and any necessary certificates, opinions, and amendments to the applicable documents necessary to effect the proposed combination shall have been executed and delivered. UMass Memorial shall have received one or more unqualified opinions from nationally recognized bond counsel that the consummation of the transactions described herein shall not adversely affect the exclusion of the interest on the Memorial Bonds or the MBIA Bonds from the gross income of the recipients thereof for federal or Massachusetts income tax purposes and that such transactions are not prohibited under any state or local law relating to the legal authority to issue such Bonds and are authorized and permitted by the instruments securing or otherwise pertaining to such Bonds. All debt of the UMass Clinical Division referred to in this Section 13.2.3 will be expressly assumed by UMass Memorial and/or the Medical Center, and UMass Memorial will in good faith attempt to obtain release of the University from such debt.

-61-

13.2.4. <u>Notice to Attorney General</u>. The Parties shall have provided to the Attorney General of the Commonwealth notice of this Agreement and the transactions contemplated hereby in mutually agreeable form.

13.2.5. <u>Antitrust</u>. None of the Federal Trade Commission, Department of Justice or Attorney General of the Commonwealth shall have challenged the transactions contemplated hereby under applicable antitrust law, and the waiting period required under the Hart-Scott-Rodino law shall have lapsed after due filing of all necessary forms with the Federal Trade Commission and the Department of Justice.

13.2.6. <u>Representations; Warranties; Covenants</u>. Each of the representations and warranties of the University, each WCCC Affiliate, and each Memorial Affiliate contained in this Agreement shall be true and correct in all material respect as though made on as of the Closing Date, as evidenced by a Closing Certificate of the Deputy Chancellor for Clinical Affairs of the University and the Chief Executive Officer of WCCC and Memorial to be delivered on the Closing Date in a form mutually agreeable to the Parties. The University, each WCCC Affiliate and each Memorial Affiliate shall, on or before the Closing, have performed all of their obligations hereunder which by the terms hereof are to be performed on or before the Closing Date.

13.2.7. <u>Delivery of Schedules and Closing Certificates</u>. Drafts of all schedules referenced herein and required to be provided at the Closing shall be delivered by the Parties to each other on or before at least 10 days prior to Closing. Final schedules shall be delivered by at the Closing and shall be satisfactory to the Parties in all respects. All other reasonably required or customary closing certificates shall be in form and substance satisfactory to the Parties.

13.2.8. <u>Satisfactory Due Diligence Review</u>. The Parties shall have completed a review of each other's assets, business and the financial condition of their respective operations, and the projected operations of the combined enterprise, the results of which shall be satisfactory to each Party in all respects in their sole discretion, and each Party shall have provided to the other and its representatives access to such financial and other materials as reasonably requested.

13.2.9. <u>Leasehold Title Insurance Policy</u>. UMass Memorial shall have obtained an acceptable Leasehold Title Insurance Policy from a national title insurance company, at normal premium rates, on the American Land Title Association's form currently in use insuring the Occupied Space together with appurtenant rights, subject only to the Permitted Exceptions set forth in the Occupancy Agreement.

13.2.10. <u>Notices of Occupancy Agreement</u>. The University shall have executed and delivered to the UMass Memorial a Notice of Occupancy Agreement in recordable form relating to the Occupancy Agreement.

13.2.11. <u>Regulatory Approvals</u>. The Parties shall have cooperated with each other and shall have taken all such action as is necessary to cause the Massachusetts Department

1192368.12

of Public Health to issue to the Medical Center, licenses to operate the Medical Center and determinations of need ("DONs") to transfer the ownership of Memorial Hospital, UMass Clinical Division, Marlborough, Clinton, and any other clinical facility or activity requiring DON or licensure approval, effective as of the Closing Date. All authorizations, licenses and permits necessary to effect the transactions contemplated hereby shall have been properly transferred or issued to the Medical Center.

13.2.12. _Absence of Litigation_. No action, suit or proceeding shall be pending or threatened before any Court or quasi-judicial or administrative agency of any federal, state, or local jurisdiction wherein an unfavorable injunction, judgment, order, ruling or charge would (i) prevent consummation of any of the transactions contemplated by this Agreement (ii) adversely affect the right of the System to lease or own the Transferred Assets and to operate the former business of the UMass Clinical System.

13.2.13. _Covenant with Respect to Medicaid Contracts_. UMass Memorial and the Medical Center shall have entered into the agreements described in Sections 10.8 and 10.9 subject to and in accordance with the conditions set forth therein.

13.2.14. _Benefits_. The Parties shall be satisfied that the provisions of Section 7.2.4.1 will be observed.

13.2.15. [Reserved]

13.2.16. _Amendments to PPIP_. The operative documents relating to the PPIP shall have been amended to be consistent with the provisions of Section 6.2.13.

13.2.17. _Tax-Exempt Status_. UMass Memorial and the Medical Center shall have received determination letters from the Internal Revenue Service recognizing them as organizations exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code and determining that they are not private foundations under Section 509(a)(1) of the Internal Revenue Code.

13.2.18. _Satisfaction of Conditions to Memorial and University Vote_. All conditions precedent to the vote of the Board of Trustees of Memorial and the University shall have been satisfied or waived prior to the Closing.

13.2.19. UMass Memorial, pursuant to a vote of its Board of Trustees, shall have executed an assignment and assumption agreement in a mutually acceptable form, pursuant to which UMass Memorial shall assume all of the rights, responsibilities, obligations and liabilities of the University and WCCC under the Agreement attached as Exhibit U, and any other agreements or obligations in connection therewith to which the University or WCCC is a party.

13.2.20. An agreement satisfactory to UMass Memorial for the continuation of the provision of uncompensated care by the Medical Center shall have been reached with the Massachusetts Department of Public Health.

## ARTICLE XIV. Miscellaneous

14.1.  Entire Agreement.  This Agreement, including each of the Exhibits and other documents attached hereto or referred to herein, represents the entire understanding of the Parties hereto with respect thereto, and each Party acknowledges to the other that no Party has made or is making any warranty or representation with respect to any matter pertaining hereto except as specifically set forth herein or in the documents attached hereto or referred to herein.

14.2.  Waiver.  The waiver by any Party of any breach of this Agreement by any Party or the waiver of any term of this Agreement will not prevent subsequent enforcement of that term and will not be deemed a waiver of any subsequent breach.

14.3.  Survival.  Subject to the provisions of Sections 11.1 and 14.17, the agreements, promises, obligations, covenants and liabilities made or created herein shall survive the date hereof and implementation of the transactions contemplated by this Agreement, and shall survive the execution of the documents referred to in this Agreement.  Effective as of the Closing, the rights and obligations of Memorial and Memorial Hospital hereunder and under the Occupancy Agreement, the Affiliation Agreement, and the License Agreement shall be deemed to be the benefits and obligations of UMass Memorial or the Medical Center, as the case may be, without the taking of any further action.

14.4.  Modification.  No variation or modification of the terms of this Agreement will be binding unless reduced to writing and signed by or on behalf of each of the Parties; provided, however, that from and after the Closing Date, only the written consent of the University and UMass Memorial shall be required to vary or modify any provision hereof, and WCCC irrevocably waives any further right to object to or consent to any further variation or modification and further hereby irrevocably designates the University as its lawful attorney-in-fact to execute any confirmations that may be required that it has waived its right to consent hereunder to any variation or modification.

14.5.  Assignment.  This Agreement shall be binding upon the Parties and their respective permitted successors and assigns.  No party may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other parties; provided, however, that Memorial and/or UMass Memorial may direct the allocation of assets to be conveyed hereunder or under any document contemplated hereby to any entity controlled by them (or, with respect to the Self Insurance Trust, to a so-called captive insurance company in accordance with the provisions of Section 10.4, and further provided, that subject to Section 6.4.1, UMass Memorial and the Medical Center may assign this Agreement to the surviving entity in the event UMass Memorial or the Medical Center merges, combines or consolidates

1192368.12

with another entity. In the event the Medical School combines, merges, or consolidates with another Medical School without the consent of the Board of Trustees of UMass Memorial (which shall not be unreasonably withheld but which may take into consideration, in addition to other factors, the support of any successor medical school for any competitor of any UMass Memorial Affiliate in Worcester County), then the President/Chief Executive Officer of UMass Memorial may propose to the University a reduction in payments under Section 3.2, and, subject always to the provisions of Section 14.18, the University and UMass Memorial shall agree upon such reduction, if any, as is appropriate. In the event the University and UMass Memorial fail to agree upon any proposed reduction, the matter shall be resolved pursuant to arbitration in accordance with Section 14.10.

14.6.  _Public Releases_. To the extent feasible, all public releases pertaining to the matter set forth herein shall be issued jointly by the University and Memorial.

14.7.  _Cooperation_. The Parties agree, each at their own expense, (a) to execute such other reasonable documents and further assurances, (b) to cooperate with each other with respect to any suits or claims subsequently filed pertaining to either the pre or post closing activities of Memorial, the UMass Clinical System, UMass Memorial, or the Medical Center, (c) to perform such other reasonable acts, and (d) to preserve and provide each other's designated representatives reasonable access to each other's books and records, to the extent necessary to effectuate the orderly implementation of the transactions contemplated herein.

14.8.  _Certain Pre-Closing Expenses_. The UMass Clinical Division and Memorial shall share equally the costs and expenses of Deloitte & Touche (including financial consultation, financial proforma preparation, efficiency study preparation and reimbursement analysis), Ropes & Gray (for antitrust advice only), Bozelle, Sawyer & Miller and Cassidy & Associates, and any other professional advisors that they agreed in writing to retain jointly during the pre-Closing period. On or before the Closing, the Parties shall reconcile all such amounts and pay any amounts owed by one Party to the other which shall be set forth on a schedule to be delivered by the Parties at the Closing. Each Party will bear its own costs and expenses relating to services of professional advisors provided for the benefit of that particular Party.

14.9.  _Consultation_. Each of the Parties agrees that, prior to the Closing Date, it will not enter into any material transactions or negotiations to enter into any material transactions without previously reviewing such proposed transaction with the Chancellor and the Chief Executive Officers of the Academic System and Memorial.

14.10.  _Arbitration_. If a dispute arises under this Agreement which cannot be resolved by the personnel directly involved, any Party may invoke the procedures set forth in this Section by giving the other Parties written notice of the dispute, in which case such Party shall designate a person with decision making authority (the "Representative") to act on behalf of the disputing Party in the dispute. The other Parties shall be required to respond to the disputing party's notice within twenty (20) days of receipt by designating in writing its own Representative. The Parties agree to use the following procedure prior to any Party pursuing other available remedies.

-65-

14.10.1.  The Parties, acting through their respective Representatives, shall meet at a mutually acceptable time and place within twenty (20) days after the non-disputing Parties designates its Representative to the disputing Party. The Representatives shall attempt in good faith to negotiate a resolution of the dispute.

14.10.2.  If, within thirty (30) days after the first meeting of the Representatives the Parties have not succeeded in negotiating a resolution of the dispute, they agree to submit the dispute to mediation in accordance with Commercial Mediation Rules of the American Arbitration Association.

14.10.3.  The Parties will jointly appoint a mutually acceptable mediator to mediate the dispute. If the parties are unable to agree on a mutually acceptable mediator within twenty (20) days of the conclusion of the negotiations, then the Parties shall request the American Arbitration Association to assist the parties in finding a mutually acceptable mediator. Each party shall bear its own costs incurred in the mediation and Memorial, on the one hand, and the University and WCCC together, on the other hand shall bear one-half the costs and expenses of the mediator and any third parties selected by the mediator to assist in resolving the dispute.

14.10.4.  The Parties agree to participate in good faith in the mediation and negotiations related thereto for a period of thirty (30 ) days. If the Parties do not resolve the dispute through mediation within such period, any Party may submit the matter to binding arbitration before a three member panel of arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

14.10.5.  The entirety of this Section is intended to be fully enforceable in accordance with the Uniform Arbitration Act for Commercial Disputes as codified in Chapter 251 of the Massachusetts General Laws, including but not limited to, all provisions relating to mediation. Notwithstanding anything herein to the contrary, nothing in this Section shall preclude any Party from seeking interim or provisional relief in the form of a temporary restraining order, preliminary injunction or other interim relief concerning the dispute, either prior to or during the proceedings provided for in this Section, if such action is deemed necessary to protect the interests of such Party.

14.10.6.  [Reserved]

14.11.  Transition.  The University and WCCC agree that from and after the Closing Date, they shall cooperate and assist UMass Memorial in transitioning the business, operations, assets and properties of the UMass Clinical Division being consolidated hereby with the UMass Memorial and shall make available such personnel of the University and WCCC as is necessary to accomplish such transition. UMass Memorial and the Medical Center agree to provide the University reasonable access to all business and financial records, books, ledgers and other documents transferred hereunder as may be necessary or useful in connection with preparing,

-66-

filing or reviewing any returns, reports or other filings that the University may be required to make or file subsequent to the Closing. The Parties have established an executive level task force to review fully all implications of the transaction with regard to employees of the University and Memorial. The Parties anticipate that prior to the Closing, the task force will recommend a fair and efficient proposal regarding the treatment and integration of the two work forces into the combined entity. The Parties acknowledge that certain aspects of such the proposal may be subject to collective bargaining obligations with incumbent labor organizations. The Parties agree that the Medical Center will recognize any labor organization that represents employees of the University in an existing bargaining unit as the bargaining representative.

14.12. <u>No Third Party Beneficiaries</u>. This Agreement is not intended, nor shall it be construed, to confer any enforceable rights on any person or entity not a party hereto, except with respect to the UMass Memorial and the Medical Center as contemplated by Section 14.3 hereof.

14.13. <u>Notices</u>. All notices hereunder shall be deemed to have been given when delivered in person or one day after sending by reputable overnight delivery service or three (3) days after mailing by certified mail, return receipt requested, addressed to any Party at its address set forth below or at any other address notified in writing to the other Parties hereto.

If to the University or WCCC:

> Chief Executive Officer
> University of Massachusetts Medical Center
> 55 Lake Avenue North
> Worcester, MA 01605

With a copy to:

> Lawrence B. Litwak, Esquire
> Brown, Rudnick, Freed & Gesmer, P.C.
> One Financial Center
> Boston, MA 02111

If to Memorial or UMass Memorial:
Prior to the Closing Date:

> Chief Executive Officer
> Memorial Health Care, Inc.
> 119 Belmont Street
> Worcester, MA 01605

After the Closing Date:

> Chief Executive Officer

1192348.12

UMass Memorial Health Care, Inc.
119 Belmont Street
Worcester, MA 01605

With a copy to:

Ronald B. Schram, Esq.
Ropes & Gray
One International Place
Boston, MA 02110

14.14.  <u>Governing Law</u>. This law shall be governed by and construed in accordance with the internal substantive laws of The Commonwealth.

14.15.  <u>Defaults</u>.

14.15.1. If the University ceases to operate a Medical School, then at the election of and upon written notice provided by the President/Chief Executive Officer of UMass Memorial, (i) the Affiliation Agreement shall terminate and (ii) the obligation of UMass Memorial and the Medical Center to make any payments under Section 3.2.1 [Base Payments] or 3.2.1.1 [Participation Payments] shall cease, and (iii) in accordance with the Occupancy Agreement, UMass Memorial shall in good faith negotiate a lease arrangement for the Occupied Space with the University at fair market value, subject to adjustment as set forth in the Occupancy Agreement.

14.15.2. [Reserved] Subject always to the provisions of the Occupancy Agreement, which shall control with respect to the rights of parties concerning all defaults or Events of Default as described therein, if UMass Memorial fails to pay when due any amounts under this Agreement or the Affiliation Agreement, then (unless such failure is otherwise the subject of a specific remedy in the Occupancy Agreement), after ninety (90) days written notice and failure to cure within said ninety (90) day period, at the election of and upon written notice provided by the Chancellor, the Affiliation Agreement, the License Agreement, and the Occupancy Agreement shall terminate, and the University shall retain all remedies at law or in equity.  This Section shall not be construed to alter any of the provisions of the Occupancy Agreement with respect to the termination of the Occupancy Agreement or late payments made thereunder.

14.15.3. If the University fails to pay when due any amounts under the Occupancy Agreement, then, after ninety (90) days written notice and failure to cure within said ninety (90) day period, at the election of and upon written notice provided by the President/Chief Executive Officer of UMass Memorial, the Occupancy Agreement shall terminate, and UMass Memorial shall retain all remedies at law or in equity.

14.16.  <u>Costs</u>.  Whenever pursuant to this Agreement any party is entitled to charge another party the "cost" of any item, good, or service, then unless otherwise agreed in writing by the parties, such cost shall be the Direct Cost of such item, good, or service.

14.17.  <u>Construction</u>.  This Agreement incorporates by reference as Exhibits certain other documents setting forth agreements between the Parties intended to remain in place over a period of many years.  The Parties intend that, except with respect to the Contracted Employee Agreement (as to which the terms of this Definitive Agreement shall prevail), in the event of any ambiguity between this Agreement and any of the agreements to be executed at the Closing (including without limitation, the Act, the Occupancy Agreement, the Affiliation Agreement, and the License Agreement), the terms of those other agreements shall prevail. However, this Definitive Agreement together with the Exhibits hereto is intended and shall be used to interpret the overall intent of the Parties in entering into a series of complex arrangements as to matters that are not clearly addressed or superseded by such other agreements.

14.18.  <u>Good Faith and Fair Dealing</u>.  The University and UMass Memorial shall meet annually to assess the overall arrangement to consider such adjustments as may be appropriate and mutually agreeable to facilitate the satisfactory implementation of the purposes of this Agreement.  Each Party agrees to cooperate in good faith and to deal fairly with the others in attempting to effect the transactions contemplated by this Agreement as well as performance of any obligations required hereunder subsequent to the Closing.

14.19.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as a sealed instrument as of the date first set forth above.

UNIVERSITY OF MASSACHUSETTS

[seal]

By: _____

Its:

WORCESTER CITY CAMPUS
CORPORATION (d/b/a UMass Health
System, Inc.)

[seal]

By: _____

Its:

MEMORIAL HEALTH CARE, INC.

[seal]

By: _____

Its:

UMASS MEMORIAL HEALTH
CARE, INC.

[seal]

By: _____

Its:

UMASS MEMORIAL MEDICAL
CENTER, INC.

[seal]

By: _____

Its:

-70-

119236R.11

EXHIBIT P

List of Persons Referred to in Section 3.2.1.1

1.    The following hospitals each of which is part of the affiliated network of the UMass
Medical Center:

Athol Hospital
Berkshire Medical Center
Clinton Hospital
Day Kimball Hospital
Harrington Memorial Hospital
Health Alliance
Henry Heywood Hospital
Holyoke Hospital
Milford-Whitinsville Hospital
Marlborough Hospital
Noble Hospital
Wing Memorial Hospital

1192368.12

EXHIBIT U

HealthAlliance MOU or Affiliation Agreement

1192368.12

EXHIBIT V

UMass Memorial/MDPH Uncompensated Care Agreement

1192368.12

# EXHIBIT W

Form of Contracted Employee Agreement

1192368.12

EXHIBIT X

Form of Contracted Clinical Faculty Agreement

1192368.12

**Exhibit 11 – 1**

EXECUTION COPY

## ACADEMIC AFFILIATION AND SUPPORT AGREEMENT

Academic Affiliation and Support Agreement (the "Affiliation Agreement") made and entered into as of the 31st day of March, 1998 by and among UNIVERSITY OF MASSACHUSETTS, an institution of higher education of the Commonwealth of Massachusetts (the "University") on behalf of its academic medical system, including its Medical school (the "Medical School"), UMASS MEMORIAL HEALTH CARE, INC., a Massachusetts nonprofit corporation, ("UMass Memorial"), and UMASS MEMORIAL MEDICAL CENTER, INC., a Massachusetts nonprofit corporation of which UMass Memorial is the sole member (the "Medical Center"). Each of the University, UMass Memorial and the Medical Center are sometimes referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, an Amended and Restated Definitive Agreement executed on March 1998 by and between the University, Worcester City Campus Corporation d/b/a UMass Health System, Inc., Memorial Health Care, Inc., UMass Memorial Health Care, Inc. and UMass Memorial Medical Center, Inc. (the "Definitive Agreement") sets forth the agreements, principles and understandings pursuant to which this Agreement and other agreements by and between the Parties have been executed the date hereof (together, the "Transaction Documents");

WHEREAS, the University includes as an integral part of its academic programs an academic medical system, which currently consists of the Medical School, a graduate school of nursing, a graduate school of biomedical sciences, and various research enterprises (the "Academic System");

WHEREAS, prior to the date hereof, the University operated in conjunction with the Academic System an acute care hospital (the "Teaching Hospital") which as of the date hereof consolidated into the operations of the Medical Center;

WHEREAS, as of the date hereof the Medical Center owns and operates, in addition to the former Teaching Hospital, a second acute care hospital formerly known as Memorial Hospital ("Memorial Hospital") (such hospitals together referred to herein as "the Hospitals," and individually as the "UMass Campus" and the "Memorial Campus," respectively);

WHEREAS, as of the date hereof UMass Memorial is the sole member of the Medical Center and also includes under its ownership or control a broad array of other entities that engage in the provision of health care services and related activities (the "Existing Affiliates");

WHEREAS, UMass Memorial intends to grow the System through merger, consolidation, or acquisition of additional health care entities ("Future Affiliates") over the term

of this Agreement (UMass Memorial, the Existing Affiliates and the Future Affiliates together referred to herein as the "System");

WHEREAS, the University desires to ensure continued access within the System to high quality clinical training sites and to clinical research opportunities and programs by its residents, medical students and other health care trainees under the auspices of the Academic System from time to time;

WHEREAS, the University desires to assure the continuation of the role formerly played by the Teaching Hospital in attempting to respond to the needs of the Commonwealth and its citizens for quality clinical and related health services;

WHEREAS, UMass Memorial and the Medical Center desire to continue to deliver, and to enhance their delivery of, quality medical services to the public;

WHEREAS, UMass Memorial desires to promote medical education, teaching and research by the provision of appropriate training and research sites within the Hospitals and throughout the System as may be appropriate; and

WHEREAS, the Parties are committed to long-term collaboration through a series of operational and financial linkages and shared destinies in order to achieve their mutual objectives, all as described in the Definitive Agreement;

NOW THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows, intending to be legally bound:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement, and in addition to the terms defined elsewhere herein, the following terms have the following definitions:

"Academic Affiliates" shall have the meaning set forth in Section 2.1.2.

"Academic System" shall have the meaning set forth in the recitals.

"Affiliation Agreement" shall have the meaning set forth in the preamble.

"Base Payment" shall have the meaning set forth in Section 8.1.

"Chancellor" shall have the meaning set forth in Section 2.1.1.

"Closing Date" shall mean the date on which the transactions contemplated by the Definitive Agreement are closed.

"Combined Score" shall have the meaning set forth in Section 8.1.

"Definitive Agreement" shall have the meaning set forth in the recitals.

"Development Office" shall have the meaning set forth in Article 5.

"Direct Cost" shall have the meaning set forth in §1.21 of the Definitive Agreement.

"Existing Affiliates" shall have the meaning set forth in the recitals.

"Exploit" shall mean to utilize in any manner, including without limitation making, having made, using, selling, leasing, and renting, and in the case of a work of authorship, includes copying or creating derivative works of such work of authorship.

"Foundation" shall have the meaning set forth in Article 5.

"Future Affiliates" shall have the meaning set forth in the recitals.

"Group Practice" means the faculty group practice plan of the University of Massachusetts.

"Hospital Affiliates" shall have the meaning set forth in Section 2.2.2.

"Hospitals" shall have the meaning set forth in the recitals.

"Liability" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due), including any liability for Taxes.

"License Agreement" means the license agreement entered into by UMass Memorial and/or the Medical Center and the University on the Closing Date.

"MBIA Bonds" means that portion of the Massachusetts Health and Educational Facilities Authority Revenue Bonds, Capital Asset Program Issue, Series J-2, the proceeds of which were loaned to the University pursuant to a Financing Agreement dated as of June 8, 1995.

"Medical Center" shall have the meaning set forth in the preamble.

-3-

"Medical Center Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Medical School" shall have the meaning set forth in the preamble.

"Memorial" means Memorial Health Care, Inc.

"Memorial Affiliate" or "Memorial Affiliates" shall refer to one or more of Memorial Health Care, Inc., Memorial Hospital, Inc., Memorial Medical Group, Inc., Memorial Services, Inc., or Memorial Ventures, Inc.

"Memorial Campus" shall have the meaning set forth in the recitals.

"Memorial Hospital" shall have the meaning set forth in the recitals.

"Memorial Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Mixed Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Most Recent Balance Sheet" means the combined balance sheet contained within the Most Recent Financial Statements.

"Most Recent Financial Statements" means, with respect to the UMass Clinical Division or any WCCC Affiliate, the audited combined Financial Statements of such entity for the fiscal year ended June 30, 1997, and with respect to any Memorial Affiliate, means the audited Financial Statements of such entity for the fiscal year ended September 30, 1997.

"Net Operating Revenues" means for any fiscal year, Net Service Revenue less all operating expenses, excluding any extraordinary or non-recurring items, the cumulative effect of changes in accounting principles, any gains or losses from the early extinguishment of debt or from the sale or other disposition of investments or fixed or capital assets and also excluding gifts, unrealized gains or losses on investments, interest, dividends and other investment income, as determined in accordance with GAAP consistently applied and audited by an independent certified public accounting firm.

"New Affiliates" shall have the meaning set forth in Section 8.1.1(g).

"Occupancy Agreement" means the long-term occupancy and shared services agreement entered into by UMass Memorial and/or the Medical Center and the University on the Closing Date.

"Occupied Space" means all space made available to UMass Memorial or the Medical Center under the Occupancy Agreement.

"Oversight Group" shall have the meaning set forth in Section 5.1.

"Participation Payments" shall have the meaning set forth in Section 8.1.1.

"Party" or "Parties" shall have the meaning set forth in the preamble.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Physician Advisory Board" means the board reporting to the Board of Trustees of UMass Memorial on all major clinical and care delivery-related issues, and described in Section 6.2.12 of the Definitive Agreement.

"Practice Plan" means the physicians formerly employed by the University and whose services are to be provided to UMass Memorial Physicians.

"President/CEO" shall have the meaning set forth in Section 2.1.1.

"Representative" shall have the meaning set forth in Section 11.1.

"Research Intellectual Property" shall have the meaning set forth in Section 2.3.1.

"Self-Insurance Trust" means all assets as of the Closing Date attributable to the "University of Massachusetts Medical Center Self-Insurance Trust" shown on the Most Recent Financial Statements of the University, intended to establish a separate revenue and expense center for the operations of the self-insurance trust maintained to insure activities of the UMass Clinical Division.

"Strategic Plan" means the strategic plan of the System, described in Section 5.1 of the Definitive Agreement.

"System" shall have the meaning set forth in the recitals.

"Teaching Hospital" shall have the meaning set forth in the recitals.

"Transaction Documents" shall have the meaning set forth in the preamble.

"University" shall have the meaning set forth in the preamble.

"UMass Campus" shall have the meaning set forth in the recitals.

"UMass Clinical Division" refers to the Teaching Hospital, the Group Practice, and the Self-Insurance Trust of the University of Massachusetts Medical Center, collectively.

"UMass Clinical System" refers to the UMass Clinical Division, Worcester City Campus Corporation and the health care providers and other organizations controlled by WCCC, collectively.

"UMass Memorial" shall have the meaning set forth in the preamble.

"UMass Memorial Affiliate" means UMass Memorial and its subsidiaries and affiliates (including without limitation the Medical Center) from and after the Closing Date.

"WCCC" means Worcester City Campus Corporation.

## ARTICLE 2

## NATURE OF AFFILIATION

2.1.  Designation of Academic and Teaching Hospital Relationship.

2.1.1.  The Academic System will be the sole medical school and clinical teaching program affiliation of the Hospitals and the Existing Affiliates, unless the Chancellor of the Medical School (the "Chancellor") and the President/Chief Executive Officer of UMass Memorial (the "President/CEO") agree to the contrary; provided, however, that in the event the Hospitals need additional residents that the Medical School is unwilling or unable to provide, after notice provided to the Medical School of at least twelve (12) months, then the Medical Center may establish a hospital-based residency program in order to satisfy such unmet need. UMass Memorial may affiliate with other medical schools and health education programs, however, for services and programs not offered by or not otherwise part of the Academic System.

2.1.2.  The Hospitals will be the primary teaching hospitals and clinical training program affiliates for the Academic System's undergraduate and graduate medical education programs and other health training programs.  At the Chancellor's request, UMass Memorial shall use its best efforts to cause each of its Existing Affiliates to serve as training sites for such Academic System training programs.  UMass Memorial shall endeavor to cause Future Affiliates and other hospitals and health care entities that may currently or in the future have contractual clinical affiliations with UMass Memorial or the Medical Center to serve as training sites, at the Chancellor's request, except that any such training affiliations need not be exclusive to the Academic System, and need not be comprehensive to the extent that such arrangements would conflict with other training affiliations in place at such time.  All Affiliates that are serving from time to time as training sites for the Academic System (including without limitation the Hospitals) are referred to herein as the "Academic Affiliates"

-6-

## 2.2. Academic Medical Education and Training Programs.

2.2.1. The Medical School shall control decisions regarding academic issues and medical education and training, including, but not limited to, continuing medical education programs of the Parties and rotations and assignments regarding graduate and undergraduate medical education training. All continuing medical education programs and, unless otherwise agreed by the Chancellor, all education and training programs of other health care professionals of the Academic Affiliates shall be conducted by or under the auspices of the Medical School. The Medical School department chairs are responsible for the supervision, direction, and control of residents assigned to the Hospitals. Each resident who receives a stipend through the Medical School or the Medical Center, and/or is appointed to a Medical School integrated residency program is subject to the Medical School Residency Program Personnel Policies. On matters of patient care and professional conduct, residents must also abide by the policies, rules and regulations of the Medical Center and the Hospitals and other Hospital Affiliates at which they are assigned.

2.2.2. All patients seen or treated at the Hospitals or any of the other hospitals that are Academic Affiliates (together, the "Hospital Affiliates") or in connection with any of their programs shall, at all times, be under the supervision and responsibility of an attending physician privileged by the respective hospital. The Hospital Affiliates shall not admit patients whose care and treatment will be provided solely by students or residents.

2.2.3. The Medical School may select and assign undergraduate students to specific clinical clerkships in the Hospital and, as applicable, in the Hospital Affiliates, in a manner and in numbers determined by the respective department chair. The Medical School shall provide the Hospital Affiliates with documentation of appropriate credentials for all undergraduate students and residents assigned to such hospitals by the Medical School.

2.2.4. Any Academic Affiliate has the right to request the Medical School to immediately transfer a student after the reasons therefor have been discussed with the respective Medical School department chair. The student may request a review of a directed transfer in accordance with Medical School policies.

2.2.5. The department chair/division directors of the respective departments and services shall be primarily responsible for assurance and documentation of the quality of the teaching programs for medical students assigned to the Academic Affiliates. Only medical staff members at the Hospital Affiliates with Medical School faculty appointments shall participate in the training of medical residents and shall be responsible for the supervision of undergraduate medical students assigned to the Academic Affiliates. Medical School students while on assignment to the Academic Affiliates shall remain subject to Medical School grading, administrative, and governance policies and procedures as specified in the Medical School

Catalog, the <u>Student Handbook</u>, and as otherwise may be applicable. They shall also abide by all appropriate rules and regulations of any Academic Affiliate at which they are assigned.

2.2.6. The System reasonably shall cooperate to provide clinical trial sites and to participate in clinical trials sponsored by the Medical School. All clinical trials and other research activities conducted by or in the facilities of UMass Memorial or the Hospitals shall be subject to the prior approval of the Chancellor and shall be conducted in accordance with policies and procedures of the University.

2.3. <u>Research, Grants and Intellectual Property Rights</u>.

2.3.1. <u>Definitions</u>. For purposes of this Section 2.3, the following terms have the following definitions, all of which exclude Intellectual Property conceived or developed by private physicians who do not have an independent contractor or employment relationship with UMass Memorial or the Medical Center and as to which neither UMass Memorial nor the Medical Center has any rights:

"Research Intellectual Property" means any Intellectual Property conceived or developed during the course of or otherwise derived from research (whether funded or unfunded) involving any material use of resources of the University or the Medical Center, including clinical drug trials and including clinical outcomes research wholly funded by or through the University but excluding clinical outcomes research wholly funded by UMass Memorial or the Medical Center.

"Medical Center Intellectual Property" means any Intellectual Property that is conceived or developed by any of the employees of UMass Memorial or the Medical Center as part of or is otherwise derived from the System's investment in improving its administrative processes, including, but not limited to, clinical outcomes research wholly funded by UMass Memorial or the Medical Center, data bases, information systems, and software relating to billing, collection, and business management of patients and capitated patient bases, patient lists, and medical records.

"Memorial Intellectual Property" means the Intellectual Property of any of the Memorial Affiliates.

"Mixed Intellectual Property" means any Intellectual Property that is conceived or developed by UMass Memorial or the Medical Center or either of its employees or to the extent it may legally required of independent contractors to do so, its independent contractors or other than Research Intellectual Property or Medical Center Intellectual Property, and specifically including clinical outcomes research not wholly funded by or through any of the University, UMass Memorial, or the Medical Center or wholly funded by the University.

**2.3.2.** <u>Transfer by Memorial Affiliates of Rights to Memorial Intellectual Property</u>. Subject to the provisions of Sections 2.3.3.1 and 2.3.3.4, the Memorial Affiliates will fully disclose and transfer to the University ownership and all rights to commercially Exploit Memorial Intellectual Property that they hold as of the Closing.

**2.3.3.** <u>Research Sponsorship</u>.

**2.3.3.1.** All funded research activities by UMass Memorial, the Medical Center, or by individuals or New Affiliates as defined in Section 8.1.1 or other Persons whose revenues are included in the Participation Payments, subject to any of their applicable research or employment policies, shall be conducted under the auspices of the Medical School. The Medical School shall be the sponsoring institution designated for all such research grants sponsored by UMass Memorial, the Medical Center, or involving any member of the Medical School Faculty.

**2.3.3.2.** The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate in good faith to resolve any issues concerning the right of UMass Memorial or the Medical Center to pursue and retain grants that are not directly available to the University.

**2.3.4.** <u>Agreement Concerning Rights to Intellectual Property Arising from Operations of System After the Closing Date</u>.

**2.3.4.1.** <u>Disclosure and Assignment of Intellectual Property Interests</u>. UMass Memorial and the Medical Center shall fully disclose to the University all of the Research Intellectual Property and Mixed Intellectual Property, whether such rights arise on or after the date of the Definitive Agreement. Each of UMass Memorial and the Medical Center shall, to the extent it is legally able to do so, require its employees and independent contractors, who are engaged in research or clinical care activities to assign to UMass Memorial or the Medical Center, as applicable, all rights to Research Intellectual Property and Mixed Intellectual Property arising in the course of or as a result of such activities except to the extent that any such employees or independent contractors are members of the Medical School Faculty and already subject to an obligation to assign any such rights to the University under the Medical School's intellectual property policies; provided, however, that no such transfer shall be required to the extent that any such individuals have independent rights in such Research Intellectual Property or Mixed Intellectual Property prior to the date of the Definitive Agreement or would be permitted to retain such rights under the Medical School's research and intellectual property policies. Rights arising prior to the date of the Definitive Agreement for the benefit of any member of the medical staff of Memorial Hospital shall be retained by such medical staff members.

2.3.4.2. <u>Right to Exploit Research Intellectual Property</u>. The Parties agree that, except as provided in Section 2.3.3.4 below, ownership of all Research Intellectual Property owned by UMass Memorial or the Medical Center shall be transferred to the University and that the University shall have the right, and neither UMass Memorial nor the Medical Center shall have the right, to commercially Exploit such Research Intellectual Property.

2.3.4.3. <u>Right to Exploit Mixed Intellectual Property</u>. The Parties agree that ownership of all Mixed Intellectual Property owned by UMass Memorial or the Medical Center shall be owned jointly and equally with the University and that the Parties shall agree in good faith as to the process by which to commercially Exploit such Mixed Intellectual Property and shall (in the absence of other agreement between the Parties) share equally in the revenues of such commercialization.

2.3.4.4. <u>Retained Rights to Use of Intellectual Property</u>. UMass Memorial and the Medical Center will retain the right to use Memorial Intellectual Property, Research Intellectual Property and Mixed Intellectual Property transferred to the University under Sections 2.3.1 or 2.3.3.2 for their own internal use, and each of them shall have the right to distribute or disseminate such Research Intellectual Property and Mixed Intellectual Property to third parties engaged in non-commercial research, free of cost, under an agreement which restricts use to non-commercial research and which prohibits redistribution or dissemination to others.

2.3.4.5. <u>Right to Exploit Medical Center Intellectual Property</u>. UMass Memorial shall retain ownership of and all rights with respect to Medical Center Intellectual Property, including the right to commercially exploit such Medical Center Intellectual Property, and the University shall not have the right to commercially exploit such Medical Center Intellectual Property. The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate in good faith to resolve any issues concerning the applicability of this Section 2.3.3.5 to any specific item of Intellectual Property.

2.3.4.6. <u>Cooperation</u>. UMass Memorial and the Medical Center will execute, and will cause the Memorial Affiliates to execute any transfers, assignments or other documents reasonably requested by the University and will cooperate fully with the University in order to obtain, register, or convey any Memorial Intellectual Property, Research Intellectual Property, or interest in Mixed Intellectual Property that is required to be conveyed hereunder; provided, however, that actions (other than execution of documents) and costs associated with such registration, conveyance, and similar actions (including without limitation the costs of prosecuting patent applications and similar rights) shall be taken by and at the expense of the University.

# ARTICLE 3

## ACADEMIC AND CLINICAL DEPARTMENTS OF MEDICAL SCHOOL AND MEDICAL CENTER

### 3.1. Academic and Clinical Operating Principles.

3.1.1. The Academic System and the System will develop complementary academic and clinical strategies that are linked through joint investments in academic and clinical programs designed to foster a cooperative and team-oriented approach.

3.1.1.1. The Academic System will have jurisdiction over academic issues (e.g., curriculum development, use of educational funds), and the System will have jurisdiction over clinical issues (e.g., service site location, program development, etc.). The University and UMass Memorial will inform and consult with each other on major changes in mission or operations. The Parties recognize that joint decision-making between the University, UMass Memorial, and the Medical Center will be necessary with respect to decisions that affect all of these entities.

3.1.1.2. UMass Memorial and the Medical Center will continue to have representation on committees of the Academic System that address matters directly related to the operations of the System, including without limitation the following: Education Policy Committee; Graduate Medical Education Committee; Continuing Medical Education Committee; Executive Council; and Faculty Council. Such representatives on such committees will be appointed by the President/Chief Executive Officer of UMass Memorial after consultation with the Chancellor.

### 3.2. Physician Leadership and Organization

3.2.1. General Principles. Except for (i) members of the medical staff of the former Memorial Hospital who did not hold Medical School faculty appointments prior to the Closing and (ii) other individual physicians specifically excluded by approval of the Chancellor, all members of the medical staff of the Medical Center shall be required to have and maintain faculty appointments at the Medical School as requested by the Medical School and to provide a reasonable amount of academic service under the supervision of the Chancellor, at no additional compensation from any of the Parties, (not to exceed more than two hundred (200) hours per year for physicians employed by any UMass Memorial Affiliate or the Practice Plan without the approval of the President/Chief Executive Officer of UMass Memorial and not to exceed fifty (50) hours per year for physicians in private practice without the prior approval of the Board of Trustees of UMass Memorial including, but not limited to, participation in resident training programs). Subject to the limitation set forth in the prior sentence, the annual amount of required academic service shall be determined from time to time by the Chancellor based on the needs of the Medical School and the resources available to it; provided, however that any increase in the

standard number of uncompensated hours to be provided by new employed members of the faculty of the Medical School is subject to approval by the Physician Advisory Board. By mutual agreement of the Chancellor and the Medical Center, the Medical Center may create or may designate specific medical staff categories to which individuals who have been exempted from the faculty appointment requirement may be appointed. The Academic System will work with the System to train, support and place physicians, students, and other health care professionals for community and clinical service in accordance with the Strategic Plan.

3.2.2. Organization.

3.2.2.1. Clinical departments of the Medical Center will mirror the organizational structure of the academic departments of the Academic System. The academic department chair and division director of the Academic System will serve as the department chair and division director, respectively, of the corresponding clinical department of the Medical Center and are referred to herein as a "department chair" or "division director" when functioning in either an academic or clinical capacity. The initial clinical chairs will be set forth on a schedule to be delivered at Closing. At least three of the initial chairs will be appointed from among physicians formerly affiliated with Memorial. Unless and until changed by the Board of Trustees of UMass Memorial, at least three of the chairs will have their principal offices at the Memorial campus. The chairs will be responsible for clinical process redesign and enforcement of the proposed redesign.

3.2.2.1.1. Initial vice chairs will be appointed so as to provide representation of both campuses in, the principal offices of the chairs and vice chairs of each department between the UMass Campus and the Memorial Campus.

3.2.2.1.2. Initial division directors will include representatives of the UMass Campus and the Memorial Campus. Departmental chairs will be responsible for appointment of the division directors, in consultation with the chief medical officers of the Medical Center and the Physician Advisory Board ("PAB"), subject to final approval by the President/Chief Executive Officer of UMass Memorial.

3.2.2.1.3. The Medical Center will have a single medical staff with a single chair of each department. The medical staff will include (i) physicians employed by the University whose services are provided under a Contracted Employee Agreement (if any), (ii) physicians employed by UMass Memorial Physicians, Inc., (iii) physicians employed by UMass Memorial Medical Group, Inc. and (iv) private practitioners. The medical staff bylaws shall be consistent with the Definitive Agreement.

3.2.2.1.4. The composition of the employed medical group or groups and the strategy to be pursued by the Medical Center in integrating physicians will be determined by the Strategic Plan.

-12-

3.2.2.1.5. The System will endeavor to establish a primary care physician network that is appropriate in size and location, and whose incentives are appropriately aligned with the System. The Parties anticipate that the initial target ratio of primary care physicians to specialists will be developed as part of the development of the Strategic Plan. Thus, desired growth or decrease in the number of specialists will be determined as part of the Strategic Plan. The Parties anticipate that quality, cost efficiency and productivity will be measured and monitored for all physicians in the network.

3.2.3. Appointment and Activities of Departmental Chairs. Academic chairs/ department chairs will be recruited by a search committee appointed by the Chancellor and shall be appointed by the Chancellor with the advice and consent of the President/Chief Executive Officer of UMass Memorial. During the first three years following the Closing Date, the search committees will be comprised of equal numbers of representatives formerly affiliated with each of the Academic System and Memorial. The Chancellor and the President/Chief Executive Officer of UMass Memorial will jointly agree upon the recruitment package to be offered to any candidate for the position of academic chair/department chair. The search committee will include participants from the PAB or their nominees. The Chancellor and the President/Chief Executive Officer of UMass Memorial will jointly undertake the annual performance review of the academic chairs/department chairs of each department and will agree upon the compensation package for such individuals. Either the Chancellor or the President/Chief Executive Officer of UMass Memorial may request termination of an academic chair/department chair, with such request to be processed expeditiously and in accordance with appropriate Medical School due process. Prior to the Closing, the Medical School and Memorial shall endeavor to establish a mutually agreeable process for termination of an academic chair/department chair, with such process to include a final determination no later than three (3) months from receipt of request for termination. In the event the Medical School and Memorial fail to agree upon such a process, or in the event they agree upon such a process but for any reason a final determination to terminate an academic chair/department chair has not been rendered within the said three (3) month period, then the President/Chief Executive Officer of UMass Memorial may remove such individual from the position of department chair; thereafter, the President/Chief Executive Officer of UMass Memorial may appoint an interim chair with the approval of the Chancellor, which approval shall not be unreasonably withheld. In the event the President/Chief Executive Officer of UMass Memorial and the Chancellor shall fail to agree upon the appointment of an interim department chair, then a four (4) member subcommittee of the Board of Trustees of UMass Memorial shall appoint the interim department chair, and the Chancellor and the President/Chief Executive Officer shall each designate two (2) trustees to serve on such subcommittee.

3.2.4. Accountability. All research activities will be managed and governed by the University, and the academic chairs of each department will be responsible for establishing mechanisms to ensure accountability for satisfactory use of clinical time.

**3.2.5. Clinical Services to the Commonwealth.** The System will endeavor to respond to the need of the Commonwealth for clinical services as identified by the Academic System.

**3.3. Cross Funded Employees.**

The Chancellor and the President/Chief Executive Officer of UMass Memorial shall cooperate with each other with respect to the establishment and cost allocation of compensation of individuals serving in dual capacities on behalf of the Medical School and UMass Memorial and/or the Medical Center, all as set forth more specifically below.

**3.3.1. Payments.** The Medical Center will supply the University with the services of certain individuals who also provide services to the Medical Center (the "Cross Funded Employees") for teaching, research, and other purposes. The University will supply the Medical Center with the services of certain individuals for clinical purposes. The proposed annual funding by each of the University and the Medical Center for such Cross Funded Employees shall be established pursuant to Section 3.3. Each of the University and the Medical Center will be reimbursed on a weekly basis, in arrears, for the cost of salaries and benefits of the Cross Funded Employees.

**3.3.2.** There will be no reduction in the aggregate dollar value of professional and support services provided by Cross Funded Employees and paid for by either of the University or the Medical Center during the University's fiscal year ending June 30, 1999 below the actual level incurred in the fiscal year ending 1998.

**3.3.3.** Prior to March 31, 1999, and prior to March 31 of each subsequent year during the term of this Agreement, each of the University and the Medical Center will present a proposed budget to the other setting forth proposed requirements under this Section 3.3 for the University's fiscal year commencing on July 1 of such year. The University and the Medical Center will negotiate in good faith to reach agreement with respect to the proposed level of services to be provided hereunder.

**3.3.4.** The Parties agree that the mutual goal of promoting and supporting research and teaching activities must be tempered by the economic realities of operating a fiscally sound clinical system. The Parties further agree that it is desirable, within the constraints of fiscal responsibility, to continue to support a broad range of physicians and other academic researchers. Accordingly, the Parties agree to support the applicable departmental chairs and to consider and attempt to accommodate continued financial support for the Cross Funded Employees and to cooperate in the chair's efforts to locate alternative funding sources for temporary interruptions or changes in financial other support for such individuals, including use of the Departmental Education Funds. The Parties agree that, in the event adequate funding is unavailable from either of the University or the Medical Center or from alternative funding sources for a particular Cross Funded Employee, the individual, if a

# Exhibit 11 – 2

physician, shall remain free to practice as a private physician in the community, but the University agrees that it will not object if the chair refuses to allow such individual to continue his academic appointment if such individual becomes employed, directly or indirectly by any licensed health care provider or affiliate thereof (excluding UMass Memorial and its affiliates) and continues to provide services in Worcester County. Anything to the contrary herein notwithstanding, each of the Medical Center and the University acknowledges and agrees that the other party shall retain authority to establish the salary and benefits, and to terminate or otherwise alter the terms and conditions of employment of the Cross Funded Employees employed by it; provided, however, that with respect to the Cross Funded Employees remaining employed by the University during the transition period contemplated by the Agreement for Practitioner Services, the Medical Center's authority with respect to such Cross Employee Services. In the event of a proposed termination of the employment of any Cross Funded Employees shall be determined in accordance with the applicable Agreement for the University and the Medical Center shall share in the severance costs, if any, of such Cross Funded Employee, or any reduction in hours, salary or other compensation of such individual, Funded Employee in proportion to the percentages each party was responsible for funding such employee immediately prior to such termination or reduction.

3.3.5. [Reserved.]

3.3.6. System Support for Faculty Academic Pursuits. In implementing the procedures set forth in Section 3.3.4 and subject always to the right of the Medical Center to establish salary and benefits, and to terminate or otherwise alter the terms and conditions of employment of the Cross Funded Employees, UMass Memorial and the Medical Center shall work with the department chairs in their efforts to define faculty compensation and allocate patient care and other responsibilities in order to promote academic and research efforts consistent with the mission of the Medical School.

## ARTICLE 4

## DEPARTMENTAL EDUCATION FUNDS

All academic funds (net assets) derived from the Group Practice and held by the University as of the Closing Date, including the net assets in the fund labeled "Group Practice Plan Fund Balance" on the Most Recent Balance Sheet of the UMass Clinical Division will remain assets of the University and will be held by the Medical Center as agent for the University and allocated to each academic department regardless of whether the department chair was formerly affiliated with UMass Clinical System or Memorial. The funds shall be transferred by the Medical Center, as agent, to the University pursuant to the provisions of Section 13.1.4. of the Definitive Agreement. Expenditures from such funds will be made upon the prior approval of the Chancellor and President/Chief Executive Officer of UMass Memorial.

Immediately after the Closing, UMass Memorial shall, in consultation with the department chairs and the Chancellor, undertake and complete within six months of the Closing a review of the method of funding academic support payments from the Practice Plan to the clinical departments of the Medical Center (the "Departmental Education Funds"). The ten percent (10%) level of funding of the Departmental Education Funds in effect as of the date of execution of this Agreement (excluding the annual transfer of "Residual Earnings" as calculated pursuant to the Rules and Regulations of the Group Practice Bylaws in Exhibit Q) shall remain in effect until such time as the review of the method of funding has been completed. Thereafter, UMass Memorial shall have the right to substitute a new method after consultation with the Chancellor; provided however that the dollar level of funding for fiscal year 1996 shall be maintained unless and until the Chancellor and the President/Chief Executive Office of UMass Memorial shall otherwise agree.

Expenditures from the Departmental Education Funds during the year in which related income is earned will be made by the Medical Center, in accordance with the budget approved by the Chancellor and the President/Chief Executive Officer of UMass Memorial. The balances, if any, remaining in the Departmental Education Funds each year following reconciliation of such approved expenditures as of the end of September (which shall expressly exclude all Residual Earnings as defined in Exhibit Q or other portion of annual net income), together with all accrued interest earned thereon, shall be transferred to the appropriate academic departments of the Medical School within one hundred twenty (120) days of such reconciliation date. In the event that any such remaining balances are not transferred within such time, such untransferred amounts shall accrue interest from the end of UMass Memorial's fiscal year as to which such reconciliation applies at the Late Payment Rate. The System and the Academic System will work together in the future to identify additional sources of funds to subsidize less lucrative academic departments.

## ARTICLE 5

## DEVELOPMENT ACTIVITIES

The Medical School development office (the "Development Office") shall be the sole development office that will conduct the fund raising and development efforts for the Medical School and all UMass Memorial Affiliates in existence on the Closing Date (the "Existing Affiliates"). Prior to the Closing, UMass Medical Center Foundation, Inc. shall amend its articles and bylaws in the forms attached hereto as Exhibits B and C, respectively, to change its name to UMass Memorial Foundation, Inc. (the "Foundation") and to provide that the predecessor entities shall appoint an equal number of board members of the Foundation. The Foundation shall provide advice and assistance to the Development Office in such efforts. The Chancellor shall serve, ex-officio, as the Chief Executive Officer of the Foundation, and such other staff as may be required will be provided by the Medical School. All fund raising efforts and approaches to potential donors on behalf of the Medical School, the System, and the Existing Affiliates shall be conducted by the Development Office. The Development Office may conduct fund raising efforts on behalf of entities that become affiliated with System after the Closing

Date by mutual agreement of the Chancellor and the President/Chief Executive Officer of UMass Memorial, but in no event shall UMass Memorial conduct independent fund raising efforts for such new affiliate, (although such new affiliate may conduct its own fund raising efforts provided it does not use the "UMass" name).

5.1. <u>Oversight Group</u>.  A Development Office oversight group, appointed by the Chancellor and including the President/Chief Executive Officer of UMass Memorial (the "Oversight Group"), shall be responsible for approving fund raising plans and strategies for contacting potential donors and resolving outstanding issues relating to distributions of the funds raised by the Development Office.  The Development Office's annual plans and strategic plans shall be adopted with the advice and consent of the President/Chief Executive Officer of UMass Memorial.

5.2. <u>Clinical Fundraising Division</u>.  A specific division shall be established within the Development Office that shall be responsible for implementing the Development Office's development efforts for the System.  The head of this division shall be appointed by the President/Chief Executive Officer of UMass Memorial, subject to the approval of the Chancellor.

# ARTICLE 6

## <u>ACADEMIC AND OPERATIONAL INTEGRATION</u>

Academic and Operational Integration shall be governed by the provisions of Section 3.1 of this Agreement.

# ARTICLE 7

## <u>USE OF NAME</u>

Use of the name "UMass" shall be governed by the License Agreement.  So long as the License Agreement is in effect, UMass Memorial shall consistently use the Marks (as defined in License Agreement) in its name and in all of its operations and general publicity materials, in accordance with and subject to the License Agreement, and shall cause the UMass Memorial Affiliates in existence on the Closing Date and any New Affiliates that have an academic affiliation agreement with the University to use the Marks in their names, operations or in all general publicity materials in accordance with and subject to the License Agreement, unless otherwise agreed by the University.  The University agrees not to grant a license to use the name "UMass" or permit any entity (other than a UMass Memorial Affiliate) to use such name as part of the name of any health facility (excepting only student health facilities, including the existing Amherst facility, which serves patients in addition to students) or physician group; provided,

-17-

however, that the University may grant a license to use the name "UMass" to a publicly-owned hospital.

## ARTICLE 8

## ACADEMIC SUPPORT

The System agrees to make the following payments to the University on the terms and conditions set forth herein. UMass Memorial and the Medical Center shall be jointly and severally liable for all amounts set forth in Sections 8.1 and 8.1.1.

8.1. <u>Baseline Support</u>. The System has agreed to make a specific annual payment to the University during the term of this Affiliation Agreement so long as the University continues to operate a medical school. The University hereby acknowledges and agrees that, except with respect to claims for coverage under the Self Insurance Trust relating to coverage prior to the date the Self Insurance Trust is transferred to a UMass Memorial Affiliate or designee under Section 10.4 of the Definitive Agreement, from and after the Closing Date it shall have no right to and shall not attempt to claim any right to any portion of the Self Insurance Trust including income or appreciation thereon (other than in connection with the obligation of UMass Memorial or the Medical Center under Section 10.4 of the Definitive Agreement to provide tail coverage and otherwise indemnify the University and its employees who were covered by the Self Insurance Trust prior to Closing) or to assess a "Medical School Tax", "Dean's Tax" or other charge against clinical or professional revenues (other than the Departmental Education Fund Tax described in Article IV and the Participation Payment described in Section 8.1.1) generated by any of the UMass Memorial Affiliates (or any future Subsidiary thereof) or any employees or independent contractors thereof and, except as provided in the Occupancy Agreement or otherwise agreed to in writing by the University and the Medical Center or any other UMass Memorial Affiliate, no other charges shall be assessed against or with respect to the clinical facility or otherwise. The Medical Center will pay the University an annual "par level" baseline support payment during the term of this Affiliation Agreement of Twelve Million Dollars ($12,000,000) (the "Base Payment"), subject to an annual adjustment for inflation by the COLA, payable in twelve (12) equal installments of One Million Dollars ($1,000,000) monthly, in arrears, on the fifteenth day of each month commencing after the first full month after the Closing, subject to inflationary adjustments on each anniversary during the term of this Affiliation Agreement as set forth herein; provided, however, that if the Closing occurs other than on the last day of a calendar month, the monthly payment shall be pro-rated for the number of days elapsed in the month following the Closing Date; and provided, further, that the Parties agree the existing Medical School Tax as defined in the Rules and Regulations Relative to the Operation and Governance of the Group Practice as set forth in <u>Exhibit Q</u> of the Definitive Agreement in effect prior to the Closing Date shall be continued through the end of the calendar month of the Medical Center during which the Closing occurs, and there will be a credit against

the $1,000,000 monthly support payment equal to the amount paid by the Practice Plan (or any successor entity) in payment of such Medical School Tax during such partial calendar month.

As more fully set forth in the Occupancy Agreement, in the event the Medical School closes during the term of the Occupancy Agreement, then from and after the date of such occurrence, the System will be relieved of all obligation to pay baseline support under this Section 8.1, and the University and the System shall negotiate a lease arrangement to permit continued occupancy of the Occupied Space at fair market value subject to certain adjustments set forth therein, all as further set forth in the Occupancy Agreement.

There shall be an adjustment to the Base Payment and the Participation Payment in the event of a material change in the enrollment of medical students at the University or a material decline in restricted research expenditures at the Academic System calculated in accordance with the provisions of this Section 8.1.

The adjustment shall be calculated by reference to a system of 200 points. Of the 200 points, 100 shall be attributable to student enrollment and 100 shall be attributable to restricted research awards. The Parties agree that the number of first year medical students enrolled at the University as of January 1, 1997 was 100 and that this shall be deemed equivalent to 100 points. The parties agree that the level of restricted research expenditures on the Most Recent Balance Sheet of Medical School Academic System for the academic year ending June, 1996 was $32,139,000 and that this level shall be deemed equivalent to 100 points.

In the event the number of first year medical students enrolled at the University as of January 1 of any year during the term of this Affiliation Agreement is less than the level set forth above, then the number of points attributable to student enrollment for that year shall be reduced to a number equal to one hundred (100) times a fraction, the numerator of which is the number of students enrolled as of January 1 in that year and the denominator of which is the number of students enrolled as of January 1, 1997.

In the event the dollar value (held constant to 1996 dollar values by adjustment to the COLA) of restricted research expenditures received by the University for the academic year in which the calculation occurs is less than the level set forth above, then the number of points attributable to restricted research expenditures for that year shall be reduced to a number equal to one hundred (100) times a fraction, the numerator of which is the dollar value of restricted research expenditures received by the University in that academic year (held constant to 1996 dollar values by adjustment to the COLA) and the denominator of which is the dollar value of 1996 restricted research expenditures.

The sum of the points for student enrollment and restricted research expenditures is herein referred to as the "Combined Score." If the average of the Combined Score for any three consecutive years during the term of this Affiliation Agreement is less than 100, then the Base Payment and the Participation Payment referred to in Section 8.1.1 shall be reduced

proportionally from what they would have been. By way of example only and not as a limitation, if the average Combined Score for three consecutive years is 80, then the Base Payment and the Participation Payment shall be reduced to 40% of what they otherwise would have been. If in either of the two years immediately following the year in which such a proportional reduction occurs, the average Combined Score for the prior three (3) years increases to above 100, then the Base Payment and the Participation Payment shall be restored in that year to the levels they would have been but for the prior reduction.

If the Combined Score is less than 100 in two consecutive years following such a reduction (i.e., there are three consecutive years of reduced Base Payment and Participation Payment), then the Parties shall in good faith renegotiate a reduction in the payment provisions of Section 8.1. and 8.1.1, but in no event shall the reduced payment level be less than the fair market value of the use of the Occupied Space subject to adjustment as set forth in the Occupancy Agreement, and in the event the Parties cannot agree upon the renegotiated payment level, the matter shall be resolved pursuant to arbitration in accordance with Section 11.1.

8.1.1. <u>Participation Payments</u>. The University will be entitled to a percentage of the Net Operating Revenues of the System generated in each fiscal year during the term of this Affiliation Agreement and commencing after the Closing Date (the "Participation Payments") in accordance with the following schedule, payable within 120 days after the end of each fiscal year and prorated for any partial years as set forth in subparagraph (c) below:

(a)    when Net Operating Revenues are positive and between 0% and 2% of Net Service Revenues, an incentive of 10% of Net Operating Revenues will be paid;

(b)    when Net Operating Revenues are between 2.01% and 3% of Net Service Revenues, an incentive equal to base (defined as "a" above) plus 15% of the incremental Net Operating Revenues above 2% will be paid;

(c)    when Net Operating Revenues are between 3.01% and 4% of Net Service Revenues, an incentive equal to base (defined as "b" above) plus 25% of the incremental Net Operating Revenues above 3% will be paid;

(d)    when Net Operating Revenues are between 4.01% and 5% of Net Service Revenues, an incentive equal to base (defined as "c" above) plus 30% of the incremental Net Operating Revenues above 4% will be paid;

(e)    when Net Operating Revenues are between 5.01% and 6% of Net Service Revenues, an incentive equal to base (defined as "d" above) plus 28% of the incremental Net Operating Revenues above 5% will be paid;

(f)     when Net Operating Revenues equal or exceed 6.01% of Net Service Revenues, an incentive equal to base (defined as "e" above) plus 28% of the incremental Net Operating Revenues above 6% will be paid.

(g)     In the event that any Person is combined or consolidated on the audited financial statements of UMass Memorial after the Closing (a "New Affiliate") then if and to the extent the principal place of business of such Person is located in Worcester County, Massachusetts, or such Person is listed on Exhibit P of the Definitive Agreement, the Participation Payments set forth in Section 8.1.1 hereof shall apply to the combined Net Operating Revenues of UMass Memorial including the New Affiliate unless (a) the Parties otherwise agree in writing or (b) the New Affiliate is an insurance company, health maintenance organization, or similar entity; and in any event the Participation Payments set forth in Section 8.1.1 shall include any mobile institutional health care service operating at more than one fixed location, such as mobile catheterization services, mobile magnetic resonance imaging service, or mobile CAT scanners.

(h)     In the event this Affiliation Agreement commences or terminates other than on a date coinciding with the end of a fiscal year of the Medical Center, the Participation Payment shall be prorated during any partial fiscal year based on the number of days elapsed during the portion of the fiscal year during which this Affiliation Agreement is in effect divided by 365; provided, however, that with respect to the Participation Payment during the first partial fiscal year, there shall be included in the calculation of Net Operating Revenues only the Net Operating Revenues attributable to operations from and after the Closing Date. The University shall have the right, at its expense, to audit or otherwise review the determination of Net Operating Revenues of the System.

8.1.2. **Debt Service Support**. The Medical Center shall expressly assume (i) all obligations to pay to the Trustee for the MBIA Bonds at the times when due all obligations of the University with respect to principal and interest on the MBIA Bonds and (ii) all other obligations of the University under that certain Financing Agreement dated as of June 8, 1995 relating to the MBIA Bonds, all as set forth in an assumption agreement to be in form and substance satisfactory to the Parties and the insurer of the MBIA Bonds. The University agrees to cooperate fully with the System with respect to any defeasance, refunding, refinancing, or restructuring of said debt obligations, and the System shall be entitled to retain all savings (if any) of any such defeasance, refunding, refinancing, or restructuring of said debt. In no event shall the University be obligated to become directly or indirectly liable (by guaranty or otherwise) for any such defeasance, refunding, refinancing, or restructuring of said debt. The University shall take no action that shall adversely affect the status of interest on the MBIA Bonds as exempt from federal income taxation or otherwise cause the MBIA Bonds to be in default.

8.1.3. **Shared Services**. The Parties agree that the University and the System will continue to share and purchase certain goods and services from each other to the extent provided in and in accordance with the terms of the Occupancy Agreement at cost.

8.1.4.  Former Related Party Budgeted Transactions.  If and to the extent previously reflected on the Combining Statement of Operations in the most recent Financial Statements, services or goods previously purchased or sold to or from the UMass Clinical System by or from the Academic System will continue to be so purchased or sold at cost until the Parties shall otherwise mutually agree.

## ARTICLE 9

## AGREEMENT TO BE RESPONSIVE TO NEEDS OF THE COMMONWEALTH

9.1.  Service to the Community

The Parties recognize the University's historic efforts to respond to the Commonwealth's need for clinical and related health care services for its citizens. Such efforts have included the provision to the public of both highly specialized services, particularly to the extent not available through other area services, and community-based primary care services. Within the realm of primary care, the University has actively developed and continually worked to enhance a primary care network, in connection with which it has provided resident physicians to various community health centers and programs to deliver needed services, and has supported community-based education for health care providers, students and workers. UMass Memorial and the Hospitals agree to continue to endeavor to respond to the State's and the community's needs as they may be identified from time to time by the Chancellor.

Such community and state needs will be among the factors taken into consideration by the strategic planning process of UMass Memorial in decisions concerning new program development, expansion or contraction of existing services, the location of clinical training sites, resource allocation, and other decisions that have a potential significant impact on the meeting of such needs.

9.2.  Covenants with Respect to Medicaid Contracts.

As of or subsequent to the Closing, the University and the Medical Center shall enter into a Medical Educational Services Agreement and the Medical Center shall enter into a Medicaid Provider Agreement, all as set forth in Sections 10.8 and 10.9 of the Definitive Agreement.

## ARTICLE 10

## TERM AND TERMINATION

10.1.  Initial Term; Renewal.

This Agreement shall remain in full force and effect for a period of ninety-nine (99) years from the date hereof, and shall expire on March 30, 2097. Following the expiration of such term, the Parties intend to renegotiate this Affiliation Agreement and the relationships created hereby, subject to compliance with all applicable law, and intend that at least three (3) years prior to such date, UMass Memorial, the Medical School, and the Medical Center will convene a special task force, to be comprised of at least the Chancellor and the President/CEO, in order to review the accomplishments of the Affiliation, current and projected medical and health care professional education needs within the Commonwealth of Massachusetts, and the status of and trends in the health care needs of the population of the Commonwealth of Massachusetts; and to work in good faith to determine in what manner the affiliation should be continued, and to take or to cause to be taken such actions as may be necessary to permit to continue without interruption such an affiliation as may be appropriate.

## 10.2.  Termination.

This Agreement may be terminated prior to the expiration of the term hereof only in accordance with the provisions of this Section 10.2.

10.2.1.  If the University ceases to operate a Medical School, then at the election of and upon written notice provided by the President/Chief Executive Officer of UMass Memorial, (i) this Affiliation Agreement shall terminate and (ii) the obligation of UMass Memorial and the Medical Center to make any payments under Section 8.1 [Base Payments] or 8.1.1 [Participation Payments] shall cease, and (iii) in accordance with the Occupancy Agreement, UMass Memorial shall in good faith negotiate a lease arrangement for the Occupied Space with the University at fair market value subject to certain adjustments set forth in the Occupancy Agreement.

10.2.2.  Subject always to the provisions of the Occupancy Agreement, which shall control with respect to the rights of parties concerning all defaults or Events of Default as described therein, if UMass Memorial fails to pay when due any amounts under the Definitive Agreement, this Affiliation Agreement, or the Occupancy Agreement, then, (unless such failure is otherwise the subject of a specific remedy in the Occupancy Agreement ), after ninety (90) days written notice and failure to cure within said ninety (90) day period, at the election of and upon written notice provided by the Chancellor, this Affiliation Agreement, the License Agreement, and the Occupancy Agreement shall terminate, and the University shall retain all remedies at law or in equity.  This Section shall not be construed to alter any of the provisions of the Occupancy Agreement with respect to the termination of the Occupancy Agreement or late payments made thereunder.

10.2.3.  If the University fails to pay when due any amounts under the Occupancy Agreement, then, after ninety (90) days written notice and failure to cure within said ninety (90) day period, at the election of and upon written notice provided by the President/Chief Executive

Officer of UMass Memorial, the Occupancy Agreement shall terminate, and UMass Memorial shall retain all remedies at law or in equity.

## ARTICLE 11

### DISPUTE RESOLUTION

In the event that any dispute arises under any provision of this Agreement, or in the interpretation of its terms, which cannot be resolved between the Chancellor and the President/CEO, any Party may invoke the binding arbitration provisions as set forth in Section 11.1 below, except that the University, on the one hand, and UMass Memorial and/or the Medical Center, on the other hand, shall each bear one-half the costs and expenses of the mediator, any third parties selected by the mediator to assist in resolving the dispute, and the costs associated with any subsequent arbitration.

11.1. Arbitration. If a dispute arises under this Agreement which cannot be resolved by the personnel directly involved, any Party may invoke the procedures set forth in this Section by giving the other Parties written notice of the dispute, in which case such Party shall designate a person with decision making authority (the "Representative") to act on behalf of the disputing Party in the dispute. The other Parties shall be required to respond to the disputing party's notice within twenty (20) days of receipt by designating in writing its own Representative. The Parties agree to use the following procedure prior to any Party pursuing other available remedies.

11.1.1. The Parties, acting through their respective Representatives, shall meet at a mutually acceptable time and place within twenty (20) days after the non-disputing Parties designates its Representative to the disputing Party. The Representatives shall attempt in good faith to negotiate a resolution of the dispute.

11.1.2. If, within thirty (30) days after the first meeting of the Representatives the Parties have not succeeded in negotiating a resolution of the dispute, they agree to submit the dispute to mediation in accordance with Commercial Mediation Rules of the American Arbitration Association.

11.1.3. The Parties will jointly appoint a mutually acceptable mediator to mediate the dispute. If the parties are unable to agree on a mutually acceptable mediator within twenty (20) days of the conclusion of the negotiations, then the Parties shall request the American Arbitration Association to assist the parties in finding a mutually acceptable mediator. Each party shall bear its own costs incurred in the mediation and UMass Memorial and/or the Medical Center, on the one hand, and the University, on the other hand shall bear one-half the costs and expenses of the mediator and any third parties selected by the mediator to assist in resolving the dispute.

11.1.4. The Parties agree to participate in good faith in the mediation and negotiations related thereto for a period of thirty (30) days. If the Parties do not resolve the dispute through mediation within such period, any Party may submit the matter to binding arbitration before a three member panel of arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

11.1.5. The entirety of this Section is intended to be fully enforceable in accordance with the Uniform Arbitration Act for Commercial Disputes, including but not limited to, all provisions relating to mediation. Notwithstanding anything herein to the contrary, nothing in this Section shall preclude any Party from seeking interim or provisional relief in the form of a temporary restraining order, preliminary injunction or other interim relief concerning the dispute, either prior to or during the proceedings provided for in this Section, if such action is deemed necessary to protect the interests of such Party.

11.1.6. [Reserved.]

## ARTICLE 12

## MISCELLANEOUS

12.1. Consistency of By-Laws, Rules, Regulations and Policies.

UMass Memorial and the Medical Center shall adopt and keep in effect bylaws, rules, regulations and policies, and the Medical Center shall adopt and keep in effect medical staff bylaws, all of which are consistent with the terms of this Agreement, except to the extent prohibited by applicable law or accreditation requirements.

12.2. Entire Agreement.

This Agreement and the Definitive Agreement represent the entire understanding of the Parties with respect to the subject matter hereof, and supersede any and all prior understandings with respect thereto. No amendment of this Agreement shall be effective unless reduced to writing and signed by each of the Parties.

12.3. Definitions.

To the extent that any capitalized term is not specifically defined within this Agreement, such term shall have the same meaning as it has in the Definitive Agreement.

12.4. Waiver.

-25-

The waiver by any Party of any breach of this Agreement by any other Party or the waiver of any term of this Agreement shall not be deemed to be a waiver of any subsequent breach and shall not prevent subsequent enforcement of any such term.

12.5. Assignment.

This Agreement shall be binding upon the Parties and their respective permitted successors and assigns. No party may assign any of its rights or delegate any of its duties hereunder without the prior written consent of the other parties; provided, however, that Memorial and/or UMass Memorial may direct the allocation of assets to be conveyed hereunder or under any document contemplated hereby to any entity controlled by them (or, with respect to the Self Insurance Trust, to a so-called captive insurance company in accordance with the provisions of Section 10.4 of the Definitive Agreement), and further provided that UMass Memorial and the Medical Center may assign this Agreement to the surviving entity in the event UMass Memorial or the Medical Center merges, combines or consolidates with another entity. In the event the Medical School combines, merges, or consolidates with another Medical School without the consent of the Board of Trustees of UMass Memorial (which shall not be unreasonably withheld but which may take into consideration, in addition to other factors, the support of any successor medical school for any competitor of any UMass Memorial Affiliate in Worcester County), then the President/Chief Executive Officer of UMass Memorial may propose to the University a reduction in payments under Article 8, and, subject always to the provisions of Section 12.8, the University and UMass Memorial shall agree upon such reduction, if any, as is appropriate. In the event the University and UMass Memorial fail to agree upon any proposed reduction, the matter shall be resolved pursuant to arbitration in accordance with Section 11.1.

12.6. Notices.

All notices hereunder shall be deemed to have been given when delivered in person or one day after sending by reputable overnight delivery service or three (3) days after mailing by certified mail, return receipt requested, addressed to any Party at its address set forth below or at any other address of which any Party notifies the others in writing.

If to University of Massachusetts, to :

Chancellor
University of Massachusetts
18 Tremont Street
Boston, MA 02108

If to UMass Memorial Health Care, Inc. or
UMass Memorial Medical Center, Inc., to:

President/Chief Executive Officer
UMass Memorial Health Care
119 Belmont Street
Worcester, MA 01605

12.7. Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of The Commonwealth of Massachusetts.

12.8. Good Faith and Fair Dealing.

The University and UMass Memorial shall meet annually to assess the overall arrangement to consider such adjustments as may be appropriate and mutually agreeable to facilitate the satisfactory implementation of the purposes of this Agreement. Each Party agrees to cooperate in good faith and to deal fairly with the others in attempting to effect the transactions contemplated by this Agreement as well as performance of any obligations required hereunder subsequent to the Closing.

12.9. Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as a sealed instrument this 31st day of March , 1998.

UNIVERSITY OF MASSACHUSETTS

By: _____
Its: _____Chancellor_____

UMASS MEMORIAL HEALTH CARE, INC.

By: _____
Its: _____President/Chief Executive Officer_____

UMASS MEMORIAL MEDICAL CENTER, INC.

By: _____
Its: _____President/Chief Executive Officer_____

1137429.09

**Exhibit 12**

GRADUATE MEDICAL EDUCATION AGREEMENT
BETWEEN
UNIVERSITY OF MASSACHUSETTS WORCESTER
AND
UMASS MEMORIAL MEDICAL CENTER, INC.

This Graduate Medical Education Agreement (herein "Agreement") made this 31st day of March, 1998 is between the University of Massachusetts Worcester (herein "University") located in Worcester, Massachusetts and the UMass Memorial Medical Center, Inc. (herein "Medical Center") located in Worcester, Massachusetts.

## PART 1 - MISSION and GOALS

The University, as a publicly supported Medical School, and the Medical Center, as a private, non-profit corporation, with a hospital located at 55 Lake Avenue North, Worcester, MA 01655 (herein "University Campus"), a hospital located at 119 Belmont Street, Worcester, MA 01605 (herein "Memorial Campus") and a hospital located at 281 Lincoln Street, Worcester, MA 01605 (herein "Hahnemann Campus") share a commitment to provide quality patient care and medical education. This mission is pursued through the University's and the Medical Center's participation in and funding of Graduate Medical Education programs which provide scholarly activities and supervised clinical training in an organized, supportive and humane learning environment. The GME Programs sponsored by the University are intended to address physician workforce needs of the Commonwealth and the region, to promote a strong clinical education network, and to provide supervised resident-physician services. The University and the Medical Center have separately entered into an Academic Affiliation and Support Agreement dated as of March 31, 1998 (the "Affiliation Agreement") and a Medical Educational Services Agreement dated as of March 31, 1998 (the "Medical Educational Services Agreement").

A.  **EDUCATION**
    The primary purpose of Graduate Medical Education is to prepare physicians for independent medical specialty practice in accordance with Accreditation Council for Graduate Medical Education Program and Institutional Requirements, and consistent with the eligibility requirements for American medical specialty board certification. The residency and fellowship programs at the University and the Medical Center seek to be academically rigorous, and to be focused on the development of each resident (herein "Resident") as regards knowledge, skills and professional values.

B.  **CLINICAL SERVICE**
    Since an integral part of all residency and fellowship programs is the provision of clinical services to meet practical training and experience requirements, it is expected that University/Medical Center Residents and fellows will provide safe, effective and compassionate patient care services, under qualified faculty supervision, and with opportunities to achieve progressive, incremental clinical responsibilities. The University/Medical Center Graduate Medical Education programs strive for an appropriate balance between supervised clinical service and education, and for appropriate Resident working conditions.

C.  **FINANCING**

The Medical Center shall pay the University for services provided by the Residents pursuant to Section 3.3 of the Affiliation Agreement and pursuant to the Medical Educational Services Agreement, provided there shall be no duplication of recovery.

D.  PHYSICIAN WORKFORCE
It is expected that the University/Medical Center residency and fellowship programs will address the health care needs of Massachusetts by emphasizing the training of generalist physicians, and of those specialists who might alleviate shortages in geographical and specialty underserved areas within the Commonwealth.

# PART II - MUTUAL RESPONSIBILITIES

## UNIVERSITY
The University, as the sponsoring institution of affiliated graduate medical education programs, shall assume final responsibility for all administrative and educational aspects of its sponsored residency and fellowship programs. The University shall comply with the Accreditation Council of Graduate Medical Education (ACGME) Institutional Requirements and shall ensure that all residency and fellowship programs comply with the ACGME Program Requirements. The University shall have in place an administrative system to oversee all residency programs. This responsibility is conducted through the UMass Graduate Medical Education Committee, the Office of Medical Education and the Office of Graduate Medical Education. The University shall consult with the Client Medical Officer of the Medical Center or the designee of the President off UMass Memorial Health Care, Inc. with respect to overall coordination and implementation of the residency and fellowship programs. The University shall ensure that the Medical Center is adequately informed about general and program specific quality and planning GME issues and shall ensure that the Medical Center appropriately participates in the review of the GME programs. A copy of the ACGME Institutional Requirements shall be provided to the Medical Center.

A.  APPOINTMENT AND ASSIGNMENT OF RESIDENTS
The University shall recruit, select, appoint, promote and employ physicians to University graduate medical education programs; and shall assign certain of these Residents to the Medical Center for education and service purposes. Residents are acting as and shall remain employees of the University and shall not, at any time, be considered agents or employees of the Medical Center or its hospitals while performing services under this Agreement. Under no circumstances shall this Agreement be considered a contract of partnership or joint venture between the University and the Medical Center.

B.  LICENSING AND INSURANCE
The University shall ensure that Residents are: 1) qualified for appointment as a member of the house staff; 2) properly licensed to practice medicine as a Resident under supervision in the Commonwealth; and 3) provided with professional liability insurance. The University shall notify the Hospital of the current licensure, appointment and insurance status of each Resident.

C.  PERSONNEL POLICIES

The University shall establish and implement personnel and institutional policies, which shall apply to all Residents appointed by the University, including Residents when assigned to the Medical Center. These policies shall be specified in the University of Massachusetts Resident Personnel Policies.

D.  **PROGRAM DIRECTOR**

The University, through its department chairs (herein "Department Chairs"), shall appoint a single program director (herein "Program Director") for each specialty residency program, who shall have direct and overall responsibility and authority for the program. The respective Program Directors shall be responsible for providing written educational goals and program design, for recruitment and selection of Residents, for supervision of teaching staff at the University and at the Medical Center, for the overall supervision and evaluation of residents, for the fair application of personnel and institutional policies, and for the general administration of the program. Each program director shall exercise these responsibilities with the cooperation and involvement of the respective teaching staffs at the Medical Center. The Program Directors shall consult with the Chief Medical Officer or the designee of the President of the Medical Center with respect to overall coordination and implementation of the residency and fellowship programs.

Each named Program Director shall provide in writing an outline of the educational objectives to be achieved while the Residents are assigned to the Medical Center. To meet this responsibility, each Program Director shall meet at least annually with the teaching staff representatives from the Medical Center. The purposes of the meetings are to coordinate educational activities, to resolve conflicts, to maintain communications, and to review and evaluate the effectiveness of the program toward meeting educational, clinical service, affiliation and physician manpower goals.

E.  **SUPERVISION**

The University shall establish the faculty supervision, work hour and work environment standards for the Residents, in consultation with the Medical Center. The University, through appropriate Department Chairs or their designees, shall retain ultimate responsibility for the Residents.

## PART II - MUTUAL RESPONSIBILITIES

**MEDICAL CENTER**

The Medical Center shall support the educational goals of each affiliated residency program by providing qualified teaching, supervision, administration and other necessary components of an accredited training program. Further, the Medical Center must adhere to, and cooperate with the University in meeting, all ACGME Institutional and Program Requirements. The Medical Center shall cooperate with the University in implementing Residency Program Personnel and Sexual Harassment Policies. The Medical Center shall provide Residents the opportunities to meet American medical specialty board eligibility requirements and to develop a personal program of learning, to participate in supervised patient care and to participate in their residency program's educational and scholarly activities. The Medical Center shall designate one or more Medical Center officials who will assume overall administrative and educational responsibility for the Residents while assigned to the Medical Center; these officials shall be a signatory to this Agreement/Contract. These Medical Center officials shall facilitate communication with the University and shall facilitate the Medical Center's participation in the review of and planning for the University's GME Programs.

F.  **EDUCATION**
The Medical Center shall provide to the Residents appropriate opportunities for supervised clinical training and classroom instruction toward meeting established program educational goals.  The Medical Center shall acknowledge that some of the individual Residents assigned to and funded by the Medical Center will, from time to time, be at institutions other than the Medical Center for required or elective educational rotations or other educational functions, and that such rotations or off-duty time be included in the Medical Center's payment to the University.  The University shall not be totally responsible for providing or funding substitute physician coverage during these absences.

G.  **SUPERVISION**
The Medical Center shall, for patient care and related purposes, provide immediate, direct supervision of the Residents.  Residents shall report to the division directors, or their designees, of the division to which the Residents are assigned at the Medical Center.  Residents, when providing services in the Medical Center, shall abide by all applicable hospital policies, rules, by-laws, regulations and procedures.

The Medical Center shall designate a residency program director for each program included in the Agreement.

H.  **EVALUATIONS**
The Medical Center shall ensure that the division director, or designee, of the Medical Center division to which the Residents are assigned shall complete required evaluations of the assigned Residents on the form provided by the University, within the specified time period.

I.  **LIABILITY INSURANCE AND WORKERS COMPENSATION**
The Medical Center shall cooperate with the University and its agents in the investigation and defense of incidents involving potential or actual liability involving services by Residents pursuant to this Agreement, including, but not limited to, access to relevant documents and records.

As a condition of professional liability insurance, Residents are required to report to the Medical Center and to the University Residency Program Director the following incidents; these incidents must be reported regardless of where they occur:

1.  Unexpected death
    Any of the following which occur as a result of medical intervention:
2.  Paralysis, paraplegia, quadriplegia
3.  Spinal cord injury
4.  Nerve injury or neurological defect
5.  Brain damage
6.  Total or partial loss of limb, or the use of a limb
7.  Sensory organ or reproductive organ loss or impairment
8.  Substantial disability or disfigurement

The Medical Center shall, at all times during the term of this Agreement, ensure that each teaching physician on the Medical Center's Medical Staff maintains professional liability insurance or coverage. The Medical Center shall also cooperate with the University in all OSHA, JCAHO and Workers Compensation requests.

J.    WORK-RELATED ILLNESS OR INJURY

The Medical Center shall ensure that any work-related injury, including blood/body fluid exposure, is immediately evaluated, and if necessary, treated on site. The Medical Center shall assist in necessary documentation for Workers Compensation claims in accordance with University requirements.

K.    HARASSMENT AND DISCRIMINATION

The Medical Center will be responsible for taking reasonable steps to maintain an environment and atmosphere in which sexual or other forms of harassment are not tolerated. The Medical Center will be responsible for notifying its employees and attending physicians of its policy on sexual harassment, the support services available to individuals who are the victims of harassment (at that site) and the possible sanctions against individuals who commit such actions. The Medical Center agrees to report any complaints involving Residents to the Office of Graduate Medical Education.

PART III GENERAL TERMS AND CONDITIONS

A.    NOTICES
All notices under this Agreement will be effective only if in writing and delivered either in-hand, by certified mail or by common carrier providing overnight delivery and confirmation of receipt as follows:

If to the University, to:
Chancellor/Dean
University of Massachusetts Medical Center
55 Lake Avenue North
Worcester, MA 01655

With a copy to:
Associate Dean/Director, Graduate Medical Education
University of Massachusetts Medical Center
55 Lake Avenue North
Worcester, MA 01655

If to the Medical Center, to:
President/CEO
UMass Memorial Medical Center, Inc.
55 Lake Avenue North

Worcester, MA 01655

Either party, by notice given to the other party in accordance with this paragraph, may designate another address or person(s) for receipt of notices or copies hereunder. Any notice required or permitted by this Agreement and given in accordance with this paragraph shall be effective:

(a) upon receipt (i) at the address of the party to whom directed or (ii) by the designated addressee, if delivered in-hand, whichever is earlier; (b) five days after the date of mailing, if by certified or registered mail; or (c) one day after delivery to the carrier, if by overnight carrier.

**B.    PARTIES**
Nothing contained in this Agreement is intended to or shall confer upon any person not a party hereto any rights or remedies, and no person other that the parties hereto shall be required to approve or consent to any amendment or modification of the provisions of this Agreement or any waiver of such provisions.

**C.    ASSIGNMENT**
The rights and obligations created under this Agreement involve the particular purposes, objectives and characteristics of each of the contracting parties and, therefore, neither party shall assign or transfer its rights or delegate any obligations hereunder.

**D.    SEVERABILITY**
If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

**E.    WAIVER**
The failure of a party to insist upon strict performance of any of the terms of this Agreement in any one or more instances shall not be construed to be a waiver or relinquishment of any such rights or provisions, but the same shall remain in full force and effect.

**F.    APPLICABLE LAW**
This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

**G.    AMENDMENT**
This Agreement may be amended by consent of the parties as set forth in a properly executed and written document.

## PART IV FINANCIAL COMMITMENTS

A. **STIPEND**
The University, in consultation with the Medical Center, shall establish an annual stipend schedule fo each Post Graduate Year (PGY) Level. The annual stipends listed in this Agreement are for a full, 365-day payroll year. The University shall provide a stipend differential for each Chief Resident position. In addition, the University has established a policy for allowing Residents with previous accredited residency training or relevant experience to receive a stipend one PGY level higher than the occupied PGY position. (For example, a Resident who completed a PGY-1 Internal Medicine year before entering a PGY-1 Emergency Medicine position might receive a PGY-2 stipend.)

B. **FRINGE BENEFITS**
The University directly incurs costs or is assessed costs by the Commonwealth of Massachusetts for Resident employee benefits, including but not limited to health and life insurance, dental insurance, retirement, workers compensation, and unemployment insurance. Residents have the option of purchasing group long term disability insurance at their own expense through the University.

C. **MALPRACTICE INSURANCE**
The University shall procure and maintain medical malpractice insurance for Residents. Such insurance shall be allocated among the individual residency program positions utilizing the general classifications of the Medical Professional Mutual Insurance Company.

D. **ADMINISTRATIVE AND EDUCATION EXPENSES**
The University incurs other expenses to support the Residents and the residency program through the Office of Graduate Medical Education and other University cost centers. These expenses include, but are not limited to, costs of recruitment, selection and orientation of new Residents; accreditation and medical licensure; payroll and other personnel processing; uniforms and name tags; certificates; counseling services; financial aid/debt management assistance; administrative and clerical personnel; education and support personnel and services and related items. The Medical Center acknowledges these costs to the University and is reimbursed for both the direct and indirect costs of such residents; therefore, the Medical Center shall make a contribution to the University toward these costs in an amount to be mutually agreed upon by the parties. The parties agree that the dollar level of funding in the University's fiscal year ended June 30, 1997 shall continue to apply unless and until the parties otherwise agree.

E. **VACATIONS AND OTHER ABSENCES**
The scheduled annual rotations of Full-Time Equivalent (FTE) positions assigned to and funded by the Medical Center may include planned out-of-Medical Center rotations for vacation and other purposes. The individual Residents occupying an assigned position at the Medical Center may be excused with pay from duty for vacation or sick days or for an approved leave of absence. The University Resident Personnel Policies regulate Resident vacation, sick, leave and other excused days; the implementation and scheduling of vacations varies among specialty residency programs.

Where appropriate, respective University Residency Program Directors and the Medical Center=s division directors may incorporate, under the provisions of this Agreement and with the approval of the

Medical Center's President/CEO and the University's Chancellor/Dean, a rotation schedule identifying expected Medical Center and out-of-Medical Center rotations among the assigned FTE positions.

F.    MEDICARE REPORTING
The University and the Medical Center shall exchange data and documentation required by the Federal Medicare program for timely and complete reporting of the annual count of Resident FTE positions, under the Intern and Resident Information System (IRIS). The University shall respond to reasonable Medical Center requests for information regarding the Medicare Direct Medical Education (DME) Reimbursement and Indirect Medical Education (IME) Adjustment methodologies. The Medical Center shall ensure that each of the Medical Center's hospitals shall provide the University with its annual DME and IME counts and other reasonable information.

To the extent legally permissible, the University shall allocate to the Medical Center a proportional share of the total annual count of Full-Time Equivalent residency program positions which are out-of-Medical Center and not included in any other participating hospital's Medicare DME or IME count, based on the number of Medical Center-funded positions in the respective residency program.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as a sealed instrument this ___ day of _____, 1998.

UNIVERSITY OF MASSACHUSETTS

By: _____

Its: _____


UMASS MEMORIAL MEDICAL CENTER, INC.

By: _____

Its: _____

**Exhibit 13 – 1**

# UNIVERSITY OF MASSACHUSETTS - WORCESTER
## FACULTY/PROFESSIONAL CONTRACT

NAME:  Kenneth K. Gerweck                                          EMPLOYEE ID: ████████

DEPARTMENT NAME & CODE:  OGME - Family Medicine & Community Health - I-55 - S4142

NATURE OF ACTION:  New Appointment Contract                  REQUEST DATE: 3/17/00

EFFECTIVE DATE:  July 1, 2000          ENDING DATE:  June 30, 2001

STATE TITLE & CODE:  Resident (90874)          GRADE & STEP:  P

WORKING TITLE & CODE:  PGY-1 (MF0501)

# HOURS WORK/WEEK:  XX          LABOR UNIT:  63WR

| PAYROLL ACCOUNT | OBJECT CODE | POSITION NUMBER | WEEKLY/HOURLY RATE | EARN TYPE | % POSIT | ANNUAL RATE | FUNDING ACCOUNT |
|---|---|---|---|---|---|---|---|
| 529664 | 11102 | 67070342 | 720.10 | Reg | 100 | 37,445.20  37,445.20 | RC 6/22 |
| DT - x63011 | | | | | | | |

1.  All appointments at the University are contingent upon the availability of funds. Specifically, this contract and any renewals are contingent upon the availability of adequate funds from the following sources:_____

2.  All employees of the University are employed pursuant to and subject to the policies and procedures of the Medical Center and the policies, rules and regulations adopted by the Board of Trustees of the University as amended, revised, or repealed from time to time, under the provisions of Chapter 75 of the General Laws, as amended from time to time.

3.  As appropriate, duties may be assigned to the employee in resident instruction, research, extension teaching, and/or any other duties as required to promote the objective of the University.

4.  The salary to be paid the staff member shall be that salary indicated on the face of the form under "effective date," except as that amount may be adjusted by any cost-of-living or merit adjustment or for any other good cause which becomes effective after the request date or the effective date.

5.  This contract is not valid until all required signatures have been affixed hereto.

This contract, consisting of the terms stated above constitutes the entire agreement between the University at Worcester and the faculty or professional staff member. Please indicate your acceptance by signing this form.

Accepted _____     Date 4/27/2000
          Employee Signature

APPROVALS: _____     _____
DEPARTMENT HEAD          DATE 4/8/00          ADMINISTRATIVE          DATE 6/6/00

_____                    _____
PRINCIPAL INVESTIGATOR          DATE          CHANCELLOR or DESIGNEE          DATE

**CROSS FUNDING APPROVALS:**
Commitment for funding from non-hiring institution from the accounts indicated in the FUNDING ACCOUNT column above, per the terms on the back of this form:

1                                              _____
                                               CHIEF OPERATING OFFICER or DESIGNEE          DATE

NAME _Kenneth Blanchett_

| CHECK | EMPLOYEE FORMS | HR USE ONLY | MISSING INFORMATION |
|---|---|---|---|
| | Retirement Enroll Form | ✓ | Percent    5   7   8  (9) |
| | State _____ | | |
| | Exempt from Retirement __ | | Fica Med Exempt –Yes  No |
| | ORP (Faculty Only) | | Exempt from 2% - Yes   No |
| | TIAA/CREF _____ | | |
| | LINCOLN LIFE _____ | | Prior Service Verified |
| | VALIC _____ | | Yes          No |
| | Prior Service Form | | |
| | **INSURANCE FORMS** | | |
| | Life and Health Insurance | | |
| | Beneficiary Designation | | |
| | Insurance Data Form (health coverage only) | | |
| | PPO/HMO Enrollment Form (retain copy) | | |
| | Dental Insurance (Family) _____ Individual _____ | | |
| | Disability Insurance ITT Hartford _____ Waiver | | |
| | Health and Life Waiver (no benefits selected) | | |
| | Miscellaneous Direct Deposit _____ SLB | | |
| Notes: | | | |

2

PLEASE PRINT OR TYPE

**UNIVERSITY OF MASSACHUSETTS**
**PERSONAL DATA QUESTIONNAIRE**

NAME: Gerweck Kenneth K
Last / First / Middle

SOCIAL SECURITY #: ⬛⬛⬛    ID #:

HOME ADDRESS: 17 Rena St #2
Number / Street

Worcester    MA    01604
City / State / Zip Code

CITIZENSHIP STATUS: ☑ US    ☐ Naturalized

CITIZENSHIP COUNTRY:

CODE: ▨

VISA TYPE:
☐ J EXCHANGE VISITOR
☐ F STUDENT
☐ H1 TEMP WORKER OF DISTINGUISHED MERIT
☐ H2 TEMP WORKER, SERVICES UNAVAILABLE IN US

EXP. DATE: ___/___/___

☐ J1 IMMIGRANT
☐ J2 SPOUSE/CHILD OF EXCHANGE VISITOR
☐ F2 SPOUSE/CHILD OF STUDENT

**PRIOR PUBLIC EMPLOYMENT IN COMMONWEALTH OF MASSACHUSETTS:**

NAME: _____    FROM _____    TO _____

BIRTH DATE: 21 68 70

BIRTH PLACE: DENVER CO USA
City / State / Country

WORK DEPARTMENT: Family Practice

HOME TELEPHONE: (508) 792 - 955 - 3
Area Code / Number

CODE: ▨

SEX: ☐ Male    ☐ Female

MARITAL STATUS: ☑ Single (S)    ☐ Married (M)    ☐ Other (O)

**MILITARY STATUS:** If applicable (see definition sheet)

Check One
V ☐ VIETNAM ERA VETERAN
O ☐ VETERAN OTHER THAN VETERAN

Check One
E ☐ DISABLED VETERAN VETERAN
D ☐ DISABLED VETERAN
S ☐ SPECIAL DISABLED VETERAN

Check One
A ☐ ACTIVE RESERVE
R ☐ RETIRED
N ☐ INACTIVE RESERVE

**PERSON TO BE NOTIFIED IN CASE OF EMERGENCY**

Name: Leo Gerweck

Address: 21 Rolling Ln
Street

Needham MA
City & State

Telephone: 781 - 444 - 744 9

IF YOUR EMPLOYMENT/EDUCATION RECORDS ARE UNDER ANY OTHER NAME(S) PLEASE SPECIFY BELOW:

_____

ETHNIC CODES (see definition sheet)
B ☐ BLACK
W ☑ WHITE
H ☐ HISPANIC
V ☐ CAPE VERDEAN

R ☐ ASIAN/PACIFIC ISLANDER
A ☐ AMERICAN INDIAN/ALASKAN NATIVE
O ☐ OTHER

DISABILITY INDICATORS: (see definition sheet)
A ☐ AMBULATORY
S ☐ SIGHT
P ☐ SPEECH
M ☐ MENTAL/PSYCHOLOGICAL

B ☐ METABOLIC
C ☐ COORDINATION
H ☐ HEARING
L ☐ LEARNING

PLEASE NOTE that space is provided to indicate ETHNIC CODE AND DISABILITY INDICATOR. You are requested to check the appropriate box. Permission to request this information is granted to the University of Massachusetts by the Massachusetts Commission Against Discrimination on February 25, 1972. This "Ethnic Code" and "Disability Indicator" information will remain confidential.

If you are currently age 60 or over, you will be affected by Section 5 of Chapter 32 of the Massachusetts General Laws. Please bring this fact to the attention of the receptionist so that this section may be explained to you.

RECEIVED
MAY 2 2000
H/R PAYROLL RECORDS

3

# Form W-4 (2000)

**Purpose.** Complete Form W-4 so your employer can withhold the correct Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7, and sign the form to validate it. Your exemption for 2000 expires February 16, 2001.

**Note:** *You cannot claim exemption from withholding if (1) your income exceeds $700 and includes more than $250 of unearned income (e.g., interest and dividends) and (2) another person can claim you as a dependent on their tax return.*

**Basic Instructions.** If you are not exempt, complete the Personal Allowances Worksheet below. The worksheets on page 2 adjust your withholding allowances based on itemized

deductions, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply. They will help you figure the number of withholding allowances you are entitled to claim. However, you may claim fewer (or zero) allowances.

**Child tax and higher education credits.** For details on adjusting withholding for these and other credits, see Pub. 919, How Do I Adjust My Tax Withholding?

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See line E below.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, you should consider making estimated tax payments using Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax.

**Two earners/two jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 prepared for the highest paying job and zero allowances are claimed for the others.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2000. Get Pub. 919 especially if you used the Two-Earner/Two-Job Worksheet on page 2 and your earnings exceed $150,000 (Single) or $200,000 (Married).

**Recent name change?** If your name on line 1 differs from that shown on your social security card, call 1-800-772-1213 for a new social security card.

---

**Personal Allowances Worksheet (Keep for your records.)**

| | | |
|---|---|---|
| **A** | Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . . . . | **A** ___1___ |
| **B** | Enter "1" if: { • You are single and have only one job; or <br> • You are married, have only one job, and your spouse does not work; or <br> • Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. } | **B** ___1___ |
| **C** | Enter "1" for your spouse. But, you may choose to enter -0- if you are married and have either a working spouse or more than one job. (Entering -0- may help you avoid having too little tax withheld.) . . . . . . . . | **C** ___0___ |
| **D** | Enter number of dependents (other than your spouse or yourself) you will claim on your tax return . . . . | **D** ___0___ |
| **E** | Enter "1" if you will file as head of household on your tax return (see conditions under **Head of household** above) . | **E** ___0___ |
| **F** | Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit . | **F** ___0___ |
| **G** | **Child Tax Credit:** <br> • If your total income will be between $18,000 and $50,000 ($23,000 and $63,000 if married), enter "1" for each eligible child. <br> • If your total income will be between $50,000 and $80,000 ($63,000 and $115,000 if married), enter "1" if you have two eligible children, enter "2" if you have three or four eligible children, or enter "3" if you have five or more eligible children | **G** ___0___ |
| **H** | Add lines A through G and enter total here. Note: *This may be different from the number of exemptions you claim on your tax return.* ▶ | **H** ___2___ |

| For accuracy, complete all worksheets that apply. | • If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2. <br> • If you are single, have more than one job and your combined earnings from all jobs exceed $34,000 OR if you are married and have a working spouse or more than one job and the combined earnings from all jobs exceed $60,000, see the **Two-Earner/Two-Job Worksheet** on page 2 to avoid having too little tax withheld. <br> • If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below. |
|---|---|

- - - - - - - - - - **Cut here and give Form W-4 to your employer. Keep the top part for your records.** - - - - - - - - - -

---

| Form **W-4** <br> Department of the Treasury <br> Internal Revenue Service | **Employee's Withholding Allowance Certificate** <br> ▶ For Privacy Act and Paperwork Reduction Act Notice, see page 2. | OMB No. 1545-0010 <br> **2000** |
|---|---|---|

| 1 | Type or print your first name and middle initial **Kenneth K**     Last name **Gerweck** | Your social security number ▋▋▋ |
|---|---|---|

| Home address (number and street or rural route) **21 Rolling Ln** | 3 ☐ Single ☒ Married ☐ Married, but withhold at higher Single rate. <br> Note: *If married, but legally separated, or spouse is a nonresident alien, check the Single box.* |
|---|---|
| City or town, state, and ZIP code **Needham, MA   02192** | 4 If your last name differs from that on your social security card, check here. You must call 1-800-772-1213 for a new card . . . ▶ ☐ |

| 5 | Total number of allowances you are claiming (from line H above OR from the applicable worksheet on page 2) | **5** | **2** |
|---|---|---|---|
| 6 | Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . . . . . | **6** | $ |
| 7 | I claim exemption from withholding for 2000, and I certify that I meet BOTH of the following conditions for exemption: <br> • Last year I had a right to a refund of ALL Federal income tax withheld because I had NO tax liability AND <br> • This year I expect a refund of ALL Federal income tax withheld because I expect to have NO tax liability. <br> If you meet both conditions, write "EXEMPT" here . . . . . . . . . . . . . . ▶ | **7** | |

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate, or I am entitled to claim exempt status.

| Employee's signature <br> (Form is not valid unless you sign it) ▶ | *Km Grm* | Date ▶ 4/27/2000 |
|---|---|---|

| 8 | Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9 Office code (optional) | 10 Employer identification number |
|---|---|---|---|

Cat. No. 10220Q

4

**FORM**
**M-4**

## MASSACHUSETTS EMPLOYEE'S WITHHOLDING EXEMPTION CERTIFICATE

Rev. 7/88

Print full name ..... Kenneth K. Carwell .....  Social Security No. ▮▮▮▮▮▮▮▮▮

Print home address ..... 17 Irene Street, Apt. 2 .....  City Worcester .....  State M.A.  Zip Code 01604

### HOW TO CLAIM YOUR WITHHOLDING EXEMPTIONS

**EMPLOYEE:**

File this form or Form W-4 with your employer. Otherwise, Massachusetts Income Taxes will be withheld from your wages without exemptions.

1. Your personal exemption. Write the figure "1". If you are age 65 or over or will be before next year, write "2".
2. IF MARRIED and if exemption for spouse is allowed, write "1". If your spouse is age 65 or over or will be before next year and if otherwise qualified, write "2". See Instruction C.
3. Write the number of your qualified dependents. See Instruction D.
4. Add the number of exemptions which you have claimed above and write the total.
5. Additional withholding per pay period under agreement with employer $

**EMPLOYER:**

Keep this certificate with your records. If the employee is believed to have claimed excessive exemptions, the Massachusetts Department of Revenue should be so advised.

A.  ☐  Check if you will file as head of household on your tax return.
B.  ☐  Check if you are blind.
C.  ☐  Check if spouse is blind and not subject to withholding.
D.  ☐  Check if you are a full-time student engaged in seasonal, part-time or temporary employment whose estimated annual income will not exceed $8,000.

**EMPLOYER: DO NOT withhold if Box D is checked.**

I certify that the number of withholding exemptions claimed on this certificate does not exceed the number to which I am entitled.

(Date) ...4.27.00...    (Signed) ...Kenneth K. Carwell...

### THIS FORM MAY BE REPRODUCED

## THE COMMONWEALTH OF MASSACHUSETTS • DEPARTMENT OF REVENUE

**A. NUMBER** — If you claim MORE than the correct number of exemptions, civil and criminal penalties may be imposed. You may claim a smaller number of exemptions. If you do not file a certificate, your employer must withhold on the basis of no exemptions.

If you expect to owe more income tax than will be withheld, you may either claim a smaller number of exemptions or enter into an agreement with your employer to have additional amounts withheld.

You should claim the total number of exemptions to which you are entitled to prevent excessive overwithholding — unless you have a significant amount of other income.

**IF YOU WORK FOR MORE THAN ONE EMPLOYER AT THE SAME TIME, YOU MUST NOT CLAIM ANY EXEMPTIONS WITH EMPLOYERS OTHER THAN YOUR PRINCIPAL EMPLOYER.**

If you are married and if your spouse is subject to withholding, each may claim a personal exemption.

**B. CHANGES** — You may file a new certificate at any time if the number of exemptions INCREASES. You MUST file a new certificate within 10 days if the number of exemptions previously claimed by you DECREASES. For example, if during the year your dependent son's income indicates that

you will not provide over half of his support for the year, you must file a new certificate.

**C. SPOUSE** — If your spouse is not working or if she or he is working but not claiming the personal exemption or the age 65 or over exemption, generally you may claim those exemptions in line 2. However, if you are planning to file separate annual tax returns, you should not claim withholding exemptions for your spouse or for any dependents that will not be claimed on your annual tax return.

If claiming a wife or husband, write "4" in line 2. Using "4" is the withholding system adjustment for the $4,400 exemption for a spouse.

**D. DEPENDENT(S)** — You may claim an exemption in line 3 for each individual who qualifies as a dependent under the Federal Income Tax Law. In addition, if one or more of your dependents will be under age 12 at year end, add "1" to your dependents total for line 3.

**IF YOU HAVE INCOME NOT SUBJECT TO WITHHOLDING, YOU ARE URGED TO HAVE ADDITIONAL AMOUNTS WITHHELD TO COVER YOUR TAX LIABILITY ON SUCH INCOME. SEE LINE 5.**

**YOU ARE NOT ALLOWED TO CLAIM "FEDERAL WITHHOLDING DEDUCTIONS AND ADJUSTMENTS" UNDER THE MASSACHUSETTS WITHHOLDING SYSTEM.**

IF YOU CLAIM THE SAME NUMBER OF EXEMPTIONS FOR MASSACHUSETTS AND U.S. INCOME TAXES, COMPLETE U.S. FORM W-4 ONLY.

150M 7/97 CRP0108

5

## PRE-PLACEMENT HEALTH SCREEN CLEARANCE FORM

To be completed by Placement Services

NAME *Kenneth Gerwork*     DATE *6/27/00*    TIME_____

DEPARTMENT *Family Practice*     JOB TITLE *Resident*

SIGNATURE_____     D.O.B._____     SS#_____

PLACEMENT SERVICES_____     EXT_____

To be completed by Family Medicine Health Services

Recommendations:    _____ The above mentioned individuals is medically capable of performing the essential functions of the position for which he/she has been examined.

_____ The above mentioned individual is not medically capable of performing the following essential functions of the position (reasonable accommodations have been discussed with the Human Resource Representative and Department Head, if needed). _____

_____

_____

Discuss position duties only; do not report individual's medical condition.

_____ No show for appointment

The following requirements have been met:

*N/A* Pre-placement Health Screen
✓ Tuberculosis Screen
✓ Rubella
✓ Measles

_____ Specific Job Required Screen

DATE *6/27/00*     SIGNED *S. Casianat NP/6w*
                          MEDICAL EXAMINER

DATE RECEIVED BY PLACEMENT SERVICES/HUMAN RESOURCES_____

6

June 14, 2001


IMASS

Return To:   *Alan Chuman*
                    @ I55

## BIOGRAPHICAL FORM
### **Personal and Confidential**

**Personal Data:**

Name:  Kenneth K. Gerweck

Name Correction: _____

S#: ███████████

SS# Correction: ____ - __ - ____

Date of Birth:   8/18/70

DOB Correction:        /      /

Marital Status:   Single

Status Correction
☑Married   ☐Single   ☐Other

Sex:   Male

Sex Correction:
☐ Male          ☐ Female

Home Address:      17 Rena Street #2   Worcester   MA   01604

Address Correction:   *22 Mohican Rd Worcester MA 01605*

Home Phone#:  (508) 792-9553

Phone Correction:  *(508) 798-8688*

Ethnicity:      White

If Ethnicity is incorrect, change to:

American Indian or Alaskan Native (a person having origins in any of the original peoples of North America and who maintains cultural identification tribal affiliation or community recognition).

Black (a person having origins in any of the Black racial groups of Africa).

Asian or Pacific Islander (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands.  This area includes, for example:  China, India, Japan, Korea, the Philippine Islands and Samoa).

Hispanic (a person of Mexican, Puerto Rican, Cuban, Central or South American culture or other Spanish Culture or origin regardless of race).

White (a person having origins in any of the original peoples of Europe, North Africa or the Middle East).

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
7



**JMASS**

Name:   Kenneth K. Gerweck                                Date:  6/14/01

Disability Claimed:    No _____

   If Disability is incorrect, change to:

] No  Disability                  ☐   Yes Disability

---

Military Status:    None _____

   If Military Status is incorrect, change to:

☐  Veteran – Other than Vietnam          ☐   Retired

☐  Vietnam Era Veteran                   ☐   Disabled Veteran

---

Visa:    None _____         Visa Correction: _____

Expiration Date: _____      Expiration Date Correction: _____

---

Emergency Contact Name:  Gerwick, Leo _____

        Address:   21 Rolling Lane    Needham    MA _____

        Phone #:   (781) 444-7449 _____

Emergency Correction:   GERWECK, Leo _____

_____

        (   )       - _____

---

Employee's Prior Name: _____

8



**UMASS**    Name:    Kenneth K. Gerweck             Date: 6/14/01

## Education Data:

| Degree1/Major | Degree1/Major Correction: |
|---|---|
| BA / Biology | |

| Institution Name1 | Institution1 Correction |
|---|---|
| Univ of Colorado | |

| Degree2/Major | Degree2/Major Correction: |
|---|---|
| MD | |

| Institution Name2 | Institution2 Correction |
|---|---|
| Umass medical | |

| Degree3/Major | Degree3/Major Correction: |
|---|---|
| | |

| Institution Name3 | Institution3 Correction |
|---|---|
| | |

---

## Tax Data:

Federal Status      __M__
Status Correction:      _____

Federal Exemptions      __2__
Exemption Correction:      _____

State Exemptions      __5__
Exemption Correction:      _____

To change your tax status, you must complete the enclosed W-4 form and return it in the enclosed envelope with your Biographical Data Form to your Department Administrator.

---

I have reviewed the above data and confirm that all information as stated above is accurate and complete.

Employee Signature: _____      Date: 7/2/01

9



**Commonwealth of Massachusetts**
**Group Insurance Commission**
P.O. Box 8747 Boston, MA 02114

## Insurance Enrollment and Change Form

*PLEASE TYPE OR PRINT CLEARLY*

Return to H.R.

| 01 | | | | |
|---|---|---|---|---|
| Insured's GIC-ID | Sex: Male ☑ Female ☐ | Date of Birth 8 / 18 / 70 | Agency/Division Number 999 — 0145 | |

Name:  Last  Garweck      First  Kenneth      MI  K

Address (Number and Street)   This is a new Address: ☑
22 Mohican Rd

| City Worcester | State MA | Zip Code 01605 | Foreign Country — |
|---|---|---|---|

Date Entered State Service: 7 / 1 / 2000      Bargaining Unit:      Agent      Unit Number

Employee Salary Funding:   State ☐   Federal ☐   Trust ☐   Other ☐   Combination ☐
Effective Date: ___ / ___ / ___

Spouse's Name  Anupama Savara      Spouse's Social Security Number      Spouse's Date of Birth  1 / 14 / 70

| 02 | Basic Life , Health, and LTD Insurance Coverage |
|---|---|

| New Enrollment ☐ | Change ☐ | Cancel Coverage ☐ |
|---|---|---|

Error Ed ☑ **Basic Life Only**      Effective Date: 9 / 01 / 2000

☐ **Long Term Disability (LTD)**      Annual Salary: $ 37,000

☑ **Basic Life and Health**      Salary Effective Date: 7 / 1 / 2000
(Select One of the Health Plans Below)

| Health Plan: | Plan Type: |
|---|---|
| ☐ **GIC Indemnity** <br> CIC: Yes ☐ No ☐ | ☐ **Individual** |
| ☐ **GIC Indemnity Plus** | ☑ **Family** |
| ☐ **Commonwealth PPO** | |
| ☐ **HMO :** TUFTS <br> (write in the name of the HMO) | |

☐ **Optional Life**

**Please Check One:**

☐ Automatic Increase
Indicate Multiple Factor (1 - 8): ___

☐ Non Automatic Increase
Amount $:___
No more than $1,000 less than annual salary
rounded down to the nearest $1,000.

**Please Check One:**

☐ Smoker

☐ Non-Smoker
Yes, I have been tobacco free for the past 12 months
and choose the lower optional life insurance rates.

- New Employee: Multiple Factor of 5 - 8 times requires a G6S form (Short Form Medical).
- Increasing Multiple Factor requires a G6 form (Medical Evidence of Insurability).
- Multiple Factor of 2 - 8 times is allowed only with Automatic Increase.
- Changing from Non-Automatic to Automatic Increase requires a G6 form.



# GROUP INSURANCE COMMISSION

P.O. Box 8747 • Boston MA 02114-8747 • (617) 727-2310

## INSURANCE DATA FORM

*Bary marriage licence*

This form is required for new enrollments in any Group Insurance Commission family health plan and for any changes in spouse or dependents. Complete it and any other health plan forms provided by your Group Insurance Coordinator and return them to the Coordinator. If you are a retiree, please return the form to the GIC.
Please PRINT clearly. Incomplete forms will be returned.

*Don't have it yet*

CHECK ONE: ☑ NEW MEMBER   ☐ ADDITION   ☐ DELETION   ☐ CORRECTION

## INSURED INFORMATION:

1. Name: _Gerweck_ (Last)   _Kenneth_ (First)   _Kercheville_ (Middle)

2. Address: _22 Mohican Rd._ (Street)
   _Worcester_ (City)   _MA_ (State)   _01605_ (Zip Code)

3. Social Security Number ▮▮▮▮▮   4. Date of Birth _8/18/70_ (Month/Day/Year)   5. Sex ☑ M ☐ F

6. Health Plan (Check one): ☐ GIC Indemnity   ☐ GIC Indemnity Plus   ☐ PPO   ☑ HMO Name: _TUFTS_

7. Are you enrolled in Medicare ☐ Yes   ☑ No   If yes, Medicare claim number _____

## SPOUSE/DEPENDENT INFORMATION:

List below all family members, including your spouse, who will be covered under your family plan. Please provide all Social Security Numbers and **exact** dates of birth for each dependent. Coverage for children ends at age 19, except for full-time students and handicapped dependents whose applications have been approved by the Group Insurance Commission. Married children are not eligible. Attach separate sheet if additional space is required.

**Important:** The Group Insurance Commission reserves the right to require you to provide a copy of a marriage certificate, birth certificate, divorce decree, certificate of appointment as legal guardian, etc., for each person you list as a dependent. This proof may be requested at any time.

| Last Name | First | Middle | Relationship | Date of Birth | Sex | Social Security Number |
|---|---|---|---|---|---|---|
| Gerweck | Anupama | Vikram | Wife | 1/14/70 | F | ▮▮▮▮▮ |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Reason for addition or deletion: _____   Effective date _9/1/2000_

## SPOUSE INFORMATION:

Name: _Gerweck_ (Last)   _Anupama_ (First)   _Vikram_ (Middle)   ☑ Married   ☐ Divorced   ☐ Widowed

Spouse's Social Security Number ▮▮▮▮▮   Date of Birth _1/14/70_ (Month/Day/Year)

Is your spouse employed ☑ Yes   ☐ No   Name of employer _New England Medical Center_

Address of employer _Washington St., Boston_

11

--over--

# Commonwealth of Massachusetts
# Group Insurance Commission
## LIFE INSURANCE BENEFICIARY DESIGNATION FORM

| _red GIC-ID: | Agency/Division |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓ | 9 9 9 / 0 1 4 5 |

| _red Name:  First | M.I. | Last |
|---|---|---|
| e n n e t h | K | G e r w e c k |

_eet Address
2 , M o h i c a n R d

| | State | Zip Code |
|---|---|---|
| _o r c e s t e r | M A | 0 1 6 0 5 |

**OU MUST READ INSTRUCTIONS ON BACK BEFORE COMPLETING FORM - PRINT CLEARLY IN CAPITAL LETTERS**

### BENEFICIARY 1

| _t Name | M.I. | Last Name | Same as Insured ☐ | Relationship |
|---|---|---|---|---|
| A n u p a m a | V | G e r w e c k | | ☒ Spouse<br>☐ Parent<br>☐ Child<br>☐ Bro./Sis.<br>☐ Other, specify: |

_eet Address   Same as Insured ☒
2 , M o h i c a n R d

| | State | Zip Code | Country (if not U.S.A.) | % of Proceeds *|
|---|---|---|---|---|
| | | | | 100 % |

### BENEFICIARY 2

| _t Name | M.I. | Last Name | Same as Insured ☐ | Relationship |
|---|---|---|---|---|
| | | | | ☐ Spouse<br>☐ Parent<br>☐ Child<br>☐ Bro./Sis.<br>☐ Other, specify: |

_eet Address   Same as Insured ☐

| | State | Zip Code | Country (if not U.S.A.) | % of Proceeds * |
|---|---|---|---|---|
| | | | | |

### BENEFICIARY 3

| _t Name | M.I. | Last Name | Same as Insured ☐ | Relationship |
|---|---|---|---|---|
| | | | | ☐ Spouse<br>☐ Parent<br>☐ Child<br>☐ Bro./Sis.<br>☐ Other, specify: |

_eet Address   Same as Insured ☐

| | State | Zip Code | Country (if not U.S.A.) | % of Proceeds * |
|---|---|---|---|---|
| | | | | |

I hereby make the above designation of beneficiary revoking any and all previous beneficiary nominations and make the above nomination of beneficiary with respect to all insurance provided now or at any time in the future under the group insurance policy(ies). I still reserve the privilege of making other and future changes subject to the policy provisions. If more than one beneficiary is designated, settlement will be made in equal shares to such of the designated beneficiary(ies) as survive me, unless otherwise provided herein. If no designated beneficiary(ies) survive me, settlement will be made as provided in the policy in the following order: to the spouse, then to the children, then to the parents, then to the siblings, then to the estate.

Signature of Insured                                                                     Date

**PLEASE MAKE A COPY OF THE COMPLETED FORM TO KEEP WITH YOUR IMPORTANT RECORDS AND PAPERS**

FOR OFFICE USE ONLY

_Kn Lnnn_    6/27/2000

M 319: 12/1/91

* DO NOT PUT A DOLLAR AMOUNT IN THE "%of Proceeds"

**TUFTS Health Plan**

Health Maintenance Organization

333 Wyman Street • P.O. Box 9112 • Waltham, MA 02454-9112

# MEMBERSHIP APPLICATION

PLEASE PRINT OR TYPE. DO NOT WRITE IN SHADED AREAS.
PLEASE BE SURE APPLICATION IS COMPLETED IN FULL TO ENSURE ENROLLMENT.

**(Top margin, rotated):** TRAVEL TO COMPLETE BULDED AREAS IN RED MAY CAUSE A DELAY IN ENROLLMENT.

**THE COMMONWEALTH OF MASSACHUSETTS**

AGENCY 777   LOCATION NUMBER

SITE/LOCATION:

**1. EMPLOYEE SOCIAL SECURITY NUMBER** (blacked out)

**2. NAME OF EMPLOYER OR GROUP**
COMMONWEALTH OF MASSACHUSETTS

**3. SITE/LOCATION**

**4. DATE OF HIRE OR QUALIFYING EVENT**
7/11/2000

**5. GROUP NUMBER** 378

**6. TYPE OF ENROLLMENT** ☒ NEW HIRE  ☐ OPEN ENROLLMENT  ☐ COBRA
☐ QUALIFYING EVENT (PLEASE SPECIFY)

**7. EFFECTIVE DATE OF COVERAGE**
7/1/2000

**9. TYPE OF COVERAGE** ☐ SINGLE  ☒ FAMILY
REQUESTED  ☐ OTHER

**8. MARITAL STATUS** ☐ SINGLE  ☐ SEPARATED  ☐ WIDOWED
☐ MARRIED  ☐ DIVORCED  ☐ OTHER

## EMPLOYEE INFORMATION

**10. LAST NAME** Gerweck

**11. FIRST NAME** Kevin   **12. MI** K

**13. PRIMARY LANGUAGE** English

**14. MAILING ADDRESS** 23 Morrican Rd

**15. APT#**

**16. CITY** Worcester   **17. STATE** MA   **18. ZIP** 01605

**19. HOME TELEPHONE** (508) 798-8483

**20. WORK TELEPHONE**

**21. SEX** ☒ MALE  ☐ FEMALE

**22. DATE OF BIRTH** 2/15/1920  MONTH DAY YEAR

**23. PRIMARY CARE PHYSICIAN FIRST AND LAST NAME**

**24. HOSPITAL AFFILIATION**

**25. PCP#**

**26. DO YOU CURRENTLY USE THIS PHYSICIAN?** ☐ YES  ☐ NO

**27. FITNESS CENTER**

**28. FITNESS CODE**

**PCP#**

**(Please check if members currently uses this physician)**

## FAMILY MEMBERS TO BE COVERED

| | SEX M/F | DATE OF BIRTH | SOCIAL SECURITY NUMBER | CHOOSE A PRIMARY CARE PHYSICIAN FOR EACH MEMBER | TUFTS HEALTH PLAN AFFILIATED HOSPITAL | FITNESS CENTER | NAMES OF FAMILY MEMBERS COVERED |
|---|---|---|---|---|---|---|---|
| **29. SPOUSE** | F | 7/14/70 | (blacked out) | Gerweck, Mark | MGH | |
| **30. CHILD** | | | | | | | |
| **31. CHILD** | | | | | | | |
| **32. CHILD** | | | | | | | |

**IF DEPENDENT CHILD IS OVER AGE 19, PLEASE CHECK ONE**  ☐ FULL TIME STUDENT  ☐ DISABLED

**33. WILL YOU OR ANOTHER FAMILY MEMBER HAVE OTHER HEALTH COVERAGE AT THE SAME TIME AS THIS COVERAGE?** ☐ YES  ☒ NO
IF SO, NAME OF HEALTH PLAN

NAME OF PLAN HOLDER

PLAN NUMBER

**34. WILL YOU OR ANOTHER FAMILY MEMBER HAVE DENTAL COVERAGE AT THE SAME TIME AS THIS COVERAGE?** ☒ YES  ☐ NO
IF SO, NAME OF DENTAL PLAN
Delta Dental provided by her Dental

NAME OF PLAN HOLDER
and is Covered by the Dental

PLAN NUMBER
No Number and Covered

**35. IS SPOUSE EMPLOYED?** ☐ YES  ☒ NO
IF YES, NAME AND ADDRESS OF EMPLOYER

**36. PLEASE CHECK IF YOU ARE USING ADDITIONAL MEMBERSHIP APPLICATIONS FOR ADDITIONAL DEPENDENT CHILDREN** ☐

**SUBSCRIBER: PLEASE KEEP YELLOW COPY AS YOUR TEMPORARY TUFTS HEALTH PLAN I.D.**

**SIGNATURE:** (signature)   **DATE:** 6/27/2000   **BENEFITS DEPT. SIGNATURE:** (signature)   **DATE:** (signature)

The information supplied on this form is true and complete. I authorize my employer to make necessary payroll deductions, if any, for my share of Tufts Health Plan coverage. I assign benefits to Tufts Health Plan providers, which means that Tufts Health Plan is authorized to make payment directly to Tufts Health Plan providers for services rendered to me (us). I grant Tufts Health Plan and any agent that I (or we) may have to recover the cost of services for an illness or injury caused by someone else when these services have been or will be paid by Tufts Health Plan. I agree that Tufts Health Plan and health care providers may obtain or release my (our) medical records and medical service-related information for the following purposes: (a) administering benefits; (b) managing care, including utilization review, quality assurance and member satisfaction procedures; (c) conducting bona fide medical research; and (d) when required by law. I understand that, except in an emergency, all health services must be provided or authorized by the Tufts Health Plan Primary Care Physician that I have designated. I understand that the benefits for which I (we) are eligible are those described in the applicable Evidence of Coverage. I understand that calls to the Customer Relations Department may be monitored for quality assurance. The effective date is determined by the eligibility rules of the Group Insurance Commission.

Enrollment forms must be returned to your Group Insurance Coordinator. Dependent coverage automatically ends at age 19. To continue a student or handicapped dependent beyond age 19, you must apply to the Group Insurance Commission.

**EMPLOYEE COPY**

13



Department of Human Resources
University of Massachusetts Medical School
55 Lake Avenue North
Worcester, MA 01655
508.856.5633/3970 (office)
508.856.2058 (fax)

Compensation and Benefits

*Umass Disability policy is not good plan through HMA is the best*

## LONG TERM DISABILIY INSURANCE WAIVER FORM

I hereby certify that I have been given the opportunity to apply for Group Long Term Disability coverage available from ITT Hartford, a state sponsored disability insurance.

I understand fully the benefits available to me under the plan. I decline to participate and hereby waive all benefits of the plan.

I further understand that by declining to participate, my right to apply at a later date will be contingent upon the need to provide medical evidence of insurability as specified by ITT Hartford.

_____          6/27/2000
(Signature)                        (Date)

███████████████████████
(Social Security Number)

14



University of
Massachusetts
UMASS. Medical School

Department of Human Resources
University of Massachusetts Medical School
55 Lake Avenue North
Worcester, MA 01655
508.856.5633/3970 (office)
508.856.2058 (fax)

Compensation and Benefits

*Umass Disability policy is not good. Plan through AMA is the best*

### LONG TERM DISABILIY INSURANCE WAIVER FORM

I hereby certify that I have been given the opportunity to apply for Group Long Term Disability coverage available from ITT Hartford, a state sponsored disability insurance.

I understand fully the benefits available to me under the plan. I decline to participate and hereby waive all benefits of the plan.

I further understand that by declining to participate, my right to apply at a later date will be contingent upon the need to provide medical evidence of insurability as specified by ITT Hartford.

_____          6/27/2000
        (Signature)                              (Date)

███████████████████████
(Social Security Number)

15

# Exhibit 13 – 2



The Commonwealth of Massachusetts
DEPARTMENT OF PUBLIC HEALTH
REGISTRY OF VITAL RECORDS AND STATISTICS

1367

BOSTON
(City or town making return)

## CERTIFICATE OF MARRIAGE

This certificate must be delivered to the person before whom the
marriage is to be contracted before he proceeds to solemnize the same

Registered No. _____
Intention No. __1267__

Place of Marriage

City or Town    DEDHAM
(Do not enter name of village or section of city or town)

2 Date of Marriage   JUNE 23 2000
(Month)    (Day)    (Year)

| | GROOM | | BRIDE |
|---|---|---|---|
| FULL NAME | KENNETH K GERWECK | 12 FULL NAME | ANUPAMA V SAVARA |
| 3A SURNAME AFTER MARRIAGE | GERWECK | 12A SURNAME AFTER MARRIAGE | GERWECK |
| 4 DATE OF BIRTH | AUG 18 1970 | 5 OCCUPATION MEDICAL RESIDENT | 13 DATE OF BIRTH JAN 14 1970 | 14 OCCUPATION STUDENT |
| 6 RESIDENCE NO. & ST. CITY/ TOWN | 22 MOHICAN RD WORCESTER ST. MA ZIP CODE 01605 | 15 RESIDENCE NO. & ST. CITY/ TOWN | 22 MOHICAN RD WORCESTER ST. MA ZIP CODE 01605 |
| 7 NUMBER OF MARRIAGE (1st, 2nd, 3rd. etc.) | 1ST | 8 WIDOWED OR DIVORCED ___ | 16 NUMBER OF MARRIAGE (1st, 2nd, 3rd. etc.) 1ST | 17 WIDOWED OR DIVORCED ___ |
| 9 BIRTHPLACE | DENVER CO (City or town) (State or country) | 18 BIRTHPLACE | BOMBAY INDIA (City or town) (State or country) |
| 10 MAIDEN NAME OF MOTHER | LINDA R COOK | 19 MAIDEN NAME OF MOTHER | NALINI V SHENOY |
| 11 NAME OF FATHER | LEO E GERWECK | 20 NAME OF FATHER | VIKRAM C SAVARA |

21 THE INTENTION OF MARRIAGE by the above-mentioned persons was duly entered by me in the records of the Community of
_____ according to law, this __25TH__ day of __MAY__ __2000__
(Name To and From)    JUN 13 2000    by    Judith A. McCarthy
(Month)    (Day)    (Year)    (City of Town Clerk or Registrar)

☐ COURT WAIVER issued
☐ AGE ORDER

22 I HEREBY CERTIFY that I joined the above-named persons in marriage at No. ___ St. Mary's Church ___ St.
(If marriage was solemnized in a church, give its NAME instead of street and number)

Dedham    on    June    23    2000
(Name of city or town)    (Month)    (Day)    (Year)

Priest
(Minister of the Gospel, Member of the Clergy, Priest, Rabbi, or Justice of the Peace)

Signature    Paul E Kilroy    Paul E. Kilroy
Paul E. Kilroy
(Print or type name)

St. City or Town of    Boston

Residence No. 70 St. Stephen St.

23 Certificate recorded by city or town clerk    JUN 28 2000
(Month)    (Day)    (Year)    CLERK OR REGISTRAR    Judith A. McCarthy

---

hereby certify that by annex-
records of the following-
s and towns are in the
the City Registrar of

ANNEXED
.........................1637
...........,...........1804
.........................1868
.........................1870

16

WITNESS my hand and the JUL 3 1 2000 f the CITY REGISTRAR

on this ___ Judith A. McCarthy ___ Day of ___ A.D.

.............................................City Registrar

By Chapter 314 of the Acts of 1892, "the certificates or attestations



```
OB                              CONSOLIDATED INQUIRY
ERWECK,KENNETH K.                                 BARG UNIT    63    SUB UNIT   WR
OB CLASS    90874  JOB CLASS            GRADE       STEP      LONGEVITY    07 01 00
K JOB CLASS MF0501 WK JOB CLASS         DISTR I55 DEPOS U     CURR HIRE    07 01 00
OB BEGIN       07 01 00       JOB END       06 30 01         NXT STEP     00 00 00
REF 19154      HRS WRKD  40 : 00 LOA FROM-SEP        TO              REASON

    ACCT  OBJ CD  POS         RATE      ET    COMMIT       PCT      JOB DEPT
1 5 29664 111 02 67070342     720.10    REG  40,000.00   1.0000    S4142 I55
2
3
4
5
6
7
           TOTAL BASE      720.10    BASE ANNUAL     37,445.20
8
9
0
1
2
           TOTAL WEEKLY    720.10    TOTAL EMP PCT  1.0000
RANS 15      ID                        ORG W   ID-SUFFIX     CANCEL
```





17



# NEW MEMBER ENROLLMENT FORM
## STATE RETIREMENT BOARD
One Ashburton Place
Boston, MA 02108
(617) 367-7770



*instead of SS, like an IRA mandatory*

**SECTION A:** To be filled out by employee.
1.          (please print or type, except for signature)

| Your Name: Keneth Gerweck | Maiden Name: — | Social Security Number: ████████ |
|---|---|---|

| Street Address: 22 Mohican Rd City, State, Zip Code: Worcester, MA 01605 | Date of Birth: 8/18/70 Telephone Number: 508·798·8682 | Sex: M |
|---|---|---|

| Marital Status: ☑ Married  ☐ Single  ☐ Widowed  ☐ Divorced | Spouse DOB: Jan, 70 | Number of Children: 0 |
|---|---|---|

| Are you a Veteran? ☐ Yes  ☑ No | Position: Medical Resident Start Date: 7/1/2000 Agency or Department: UMMC Agency Telephone Number: 508-856-5633 |
|---|---|

| Dates of Military Service: _____ | A Copy Of Military Discharge May Be Requested |
|---|---|

The retirement law establishes specific periods of active service, which may qualify you for certain Veteran benefits

2.   Past membership history with any other contributory retirement system in Massachusetts.

| RETIREMENT SYSTEM | FROM | TO | WAS REFUND TAKEN | |
|---|---|---|---|---|
|  |  |  | YES | NO |
|  |  |  | YES | NO |
|  |  |  | YES | NO |
|  |  |  | YES | NO |

3.

| Are you currently or have you ever received a retirement allowance from another public retirement system. | ☐ Yes    ☑ No |
|---|---|

4.   **Statement and Signature By Member**

          I certify the above information to be true and correct to the best of my knowledge and hereby accept membership in the Massachusetts State Retirement System. This statement is signed under penalties of perjury.

Date: 6/26/2000          Signature: _Km lin_

7/96      18



# DELTA DENTAL
### Delta Dental Plan of Massachusetts

465 MEDFORD STREET
BOSTON, MASSACHUSETTS 02129-1454
CORPORATE OFFICE:  (617) 886-1000
FAX:  (617) 886-1293
MA & NAT'L TOLL FREE  (800) 451-1249
www.deltamass.com

## ENROLLMENT FORM
### PLEASE PRINT OR TYPE -
### BE SURE FORM IS COMPLETED IN FULL TO ENSURE ENROLLMENT

| 1. GROUP NAME: Umass Medical School | 2. EFFECTIVE DATE: 9/1/2000 | 3. DATE OF HIRE: 7/11 2000 | 4. GROUP NUMBER: 00133 - 6601 |
|---|---|---|---|

| 5. SOCIAL SECURITY NO. | 6. LAST NAME (Subscriber): Garweck | 7. FIRST NAME: Kenneth | 8. DOB: 8/18/70 | 9.SEX: M |
|---|---|---|---|---|

| 10. HOME ADDRESS: 22 Morican Rd | 11. CITY: Worcester | 12. STATE: MA | 13. ZIP: 01605 |
|---|---|---|---|

## PLAN SELECTION

**14. PLAN:** Select plan you are enrolling in:

[✓] **DeltaPremier**      [ ] **DeltaPreferred**      [ ] **DeltaCare**

If DeltaCare is selected, each subscriber & dependent must choose a DeltaCare Primary Care Dentist (PCD).

## PLEASE LIST ALL DEPENDENT(S) COVERED UNDER YOUR POLICY

| 15. FIRST NAME | 16. LAST NAME (IF DIFFERENT FROM SUBSCRIBER) | 17. DATE OF BIRTH | 18. SEX M/F | 19. CHECK IF DEPENDENT IS OVER 19 AND A FULL TIME STUDENT | DELTACARE ONLY 20. CHOOSE A PCD FOR EACH COVERED INDIVIDUAL | 21. PROVIDER # | 22. DO YOU CURRENTLY USE THIS DENTIST? |
|---|---|---|---|---|---|---|---|
| SUBSCRIBER Kenneth | | | | | | | |
| SPOUSE Anupama | | 1/14/2000 | F | | | | |
| CHILDREN | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## 23.   REASON FOR SUBMISSION (CHECK ONE)

[✓] New Addition
   [ ] Individual   [ ] Individual + 1   [ ] Family
[ ] Termination: Date of termination _____
[ ] Add dependent to family
[ ] Reinstatement
[ ] Name / address change
[ ] Remove dependent from student status
[ ] Transfer from sublocation _____ to _____

[ ] Status change (must be 1st of month)
   [ ] Individual to Family   [ ] Individual + 1   [ ] Family to Individual
[ ] Cobra - Reinstatement of subscriber
[ ] Cobra - new addition of dependent formerly covered under ID # _____
Number of months Cobra eligible _____
[ ] Cobra - reinstatement - transfer to Cobra sublocation

## 24. COORDINATION OF BENEFITS

Are   [ ] you   OR   [ ] any other family member covered by another dental plan?   [✓] No   [ ] Yes
If YES, please indicate name of covered individual _____

| OTHER DENTAL INSURANCE COMPANY: | EMPLOYER NAME: | POLICY HOLDER ID NO.: | EFFECTIVE DATE |
|---|---|---|---|

**25.** Are   [ ] you   OR   [ ] any other family member covered by another medical plan?   [✓] No   [ ] Yes
If YES, please indicate name of covered individual _____

| OTHER MEDICAL INSURANCE COMPANY: | EMPLOYER NAME: | POLICY HOLDER ID NO.: | EFFECTIVE DATE |
|---|---|---|---|

I certify that all information is true and correct to the best of my knowledge.  Also, I understand that the effective date and termination date of my membership will be determined by my employer or plan sponsor in accordance with the underwriting guidelines of Delta Dental Plan of Massachusetts.  In addition, if my employer requires employee contributions for this coverage, I authorize the deductions of these amount from my wages.

| 26. Subscriber Signature | Date 6/27/2000 | Benefit Administrator Authorization | Date 6-24-00 |
|---|---|---|---|

19   DDP-605 (2/99)

GROUP COPY RETAIN FOR YOUR FILES

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE.** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last Gerweck | First Kenneth | Middle Initial K | Maiden Name — |
|---|---|---|---|

Address (Street Name and Number) 22 Mohican Rd — Apt. # —    Date of Birth (month/day/year) 8/18/70

City Worcester    State MA    Zip Code 01605    Social Security #

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
A citizen or national of the United States ✓
A Lawful Permanent Resident (Alien # A_____
An alien authorized to work until __/__/__
(Alien # or Admission #_____

Employee's Signature    Date (month/day/year) 6/26/2000

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

Preparer's/Translator's Signature    Print Name

Address (Street Name and Number, City, State, Zip Code)    Date (month/day/year)

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: _____ | | S27834184 | | SS# |
| Issuing authority: _____ | | MA Driver's Lic. | | SSA |
| Document #: _____ | | | | |
| Expiration Date (if any): __/__/__ | | 8_18_01 | | __/__/__ |
| Document #: _____ | | | | |
| Expiration Date (if any): __/__/__ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) 7/1/00 and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative Juckie S. Martin | Print Name Juckie S. Martin | Title Administrator |
|---|---|---|

Business or Organization Name    Address (Street Name and Number, City, State, Zip Code)    Date (month/day/year)
Univ. of Mass./Worcester    55 Lake Ave. N., Worcester, MA 01655    6/27/00

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.
Document Title:_____ Document #:_____ Expiration Date (if any):__/__/__

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|

Form I-9 (Rev. 11-21-91) N

20

# University of Massachusetts Medical School

**UMASS.**

## CONFLICT OF INTEREST
## AND
## POLITICAL ACTIVITY

### ACKNOWLEDGEMENT OF RECEIPT

I have received copies of the <u>Guide to the Conflict of Interest Law</u> and the <u>Guide to Political Activity for State, County and Municipal Employees.</u>  I understand that it is my obligation to familiarize myself with the conflict of interest law, G.L. c.268A and c.268B, and campaign finance law, G.L. c.55, and my agency's personnel policy.  I understand that I must abide by these laws and my agency's personnel policy.

_Kenneth K. Gerweck_
**Employee's Name (Please Print)**

_Ken Gw_                               4/27/2000
**Employee's Signature**          **Date**

21

Kenneth Kercheville Gerweck
17 Rena St. #2
Worcester, MA 01604
(508) 792-9553
kenneth.gerweck@umassmed.edu

**Medical Education**

University of Massachusetts Medical School , Worcester,MA
08/1996 - 06/2000
M.D., 06/2000

**Undergraduate Education**

University of Colorado, Boulder, CO
08/1988 - 12/1993
B.A., Biology

**Employment**

08/1994 - 08/1996
Infectious Disease Unit, Mass. General Hospital
Research Technician
I worked under Dr. Martin Hirsch on various HIV drug trial studies.  Daily activities included cell cultures and assays, ELISAs, and flow cytometry.  I also was involved in research comparing prognostic indicators for patients with hepatitis C.

02/1994 - 07/1994
Weston Veterinary Clinic
Technician
Activities included spinning bloods, doing invoicing, cleaning cages, and walking animals.

05/1993 - 08/1993
University of New Mexico
Field research technician
I lead an independent project to assess the effects of late summer monsoons on a perennial semi-arid desert river.  We specifically addressed ground water dynamics, water chemistry, and water flora.

05/1992 - 08/1992
Woods Hole Oceanographic Institute
Summer 'Fellow'
I researched feeding rates and selectivity of the atlantic oyster in its larval stage.  This was one component of a larger research project, the goal of which was to investigate the possible causes of rising mortality rates of regional oyster crops.

05/1989 - 08/1989
Radiation Oncology, Mass. General Hospital
Research Technician
Research involved assessing the effects of radiation on hamster cell lines; specifically, post-radiation cell viability under varying oxygen concentrations and glucose availability.  My activities included cell culturing and data entry.

05/1989 - 08/1996
Please see "work experience"
Four positions as described above


## Publications

10/1995
Comparison of Biochemical and Virological Responses to Interferon Therapy in Chronic Hepatitis: a Meta-analysis
Kenneth K. Gerweck, Angela M. Cheung, David K.H. Wong
Hepatology
225, suppl., 420A

07/1993
Energy Status and Radiobiological Hypoxia at Specified Oxygen Concentrations
Leo E. Gerweck, Tara Seneviratne, and Kenneth K. Gerweck
Radiation Research
135, 69-74


## Volunteer Experience

05/1999 - 09/1999
Save the Harbor Save the Bay
volunteer
Throughout my life I have enjoyed Boston, a city historically tied to the sea.  The harbor has been successfully cleaned; the focus now is on making the sea-front accessible to the public.  I volunteer in the office and at major fund-raising events.

02/1998 - 07/1998
Free Clinic at Epworth Church
student doctor
Helping out at a free clinic, I saw patients, formulated plans, and assisted them as best I could. Sometimes this was in the form of a medication, other times, it was listening sincerely and offering emotional support.

10/1996 - 05/1997
Mustard Seed
cook and server
I helped out at a local soup kitchen on three occasions.  This was especially gratifying to me and, in fact, I had done this before when I was younger.  I have had an affinity for street persons ever since my parents dragged me around Boston as a child.

08/1992 - 05/2060
Big Brothers
big brother
When I first met Conrad in Colorado he was seven years old - now he's fourteen!  Although  I have since moved east, I still talk with him on the phone and visit him once a year.  We mean a great deal to each other.

23

Licensure

USMLE Step 1            06/1998

## Language Fluency (Other than English)

I am conversant in Spanish. I will continue to improve my language skills this spring, 2000, when I perform electives in Mexico and, possibly, Puerto Rico.

## Other Accomplishments

Maintaining a loving relationship with my girlfriend (now fiance) during medical school, strengthening the ties with my family, and being there for my 'little brother' in the Big Brothers program are my proudest 'accomplishments'.

## Hobbies/Interests

I enjoy fishing, playing guitar, homebrewing, and cooking. I am interested in philosophy, horror films, and the natural history of New England.

24

# University of Massachusetts - Worcester
## Personnel Action Form

Date filed in: **5/20/2003**

Not all the fields are used. Shaded fields are formulas

Link to Lookup FRS crosswalk to new COA codes web site

| Employee Name: | | | |
|---|---|---|---|
| Last Name | First Name | Middle Initial | Employee ID: |
| Gerweck | Kenneth | | 10010538 |

| | Action - Action Description (ACODE-Desc) |
|---|---|
| 1. Termination - Contract Completion | 3. Action - Action Description (ACODE-Desc) |
| 2. Action - Action Description (ACODE-Desc) | 4. Action - Action Description (ACODE-Desc) |

Position Number (if req'd): 

Working Title: Graduate Medical Education-W414200

Department Name & ID: 

FTE% 0.0000   Hours: 0.00   Salary Plan

EEs Current Salary: $ - 

Task Profile: 

Effective Date: **7/1/2003**
Last Day Worked: **6/30/2003**
Expected Return Date:

Job Code: 
Regular
Compensation

Grade: Medical School   Step:

UMWOR   Work Group:
Union Code - Description
Workgroup - Description

Bargaining Unit:

Icode
Resident

Comp. Rate: **$0.00**

End Date(Fund):

Contract End Date   **6/30/2003**

payroll use only   Union Code:

| HR Acct Code | Fund | Department ID | Program | Project / Grant | Class | Earnings | Acct % Split | Comp. Rate Bi-Weekly or Hourly | Annual Rate | Encumbrance/Exceptions DATE / Fixed Cap |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 0.00 | $0.000 | $0.000 | $0.00 |
| | | | | | | | 0.00 | $0.000 | $0.000 | $0.00 |
| | | | | | | | 0.00 | $0.000 | $0.000 | $0.00 |
| | | | | | | | 0.00 | $0.000 | $0.000 | $0.00 |
| | | | | | | | 0.00 | $0.000 | $0.000 | $0.00 |
| | | | | | | | 0.00 | $0.000 | $0.000 | $0.00 |

TOTALS: 0.0%      $0.00

Received

HR Data Group

Remarks: This is where you would type your remarks or if any information is not found in the pull down tables.

PROCESSED   x62903

SEP 16 2003

| Donna Robillard | | PA Contact Phone Number: |
|---|---|---|
| | Date | |
| Principal Investigator | Date | Principal Investigator |
| | Date | Compensation |
| Chancellor or Designee | Date | |
| | Date | |
| | | Date |
| | | Date |

UMASS

25

| Employee ID: | Employee Name: KENNETH K GERWECK | | | Advice Date: 11/02/01 |
|---|---|---|---|---|

| | GROSS | FEDERAL TAXES | STATE TAXES | DEDUCTIONS | NET | RATE |
|---|---|---|---|---|---|---|
| Current | 762.98 | 64.34 | 32.24 | 109.14 | * 557.26 | 762.98 |
| Y-T-D | 32,413.36 | 2,702.95 | 1,251.64 | | | |

PAY PERIOD ENDING: 10/27/01

| CURRENT | | | | | | YEAR TO DATE | |
|---|---|---|---|---|---|---|---|
| EARNING TYPE | HRS/MIN | GROSS AMOUNT | DEDUCTION | AMOUNT | | DEDUCTION | AMOUNT |
| REG | 40:00 | 762.98 | RETIRE + 2% | 72.39 | | RETIRE + 2% | 3,057.72 |
| | | | BASIC INS/PR | 23.06 | | FICA | 455.93 |
| | | | WOR PARK PRE | 3.00 | | PRETX PK | 91.50 |
| | | | FICA MED | 10.69 | | PRETXINS | 878.50 |

ADDITIONAL COMPENSATIONS BALANCE

| HRS BALANCE | USED | AWARDED | BALANCE |
|---|---|---|---|
| Vacation | 0:00 | 0:00 | 80:00 |
| Sick | 0:00 | 0:00 | 224:00 |
| Personal | 0:00 | 0:00 | 24:00 |

Taxable Marital Status: M
Fed Exemptions: 02
State Exemptions: 05

UNIVERSITY OF MASSACHUSETTS          **ADVICE NUMBER   168055**

IT'S NOT JUST TRASH ANYMORE  -  RECYCLE AT UMASS
MAINTAINING INVESTMENT FOCUS WORKSHOP 11/8 AMP2 @ 12
────────Detach at Perforation────────
"COMECC CAMPAIGN 10/29-11/20--DO YOUR PART--PLEASE PLEDGE!"

**THE FACE OF THIS CHECK CONTAINS HIDDEN SECURITY FEATURES**

UNIVERSITY OF MASSACHUSETTS

Advice Number
168055

**NON - NEGOTIABLE**

26

**Exhibit 14**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**CIVIL ACTION NO.:**  4:04-cv-40249-FDS

|  |  |
|---|---|
| REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE, AS CO-EXECUTORS OF THE ESTATE OF ANGELINA OWUSU-AFRIYIE, **Plaintiffs** | ) ) ) ) ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, KENNETH K. GERWECK, M.D., AND SANDRA L. SALERNO, R.N. **Defendant** | ) ) ) ) |

## AFFIDAVIT OF GERALD S. GLEICH

I, Gerald S. Gleich, M.D., having personal knowledge of the following information do hereby depose and stand under oath as follows:

1.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, in August of 2002 I was employed by the University of Massachusetts (hereinafter "The University") as Director of the Worcester Family Medicine Residency Program at the University of Massachusetts Medical School, (Hereinafter "The Medical School") and the University of Massachusetts Memorial Group.

2.  At all times pertinent to the incident alleged in the Plaintiff's Complaint, I was responsible for directing the overall operation, management, and administrative functions of the University of Massachusetts Worcester Family Medicine Residency Program.

3.  At all times pertinent to the incident alleged in the Plaintiff's Complain, Lise Tardiff, M.D., held a faculty appointment with the University of Massachusetts Medical School.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 24ᵗʰ DAY OF __July__, 2006.

_____
Gerald S. Gleich, M.D.