DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 4:04-cv-40249-FDS

)
REGINA ANKRAH AND ISAAC )
OWUSU-AFRIYIE, AS CO- )
EXECUTORS OF THE ESTATE OF )
ANGELINA OWUSU-AFRIYIE, )
    Plaintiffs )
)
v. )
)
THE UNITED STATES OF AMERICA, )
KENNETH K. GERWECK, M.D., AND )
SANDRA L. SALERNO, R.N. )
    Defendant )

**THE DEFENDANT, KENNETH K. GERWECK, M.D.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

    1.    The Plaintiff, Regina Ankrah was admitted to the University of Massachusetts Memorial Medical Center Memorial Campus, in labor in the late evening of August 11, 2002. She was treated by Lise Tardif, M.D., an attending family medicine physician at the Medical Center; Kenneth Gerweck, M.D., a PGY-3 family medicine resident physician; and Sandra Salerno, a registered nurse. Shortly after her admission, an obstetrical consultation was obtained, however, the Plaintiffs allege that the failure to obtain subsequent obstetrical consultations and delay in performing an emergency cesarean section in the face of non-reassuring fetal monitor readings, was the proximate cause of Angelina Owusu-Afriyie's death. (See "Exhibit 2" Plaintiff's Complaint; See "Exhibit 3" Defendant Kenneth K. Gerweck, M.D.'s Answers to Plaintiff's 1st Set of Interrogatories at Interrogatory No. 11).

    2.    Dr. Lise Tardif, Attending Family Medicine physician was on call for the Family Medicine Service on the night of August 11 and into August 12, 2002. Defendant, Kenneth Gerweck, M.D., was the "on-call" resident for the Family Medicine Service. (See "Exhibit 4"

Deposition of Defendant Kenneth K. Gerweck, M.D., at page 26, lines 2-11).  On the night in question, Dr. Gerweck was responsible for care of family medicine patients at the Memorial campus under the supervision of Dr. Tardif.  Dr. Gerweck actually spent most of the night in the Emergency Room seeing patients, and therefore, spent relatively little time with the Plaintiff, Regina Ankrah.  (See Exhibit 4 page 44, lines 3-21; "Exhibit 7" Deposition of Lise Tardiff, M.D. page 68, lines 4-21).  Dr. Gerweck took Ms. Ankrah's admission history and performed the admission physical exam on August 11, 2002 at approximately Nine O'clock PM.  (See "Exhibit 5" Admission History and Physical).  Dr. Gerweck saw Ms. Ankrah only once after that, at one o'clock am.  (See "Exhibit 6" Portion of Physicians Progress Notes).  During his care of Ms. Ankrah, Dr. Gerweck always discussed his observations and plan of care with Dr. Tardif.  (See Exhibit 5; Exhibit 3 at Interrogatory No. 3).  Dr. Lise Tardif evaluated Ms. Ankrah frequently during the course of her labor and made all decisions relative to her care.  (Exhibit 7 at page 38 lines 8-18; and page 68; Exhibit 5).  It was Dr. Tardif's responsibility as the attending physician to determine when the Obstetrical Service was to be re-consulted.  This was not a decision to be made by the family medicine resident.  (Exhibit 7 at page 66, line 21-page 67, line 13).  The cesarean section delivery was performed by the Obstetrical team.  Kenneth K. Gerweck, M.D. did not participate in the delivery of Ms. Ankrah's infant.  (See Exhibit 4 at page 52, lines 21-23).

      3.     On or about August 11 and 12, 2002, the Defendant, Kenneth Gerweck, M.D., was a PGY-3 Resident in the Family Medicine Residency Program, and thereby employed by the University of Massachusetts Medical School (Hereinafter "the University"), an agent of the Commonwealth of Massachusetts.  (See "Exhibit 8, ¶ 1" Affidavit of Kenneth K. Gerweck, M.D.; "Exhibit 9 ¶ 3" Affidavit of Gerald S. Gleich, M.D.; Exhibit 3 at Interrogatory No. 11).

4. As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. was required by the residency program to participate in certain rotations, including rotations at the University of Massachusetts Memorial Medical Center Memorial Campus, (Hereinafter "The Medical Center"), where the Plaintiff received the care incident to this lawsuit. (See Exhibit 8 ¶ 2; Exhibit 9 ¶ 5).

5. The University of Massachusetts Medical School has been and still is an agency of the Commonwealth of Massachusetts. M.G.L.c. 75 §§ 1, 34. As such, the University of Massachusetts Medical School is a public entity and is not separate from the Commonwealth. *See also McNamara v. Honeyman,* 406 Mass. 43, 47-48 (1989)(Holding that the University of Massachusetts Medical School is not an independent body politic, but an agency of the Commonwealth).

6. On November 11, 1997, pursuant to legislation passed by the Massachusetts Legislature, the operations of the UMass Clinical System were merged with a private non profit corporation, Memorial Health Care, Inc. (See "Exhibit 10 ¶ 4" Affidavit of Richard Stanton). This merger formed two separate private non profit corporations; UMass Memorial Heath Care, Inc. (hereinafter "UMass Memorial"), and the University of Massachusetts Medical Center, Inc., (hereinafter "The Medical Center") along with the attendant campuses. These two private entities are separate from the University of Massachusetts Medical School. (Exhibit 10 ¶ 5).

7. While The Medical Center and UMass Memorial are private nonprofit corporations separate from the University Medical School, these three entities executed a contractual agreement, by which the University Medical School is the exclusive teaching affiliate of The Medical Center and UMass Memorial. (See Exhibit 10 ¶ 12; "Exhibit 11" Academic Affiliation and Support Agreement at page 6). By the terms of this contractual agreement the

University is responsible for controlling any and all decisions regarding academic issues and medical education and training for the residents provided by the University. (See Exhibit 10 ¶ 13; Exhibit 11 page 7).

8. Further, under the contractual agreement between the University, The Medical Center, and UMass Memorial; it is the University, an agency of the Commonwealth of Massachusetts, by and through the department chairs of the Medical School who are deemed responsible for the supervision, direction and control of residents, regardless of which medical facility they happen to be assigned to work at. (See Exhibit 10 ¶ 13; Exhibit 11 at page 7).

9. Pursuant to a separate contractual agreement between the University and The Medical Center, entitled the Graduate Medical Education Agreement, residents explicitly remain employees of the University. (See Exhibit 10 ¶ 14; "Exhibit 12" Graduate Medical Education Agreement at page 3). The GME Agreement explicitly provides that residents "shall not, at any time, be considered agents or employees of the Medical Center." (See Exhibit 10 ¶ 14; Exhibit 12 at page 3). This Agreement further provides in explicit language that the University by and through its various residency program directors shall remain responsible for the supervision and evaluation of all University resident physician. (See Exhibit 10 ¶ 15; Exhibit 12 at page 5).

10. As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D.'s treatment of patients was always supervised by an attending physician. (See Exhibit 8 ¶ 3; Exhibit 9 ¶ 14).

11. As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D.'s work hours, rotation schedules and on-call requirements were established by University personnel who were responsible for the operation of the Family Medicine Residency Program. (See Exhibit 8 ¶ 4; Exhibit 9 ¶ 8).

12.     As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. could be dismissed at any time, for any reason, and at the sole an unfettered discretion of the Director of the Family Medicine Residency Program.  (See Exhibit 8 ¶ 5; Exhibit 9 ¶ 9).

13.     As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. did not have staff privileges at any of the hospitals at which he was assigned to work rotations.  Instead the Defendant had limited resident privileges for the sole purpose of participating in the residency program.  As a result of these limited privileges, the Defendant was unable to admit or discharge any patients without discussing those plans with an attending physician, and securing their approval.  (See Exhibit 8 ¶¶ 6+7; Exhibit 9 ¶¶ 6, 14).

14.     As a PGY-3 Resident in the Family Medicine Residency Program at the University, any and all patients treated by Kenneth Gerweck, M.D. were assigned to him, and as a result he had neither independent patients separate of the residency program, nor the choice of what patients he would treat or not treat during the course of his residency program.  (See Exhibit 8 ¶ 7; Exhibit 9 ¶ 10).

15.     As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. did not bill any patients for services rendered.  Instead he received a fixed salary for his participation in the residency program, that did not depend on the number of patients treated, his productivity, or his hours worked.  (See Exhibit 8 ¶¶ 8, 12; Exhibit 9 ¶¶ 4, 7).

16.     As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D. was on the payroll of the University and thus received all his pay from the Commonwealth of Massachusetts.  During his time in the Residency Program,

Kenneth Gerweck, M.D. participated as required by the Commonwealth in both the Commonwealth's group insurance plan and the Commonwealth's mandatory contributory retirement plan. (See Exhibit 8 ¶¶ 9-10; Exhibit 9 ¶¶ 11-12; "Exhibit 13" Kenneth Gerweck, M.D.'s University of Massachusetts Employment Records, Social Security Information Redacted).

17. As a PGY-3 Resident in the Family Medicine Residency Program at the University, Kenneth Gerweck, M.D.'s compensation, health coverage, benefits, discipline and grievance procedures, vacation time, sick leave, hours of work, and other pertinent conditions of employment were regulated and provided to him by and through the University. (See Exhibit 9 ¶ 11).

18. As a PGY-3 Resident in the Family Medicine Residency Program at the University, The University retained control over Dr. Gerweck's Training, and his day to day activities, during the course of his employment by the University. (See Exhibit 8 ¶ 13; Exhibit 9 ¶ 6).

19. During his participation in the Family Medicine Residency Program, Kenneth Gerweck, M.D. considered himself to be an employee of the University of Massachusetts and therefore bound to abide by all policies, rules, and regulations of the University. (See Exhibit 8 ¶ 11).

20. During his participation in the Family Medicine Residency Program, Kenneth Gerweck, M.D. had an employment contract with the University of Massachusetts, which governed the nature and scope of his employment relationship with the University. (See Exhibit 13).

        The Defendant,
**KENNETH K. GERWECK, M.D.**

By His Attorneys,
**MORRISON MAHONEY LLP**

/s/ *Dennis R. Anti, Esquire*

/s/ *Heather G. Beattie, Esquire*
Dennis R. Anti, Esquire, BBO#545898
Heather G. Beattie, Esquire, BBO#643197
1500 Main Street, Suite 2400
P.O. Box 15387
Springfield, MA  01115-5387
(413) 737-4373
(413) 739-3125 (Fax)

Dated:

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on (date).

/s/ *Heather G. Beattie, Esquire*
Heather G. Beattie, Esquire
BBO#: 643197