UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| REGINA ANKRAH and ISAAC OWUSU- ) | CIVIL ACTION NO: 04-40249-FDS |
| AFRIYIE, as CO-EXECUTORS OF THE ) | |
| ESTATE OF ANGELINA OWUSU-AFRIYIE ) | |
| ) | |
| PLAINTIFFS, ) | |
| ) | |
| V. ) | |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| KENNETH K. GERWECK, M.D. AND ) | |
| SANDRA L. SALERNO, R.N. ) | |
| ) | |
| DEFENDANTS. ) | |
| _____) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT KENNETH K. GERWECK, M.D.'S MOTION FOR SUMMARY JUDGMENT

NOW COME the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as

Co-Executors of the Estate of Angelina Owusu-Afriyie, in the above-entitled

matter and hereby oppose the defendant, Kenneth K. Gerweck, M.D.'s Motion for

Summary Judgment.  As grounds therefore, the plaintiffs state as follows:

1. Summary judgment should be denied because Massachusetts case law is unsettled on the question of whether the University of Massachusetts Medical School remains a public or private entity, thereby establishing a genuine issue of material fact with respect to the defendant, Kenneth K. Gerweck, M.D.'s employment status.

2. Summary judgment should be denied because Dr. Gerweck acted within his own, independent discretion in the treatment of Regina Ankrah and Angelina Owusu-Afriyie, thereby establishing a genuine issue of material fact as to whether Dr. Gerweck, M.D. was under the "direction and control" of the Commonwealth of Massachusetts.

I      **INTRODUCTION**

This is a complex medical malpractice action brought by the plaintiffs, Regina Ankrah and Isaac Owusu-Afriyie, as co-executors of the estate of their late daughter, Angelina Owusu-Afriyie.  This action has been brought to recover for the wrongful death of Angelina Owusu-Afriyie due to the alleged negligent medical care and treatment rendered to her and her mother by the defendants, the United States of America through its agent, Lise Tardif, M.D., as well as Kenneth Gerweck, M.D. and Sandra L. Salerno, R.N.

The defendant, Kenneth K. Gerweck, M.D. has moved for summary judgment asserting that he is immune from liability for any and all negligent acts committed during the period of alleged negligence under M.G.L. c. 258 § 2. Plaintiffs oppose summary judgment and thereby assert that there is a genuine issue of material with respect to whether the defendant, Kenneth K. Gerweck, M.D. was under the "direction and control" of the Commonwealth of Massachusetts when he provided care to Regina Ankrah and Angelina Owusu-Afriyie.

II      **STATEMENT OF MATERIAL FACTS OF RECORD**

1.      Late in the evening on August 11, 2002, the plaintiff, Regina Ankrah,  was in labor and admitted to the University of Massachusetts Memorial Medical Center and became the patient of an attending family medicine physician, defendant Lise Tardif, M.D., a family medicine resident physician, defendant

Kenneth Gerweck, M.D., and a registered nurse, defendant Sandra Salerno, R.N. (See "Exhibit 1" Deposition of Defendant Kenneth K. Gerweck, M.D., at page 26, 28, 53).

2.      Prior to his treatment of Ms. Ankrah, Dr. Gerweck had been involved with approximately 50 to 150 labor and deliveries.  (See Exhibit 1 page 60).

3.      Dr. Gerweck admitted Ms. Ankrah to the hospital on his own.   (See Exhibit 1 page 27).

4.      Upon admitting Ms. Ankrah, Dr. Gerweck personally obtained her history and performed his own physical examination, which he dictated into the medical record.  (See Exhibit 1 page 29).

5.      Dr. Tardif was not present at the time.  (See Exhibits 1; 2 *generally*).

6.      Dr. Gerweck elected, on his own, not to perform a pelvic examination when he initially saw Ms. Ankrah.  (See Exhibit 1 page 33).

7.      Shortly after Ms. Ankrah's admission, an obstetrical consultation was obtained.  (See Exhibit 1 page 41).

8.      There is a question of material fact as to whether Dr. Gerweck obtained this consultation on his own or if he did so in conjunction with Dr. Tardif.  (See Exhibit 1 page 42).

9.      The purpose of the consult was to determine how to manage Ms. Ankrah's care.  (See Exhibit 1 page 43).

10.     The next time Dr. Gerweck visited Ms. Ankrah was around 1:00 a.m. on August 12, 2002.  (See Exhibit 1 page 45).

11.    Dr. Tardif was not present at the time.  (See Exhibit 1 generally; "Exhibit 2" Deposition of Defendant Lise Tardif, M.D., at page 68).

12.    Dr. Gerweck admits that he is unsure as to why he saw Ms. Ankrah at that time.  (See Exhibit 1 page 45).

13.    There is a question of material fact as to whether Dr. Gerweck was instructed to check on Ms. Ankrah or if he, himself, made the decision to check on her.  (See Exhibit 1 page 45).

14.    Upon visiting Ms. Ankrah around 1:00 a.m., Dr. Gerweck determined she was uncomfortable, he performed a pelvic exam, examined the tocometer, strip and fetal heart tracing, and noted his findings.  (See Exhibit 1 page 47).

15.    Dr. Tardif was not present at the time.  (See Exhibits 1; 2 *generally*).

16.    There is nothing in the medical record to suggest that Dr. Gerweck relayed his findings from the 1:00 a.m. examination to Dr. Tardif.  (See Exhibit 1 page 51-2).

17.    Dr. Tardif has testified that she was very busy during the period of alleged negligence and that she was with Dr. Gerweck only during the beginning of the night.  (See Exhibit 2 page 68).

18.    Around 4:15 a.m., nurse Salerno sought Dr. Gerweck while he was sleeping in the on-call room and expressed to him that she was concerned about Ms. Ankrah's condition.  There is no indication in the medical record that Dr. Gerweck consulted with Dr. Tardif at the time about Ms. Ankrah's care.  (See Exhibit 1 pages 46, 54).

19.    Massachusetts case law is unsettled as to whether the University of Massachusetts Medical School in a public employer.  *Mensah v. Goedken*, 2006 WL 1075453 at *7 (Mass. Super. April 4, 2006).

### III    <u>STANDARD OF REVIEW</u>

Summary judgment shall be granted where there are no genuine issues of material fact in dispute and the moving party is thus entitled to judgment as a matter of law.  *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  The moving party bears the burden of affirmatively demonstrating these elements.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "An issue is 'genuine' for purposes of summary judgment if the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Carcieri v. Norton,* 398 F.3d 22, 29 (1st Cir. 2005) (*emphasis added*).

The Court must view the record, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Chapman v. Bernard's Inc.,* 167 F.Supp.2d 406, 411 (D.Mass. 2001) (*citing O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting 'enough competent evidence to enable a finding favorable to the nonmoving party.' " *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 842 (1st Cir.

1993) (quoting *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir. 1993)).  Summary judgment is inappropriate where a trial judge finds that a reasonable-minded jury *could* find in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (*emphasis added*).

## IV     CHOICE OF LAW

This case was initially filed in Massachusetts Superior Court, but was subsequently removed to this Honorable Court due to the applicability of the Federal Tort Claims Act with respect to the liability of (then) defendant, Lise Tardif, M.D.  Since removal to Federal Court, all claims of liability against Dr. Tardif are being adjudicated against the United States of America, under federal question jurisdiction pursuant to 28 U.S.C. § 1331.  All claims against Kenneth Gerweck, M.D. shall be heard by this Federal Court under supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  State-law claims in the Federal District Court, brought purely under supplemental jurisdiction, must be adjudicated according to the substantive law of the forum state within which the District Court sits.  *Dykes v. Deputy, Inc.*, 140 F.3d 31, 39 (1st Cir. 1998); *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Because Dr. Gerweck's liability is purely an issue of Massachusetts state law, this court is to apply controlling state law in adjudicating all claims against Dr. Gerweck.  Specifically, by claiming to be a "public employee" for the purposes of immunity under M.G.L. c. 258 § 2,

this Honorable Court is bound by the Massachusetts state courts' treatment of this particular issue.


**V      ARGUMENT**

    **A.      Summary Judgment Should be Denied because a Genuine Issue of Material Fact Exists as to whether the University of Massachusetts Medical School is a Public Employer**

    The Massachusetts Tort Claims Act establishes that a "public employee" shall not be held personally liable for his negligent acts committed during the course of his employment.  M.G.L. c. 258 § 2.  A public employer is "the Commonwealth and any county, city, town, educational collaborative, or district…and any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof *which exercises direction and control over the public employee*."  M.G.L. c. 258 § 1; M.G.L. c. 258 § 2; *McNamara v. Honeyman*, 406 Mass. 43 (1989) (*emphasis added*).

    Case law prior to 1998 had consistently held that the University of Massachusetts Medical School is a "public employee" due to its close affiliation with and dependence on the Commonwealth in many regards, including state regulation of appropriations, purchasing power, employment practices, etc. *McNamara* 406 Mass. at 48.  However, since the 1998 merger of the "public", UMass Clinical System and the "private", Memorial Health Care, Inc., Massachusetts courts have held that a genuine issue of material fact exists as to whether the UMass Medical School, in fact, remains a "public employer" pursuant

to M.G.L. c. 258 § 2. *Mensah v. Goedken*, 2006 WL 1075453 at *7 (Mass. Super. April 4, 2006) (applying *McNamara* 406 Mass. 43).

Prior to 1998, the University of Massachusetts operated the UMass Medical School and the UMass Medical Center ("UMMC"), together with a number of other medical facilities, known as the "UMass Clinical System." *Id.* at *1. In 1998, the UMass Clinical System merged with Memorial Health Care, Inc., a *private*, non-profit corporation, which created two *private* corporations, UMass Memorial Heath Care, Inc. ("UMass Memorial"), and UMass Memorial Medical Center, Inc. ("The Medical Center"). *Id.*

Prior to the merger, the University of Massachusetts, UMass Memorial, and the Medical Center executed an Academic Affiliation and Support Agreement ("Affiliation Agreement"), which made Medical School the sole teaching affiliate of the Medical Center. *Id.* The Affiliation Agreement made certain that residents would have continued access to clinical sites and research opportunities following the merger. *Id.* The Affiliation Agreement also established that the University was to control all medical education and training, and supervision, direction, and control of its residents. *Id.* As part of each resident's specific rotation assignment, a Graduate Medical Executive Agreement ("GME") was executed specifying that all residents were intended to remain employees of the University, not the Medical Center. *Id.* at *2.

Dr. Gerweck contends that as a resident under the Affiliation and GME Agreements, he remained a public employee during his course of treatment of the

plaintiff.    However, Massachusetts state courts have held that such a determination is by no means clear-cut.  *Id*. at *7.  Specifically, the 1998 merger of the various public and private entities created two *private*, non-profit corporations, evidenced even on the face of the merger agreement.  *Id*. (*emphasis added*).   Despite the content of the post-merger agreements, this does not automatically entitle the physicians to a finding of "public employee"; rather, Courts must examine the *specific manner* in which each defendant physician actually treated the plaintiff.  *Id*.

In Dr. Gerweck's Motion for Summary Judgment, the defendant focuses exclusively upon the pre-merger status of the University of Massachusetts Medical School and completely ignores the recent development in Massachusetts case law with respect to this issue.  Given the post-merger status of the Medical School and recent Massachusetts case law addressing this precise issue, the plaintiffs assert that a genuine issue of material fact exists with respect to whether UMass Medical School is, in fact, a public employer.

### B.    Summary Judgment Should be Denied because Dr. Gerweck Treated the Plaintiff Independent of the Direction and Control of the Medical School

The Massachusetts Tort Claims Act provides that "public employees" shall be immune from liability for any and all negligent acts committed during the course of their employment.  M.G.L. c. 258 § 2.  Likewise, "public employers" shall be held ultimately liable for the negligent acts of their "public employees", if

committed within the scope of employment.  *Pruner v. Clerk of Superior Court in the County of Norfolk*, 382 Mass. 309, 313, (1981); M.G.L. c. 258 § 2. Specifically, the "public employer" must  exercise direction and control over the employee in order to be considered a "public employee." M.G.L. c. 258 § 2; *McNamara v. Honeyman*, 406 Mass. 43 (1989).

Although an individual may be employed by a "public employer", he does not automatically enjoy the status of "public employee."  *Smith v. Steinberg,* 395 Mass. 666, 668 (1985).  In order to determine whether an individual is a  "public employee", courts are required to examine "whether an agent is a servant for whose negligent acts a principal may be liable under the common law doctrine of respondeat superior."  *Kelley v. Rossi,* 395 Mass. 659, 661 (1985).  As a general rule, it is well established that physicians are not servants subject to the direction and control of their employer-facilities.  *Smith*, 395 Mass. 666 at 667.  The determination of whether a physician is a "public employee" is based upon the extent to which the "public employer" directs the specific care and treatment of each individual patient.  *Id.*

The Courts must consider several factors in determining whether a resident-physician is a "public employee", such as whether the "public employer": 1) assigns the resident's duties; 2) regulates the resident's schedule; 3) controls which patients the resident treats;  4) assigns the resident to a particular department; 5) has authority to dismiss the resident from the program; 6) requires the resident to follow its policies and regulations; 7) controls the resident's

admitting privileges; 8) authorizes the resident to discharge patients; and 9) pays the salary and benefits of the resident. *Kelley*, 395 Mass. at 664. Courts must also, however, closely examine 1) the resident's individual discretion in treating a patient; 2) the extent to which the resident sought the assistance of the attending physician; and 3) how closely and consistently the resident worked with the attending physician. *Mills-Ort v. Germano*, 2006 WL 1360813 at *4 (Mass. Super. April 4, 2006).

Further, where the record is unclear as to the extent of direction and control the attending exercised over the resident, Courts place particular emphasis on testimony. *Id*. Where there is an absence of specific details concerning the supervision of residents, Massachusetts courts have deemed summary judgment to be inappropriate. *Id*. Massachusetts courts have consistently held that summary judgment is improper where the record fails to show, indisputably, that the defendant was subject to the control of the "public employer." *Smith*, 395 Mass. 666 at 669.

Here, in an attempt to qualify as a "public employee", Dr. Gerweck focuses his Motion for Summary Judgment entirely upon his contractual relationship with the University of Massachusetts, as well as his official duties and obligations to the Medical Center, but fails to provide any details of his actual care and treatment of Mr. Ankrah. A careful look at the medical records and sworn testimony reveals that Dr. Gerweck treated Ms. Ankrah in a manner independent of the supervision, direction, and/or control of the attending

physician, Dr. Tardif, and the University of Massachusetts.  (See Exhibit 1 *generally*).

Prior to the period of alleged negligence, Dr. Gerweck had been involved in many labor and deliveries.  (See Exhibit 1 page 60).  Upon Ms. Ankrah's admission to the Medical Center, Dr. Gerweck, acting on his own, obtained her medical history and performed a physical examination.  (See Exhibit 1 page 29).  Dr. Tardif was not present when this was done. (See Exhibit 1 page 33).  Dr. Gerweck elected, on his own, not to perform a pelvic examination at the time.  *Id*. The next time Dr. Gerweck visited Ms. Ankrah was around 1:00 a.m. on August 12, 2002.  (See Exhibit 1 page 45).  Dr. Tardif was also not present for this visit. *Id*.

During his 1:00 a.m. visit with Ms. Ankrah, Dr. Gerweck determined she was uncomfortable, performed a pelvic exam, and examined and noted his findings of the tacometer and fetal heart tracing.  (See Exhibit 1 page 47).  Dr. Tardif was not present during these interactions.  (See Exhibit 1 page 45).  Dr. Gerweck recalls speaking with Dr. Tardif on the telephone, yet fails to remember if they ever discussed Ms. Ankrah's labor. (See Exhibit 1 page 46).  The substance of this conversation is also absent from the medical records.  *Id*.  It is important to note that Dr. Tardif admits that both she and Dr. Gerweck were very busy on the night in question and that she was only with Dr. Gerweck during the beginning of the night.  (See Exhibit 2 page 68).  Therefore, for the vast majority of Ms. Ankrah's labor during the period of time in which the plaintiffs allege that

intervention was required, Dr. Gerweck was managing Ms. Ankrah on his own. Later that evening, around 4:15 a.m., nurse Salerno sought out and notified Dr. Gerweck that she was concerned about Ms. Ankrah's labor.  (See Exhibit 1 page 54).

When applying the criteria set forth in *Mills-Ort v. Germano*, 2006 WL 1360813 (Mass. Super. April 4, 2006), it is clear that Dr. Gerweck was not under the "direction and control" of his alleged public employer.  The medical records and deposition testimony establish that: Dr. Gerweck exercised his own discretion in caring for and treating Ms. Ankrah; Dr. Gerweck did not consult Dr. Tardif throughout the vast majority of his time spent caring for Ms. Ankrah; and Dr. Gerweck was not working closely or consistently with Dr. Tardif during his care and treatment of Ms. Ankrah.

Clearly, there is an absence of specific details concerning what supervision, if any, Dr. Gerweck was subject to during the period of time he cared for Regina Ankrah and Angelina Owusu-Afriyie.  However, from the information that is available, it is clear that Dr. Gerweck was acting independently with regard to the decisions he was making and his overall care and treatment of the plaintiffs. Certainly, when these facts are viewed in a light most favorable to the plaintiffs, a genuine issue of material fact exists as to whether Dr. Gerweck was under the "direction and control" of Dr. Tardif during his care and treatment of Ms. Ankrah.

## VI     <u>CONCLUSION</u>

While claiming public immunity under M.G.L. c. 258 § 2 in his Motion for Summary Judgment, Dr. Gerweck has relied on out of date case law concerning the status of the University of Massachusetts Medical School as a public employer.   Given the complex nature of the merger between multiple public and private heath care facilities and teaching institutions, a genuine issue of material fact exists as to whether the Medical School is a public employer. Further, it is clear from the medical records and deposition testimony that, a genuine issue of material fact exists as to whether Dr. Gerweck was subject to the direction and control of a public employer while treating Ms. Ankrah.  Rather, Dr. Gerweck was making his own, independent evaluations, assessments, and decisions with regard to his care and treatment of Regina Ankrah.  It is those evaluations, assessments, and decisions that he made that are at the heart of the malpractice case filed against him.  Therefore, for the reasons mentioned above, summary judgment is inappropriate.

WHEREFORE, the plaintiffs respectfully request this Honorable Court:

A.     Deny Defendant's Motion for Summary Judgment;

B.     In the alternative, grant the plaintiffs a hearing on this Motion; and

C.     Grant such further relief as may be just and proper.

Respectfully submitted,
Regina Ankrah and Isaac Owusu-Afriyie,
By their attorney,


/s/ David W. Suchecki
David W. Suchecki
Elizabeth N. Mulvey
Crowe & Mulvey, LLP
141 Tremont Street
Boston, MA  02111
(617) 426-4488

Volume:      I
Pages      1-68
Exhibits:     2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 04-40249

- - - - - - - - - - - - - - - - - x

REGINA ANKRAH and ISAAC OWUSU-AFRIYIE,
AS CO-EXECUTORS OF THE ESTATE
OF ANGELINA OWUSU-AFRIYIE,

Plaintiffs

V.

THE UNITED STATES OF AMERICA,
KENNETH K. GERWECK, M.D. and
SANDRA L. SALERNO, R.N.,

Defendants

- - - - - - - - - - - - - - - - - x

DEPOSITION of KENNETH K. GERWECK, M.D.,

called on behalf of the Plaintiffs, taken pursuant to

the provisions of the Massachusetts Rules of Civil

Procedure, before Kathleen Pellegrino, a Professional

Court Reporter and Notary Public, in and for the

Commonwealth of Massachusetts, at Crowe & Mulvey, 141

Tremont Street, Boston, MA 02111, on Thursday,

March 2, 2006, commencing at 10:07 a.m.

- - - - - - - - - - - -

**KATHLEEN PELLEGRINO**
**COURT REPORTING SERVICES**
35 French Avenue
Braintree, MA   02184
(781) 849-3838

| | | |
|---|---|---|
| 1 | | duties. |
| 2 | Q | All right.  What were your duties and |
| 3 | | responsibilities on August 11th of 2002 when |
| 4 | | Regina Ankrah was a patient at Memorial |
| 5 | | Hospital? |
| 6 | A | That evening I was on call for Family |
| 7 | | Medicine for the Family Health Center.  So I |
| 8 | | was involved in various things, including |
| 9 | | seeing medical patients, spending some time |
| 10 | | with this obstetric patient, taking calls and |
| 11 | | doing phone triage. |
| 12 | | |
| 13 | | (Whereupon, Mr. Farquhar entered |
| 14 | | the deposition at 10:28 a.m.) |
| 15 | | |
| 16 | Q | When you said you were on call, what do you |
| 17 | | mean by on call? |
| 18 | A | That means that during the after-hours I have |
| 19 | | -- what do you mean by on call? |
| 20 | Q | Did you have an on-call schedule?  How did |
| 21 | | you happen to be at the hospital on that -- |
| 22 | A | I was at the hospital because I was on call, |
| 23 | | and we oftentimes take call from the hospital |
| 24 | | because we'd see patients in the hospital. |

```
 1      Q    Did you spend the entire day on August 11th

 2           at the hospital?

 3      A    I don't remember.

 4      Q    Where else would you had been?

 5      A    If I had clinic that day, I'd be in the

 6           clinic.

 7      Q    This is the Family Practice Clinic, correct?

 8      A    That's correct.

 9      Q    Did you ever see Mrs. Ankrah in the clinic

10           during her prenatal visits?

11      A    I don't believe so.

12      Q    Have you ever looked at the prenatal records?

13      A    Not that I recall.

14      Q    Approximately what time was your first

15           contact with Mrs. Ankrah?

16      A    It would be shortly after she arrived into

17           the nurses' triage room, --

18      Q    Please feel free to look at the records.

19      A    -- which would be shortly before I wrote the

20           note, that first note.  So probably sometime

21           around 11 p.m. -- 9 p.m.  Around 9 p.m.

22      Q    So shortly after she was admitted to the

23           hospital?

24      A    That's correct.
```

1    Q    To your understanding, was that the first

2         time you ever met Mrs. Ankrah?

3    A    Yes.

4    Q    What did you consider to be your duties and

5         responsibilities with respect to her labor

6         and delivery?

7    A    Well, that's hard to say.  Duties and

8         responsibilities?  I was under the

9         supervision of the attending physician.

10   Q    Who was the attending?

11   A    That's Dr. Tardif.

12   Q    Was Dr. Tardif an attending Family Practice

13        physician?

14   A    Yes.

15   Q    Why was Mrs. Ankrah admitted to the Family

16        Practice service as opposed to the

17        obstetrical service?

18   A    Because she was a Family Practice patient.

19   Q    Do you know how she became a Family Practice

20        patient?

21   A    No.

22   Q    Was there an obstetrical clinic at Memorial

23        Hospital at that time also?

24   A    There was at least an obstetric high-risk

| | | |
|---|---|---|
| 1 | | clinic.  I don't know where their other |
| 2 | | clinics are. |
| 3 | Q | So you were being supervised on that evening |
| 4 | | by Dr. Tardif who was Mrs. Ankrah's attending |
| 5 | | physician, correct? |
| 6 | A | For that evening, yes. |
| 7 | Q | Where was Mrs. Ankrah when you first saw her? |
| 8 | A | I believe she was in the nurses' triage room. |
| 9 | Q | What did you do when you first saw her? |
| 10 | A | I don't remember the specifics of what I did. |
| 11 | Q | Do you have any independent memory apart from |
| 12 | | what's in the medical record of this first |
| 13 | | visit you had with Mrs. Ankrah? |
| 14 | A | No. |
| 15 | Q | Based upon your review of the medical |
| 16 | | records, what did you do when you first saw |
| 17 | | her? |
| 18 | A | Well, again, I don't know what I first did, |
| 19 | | but at some point I did a history and did an |
| 20 | | exam. |
| 21 | Q | What was the history that you took at that |
| 22 | | first visit? |
| 23 | A | Would you like me to read it? |
| 24 | Q | Are you referring to the Admission History |

33

```
 1            have in front of us about her prenatal course

 2            that is concerning, correct?

 3                      MS. BEATTIE:  Objection.

 4                      Go ahead.

 5    A       Well, let's see.  There's a portion of the

 6            prenatal labs here that look okay, and

 7            there's nothing here stating that she told me

 8            that there were concerns during the prenatal

 9            course.

10    Q       Did you then do a physical examination?

11    A       Yes.

12    Q       What did you do in the course of your

13            physical examination?

14    A       Well, I don't recall, but looking at the

15            notes, it looks like first I looked at her

16            and felt that she appeared comfortable.  I

17            looked at her temperature.  I did a pelvic

18            exam -- or actually, it wasn't me.  It was

19            the nurse who did the exam, the pelvic exam

20            portion of it.  It appears I did an abdominal

21            exam and listened to her heart.

22    Q       There's an indication in your record that she

23            had a temperature of 101.1, correct?

24    A       That's correct, right.
```

| | | |
|---|---|---|
| 1 | | respect to this particular practice, right? |
| 2 | A | Yes. |
| 3 | Q | One of the way you'd do that is by providing |
| 4 | | information to the attending, correct? |
| 5 | A | In what situation? |
| 6 | Q | In this situation. |
| 7 | A | In this particular situation I provided |
| 8 | | knowledge to the attending. |
| 9 | Q | And that was Dr. Tardif, right? |
| 10 | A | That's correct. |
| 11 | Q | One of the things you would have told her was |
| 12 | | that the fetal heart tracing was not |
| 13 | | reassuring, correct? |
| 14 | A | Most likely I would have described what I |
| 15 | | saw.  Whether I used that term or not, I |
| 16 | | can't tell you. |
| 17 | Q | What was the plan of treatment that was |
| 18 | | determined for this labor and delivery based |
| 19 | | upon your review of the medical records? |
| 20 | A | The obstetrician was consulted.  So at that |
| 21 | | point in time the plan was to consult OB, to |
| 22 | | order a CBC type and screen, -- |
| 23 | Q | I'm sorry, a what? |
| 24 | A | A complete blood count, and to start |

```
 1              penicillin for a possible chorioamnionitis.

 2       Q      What is chorioamnionitis?

 3       A      I don't know specifically anymore what that

 4              is.  I think literally it would be

 5              inflammation of the chorion.

 6       Q      Were you the one that asked for an OB

 7              consult?

 8       A      I don't know if it was me or it was

 9              Dr. Tardif.

10       Q      Or it could have been the two of you in

11              conjunction?

12       A      Well, I suppose.

13       Q      As a result of the consult with the

14              obstetrician, what was done, if anything,

15              with respect to Mrs. Ankrah?

16       A      So OB was consulted.  They reviewed the case,

17              and they recommended "treating as for

18              chorioamnionitis" -- that's a quote -- with

19              ampicillin and gentamicin.  They recommended

20              Tylenol and consideration of an amnioinfusion

21              if decelerations proved to be variable.  So

22              that was their recommendation.

23       Q      Was that recommendation followed according to

24              the medical records?
```

1    A    Yes.  Well, I'm not sure about the Tylenol,

2         but I believe the amp. and gent. were given.

3    Q    What was the purpose for obtaining an

4         obstetrical consult as you understand it?

5    A    I would imagine that it was obtained to

6         provide further opinions as to how this case

7         should be managed.

8    Q    Because the obstetricians were the experts in

9         this field, correct?

10   A    Well, we felt that they could offer some

11        advice that would be helpful.

12   Q    Were you told by the obstetrical service to

13        re-consult with them if any problems came up?

14   A    I believe so.

15   Q    What was your next contact with Mrs. Ankrah?

16   A    My next contact as far as the notes suggest

17        was around 1 a.m.

18   Q    Did you actually type a note into the record

19        at that time?

20   A    Yes, I did.

21   Q    So was this the first time you had seen her

22        after the admitting physical?

23   A    I don't recall.  All I can do is go by the

24        notes.  That's the first time I had written a

```
1    Q    So at least according to the record, you next

2         saw Mrs. Ankrah at approximately 1 a.m.

3         We're now on August 12th, correct?

4    A    That's correct.

5    Q    For what reason did you see her at that time?

6    A    I'm not sure exactly why I saw her at that

7         time, whether I was asked to see her or felt

8         that it was an appropriate time to see her or

9         if I had a free moment.  I can't tell you

10        what the specific reason was.

11   Q    Who was the attending physician responsible

12        for her labor and delivery from admission at

13        approximately 9:19 to 1:00 when you saw her?

14   A    The Family Medicine attending physician is

15        Lise Tardif.

16   Q    Do you have any memory of any conversations

17        that you had with Dr. Tardif or anybody else

18        with respect to this labor and delivery

19        between your admitting note and 1:00 in the

20        morning?

21   A    I only had one recollection, and it's just

22        very vague.  I remember while I was in the ER

23        I was on the phone with her.

24   Q    With --
```

1    A    Dr. Tardif.

2    Q    Okay, and what do you remember about the

3         conversation?

4    A    Nothing.

5    Q    Do you know whether it had anything to do

6         with Mrs. Ankrah?

7    A    I don't remember anything about the

8         conversation.  Typically it would be about

9         the patients that I'm seeing either in the ER

10        or perhaps about the patient in the -- the OB

11        patient here, or both, but again, I don't

12        recall.

13   Q    You don't know what time the conversation

14        took place?

15   A    No.

16   Q    And you don't remember what the subject of

17        the conversation was?

18   A    That's correct.

19   Q    Why is it that you remember that there was a

20        conversation?

21   A    I don't know.

22   Q    When you came to see Mrs. Ankrah at 1:00,

23        what did you do?

24   A    I looked at her, and it appears that I

```
 1              thought she was uncomfortable.  I reviewed
 2              the vital signs.  Again, I'm getting this
 3              information from the chart note here.
 4      Q      Right.  Just so that we're clear on the
 5              record, you have no independent memory of
 6              seeing her at 1:00, correct?
 7      A      No.
 8      Q      What you're telling us is based upon what's
 9              in the record?
10      A      That's correct.
11      Q      You have no other knowledge or information
12              about seeing her at that time other than
13              what's in the record, right?
14      A      That's right.
15      Q      I interrupted you.  So tell me what you were
16              doing.
17      A      That's right, and it appears that I did a
18              pelvic exam.  I notated that, and I looked at
19              the strip, the tocometer, as well as the
20              fetal heart tracing and commented on that.
21      Q      Why would you have looked at the strip?
22              Would that have been part of your practice
23              and procedure at that time?
24      A      That would be the custom.
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you know what you meant by that? |
| 3 | A | No. |
| 4 | Q | Do you know what Nubain is? |
| 5 | A | It's a medicine that's commonly used in |
| 6 | | Obstetrics.  I've never seen it used |
| 7 | | elsewhere, actually.  I don't know what class |
| 8 | | it's in. |
| 9 | Q | What's it given for, if you remember? |
| 10 | A | Pain. |
| 11 | Q | How was it given, if you recall? |
| 12 | A | I don't remember. |
| 13 | Q | Then your last line on that note is, "Discuss |
| 14 | | with Dr. Tardif," correct? |
| 15 | A | That's correct. |
| 16 | Q | That's something that as a third-year |
| 17 | | resident you would have done given these |
| 18 | | findings, right? |
| 19 | A | Yes. |
| 20 | Q | And then your name appears, right? |
| 21 | A | That's right. |
| 22 | Q | When did you next see or hear anything about |
| 23 | | Mrs. Ankrah? |
| 24 | A | I don't recall when I next heard or saw her. |

52

```
 1         I may have never seen her again.
 2    Q    Do you have any other entries in the record
 3         other than the ones that we've just looked
 4         at?
 5    A    Not that I know of.
 6    Q    Well, were you present when the decision was
 7         made to do a cesarean section?
 8    A    I don't know.
 9    Q    Did you ever hear about what happened with
10         respect to this delivery?
11    A    Yes.
12    Q    What did you hear?
13    A    That the baby died.
14    Q    How did you hear that?
15    A    I don't know who told me, but I believe I was
16         in the clinic at the time when I heard about
17         it.
18    Q    Did you hear about it the same day that it
19         happened?
20    A    I'm not sure.
21    Q    You were not present for the cesarean
22         section, correct?
23    A    That's correct.
24    Q    After you heard that the baby died, what did
```

```
 1              you do, if anything?

 2      A       I don't remember.

 3      Q       Did you have any conversations with anybody?

 4      A       I don't remember.

 5      Q       Were you surprised?

 6      A       I really don't remember.

 7      Q       Did you discuss this labor and delivery and

 8              the results with any other physician

 9              afterwards?

10      A       I don't remember.  I don't believe I

11              discussed it a lot with anybody.

12      Q       Well, that's not what I asked you.  Did you

13              have any discussions at all with anybody?

14      A       Well, if I did, I don't remember them.

15      Q       Who was the Labor nurse for Mrs. Ankrah

16              during this labor?

17      A       I believe it was Salerno.  Is that her last

18              name?

19      Q       Do you remember any contact that you had with

20              Ms. Salerno during the course of this labor?

21      A       The only memory I have is I believe she was

22              present when I first saw the patient.

23      Q       In your Answers to Interrogatories you

24              indicated, and you say, (Reading):
```

1                        "The medical record

2                        indicates --

3

4        Strike that.  Let me start over again.

5        (Reading):

6

7                        "I also recall at some point

8                        taking a nap in the on-call

9                        room and being awakened by

10                       Ms. Salerno because she had

11                       concerns regarding Mrs.

12                       Ankrah.  The medical record

13                       indicates this was at

14                       approximately 4:15 a.m."

15

16       Where did you get that information?

17   A   The Interrogatories were taken about a year

18       and a half ago, so at the time it may have

19       been from my memory.

20   Q   Would it have been your custom and practice

21       when you saw Mrs. Ankrah at 1:00 to review

22       the nurses' notes?

23   A   I don't remember.

24   Q   You can't remember whether that was something

1       responsibility, don't they?

2               MS. BEATTIE:  Objection.

3               Go ahead.

4   A   No, I -- no.

5   Q   Whose job was it to formulate the treatment

6       plan for this labor and delivery?

7   A   Primarily, Dr. Tardif's.

8   Q   To your knowledge, have you ever spoken with

9       Mrs. Ankrah or the baby's father after this

10      death?

11  A   I have no memory of speaking to them

12      afterwards.

13  Q   How many labor and deliveries had you been

14      involved in prior to this, approximately?

15  A   I have a very poor memory of that.  The

16      approximation would be probably not accurate

17      in any way, but perhaps somewhere between 50

18      and 150.

19  Q   Before this death, correct?

20  A   Yes.

21  Q   How did you learn how to read fetal heart

22      monitor strips?

23  A   I don't recall the specifics.  Some of it

24      would involve on-the-job training.  Some of

Volume:      I
Pages      1-74
Exhibits:    0

COMMONWEALTH OF MASSACHUSETTS

U.S. DISTRICT COURT
CIVIL ACTION
NO. 04-40249

- - - - - - - - - - - - - - - - - x

REGINA ANKRAH AND ISAAC OWUSU-AFRIYIE,
AS CO-EXECUTORS OF THE ESTATE OF
ANGELINA OWUSU-AFRIYIE,

        Plaintiffs

V.

THE UNITED STATES OF AMERICA,
KENNETH K, GERWECK, M.D. and
SANDRA L. SALERNO, R.N.

        Defendants

- - - - - - - - - - - - - - - - - x


     DEPOSITION of LISE J. TARDIF, M.D., called on behalf of the Plaintiffs, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Kathleen Pellegrino, a Professional Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at Crowe & Mulvey, 141 Tremont Street, Boston, MA 02111, on Monday, May 8, 2006, commencing at 1:05 p.m.


- - - - - - - - - - -
**KATHLEEN PELLEGRINO**
**COURT REPORTING SERVICES**
35 French Avenue
Braintree, MA  02184
(781) 849-3838

| | | |
|---|---|---|
| 1 | | of the actual conversations? |
| 2 | A | Not word for word, just a vague content |
| 3 | | usually pertaining to management. |
| 4 | Q | Do you have a memory that Dr. Gerweck spent a |
| 5 | | great deal of time that night in the |
| 6 | | Emergency Room with other patients? |
| 7 | A | I do recall a very busy night.  I do recall |
| 8 | | him being very busy and calling me several |
| 9 | | times for other things.  I do recall that. |
| 10 | Q | In looking back, pursuant to your memory, do |
| 11 | | you have a memory of who was with Ms. Ankrah |
| 12 | | more, who was examining Ms. Ankrah more, |
| 13 | | whether it was you or Dr. Gerweck? |
| 14 | A | We were both there at the beginning, but |
| 15 | | going towards further in the night, |
| 16 | | Dr. Gerweck was busy, and I was also busy, |
| 17 | | but it was not as much with Ms. Ankrah as I |
| 18 | | came across. |
| 19 | Q | So you were with Ms. Ankrah more as the night |
| 20 | | progressed, is that correct? |
| 21 | A | Correct. |
| 22 | Q | Do you have a memory of when it was you |
| 23 | | actually last saw Ms. Ankrah before 4:00? |
| 24 | A | I don't.  I did not -- I know that I visited |

KATHLEEN PELLEGRINO